## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| HELGA GLOCK, | |
|     Plaintiff, | |
| | |
|         v. | No. _____ |
| | JURY TRIAL DEMANDED |
| GASTON GLOCK SR., | |
| GLOCK GES.M.B.H., | |
| GLOCK, INC., | |
| GLOCK AMERICA N.V., | |
| GLOCK (H.K.) LTD., | |
| GLOCK PRIVATSTIFTUNG, | |
| VALUE PRIVATSTIFTUNG, | |
| CON HOLDING Ges.m.b.H., | |
| CONSULTINVEST, INC., | |
| STEPHAN DOERLER, | |
| CHARLES M. J. EWERT, | |
| FITOX A.G., | |
| INC HOLDING Ges.m.b.H., | |
| JOERG-ANDREAS LOHR, | |
| LOHR + COMPANY G.m.b.H., | |
| PETER S. MANOWN, | |
| JOHANN QUENDLER, | |
| ROCHUS G.m.b.H., | |
| KARL WALTER, and | |
| HUBERT WILLAM, | |
|     Defendants. | |

## COMPLAINT

*"[Gaston] Glock is not Snow White.  He's got a lot of skeletons. . . .   He spends money on mistresses, on houses, on sex, on cars.  He bribes people.  He's just a bad guy."*

*—Defendant Peter Manown[*]*

## TABLE OF CONTENTS

I.      Nature of the Action ........................................................................1

II.     Parties.............................................................................................11

III.    Jurisdiction and Venue ..................................................................16

IV.     Background Information ..................................................................18

        A.    The So-Called "Glock Group" Today....................................18

        B.    Humble Origins ....................................................................19

        C.    Development of the Gun .......................................................22

        D.    The Formation of Glock Ges.m.b.H. ....................................25

        E.    Glock Comes to America.......................................................26

        F.    Trouble Behind the Scenes ...................................................28

        G.    Structure of the "Glock Group" — Defendants' Failure to
              Abide by Corporate Formalities.............................................31

        H.    The Falling Out Between Glock Sr. and Ewert ....................37

V.      The Mechanics of Defendants' Scheme to Steal from Plaintiff Helga
        Glock..............................................................................................41

        A.    Glock Sr.'s Theft of 50% of Glock, Inc. from His Partnership
              with Ms. Glock.....................................................................44

        B.    Fraudulent Royalty Payments Siphoned and Diverted from
              Glock, Inc. into Glock Sr.'s Pockets......................................47

              1.    Sham Licensing Fees Purportedly Owed to Glock
                    Ges.m.b.H. ...............................................................47

              2.    Sham Licensing Fees Owed by Glock Ges.m.b.H....................51

---

\* *State v. Manown*, Crim. Act. File No. 07-9-5418 (Cobb Cnty. Ga. Super. Ct.),
Oct. 17, 2007 Proffer Testimony of Peter Manown, at 110:9, 13-14.

C.   Defendants' Use of the Billing Companies to Siphon and
     Divert Misappropriated Funds into Glock Sr.'s Coffers....................53

     1.   Overview of Defendants' Shell Game Using Billing
          Companies and the So-Called Glock Group's Operating
          Entities ..............................................................................55

     2.   Phantom Shipments from and Wire Transfers through
          Glock Hong Kong.................................................................60

          (i)    Glock Hong Kong:  Glock Sr.'s Control .........................60

          (ii)   Glock Hong Kong's Role as Middle-Man......................61

          (iii)  Glock Hong Kong's Billing Company:  Minami
                 Enterprises..................................................................64

          (iv)   Transfers from Minami to Reofin ...................................66

          (v)    Improper "Dividend" Payments from Glock
                 Hong Kong to Unipatent...................................................67

          (vi)   Transfers from Glock Ges.m.b.H. to Base
                 Technical.......................................................................68

     3.   Phantom Shipments from and Wire Transfers Through
          Glock America ..................................................................70

          (i)    The Role of Glock America in Glock Sr.'s Billing
                 Scheme ........................................................................70

          (ii)   Glock America's Billing Company:  Taziria
                 Holding A.V.V. .................................................................72

D.   Defendants Use of Consultinvest to Siphon and Divert Funds
     from Glock, Inc. ........................................................................73

     1.   Fraudulent Loans from Warwick and United European
          Finance to Consultinvest ................................................79

E.   Residential Real Estate Holding Companies........................................80

VI.    Predicate Acts Committed by Defendants:  Transportation of Stolen
       Goods (Improper Transfers Out of Glock, Inc. by Glock Sr. and His
       Associates) ........................................................................................82

       A.     Improper Transfer of Glock, Inc. Shares and Payment of
              Dividends to Unipatent and Rochus ......................................83

       B.     Transfers to Glock Hong Kong..............................................85

              The $588,810.64 Transfer ........................................................87

              The $3,019,040.53 Transfer ......................................................87

              The $3,499,303.40 Transfer ......................................................88

              The $942,137.90 Transfer ........................................................89

              The $1,081,269.50 Transfer ......................................................89

              The $1,548,895.20 Transfer ......................................................90

              The $1,278,478.50 Transfer ......................................................91

              The $1,099,659.10 Transfer ......................................................91

              The $1,181,487.80 Transfer ......................................................92

              The $2,112,092.70 Transfer ......................................................92

              The $682,924.70 Transfer ........................................................93

              The $1,663,361.80 Transfer ......................................................94

              The $2,944,831.90 Transfer ......................................................94

       C.     Sham Leases Between Consultinvest and Glock, Inc. .........................95

              1.     Original Glock Office Space/ Expanded Office and
                     Firing Range Space ......................................................96

                     (i)     "Loans" on the Original Glock Office Space .................97

                     (ii)    Expanded Office and Firing Range Space ...................100

          (iii)    Improper Lease Payments on the Expanded
                 Office and Firing Range Space .......................................102

     2.    Unimproved Glock Property and the Lease Option
         Agreement ....................................................................103

         (i)     The Lease Option Agreement.........................................105

     3.    Consultinvest's Lease of Machinery Equipment to
         Glock, Inc. ....................................................................107

VII.  Predicate Acts Committed by Defendants:  Receipt of Stolen Goods
    (Glock Sr.'s Receipt of Funds Improperly Transferred Out of Glock,
    Inc.) ......................................................................................109

    A.    Sham Royalties Paid to Glock Sr. by Glock, Inc. and Glock
        Ges.m.b.H. ....................................................................110

       1.    Glock, Inc.'s Transfers through Eaglesmith ...........................112

    B.    Glock America:  Glock Sr.'s Receipt of Stolen Property ..................117

    C.    Property Stolen from Glock, Inc. and Transferred to Base
        Technical .......................................................................118

       The $1,169,229 "Commission" ...........................................................119

       The $1,097,583 "Commission" ...........................................................120

       The $1,016,881 "Commission" ...........................................................121

       The $985,253 "Commission" .............................................................122

       The $1,142,491 "Commission" ...........................................................122

       The $911,848 and $1,294,370 "Commissions" ....................................123

       The $1,856,793 "Commission" ...........................................................124

       The $1,414,220 "Commission" ...........................................................125

       The $1,258,848 "Commission" ...........................................................126

The $1,362,504 "Commission" ................................................126

The $1,755,957 "Commission" ................................................127

The $1,320,718 "Commission" ................................................128

The $1,128,506 "Commission" ................................................128

The $1,194,220 "Commission" ................................................129

The $1,474,724 "Commission" ................................................129

The $1,440,993 "Commission" ................................................130

The $1,300,601 "Commission" ................................................130

The $1,296,544 "Commission" ................................................131

The $1,211,186 "Commission" ................................................132

The $1,397,563 "Commission" ................................................132

The $1,004,119 "Commission" ................................................133

The $1,309,276 "Commission" ................................................133

The $912,298 "Commission" ................................................134

The $1,457,245 "Commission" ................................................134

The $1,236,722 "Commission" ................................................135

The $10,046,635 "Commissions" ................................................135

VIII. Predicate Acts Committed by Defendants:  Theft by Taking; Theft by
Deception; Theft by Conversion; Theft by Receiving Stolen Property ......136

    A.    Theft of 50% of Glock, Inc. from Ms. Glock ........................137

    B.    Sham Royalty/Licensing Payments ................................139

    C.    Fraudulent Invoicing/Billing Companies ..........................141

D.      Fraudulent Leases Between Consultinvest and Glock, Inc. .............143

IX.    Predicate Acts Committed by Defendants:  Forgery....................................145

A.      Forgery Used to Steal Ownership over 50% of Glock, Inc. .............146

B.      Forgeries in Connection with the Master Agreements ...................146

C.      Forged Lease Documents .......................................................................148

X.     Predicate Acts Committed by Defendants:  Mail/Wire Fraud..................148

A.      Fraudulent Transfers from Glock, Inc. to Glock Hong Kong .........148

The $588,810.64 Transfer ........................................................................149

The $3,019,040.53 and $2,702,977.10 Transfers...................................150

The $3,499,303.40 and $3,069,680 Transfers........................................151

The $942,137.90 and $836,738 Transfers...............................................152

The $1,081,269.50 and $980,855 Transfers............................................154

The $1,548,895.20 and $1,403,734.40 Transfers...................................155

The $1,278,478.50 and $1,084,766.90 Transfers...................................156

The $1,099,659.10 and $1,060,754.70 Transfers...................................158

The $1,181,487.80 and $1,060,124.50 Transfers...................................159

The $2,112,092.70 and $1,894,418.60 Transfers...................................160

The $682,924.70 and $594,519.80 Transfers..........................................162

The $1,374,606.70 Transfer ....................................................................163

The $1,663,361.80 and $1,484,880.80 Transfers...................................164

The $2,944,831.90 and $2,580,270 Transfers........................................165

B.    Fraudulent Transfers from Glock Hong Kong to Minami ..............167

    The $1,050,000 Transfer to Minami ......................................168

    The $1,150,000 Transfer to Minami ......................................169

    The $1,210,000 Transfer to Minami ......................................170

    The $700,000 Transfer to Minami .........................................171

    The $2,120,000 Transfer to Minami ......................................172

    The $1,800,000 Transfer to Minami ......................................172

    The $1,550,000 Transfer to Minami ......................................173

    The $2,200,000 Transfer to Minami ......................................175

    The $807,500 Transfer to Minami .........................................176

    The $482,830 Transfer to Minami .........................................178

    The $307,723 Transfer to Minami .........................................179

    The $452,400 Transfer to Minami .........................................180

    The $605,000 Transfer to Minami .........................................181

    The $555,200 Transfer to Minami .........................................182

    The $309,750 Transfer to Minami .........................................184

    The $1,758,450 Transfer to Minami ......................................185

    The $5,249,900 Transfer to the "Cloned" Minami .............186

    The $1,600,000 Transfer to the "Cloned" Minami .............189

C.    Dividend Payments from Glock Hong Kong to Unipatent.............190

    March 2 Dividend Payment of $150,000 ..............................192

    June 1 Dividend Payment of $150,000.................................193

December 22 Dividend Payment of $600,000 .....................................194

August 16 Dividend Payment of $600,000 .........................................194

October 4 and 7 Dividend Payments Total $400,000 .........................195

September 3 Dividend Payment of $300,000 .....................................196

D.    Fraudulent Transfers from Minami to Reofin .................................197

Minami Wires Out the $1,050,000 Transfer ........................................198

Minami Wires Out the $1,150,000 Transfer ........................................199

Minami Wires Out the $1,550,000 Transfer ........................................200

Minami Wires Out the $2,200,000 Transfer ........................................201

Minami Wires Out the $807,500 Transfer ...........................................202

Minami Wires Out the $482,830 Transfer ...........................................203

Minami Wires Out the $307,723 Transfer ...........................................204

Minami Wires Out the $452,400 Transfer ...........................................205

Minami Wires Out the $605,000 Transfer ...........................................206

Minami Wires Out the $555,200 Transfer ...........................................207

Minami Wires Out the $309,750 Transfer ...........................................208

Minami Wires Out the $1,758,450 Transfer ........................................209

E.    Fraudulent Transfers from Glock America to Taziria ......................209

The $1,200,000 Transfer to Taziria .....................................................210

The $500,000 Transfer to Taziria ........................................................211

The $2,200,000 Transfer to Taziria .....................................................213

The $1,800,000 and $100,000 Transfers to Taziria .............................214

The $400,000 and $200,000 Transfers to Taziria ................................. 215

The $420,000 Transfer to Taziria ........................................................ 216

The $820,000 Transfer to Taziria ........................................................ 218

The $805,000 Transfer to Taziria ........................................................ 219

The $505,000 Transfer to Taziria ........................................................ 220

The $515,000 Transfer to Taziria ........................................................ 221

The $1,785,000 and $200,000 Transfers to Taziria ............................. 222

The $500,000 Transfer to Taziria ........................................................ 224

The $757,862 Transfer to Taziria ........................................................ 225

The $1,435,800 Transfer to Taziria ..................................................... 227

The $483,700 Transfer to Taziria ........................................................ 229

The $912,300 Transfer to Taziria ........................................................ 230

The $810,250 Transfer to Taziria ........................................................ 232

The $1,842,500 Transfers to Taziria .................................................... 234

The $2,333,000 Transfers to Taziria .................................................... 235

Additional Transfers to Taziria for "Consultancy Services" ........... 236

F.      Fraudulent Transfers Through Consultinvest to
        Warwick/UEF ......................................................................... 237

        1.      Wires Related to "Loans" on the Original Glock Office
                Space ............................................................................... 240

        2.      Wires Related to the Unimproved Glock Property ............... 240

        3.      Wires on Additional "Loans" from UEF to
                Consultinvest ................................................................... 242

G.      Transfers Through Eaglesmith to Glock Sr. .......................................249

XI.    Predicate Acts Committed by Defendants:  Money Laundering and
       Engaging in Monetary Transactions Using Property Derived from
       Specified Unlawful Activities ............................................................253

       A.      The Ultimate Destination:  Movement of Funds into the Glock
               Foundation and the Value Foundation ................................................254

       B.      Laundering Through the Payment of Improper "Royalties" to
               Glock Sr. ............................................................................................255

               1.      Glock, Inc.'s Transfers through Eaglesmith ............................257

               2.      Violations of Provisions Prohibiting Laundering of
                       Monetary Instruments ...............................................................259

                       (i)      Jurisdiction over Foreign Defendants ...........................262

                       (ii)     Jurisdiction over Defendants' United States
                                Assets ...........................................................................263

       C.      Laundering Using Glock Hong Kong, Glock America, and the
               Billing Companies ................................................................................263

               1.      The Laundering Cycle Though Glock Hong Kong ................263

                       (i)      Transfers Using Minami...................................................265

                       (ii)     The Use of Reofin as an Intermediate Collection
                                Point ............................................................................267

                                Defendants' Laundering of $1,050,000 Stolen from
                                Glock, Inc. ..................................................................268

                                Defendants' Laundering of $1,150,000 Stolen from
                                Glock, Inc. ..................................................................269

                                Defendants' Laundering of $1,550,000 Stolen from
                                Glock, Inc. ..................................................................269

Defendants' Laundering of $2,200,000 Stolen from Glock, Inc. ..................................................................270

Defendants' Laundering of $807,500 Stolen from Glock, Inc. ..................................................................270

Defendants' Laundering of $482,830 Stolen from Glock, Inc. ..................................................................271

Defendants' Laundering of $307,723 Stolen from Glock, Inc. ..................................................................272

Defendants' Laundering of $452,400 Stolen from Glock, Inc. ..................................................................272

Defendants' Laundering of $605,000 Stolen from Glock, Inc. ..................................................................273

Defendants' Laundering of $555,200 Stolen from Glock, Inc. ..................................................................274

Defendants' Laundering of $309,750 Stolen from Glock, Inc. ..................................................................274

Defendants' Laundering of $1,758,450 Stolen from Glock, Inc. ..................................................................275

(iii)    Transfers Through Unipatent .........................................276

(iv)    Movement Through Glock Ges.m.b.H. to Base Technical ..........................................................................277

2.    Laundering Through the Caribbean .........................................279

(i)    Transactions Using Glock America and Taziria ..........281

Wash Transactions .........................................................282

Near-Wash Transactions ...................................................284

Direct Transfers to Glock Ges.m.b.H. ............................293

3.      Violations of Provisions Prohibiting Laundering of
Monetary Instruments ...............................................................295

(i)     Jurisdiction over Foreign Defendants ...........................298

(ii)    Jurisdiction over Defendants' United States
Assets ...........................................................................299

D.      Laundering Through Consultinvest ....................................................299

1.      Original Glock Office Space and the "Loan" from UEF ........300

2.      Unimproved Glock Property & the Warwick "Loan" ...........301

(i)     The Real Loan from BfG ................................................301

(ii)    The Fraudulent Loan from Warwick ............................302

(iii)   Payments on the Fraudulent Warwick Loan ..............303

3.      Additional "Loans" from UEF and Consultinvest's
"Repayment" Plan ...................................................................304

4.      Consultinvest's Purchase Using $7.5 Million in
Laundered Funds .....................................................................308

5.      Violations of Provisions Prohibiting Laundering of
Monetary Instruments ...............................................................314

(i)     Jurisdiction Over Foreign Defendants ...........................317

(ii)    Jurisdiction Over Defendants' United States
Assets ...........................................................................318

XII.   RICO Specific Allegations ............................................................................318

COUNT I — Piercing the Corporate Veil ...................................................................321

COUNT II — Violation of 18 U.S.C. § 1962(c) ........................................................335

COUNT III — Violation of 18 U.S.C. § 1962(d) .......................................................335

COUNT IV — Violations of O.C.G.A. § 16-14-4(c) .................................................336

COUNT V — Punitive Damages ..................................................................................337

Prayer for Relief ........................................................................................................338

> *The problem is, is you just said on the record, that*
> *Mr. Glock is a bad guy, he is an illegal guy, he bribes*
> *people and all that.*
>
> —*John Renzulli, Esq.*
>
> *Well, I know that[.]  I did some of them for him, John.*
>
> —*Defendant Peter Manown*[1]

Plaintiff Helga Glock ("Helga" or "Ms. Glock"), by and through counsel,

brings this RICO action against the above-captioned Defendants, and alleges the

following:

## I.    NATURE OF THE ACTION

1.    This is an action to recover approximately $500 million in damages

that Defendants intentionally caused to Ms. Glock, through a multiple-decade,

virtually-world-wide, continuing racketeering scheme.

2.    Defendants, led by Ms. Glock's former husband, Gaston Glock

("Gaston" or "Glock Sr."), designed their scheme for the purpose of taking

money from Ms. Glock and injuring her.  The scheme has employed various

fraudulent and criminal methods — including improper royalty payments to

---

[1]    *State v. Manown*, Crim. Act. File No. 07-9-5418 (Cobb Cnty. Ga. Super. Ct.), Oct. 17, 2007 Proffer Testimony of Peter Manown, at 112:23 to 113:2.

Mr. Renzulli is a long-time attorney and business advisor to Defendant Gaston Glock, and a former Chief Executive Officer of Defendant Consultinvest, Inc., a Georgia corporation.

Glock Sr., funds laundered through fraudulent billing companies, and sham lease and loan agreements — and other not-yet-identified means that, on information and belief, continue to this day.

3.    Glock Sr. has always believed that the assets of the so-called "Glock Group" (the patents, trademarks, earnings, profits, real estate, etc.) belong to him:  "*Alles ist meine!*"[2]  In order to put Glock Sr.'s belief into practice, Defendants implemented their racketeering scheme by, among other things:

- exhibiting total disregard for any semblance of corporate structure or form of Glock Ges.m.b.H. (together with its subsidiaries and affiliates, the "Company"), Glock, Inc., and other members of the "Glock Group";

- setting up a complicated network of sham companies in such far-flung jurisdictions as Bermuda, Curaçao, Hong Kong, Ireland, Liberia, Luxembourg, and Panama.

- transferring money out of Glock, Inc. (the "cash cow" of the "Glock Group") and into members of the "Glock Group" that were wholly-owned or controlled by Glock Sr. in order to mask the origins of the funds;

- making "royalty" or "licensing" payments to Glock Sr. for use of the "Glock" name and logo — which Glock Sr. have never owned;

- issuing fraudulent invoices for services that were never performed or products that were never delivered in order to funnel money into sources controlled only by Glock Sr., and away from companies in which Ms. Glock and Glock Sr. were partners;

---

[2]    Roughly translated from the German:  "All is mine!"

- creating fraudulent leases to be paid by Glock, Inc. for real and improved property that had been purchased by other entities in the "Glock Group" with money stolen from Glock, Inc.;

- laundering the proceeds from the fraudulent leases through members of the so-called "Glock Group" by setting up fake loans;

- deceiving Ms. Glock into transferring her interest in Glock Ges.m.b.H. — the company she co-founded, built, and co-owned with Glock Sr. — into foundations established and ultimately controlled by Glock Sr.;

- transferring and laundering the stolen assets into those foundations in Austria.

Defendants engaged in this scheme to directly target and harm Ms. Glock.

4.       Defendants stole and laundered money using a tangled web of fictive legal relationships, offshore business entities, and international financial transactions, in violation of the Federal and Georgia Racketeer Influenced and Corrupt Organizations  ("RICO") acts, 18 U.S.C. § 1961, *et seq.*, and O.C.G.A. § 16-14-4, *et seq.*

5.       Defendants' racketeering activities included hundreds of violations of the Federal mail fraud, wire fraud, national stolen property, and money laundering statutes.  The object of their scheme was to siphon, divert, and hide monies and assets away from the view and reach of Ms. Glock.  Specifically, Defendants' scheme deprived Ms. Glock of the financial benefits of her ownership interest in Glock Ges.m.b.H. and its primary economic engine — the

3

Smyrna, Georgia-based Glock, Inc. — and converted them to Defendants' own illicit purposes.

6.     Defendants as a matter of practice disrespected and misused virtually all of the characteristic instruments of lawful commerce, by documenting pretextual corporate acts, titles, contracts, and legal relationships, by issuing and paying sham invoices for transactions without economic substance, and by creating "dummy" corporate entities and structures which lacked any valid business purpose.  These machinations were designed to provide Glock Sr. and his associates with plausible deniability and the false appearance of arm's-length dealings.

7.     At all times relevant herein, Glock Sr. — with the collaboration of his associates — personally directed and controlled the numerous entities that comprised "his" commercial empire, often referred to as the "Glock Group," treating them as alter egos and mere instrumentalities for the accomplishment of his own purposes.  Glock Sr. ruled the "Glock Group" as an absolute Monarch. The "Glock Group" is Glock Sr.'s alter ego.

8.     Irregularities in the administration and operation of the "Glock Group" were not isolated events, but tools for furthering and concealing Defendants' criminal scheme.  So too was Glock Sr.'s exploitation of his

then-wife's trust, stealing from her while continually promising that everything he did was for the good of the Company and their family.

9.   Glock Sr. was able to deflect his partner's questions about *their* business with a combination of (a) promises of fidelity; (b) demands for trust; (c) intimidation; and (d) statements that it would be better that she not be knowledgeable about their financial affairs.  Ms. Glock trusted and relied on the words of her business partner and husband during their nearly fifty years of marriage.

10.   Only later — after having been locked out of the family home, divorced, and terminated (along with the Glocks' three children) from the Company that she had helped to build — would Plaintiff begin to learn the massive scope of Glock Sr.'s betrayal.  Within a few weeks of the divorce becoming final,[3] in June 2011, Glock Sr. married a girlfriend (his purported "nurse," Kathrin[4]) more than fifty years his junior.

---

[3]   In Austria, matters related to divorce can take place separate proceedings. The first phase of the Glocks' divorce dealt with the breakup of their marriage and determined that Glock Sr. was solely at fault for dissolution of the relationship.   Under Austrian law, Ms. Glock was required to institute separates proceedings in connection with her claims for alimony and distribution of marital assets.  Those proceedings remain pending.

[4]   On information and belief, Kathrin Glock has no medical training and never worked as a "nurse," as that term is customarily used.

11.     While Glock Sr. had been promising his wife that all of his efforts were directed at building up the Company, and preserving it for the family's future, he and his associates had instead been systematically stealing from, and laundering the proceeds through separately-owned business entities and bank accounts.

12.     Glock Sr. concealed thefts from his wife through a variety of dummy corporate entities formed by his associates in the United States and abroad. Among other things, Glock Sr. used his personal stash of "fun money" to cavort with women around the world. Here in metro Atlanta, an associate formed and operated several Georgia corporations for the special purpose of owning residential properties purchased with stolen funds, so that Glock Sr. could more conveniently house women away from his wife's notice.

13.     Glock Sr.'s betrayal of his wife would culminate in an effort to use Austrian private foundations (*Privatstiftung*) to place his assets, including proceeds from Defendants' racketeering scheme, beyond the reach of Ms. Glock in their divorce proceedings, and beyond the mandatory inheritance shares of their three children, Brigitte, Gaston Jr., and Robert (all of whom are adults). Glock Sr. became the sole beneficiary.

14.     Glock Sr. and his associates had laid the groundwork for this by persuading Ms. Glock and the children to donate assets and waive inheritance

6

rights in exchange for being made beneficiaries of the foundations. Ms. Glock's donations included 14% of the shares of Glock Ges.m.b.H., leaving her with a 1% remaining interest in the Company. Glock Sr. had also placed assets, including the proceeds of Defendants' theft and 85% of the shares of Glock Ges.m.b.H., into the foundations.

15.     The *Glock Privatstiftung* (the "Glock Foundation") was established on or about December 1, 1999, purportedly for the benefit of Glock Sr., Ms. Glock, and their family members. Although both Ms. Glock and Glock Sr. were founders, Glock Sr. retained, for himself only, the ability to enforce the rights of the founders, appoint members to and direct the conduct of the managing board, and change the terms of the deed that created the foundation.

16.     Shortly after their divorce in 2011, Glock Sr. unilaterally changed the deed for the Glock Foundation so as to remove Ms. Glock, Brigitte, Gaston Jr., and Robert as beneficiaries of the foundations. He also banned them *and their descendants* from any further association with the Company.

17.     Glock Sr. completely controls the operations of the foundations, using his extraordinary founder rights, including Defendants the Glock Foundation and the *Value Privatstiftung* (the "Value Foundation"). Glock Sr. is the sole beneficiary of the foundations. On information and belief, Defendant Stephan Doerler is a member of the board of both foundations; Defendant

7

Dr. Jöerg-Andreas Lohr was a member of the board of both the Glock Foundation and Glock Ges.m.b.H. until sometime in 2013.

18.    Glock Sr. and his associates further struck out at Ms. Glock's financial welfare by causing Glock Ges.m.b.H. to halt its regular distribution of dividends, and instead to pointlessly stockpile earnings for years on end.  And as if that were somehow not enough, Glock Sr. also sought to force the sale of Ms. Glock's remaining 1% ownership interest in Glock Ges.m.b.H., and instituted proceedings against his own adult children for the return of previous "private bonus payments" he had made to them.

19.    The foundations established for the stated purpose of preserving the Company for the future of the Glock family, and which hold proceeds of Defendants' racketeering scheme, now fund a horse farm, multi-million dollar horses (including a $15 million, 12-year-old horse Glock Sr. bought at auction for his new wife[5]), and lavish events hosted at a state-of-the-art equestrian facility —

---

[5]    "Austrian gun designer Gaston Glock recently forked out $15 million on a new horse for his wife, Kathrin.

Glock, 84, bought London, the 12-year-old Olympic silver-medal winning show jumping horse at an auction.  Kathrin, 31, plans to use London in the Glock Horse Performance Center, which was built near their house in Carinthia, Austrian Times reports.  The Glocks also hope to use London to take home a medal in the 2016 Olympic Games.

the Glock Horse Performance Center – which is managed by that new wife. Under the direction of Glock Sr. and his associates, the foundations are also frittering away funds on such medical quackery as "cancer-curing" volcanic ash.

20.     Defendants' scheme resulted in Ms. Glock going from holding a 15% ownership interest in Glock Ges.m.b.H. — which owned 100% of its Smyrna-based subsidiary Glock, Inc. — to Glock Sr. alone owning (through the Glock Foundation) 50% of Glock, Inc. and 99% of the remaining half of Glock, Inc.  Through the Glock Foundation, he owns and controls 99% of Glock Ges.m.b.H.  Defendants' scheme was implemented specifically to harm Ms. Glock and to deprive her of assets to which she was entitled.

21.     Over the years of their marriage and business partnership, Glock Sr. accumulated and spent over €1 billion in personal wealth, approximately €700 million of which, on information and belief, cannot be accounted for through his legitimate or illegitimate sources of income currently known to Plaintiff.

---

At nearly $15 million, Glock's purchase of London is one of the highest prices ever paid for a horse."

By Brent McCluskey, "Gaston Glock buys wife $15 million horse," May 2, 2014, at http://www.guns.com/2014/05/02/gaston-glock-buys-wife-15-million-horse/ (citing Austrian Times).

22.     Glock Sr.'s actions towards Ms. Glock and her children, especially in their later and particularly spiteful stages, resemble the senseless and self-destructive rage of Shakespeare's King Lear, when he foolishly mistreats a loyal but candid daughter, Cordelia, in favor of cunning and ruthless flatterers. Perhaps neither pathology nor psychology can provide a satisfactory explanation for why an aging billionaire would spend his twilight years seeking to terrorize members of his own family.

23.     But whatever the cause of *this* particular madness, and family tragedy, its execution by Defendants has proceeded in violation of American criminal laws prohibiting transmission or receipt of stolen goods (18 U.S.C. §§ 2314-2315); theft by taking (O.C.G.A. § 16-8-2); theft by deception (O.C.G.A. § 16-8-3); theft by conversion (O.C.G.A. § 16-8-4); theft by receiving stolen property (O.C.G.A. § 16-8-7); forgery (O.C.G.A. § 16-9-1); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); money laundering and engaging in monetary transactions using property derived from specified unlawful activities (18 U.S.C. §§ 1956-1957); and racketeering (18 U.S.C. § 1962 and O.C.G.A. § 16-14-4).

24.     Accordingly, Plaintiff Helga Glock respectfully demands and prays that this Court hold Glock Sr. and his fellow Defendants to account, in civil damages, for the hundreds of millions of dollars of financial harm caused to her

business and property by reason of these criminal acts.  The Court should punish Defendants' wrongdoing, vindicate the law, and provide at least some measure of personal justice for Plaintiff Helga Glock.

II.     **PARTIES**

25.     Plaintiff Helga Glock ("Helga" or "Ms. Glock") is a citizen of the Republic of Austria.  Ms. Glock is and has been at all relevant times a shareholder of Defendant Glock Ges.m.b.H., and was married to Defendant Gaston Glock from June 1962 to June 2011.

26.     Plaintiff has standing to bring these claims, because, as described more fully herein, she is a person who has sustained injury to her business or property by reason of Defendants' conduct.  Defendants' acts of racketeering have been directed at her and she was and is the intended victim.

27.     Plaintiff suffered significant financial harm and losses, and this injury was caused by Defendants' conduct.  Because Defendants are directly responsible for losses suffered by Plaintiff, each is liable to Plaintiff for treble the amount of Plaintiff's losses, and attorneys' fees, as permitted by law.

28.     Plaintiff was the target of Defendants' racketeering scheme.  The original and ongoing purpose of the scheme was to inflict harm on Plaintiff individually.  Her injuries (as detailed herein) are a direct result of that scheme and Defendants' conduct.

11

29.     Defendants' scheme was designed to injure Plaintiff and her injuries were proximately and directly caused by Defendants' violations of federal and Georgia RICO.

30.     Defendant Gaston Glock ("Gaston" or "Glock Sr.") is a citizen of the Republic of Austria.

31.     Defendant Glock Ges.m.b.H. ("Glock Ges.m.b.H.") is a *Gesellschaft mit beschränkter Haftung* (company with limited liability) organized under the laws of the Republic of Austria.

32.     Defendant Glock, Inc. ("Glock, Inc.") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

33.     Defendant Glock America N.V. ("Glock America") is a *Naamloze vennootschap* (nameless partnership or anonymus venture) organized under the laws of Curaçao, Netherlands Antilles.

34.     Defendant Glock (H.K.) Ltd. ("Glock Hong Kong") is a private limited company organized under the laws of Hong Kong.

35.     Defendant *Glock Privatstiftung* (the "Glock Foundation") is a *Privatstiftung* (private foundation) organized under the laws of the Republic of Austria.

36.     Defendant *Value Privatstiftung* (the "Value Foundation") is a *Privatstiftung* (private foundation) organized under the laws of the Republic of Austria.

37.     Defendant CON Holding Ges.m.b.H. ("CON Holding") is a *Gesellschaft mit beschränkter Haftung* (company with limited liability) organized under the laws of the Republic of Austria.

38.     Defendant Consultinvest, Inc. ("Consultinvest") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

39.     Defendant Stephan Doerler ("Doerler") is a citizen of the Republic of Austria.

40.     Defendant Charles M. J. Ewert ("Ewert") is a citizen of the Grand Duchy of Luxembourg.

41.     Defendant Fitox A.G. ("Fitox") is an *Aktiengesellschaft* (public limited company) organized under the laws of the Swiss Confederation.

42.     Defendant INC Holding Ges.m.b.H. ("INC Holding") is a *Gesellschaft mit beschränkter Haftung* (company with limited liability) organized under the laws of the Republic of Austria.

43.     Defendant Jöerg-Andreas Lohr ("Lohr") is a citizen of Germany.

13

44.     Defendant Lohr + Company G.m.b.H. ("Lohr & Co.") is a *Gesellschaft mit beschränkter Haftung* (company with limited liability) organized under the laws of the Federal Republic of Germany and is located in both the Federal Republic of Germany and the Republic of Austria.

45.     Defendant Peter S. Manown ("Manown") is a citizen of the State of Georgia.

46.     Defendant Johann Quendler ("Quendler") is a citizen of the Republic of Austria.

47.     Defendant Rochus G.m.b.H. ("Rochus") is a *Gesellschaft mit beschränkter Haftung* (company with limited liability) organized under the laws of the Federal Republic of Germany.

48.     Defendant Karl Walter ("Walter") is a citizen of the State of Georgia.

49.     Defendant Hubert Willam ("Willam") is a citizen of the State of Georgia.

50.     Each of the Defendants named herein is a "person" as defined by 18 U.S.C. § 1961(3), because each is an "entity capable of holding a legal or beneficial interest in property."

51.     The individual and business-entity Defendants named herein, together with Minami Enterprises Limited, Taziria A.V.V., Base Technical Engineers Limited, Unipatent Holding S.A., Reofin International S.A., Eaglesmith

14

Partners, Inc., BIA America, Inc., Fire Arms Insurance Registry, Ltd., Blackland Holdings, Inc., Vinings Cove Holdings, Inc., Glendale Terrace, Inc., Cofer, Beauchamp & Butler, Langford de Kock & Co., Summit National Bank, Heidi Hein, Miroslava Torres-Young, Selpro Limited, Warwick International Limited, United European Finance, Ltd., together constitute the currently known members of an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

52. The Enterprise had: a common purpose; an ongoing structure or organization supported by personnel or associates with continuing functions or duties; relationships among those associated with the Enterprise; and longevity sufficient to permit those associates to pursue the Enterprise's purpose.

53. A hierarchy existed in which Glock Sr. was the leader, while the other individual Defendants named herein participated in and conducted the operation and management of the Enterprise's affairs.

54. The Enterprise is distinct from the pattern of racketeering activity in which Defendants have engaged and the Enterprise is distinct from any one Defendant.

55. Defendants used the numerous business entities identified herein and others as an instrument of their and the Enterprise's illegal conduct.

15

### III.    JURISDICTION AND VENUE

56.    This Court has subject matter jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1331 (federal question), because Plaintiff's claims arise pursuant to 18 U.S.C. §§ 1961-1968 (Civil RICO).

57.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under state law, because the claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

58.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, on the basis of complete diversity.  Plaintiff and Defendants are of diverse citizenship, and the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest.

59.    Defendants Manown, Walter, and Willam are subject to the personal jurisdiction of this Court because they reside in the State of Georgia and committed the wrongs described herein in the State of Georgia.

60.    Defendants Glock, Inc. and Consultinvest are subject to the personal jurisdiction of this Court because they are organized under the laws of the State of Georgia, maintain their principal places of business in the State of Georgia, and committed the wrongs described herein in the State of Georgia.

61.    Defendants Glock Sr., Ewert, Quendler, Lohr, Glock Ges.m.b.H., Glock America, Glock Hong Kong, and Lohr & Co. have regularly done and solicited business in the State of Georgia, engaged in other persistent courses of conduct in the State of Georgia, and derived substantial revenues from goods used or consumed, or services rendered, within the State of Georgia.

62.    Defendants Glock Sr., Ewert, Quendler, Lohr, Glock Ges.m.b.H., Glock America, Glock Hong Kong, and Lohr & Co. are subject to the personal jurisdiction of this Court pursuant to O.C.G.A. §§ 9-10-91(1) to (3), because they:

     a.    transacted business within the State of Georgia;

     b.    committed tortious acts and omissions within the State of Georgia; and

     c.    committed tortious injuries within the State of Georgia by acts and omissions outside of the State of Georgia.

63.    Defendants Glock Sr., Glock Ges.m.b.H, Glock America, and Glock Hong Kong are additionally subject to the personal jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91(4) because they owned, used, or possessed real property situated within the State of Georgia.

64.    The Court may exercise personal jurisdiction over the foreign Defendants named herein because they committed offenses under 18 U.S.C.

17

§ 1956(a) involving financial transactions that occurred in part in the United States.

65.     Defendants may be served pursuant to Rule 4 of the Federal Rules of Civil Procedure, O.C.G.A. § 9-11-4, and 18 U.S.C. § 1965(d).

66.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.  Moreover, Defendant Manown resides in this judicial district, and Defendants Glock, Inc. and Consultinvest maintain their principal places of business in this judicial district.  Venue is also proper in this district pursuant to 18 U.S.C. §§ 1956(i), 1965(a).

## IV.   BACKGROUND INFORMATION

### A.   The So-Called "Glock Group" Today

67.     The Company — Glock Ges.m.b.H. and an assortment of subsidiaries, affiliates, and other business entities often collectively referred to as "Glock" or the "Glock Group" — is one of the world's best known and most profitable arms companies.

68.     Glock supplies weaponry to military and law enforcement agencies in at least 48 countries, and to civilians in more than 100 countries.  Glock pistols

are popular choices for law enforcement officers, self-defense, and concealed carry.

69.     With an approximate 65% market share, Glock dominates the United States gun market.  Throughout its history, the overwhelming bulk of Glock's revenues have come from the United States.

70.     Glock's annual revenues have been estimated at $400 million, with more than a million of its guns sold in the United States in a single year.

71.     Glock Sr. is reportedly among the twenty wealthiest individuals in all of Austria, with an estimated net worth of at least €1.4 billion.[6]

**B.     Humble Origins**

72.     The Company's origins go all the way back to 1963, when it began as a mom-and-pop garage machine shop.

73.     Helga and Gaston had met in 1958, and married in 1962.  In 1963, the Glocks co-founded Glock KG, an Austrian *Kommanditgesellschaft* (limited partnership), financing the venture equally with their joint savings.  Monies that the couple had earmarked for the purchase of their first home (a condominium in Vienna) were instead used to purchase land for a factory in Deutsch-Wagram, Austria.

---

[6]     Figures used in this Complaint are reflected in U.S. Dollars or Euros depending on the currency used in the original information source.

74.     Ms. Glock had worked as the head secretary of the executive committee of the Bavarian Insurance Chamber, in Munich, and later as a secretary at a Vienna law firm.

75.     Glock Sr. was employed as a Technical Operations Manager at Kühler Metall in Vienna.  Kühler Metall manufactured automobile radiators. Glock Sr. worked there during the day, and worked on the construction of the Glock KG factory in the evenings.

76.     Ms. Glock and Mrs. Stefanie Eigner ("Mrs. Eigner"), Glock Sr.'s mother, mixed and delivered soldering fluid to customers of Kühler Metall in order to earn additional money.  At night, Ms. Glock handled Glock KG's office work.

77.     The whole family — including Glock Sr.'s mother, and Ms. Glock with the Glocks' young children — all worked at building the new factory. Family members did everything that they could do:  digging for the foundation, pouring concrete, welding metal gates and columns, painting, and the like.  They devoted every spare moment to building up their company.

78.     It was out of this backdrop of energetic activity and hope for the future that the first signs of future troubles would begin to emerge.  These principally related to Glock Sr.'s obligations with respect to his existing employer, Kühler Metall.

79.     Glock Sr. was well-liked by Leopold Fischer ("Mr. Fischer"), the owner of Kühler Metall.  Kühler Metall supported the formation of the predecessor to Glock KG (named KAEF) by giving the new company orders that Kühler Metall could not fill or chose not to fill for whatever reason.  Mr. Fischer, however, had not wanted Glock Sr. to set up his own company parallel to his job at Kühler Metall, and forbade him from doing so.

80.     Glock Sr. circumvented this restriction by having his *mother* sign the paperwork for the incorporation for KAEF (and later for Glock KG).  In that way, KAEF was not — on paper — a company that belonged to Glock Sr. and he avoided the conflict of interest that had caused Mr. Fischer not to want him to set up a competing firm.

81.     The founding papers of Glock KG did not reflect the reality of the actual sums that each shareholder had contributed — Mrs. Eigner had in fact contributed no money at all — but that was of no importance to Glock Sr.  Only later, when it was convenient for his purposes, would Glock Sr. remove his mother from the Glock KG papers.

82.     Glock Sr. often had people who were close to him sign papers at his direction.  He demanded that they do so without explanation, based solely on trust.  Moreover, Glock Sr.'s paperwork did not necessarily have any relationship with reality.  That is how Glock Sr. did business.

83.     Likewise, Glock Sr.'s heavy reliance on the friendly assistance of his employer, Kühler Metall, eventually came to be regarded as poaching.  Tensions developed between Glock Sr. and his employer.

84.     Glock Sr. continued working at Kühler Metall until the Glock KG factory was completed in 1979.  Then — when he no longer needed anything from Kühler Metall — Glock Sr. left his employer.  That too is how Glock Sr. did business, using people and relationships for a time, then discarding them when they had outlived their usefulness.

85.     The Glocks and their children moved into an apartment directly above their factory in Deutsch-Wagram.  Glock KG manufactured curtain rods and brass fittings for doors and windows, as well as machine gun belts and knives for the Austrian army.  The Glocks were proud of their small but successful business.

## C.     Development of the Gun

86.     It was through Glock KG's contacts with the Austrian Army that Glock Sr. first learned of its Request For Proposal ("RFP") for a new firearm.

87.     He discovered that established gun manufacturers, including the Austrian company Steyr, had been having difficulty in meeting the requirements of the Army's RFP.

88.     Sensing an opportunity, Glock Sr. asked whether his company could submit a proposal.  He was informed that such a proposal would be welcomed, but that it would have to be prepared within two years.  This was a very short period of time for the development of a new gun.

89.     Glock Sr. had to overcome substantial obstacles in order to meet this objective.  The first and most obvious obstacle was that he had little experience with firearms in general, much less in designing or manufacturing them.

90.     A perhaps more surprising obstacle was Glock Sr.'s Socialist political beliefs, which caused him to strongly dislike guns.

91.     But Glock Sr. found a way to overcome his political beliefs, and his Socialism did not prevent him from producing a pistol.  Nor did it prevent him from becoming an aggressive and highly successful Capitalist, amassing vast private wealth by selling guns, especially in the United States.

92.     Glock Sr. tackled the design challenge by consulting with gun experts and by studying existing pistol designs.  Implementing a pattern Glock Sr. would employ over and over, the experts received no compensation and included among them the Austrian procurement officer for the RFP Glock Sr. was vying to win.

93.     Glock Sr. produced drawings for the new pistol, which were implemented in the factory by Reinhold Hirschheiter ("Hirschheiter"), a Glock KG employee.

94.     Hirschheiter had worked with Glock Sr. at Kühler Metall.  He became Glock Sr.'s right-hand man at Glock KG, and later Glock Ges.m.b.H.  Glock Sr. and Hirschheiter worked hard to beat the Army's deadline, building, testing, and refining ideas.

95.     Key characteristics of their approach were the use of injection-molded plastic, and a design that required fewer separate parts.  This allowed for a pistol that was light, reliable, and inexpensive to manufacture.

96.     While Glock Sr. and Hirschheiter worked on the pistol, Ms. Glock and employees of Glock KG kept the factory going.  They still needed to keep producing knives, soldering fluid, and machine gun belts in order to meet existing orders and to earn money for manufacturing the pistol.

97.     These efforts bore fruit, and in April 1981, Glock Sr. filed for an Austrian patent on the Glock 17 semi-automatic pistol.

98.      In 1982, Ms. Glock personally delivered samples of the pistol to the Austrian Army for review and evaluation.  Well prepared, she represented Glock KG with pride and expertise in presenting its proposal to Army decision makers.

Ms. Glock was likely the first woman to make such a presentation to the Austrian Army.

99.    Glock ultimately won the contract with the Austrian Army, besting competitors that included Heckler & Koch, Sig Sauer, Beretta, Steyr, and Fabrique Nationale.

**D.    The Formation of Glock Ges.m.b.H.**

100.    In 1983, Glock KG became Glock Ges.m.b.H.  Helga and Gaston were the only two shareholders of the Company, since Gaston had by that time removed his mother's name from its predecessor's incorporation papers.

101.    Notwithstanding their previous joint ownership of Glock KG, and equal financial contributions to its establishment, Glock Sr. gave himself an 85% ownership interest in the new Glock Ges.m.b.H.  He told Ms. Glock that it was advantageous for legal and business reasons that she own precisely 15% of the Company.

102.    Ms. Glock trusted her husband and accepted his explanation, because she thought that they were both working for the same goal.

103.    Glock Sr. became the public face of Glock Ges.m.b.H., and its *Geschäftsführer* (Managing Director), while Ms. Glock continued to work in the background.  Ms. Glock handled the growing office work with their daughter,

Brigitte, who joined the Company in 1983.  Later, sons Gaston Jr. and Robert would also go to work for the Company.

104.    Production for the contract with the Austrian Army ran smoothly. The Company soon found itself with the ability to produce more pistols than could be sold in Austria.

### E.    Glock Comes to America

105.    America was the outlet for the Company's excess production capacity.

106.    In 1985, Glock Sr. flew to Atlanta, Georgia to sign incorporation papers for a U.S. subsidiary.  A gun salesman, Defendant Karl Walter ("Walter"), and a local lawyer, Defendant Peter S. Manown ("Manown"), assisted Glock Sr. in forming a Georgia corporation and getting it off the ground.

107.    The new Glock, Inc. ("Glock, Inc."), which was based in Smyrna, Georgia, would distribute pistols that were manufactured by Glock Ges.m.b.H. in Austria.  Glock Sr. became President of Glock, Inc., and Walter became Vice-President.

108.    Walter's sales plan was to focus on law enforcement agencies, providing them with liberal samples, training, and discounts on the new Glock pistols.  He recognized the commercial opportunity presented by the fact that

26

many U.S. police departments still used revolvers, while other countries had already converted to semi-automatic pistols.

109.    Walter also knew how to show prospects a good time, entertaining them with lavish dinners in downtown Atlanta restaurants, and late-night visits to the Gold Club.

110.    Indeed, Thursday night was "Glock Night" at the Gold Club. Performers from the Gold Club also represented Glock at tradeshows, and went along for rides on the Company's corporate jet.[7]

111.    Walter's sales plan worked.  At the same time that the Glock pistols were catching on with law enforcement, they also began to appear in movies, television shows, and music lyrics.  Glock became perhaps the best known gun in the United States.

112.    Glock, Inc.'s sales rose rapidly, frequently outstripping the production capacity of the Glock Ges.m.b.H. factory in Austria.  The Company's high degree of success in penetrating the world's largest gun market, combined with an estimated profit margin per pistol of 68%, made Glock, Inc. a cash cow and extraordinary wealth-generating machine.

---

[7]    The Gold Club was later shut down after its owner, as well as various Gold Club managers and employees, were indicted for a racketeering conspiracy that included money laundering and rampant prostitution.

113.   From Ms. Glock's perspective, the success of Glock, Inc. meant not only an improvement in her material lifestyle, but also an increased division of labor with her husband.

114.   Glock Sr. now traveled much more frequently, especially to the United States.  Ms. Glock had more office work to oversee in Austria, with the assistance of additional employees.

115.   Ms. Glock had no reason to doubt Glock Sr.'s activities or work.  She was pleased with their success and trusted her partner.

**F.    Trouble Behind the Scenes**

116.   Behind the scenes of Glock, Inc.'s astonishing success in conquering the American gun market, however, all was not well.  Unbeknownst to Plaintiff, Glock Sr. and his associate — Georgia lawyer, Defendant Peter Manown — had initiated a sequence of sham corporate acts that would repeatedly and falsely manipulate the stated ownership of Glock, Inc.

117.   These corporate machinations, *which began almost as soon as Glock, Inc. had been formed*, were just the beginning stages of what would eventually become a much broader scheme by Defendants to siphon, divert, and hide monies and assets away from the view and reach of Ms. Glock.

118.   The history of corporate acts reflecting the purported ownership of Glock, Inc. over time is a study in disrespect for corporate formalities and the

corporate form.  It includes backdated documents, bogus agreements, phantom capital increases, and gratuitous share transfers.

119.    This was consistent with Glock Sr.'s habitual disregard of corporate formalities, and purposeful misuse of legal documents that failed to correspond with reality.

120.    Glock, Inc.'s business purpose was to distribute pistols manufactured by Glock Ges.m.b.H.  Moreover, its funding and direction came from Glock Ges.m.b.H.  It is logical, therefore, that Glock, Inc. would be formed as a wholly-owned subsidiary of Glock Ges.m.b.H.

121.    And at the very beginning, it was.  In November 1985, at the direction of Glock Sr., and "on behalf of and in the name of" Glock Ges.m.b.H, Manown had formed Glock, Inc. as a Georgia corporation with its registered offices in Atlanta, Georgia.

122.    Due to its success, and the magnitude of the further business opportunities presented by the U.S. gun market, Glock, Inc. quickly became the most valuable and strategically important asset of Glock Ges.m.b.H.

123.    Nevertheless, for reasons which will be explained in detail below,[8] Manown and Glock Sr. later prepared false, backdated correspondence and

---

[8]    *See* paragraphs 185 through 196, *infra*.

agreements reflecting that part of Glock, Inc. was owned separately from, and independent of, Glock Ges.m.b.H.

124.   Glock Ges.m.b.H. thereby gave away, for no consideration, a substantial fraction — first documented as 25%, then later shown as 50% — of the ownership of its most valuable and important asset:  Glock, Inc.

125.   This separate ownership stake in Glock, Inc. would subsequently change hands, on paper at least, several times.  The various other owners of Glock, Inc. have included:

      a.     Peter Manown, as "Trustee";

      b.     Unipatent Holding S.A., a Luxembourgish entity;

      c.     Glock Sr., personally;

      d.     Multipatent S.A., a Luxembourgish entity; and

      e.     Rochus G.m.b.H., a German entity.

Both the creation of this separate ownership stake, and the subsequent transfers, were sham transactions which lacked any legitimate purpose.

126.   Glock Sr. and his associates simply misappropriated — a better word is "stole" — 50% of Glock, Inc. for themselves, to the detriment of Glock Ges.m.b.H. and Plaintiff Helga Glock.

127.   Ms. Glock had no knowledge of these purported transactions, and no ownership interest in any of the entities which came to own the other 50% of

Glock, Inc.  She trusted her husband, who chose to conceal these activities from her.

### G.   Structure of the "Glock Group" — Defendants' Failure to Abide by Corporate Formalities

128.   Glock Sr. and his associates did not limit themselves to stealing 50% of Glock, Inc.  Instead, they set up an elaborate structure of domestic and international entities that was designed to steal much, much more.

129.   The structure of what would become known as the "Glock Group" was the brainchild of Glock Sr. and a Luxembourger, Defendant Charles Ewert ("Ewert").

130.   Ewert was a purveyor of shell companies and corporate domiciliary services, through his own entities, International Trustee Services and Corporate Development Services.  He was nicknamed "Panama Charly," for his use of entities incorporated in that jurisdiction.  Glock, Inc. employees instead referred to Ewert as the "Duke," for his haughty personal demeanor and British accent.

131.   Glock Sr. and Ewert first met in 1986.  Together, they developed a comprehensive plan for structuring and operating the so-called "Glock Group" in such a way that Glock Sr. and his associates would be able to systematically appropriate virtually all of the income and assets of the Company for themselves. The Glock Group was created to and continues to operate as Glock Sr.'s alter ego.

132.   The structure devised by Glock Sr. and Ewert was complex, and had several salient features intended to facilitate their scheme.[9]

133.   Defendants carried out a methodical, deliberate pattern and practice of conducting sham transactions over a period of decades.

134.   Proceeds of Defendants' scheme, generated through sham transactions among the various entities associated with the "Glock Group," were treated as the personal funds of Glock Sr. and his associates.

135.   Defendants fraudulently concealed information from Plaintiff that would have allowed her to discover the injuries inflicted by Defendants' racketeering.  Plaintiff could not have discovered this information, despite her exercise of reasonable diligence.

136.   The first feature was that Ewert would act as the public face of a Luxembourgish entity named Unipatent Holding S.A. ("Unipatent") — falsely portrayed by Glock Sr. as an arm's-length partner of Glock Ges.m.b.H, which had supposedly helped the Company to distribute its products internationally.

137.   Ewert, through Unipatent, would behave as an essentially fictional co-owner of 50% of each of the Company's operating entities outside of Austria.

---

[9]   An organizational chart illustrating this structure as of 2011 is attached hereto as Exhibit A.  It does not include every member of the so-called "Glock Group" or of the Enterprise described in this Complaint.

These operating entities included not only Glock, Inc. (distribution for North America), but also Glock Hong Kong, Glock America, and Glock France (distribution for Asia, South America, and France, respectively).

138.    The second feature was a system of "royalty" payments to be made by Glock, Inc. for use of the "Glock" name and logo.  Although any legitimate payments should have been made to Glock Ges.m.b.H. (which held, at a minimum, a trademark for the logo), they were actually used as a means to funnel money directly to Glock Sr.

139.    By way of illustration, the initial agreement concerning royalty payments was dated as of December 1985 and signed by Glock Sr. (on behalf of Glock Ges.m.b.H.) and his associate Walter (on behalf of Glock, Inc.).  On information and belief, Glock Sr. has directly received and continues to directly receive — to this day — improper royalty payments, despite the fact that he has never owned a trademark for either the Glock name or logo.

140.    On information and belief, Defendants used money transferred from Glock, Inc. to Glock Ges.m.b.H. — which they had stolen for the purpose of injuring Ms. Glock — to fund at least some of the royalty payments that Glock Ges.m.b.H. made to Glock Sr.

141.    The third feature of the scheme was that Ewert would form and operate three offshore "billing companies," whose sole purpose was to issue fake

33

invoices to the operating entities of the so-called "Glock Group."  These billing companies included:

      a.    Base Technical Engineers Limited ("Base Technical"), incorporated in Ireland, which issued fake invoices to Glock Ges.m.b.H.;

      b.    Minami Enterprises Limited ("Minami"), incorporated in Liberia, which issued fake invoices to Glock Hong Kong; and

      c.    Taziria A.V.V. ("Taziria"), incorporated in Aruba, which issued fake invoices to Glock America.

142.    The fourth feature was that Ewert would act as the face of real estate holding companies, also owned by Unipatent, whose purpose was to "own" the real property and equipment of "Glock Group" companies, and to collect fraudulent "rents" from operating Glock Group companies.  These real estate holding companies included Consultinvest, Inc. ("Consultinvest"), incorporated in Georgia, and Compagnie d'Investissement et de Financement Immobilier S.a.r.l. ("CIFI"), incorporated in France.

143.    Glock Sr. and his associates incorporated Consultinvest solely for the purpose of collecting rents from Glock, Inc.  In just one example of their disregard of the corporate form of the entities within the so-called "Glock Group," U.S.-based counsel for Glock Sr. recently privately emphasized that

34

"[a]nything that takes value from Consultinvest also takes value from

Mr. Glock."

144.    Ultimately, 100% of the ownership of Consultinvest would be

brought back under Glock Sr. through his ownership of Defendant CON

Holding, Ges.m.b.H.

145.    The fifth feature was that Ewert would form and operate sham

finance companies, whose purpose was to document phony loans to the real

estate holding companies — such as Consultinvest — and to issue fake invoices

to them for purported interest on those loans.  These sham finance companies

included Warwick International Ltd. ("Warwick") and United European Finance

Corp. ("UEF"), both incorporated in Ireland.

146.    Contrary to public appearances, and indeed sworn deposition

testimony, Glock Sr. stood behind and personally participated in the activities of

each of the foregoing entities.  Glock Sr. owned 100% of Unipatent through a

Panamanian entity, Reofin International S.A. ("Reofin").[10]

---

[10]    Glock Sr. gave deposition testimony in a case against Glock, Inc. and Glock
Ges.m.b.H. in South Carolina state court that he did not know who owned
Unipatent, that Ewert was its principal, and that he did not derive any
income from the company.

*Kimbrell v. Glock, Inc.*, Case No. 96-C-42-1946 (Ct. Common Pleas,
Spartanburg Cnty., S.C.), Mar. 2, 1998 Glock Sr. dep. at 69, 71.  John F.
Renzulli, Esq. represented defendants Glock, Inc. and Glock G(es.)m.b.H.

147.     Through a series of foreign entities, including Reofin and Unipatent, Glock Sr. owned 100% of the real estate holding companies Consultinvest and CIFI, and 100% of the "other half" of the Glock operating subsidiaries Glock, Inc., Glock Hong Kong, Glock France, and Glock America.  Either through Reofin, or directly, Glock Sr. also owned 100% of the three offshore "billing companies" — Base Technical, Minami, and Taziria.

148.     Reofin was intended to function as the collection point for Glock Sr., for all of the income and assets that Defendants siphoned or diverted away from Ms. Glock.  Ewert did not receive formal compensation for his role in the scheme, but was instead expected to take his cut directly from the entities and bank accounts that he administered.

149.     Ms. Glock had no knowledge of this complex structure, and no indication that Glock Sr., together with his associates Ewert and Manown, were using shell companies, fake invoices, and fraudulent rents to steal from her.

150.     Glock Sr. deflected any questions from Ms. Glock by demanding her trust.  His standard response in these situations was either "I strongly hope you will trust me, won't you!" or "Trust me, it's all for the family."

151.     Glock Sr. falsely told Ms. Glock that profits from the ongoing success of Glock, Inc. would be used for expanding the Company's worldwide

sales offices.  Instead, Glock Sr. appropriated the benefits of the Company's

financial success for himself and his associates.

### H.   The Falling Out Between Glock Sr. and Ewert

152.   Defendants' scheme to siphon, divert, and hide monies and assets

away from the view and reach of Ms. Glock proceeded without any significant

disruption until the summer of 1999.

153.   For reasons that are not entirely clear, relations had deteriorated

between Glock Sr. and Ewert.  They scheduled a July meeting in Luxembourg to

discuss matters face-to-face.

154.   Upon his arrival for the meeting, Glock Sr. was attacked by an

individual later identified as Jacques Pecheur.  Ewert, who was with Glock Sr. at

the time, turned and ran the other way.

155.   Although Glock Sr. was injured by the attacker, he survived.  The

meeting with Ewert never took place.

156.   Instead, Glock Sr. and Ewert immediately commenced a struggle for

control of the "Glock Group," including Unipatent, Consultinvest, and their

respective bank accounts.

157.   Glock Sr. won that struggle.  Alleging that Ewert was an embezzler

who had stolen more than $100 million, and that Ewert had tried to

surreptitiously take control of the Glock Group through fraudulent corporate

acts, Glock Sr. was successful in reasserting personal control over the disputed entities and bank accounts.

158.    Through vigorous legal action and self-help by Glock Sr. and his attorneys, Ewert was eventually ousted from all of his offices and ownership stakes in the various entities of the greater Glock Group.

159.    Ewert and Pecheur would later be prosecuted and convicted for the attempted murder of Glock Sr.

160.    In pursuing Ewert through the Courts, however, Glock Sr. had to disavow the fictive legal relationships *that he and Ewert had previously put in place together* for the purpose of making business and financial transactions in which the so-called "Glock Group" had engaged appear legitimate.

161.    The testimonial declarations that Glock Sr. provided to the courts in Luxembourg, in order to "get Ewert," revealed the essence of the fraudulent scheme in which Glock Sr., Ewert, and their associates had all been involved.

162.    Contrary to Glock Sr.'s previous portrayal of Ewert (and Unipatent) as an arm's-length partner for Glock Ges.m.b.H., Glock Sr. now claimed that Ewert's sole role was to help him remove monies from the operating companies of the Glock Group.

163.    According to Glock Sr., the "Glock Group" had never needed outside capital or assistance in expanding to markets beyond Austria.  Moreover,

38

Ewert lacked any relevant knowledge or experience in the firearms industry. All of the legal relationships and corporate structures were simply a *legal construct* for Glock Sr.'s removal of money from the Company.

164.    In other words, whatever money that Ewert may have "stolen" from Glock Sr. — allegedly $100 million — was all derivative of Glock Sr.'s own thefts from the Company.

165.    When Glock Sr. and Unipatent had Ewert prosecuted in Luxembourg for forgery and embezzlement, Ewert defended himself by claiming, among other things, that he had always acted with Glock Sr.'s consent.

166.    Despite this defense, the Luxembourg courts did not permit Ewert to confront or cross-examine his accuser, Glock Sr. Ewert was, in due course, convicted of forgery, and assessed a modest monetary fine.[11]

167.    Following Ewert's departure and imprisonment, other associates of Glock Sr. simply picked up where Ewert had left off. Johann Quendler ("Quendler") — Glock Sr.'s personal attorney and President of Glock, Inc. from 2002 through 2008, took over Ewert's previous role in the scheme by continuing the issuance of fake invoices from the "billing companies."

---

[11]    The Luxembourgish court, however, found only that Ewert had appropriated less than €5 million from the "Glock Group."

168.   Likewise, when Hubert Willam left his position as the controller of the "Glock Group," his successor, Stephan Doerler ("Doerler") continued the direction of Defendants' fraudulent billing from Austria.

169.   Defendant Jöerg-Andreas Lohr ("Lohr") and his firm, Lohr+Company GmbH ("Lohr & Co."), have played an active role in Defendants' scheme since at least 1999.

170.   It was Lohr who spearheaded the restructuring of the Glock Group, and creation of *Privatstiftung*, following Glock Sr.'s falling out with Ewert.

171.   Lohr and his firm also took over some of the roles that had previously been performed by Defendants Ewert and Manown.

172.   As a result of Defendants' scheme, Glock Sr. controls 99% of Glock Ges.m.b.H. through the Glock Foundation.  Assets unrelated to the Company are purportedly held in the Value Foundation, which was established on or about June 22, 2007.  After moving the proceeds of their thefts from Glock, Inc. around the world through multiple series of wire transfers into and out of members of the "Glock Group," on information and belief, Defendants began centralizing the funds into the Glock Foundation and the Value Foundation.  This placed the illicit monies more directly under Glock Sr.'s control and was directly targeted to injure Ms. Glock and place the funds beyond her reach.

173.    Despite Glock Sr.'s assertions that the foundations were being created for the benefit of the family, Ms. Glock and the Glocks' children are expressly prohibited from being beneficiaries of the Glock Foundation from 2011 or later.

## V.    THE MECHANICS OF DEFENDANTS' SCHEME TO STEAL FROM PLAINTIFF HELGA GLOCK

174.    Defendants' scheme was administered by Glock Sr., Ewert, Manown, and other Defendants over the course of multiple decades.

175.    As part of this scheme, Defendants formed various corporations (or purchased shell corporations) across several continents that served as the alter ego of Glock Sr.  Defendants disregarded the corporate form and corporate formalities of those entities throughout the course of their scheme.  The Court should pierce the corporate veil of Defendants Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock America, and Glock Hong Kong.

176.    Defendants plundered hundreds of millions of dollars from Glock, Inc. by stealing funds from Glock, Inc. and fraudulently transferring them to entities exclusively owned or controlled by Glock Sr.  The illegal transfers of funds — which often purported to be for services or products — were, in fact, shams.  Defendants' theft of funds from Glock, Inc. and transfers of those funds

were perpetrated with the sole goal of depriving Ms. Glock of her interests in those funds — interests to which she was rightfully entitled.

177.    When Glock, Inc. was created in November 1985, it was wholly-owned by Glock Ges.m.b.H.  Glock Sr. made the decision to form Glock, Inc.

178.    At all relevant times, Glock Sr. was the managing director of Glock Ges.m.b.H.

179.    Ms. Glock has been an owner of Glock Ges.m.b.H. since its inception.  Prior to Glock Sr.'s transfer to the Glock Foundation of his interest — and his deceiving Ms. Glock into transferring her own interest — in Glock Ges.m.b.H., there had never been any owner in Glock Ges.m.b.H. other than Glock Sr. and Ms. Glock.

180.    As an owner of Glock Ges.m.b.H., Ms. Glock was and is entitled to benefit from any distributions made to Glock Ges.m.b.H. by the entities that it owned and owns, including Glock, Inc.  Further, the overall value of Glock Ges.m.b.H. was largely predicated on the value of the entities it owned and controlled.

181.    From its creation until mid-1999, Ms. Glock owned 15% of Glock Ges.m.b.H. outright.  During the period from the Fall of 1999 through the Spring of 2000, Ms. Glock was pressured by Glock Sr. and his associates to move all of

her shares of Glock Ges.m.b.H. into what became the Glock Foundation.  That foundation was purportedly established for the benefit of Glock Sr., Ms. Glock, and their children.

182.   Ms. Glock ultimately agreed to move certain of her shares of Glock Ges.m.b.H. to the Foundations because she trusted her then-husband of 37 years. After placing a portion of her Glock Ges.m.b.H. shares in the Glock Foundation, Ms. Glock continued to hold a 1% interest in Glock Ges.m.b.H. outright.

183.   Glock Sr. directed all of the business activities of Glock, Inc. and of the entities comprising the "Glock Group."  They function as his alter ego.  Glock Ges.m.b.H. has been at the "top" of the Glock Group since that company was created on or about January 9, 1981.

184.   Unbeknownst to Ms. Glock, however, Glock Sr. set about creating various companies throughout the world that would fall under the "Glock Group" umbrella, in which Glock Ges.m.b.H. would have no ownership interest at all or only a partial ownership interest—despite Glock Ges.m.b.H.'s position at the "top" of the Glock Group.  The portion of the ownership interests not owned by Glock Ges.m.b.H. were held in entities owned and controlled by Glock Sr.  In this manner, Glock Sr. purposefully and improperly reduced the value of assets held by Glock Ges.m.b.H., the value of Glock Ges.m.b.H., and Ms. Glock's ownership interests in Glock Ges.m.b.H. and Glock, Inc.

A.    **Glock Sr.'s Theft of 50% of Glock, Inc. from His Partnership with Ms. Glock**

185.    In February 1987, Glock Sr. purchased Reofin, which was an already extant shell company, from Ewert's International Trustee Services.  Shortly thereafter, in March 1987, Reofin itself acquired Unipatent, another existing shell company, also from International Trustee Services.

186.    It was important to Glock Sr. that these shell companies had already been in existence prior to the formation of Glock, Inc.  That way, Manown could backdate the corporate records for Glock, Inc., to create the appearance that the whole structure had been in place *ab initio*.

187.    Glock Sr. owned 100% of the shares of Reofin.  Accordingly, Glock Sr. controlled and indirectly owned 100% of Unipatent.

188.    Shortly after it was incorporated, Glock Sr. ordered that shares of Glock, Inc. be fraudulently transferred to Unipatent.  The documents giving shares to Unipatent were backdated to January 1986 — more than a year before Glock Sr. acquired either Reofin or Unipatent.

189.    Glock Sr.'s directive that Glock, Inc. shares be given to Unipatent had the effect of reducing Glock Ges.m.b.H.'s ownership of Glock, Inc. from 100% to 50%.  This, in turn, reduced the value of Ms. Glock's interest in Glock Ges.m.b.H. and the value of her indirect interest in Glock, Inc.

190.    Unipatent purportedly paid $75,000 for its shares of Glock, Inc., an absurdly low amount to obtain a near-controlling interest in Glock, Inc.  On information and belief, Unipatent never actually paid the purchase price for its shares of Glock, Inc.  Rather, the shares were simply transferred from Glock Ges.m.b.H. to Unipatent.

191.    Ms. Glock did not know or have any reason to suspect that Glock Sr. had stolen 50% of Glock Ges.m.b.H.'s ownership of Glock, Inc. until her divorce proceedings from Glock Sr. in 2011.

192.    Glock Sr.'s direction that Unipatent be provided with a 50% ownership interest in Glock, Inc. was made for the sole purpose of harming Ms. Glock.

193.    The value that was taken from Ms. Glock went directly into the pockets of Glock Sr.  Because Glock Sr. owned and controlled Unipatent (by which he deprived Glock Ges.m.b.H. of 50% of its ownership interest in Glock, Inc.), benefits that should have been realized by Ms. Glock were instead hoarded by Glock Sr.

194.    When Glock, Inc. was originally incorporated it was 100% owned by Glock Ges.m.b.H.  Ms. Glock owned 15% of Glock Ges.m.b.H. and Glock Sr. owned 85%.

45

195.    By 2011, Glock Ges.m.b.H. was 98% owned by the Glock Foundation and Glock Ges.m.b.H. only owned 50% of Glock, Inc.[12]  Unipatent's ownership of 50% of Glock, Inc. had passed through Multipatent to Rochus.  Rochus is 100% owned by INC Holding Ges.m.b.H. ("INC Holding").  Glock Sr. is the *Geschäftsführer* of INC Holding.  INC Holding is 100% owned by the Glock Foundation.[13]

196.    Because of Defendants' racketeering scheme, instead of having a 15% interest in 100% of Glock, Inc., Ms. Glock now has a 1% interest in 50% of Glock, Inc. (through her 1% ownership of Glock Ges.m.b.H.).  The remainder of Glock, Inc. and Glock Ges.m.b.H. are controlled by Glock Sr. through the Glock Foundation — a foundation he supposedly established for the benefit of Ms. Glock and the Glock children.

---

[12]    On information and belief, in 2011, Glock Sr. continued to own 1% of Glock Ges.m.b.H. directly and later transferred that remaining 1% into the Glock Foundation, which he controls for his sole benefit.

[13]    *See* organizational chart attached hereto as Exhibit B, which depicts the ownership structure of certain entities in the "Glock Group" as of 2011, which was supplied by Defendant Stephan Doerler, controller of Glock Ges.m.b.H.

**B.     Fraudulent Royalty Payments Siphoned and Diverted from Glock, Inc. into Glock Sr.'s Pockets.**

197.    Over the life of Glock, Inc., Defendants siphoned off and diverted profits from Glock, Inc. through the use of sham "royalty" or "licensing" payments made by Glock Ges.m.b.H. and Glock, Inc.

198.    Glock Sr. and Defendants have taken in excess of €122 million from Glock Ges.m.b.H. and Glock, Inc. through improper "royalty" or "licensing" payments.[14]  On information and belief, at least a portion of the payments made by Glock Ges.m.b.H. used funds from Glock, Inc. that Defendants stole for the purpose of injuring Ms. Glock.

**1.     Sham Licensing Fees Purportedly Owed to Glock Ges.m.b.H.**

199.    Glock Ges.m.b.H. applied for a trademark for the "Glock" logo in Austria in or about December 22, 1983 and registered the mark on or about May 8, 1984; it registered the mark in the United States on or about February 4, 1986.[15]

200.    While Glock Ges.m.b.H. held trademarks in Austria and the United States for the "Glock" logo, neither it nor Glock, Inc. held a trademark for the

---

[14]   This figure is an estimate based on conversion from Austrian schillings at a rate of 0.07267 (the fixed conversion rate since December 31, 1998, when the schilling was replaced by the Euro as the official currency of Austria).

[15]   *Glock, Inc. v. Wu*, 1:14-CV-568-AT (N.D. Ga.), ECF No. 1-14.

name "Glock" in the United States until Glock, Inc. registered the name on or about June 9, 1992.  Glock Ges.m.b.H. registered the name "Glock" as a trademark in Austria on or about March 13, 2008.[16]

201.    On information and belief, Glock Sr. has never held a trademark in the United States or Austria for the "Glock" name or logo.  Accordingly, he was not entitled to royalty or licensing payments from Glock, Inc. or Glock Ges.m.b.H. for any such trademarks.

202.    The Trademark Agreement entered into by Glock Ges.m.b.H. and Glock, Inc. dated December 1, 1985 was signed by Glock Sr., on behalf of Glock Ges.m.b.H., and by his associate Walter, as Vice President of Glock, Inc.

203.    Under the Trademark Agreement, Glock, Inc. agreed to pay royalties to Glock Ges.m.b.H. for use of the "Glock" logo, in connection with its sale of pistols and accessories.  Glock, Inc. was to pay 3% of the "total invoice price" for all merchandise it purchased from Glock Ges.m.b.H. for sale in North America.

204.    Royalties due under the Trademark Agreement were billed annually.  The Trademark Agreement was to remain in effect as long as the oral sales agreement between Glock, Inc. and Glock Ges.m.b.H. was in place.

---

[16] *Glock, Inc. v. Wu*, 1:14-CV-568-AT (N.D. Ga.), ECF No. 1-14.

205.    The price that Glock, Inc. paid Glock Ges.m.b.H. for the products it purchased was determined by Glock Ges.m.b.H. and was set in Austrian shillings.  Moreover, the exchange rate to be paid by Glock, Inc. was also set by Glock Ges.m.b.H. on a semi-regular basis.

206.    Under a separate agreement between Glock Ges.m.b.H. and Unipatent dated March 28, 1991, Glock Ges.m.b.H. temporarily relinquished its right to collect royalties from Glock, Inc. for use of the "Glock" logo *and name* — despite the fact that Glock Ges.m.b.H. did not have a trademark for the "Glock" name.

207.    In trademark litigation currently pending in this Court, Glock, Inc. has asserted that *it* obtained the registration of the trademark Glock logo in February 1986 (rather than Glock Ges.m.b.H.).  The registration applies to hand-held weapons, ammunition, bullets, explosives, and hand-grenades, among other things.[17]  Were Glock, Inc.'s assertion correct, it would have been required to make payments to Glock Ges.m.b.H. under the Trademark Agreement for a trademark that Glock, Inc. itself owned.

208.    In any event, the payments Glock, Inc. made under the Trademark Agreement were not even actually paid to Glock Ges.m.b.H.  At least some of

---

[17] *Glock, Inc. v. Wu*, 1:14-CV-568-AT (N.D. Ga.), ECF Nos. 1, 1-12, 1-13, 1-14 (Compl. ¶ 37 & Exs. D1-D3).

those payments were transferred into an account at Summit National Bank in Atlanta, Georgia ("Summit Bank") held by Eaglesmith Partners, Inc. ("Eaglesmith"). The funds were then transferred directly into Glock Sr.'s bank account in Austria.

209.    Glock Sr. and Manown also used Eaglesmith as a destination for millions of dollars stolen directly from Glock, Inc., under the guise of these "royalty" payments.

210.    These purported royalty payments were fraudulent on multiple levels. Not only was there no valid basis for Glock Sr. to charge a company named Glock, Inc. for using the name Glock to distribute a product called a Glock, but the supposed contractual right to receive such a payment had already been documented in the Master Agreements as belonging to Glock Ges.m.b.H.

211.    Moreover, Glock Ges.m.b.H. did not hold a trademark for the name "Glock" either in the United States or in Austria until 2008. There was no basis in the Master Agreements for Glock, Inc. to pay anything for use of the name "Glock."

212.    But details like that seldom stopped Glock Sr. from doing what he wanted, however, because he treated everything — all of the assets of all of the entities — as his own personal property. Glock Sr. simply appropriated the

monies to himself, and for his own purposes, to the detriment of his wife and business partner, Ms. Glock.

## 2.    Sham Licensing Fees Owed by Glock Ges.m.b.H.

213.    In addition to the improper Trademark Agreement between Glock, Inc. and Glock Ges.m.b.H. (and royalty payments thereunder), on information and belief, Defendants implemented a fraudulent royalty/licensing agreement among Glock Ges.m.b.H., Unipatent, and Base Technical in an attempt to cover up improper transfers of funds — to which both Ms. Glock and Glock Sr. were ostensibly entitled — into the sole possession and control of Glock Sr.

214.    Under the terms of the Master Agreement effective November 1, 1985 among Glock Ges.m.b.H., Unipatent, and Base Technical,[18] Glock Ges.m.b.H. agreed to pay Base Technical, on a quarterly basis, 12% of the net wholesale price of all products sold by Glock Ges.m.b.H. to certain customers.  In April 1986, that amount was increased to 21.5% for the first three years of the agreement; 16% for the following seven years; and 10% for the remainder of the term of the Master Agreement.

---

[18]    Unipatent, however, did not become part of the "Glock Group" until at least 1986.   Base Technical was not incorporated until 1991.   Accordingly, it appears that the Master Agreement was backdated in order to "paper" the improper transfer of funds from Glock, Inc. into Glock Sr.'s control.

215.    Glock Ges.m.b.H. also granted Unipatent and Base Technical the right to use its trade name and logos.

216.    There was, however, no basis for Glock Ges.m.b.H. to enter into any agreement to pay Base Technical (a "billing" company set up by Defendants) a percentage of its net sales.  On information and belief, these payments were in fact improper royalties or licensing fees.

217.    In exchange for the payments owed by Glock Ges.m.b.H. under the Master Agreement, Unipatent and Base Technical were, among other things, to "sound the markets" for Glock products and "open channels of information and distribution."  These purported "services" were, however, wholly unnecessary and were never performed.

218.    Unipatent and Base Technical were, of course, under the direction and control of Glock Sr. and his associates.  The Master Agreement was signed by Glock Sr., on behalf of Glock Ges.m.b.H., and by his associate Ewert, under his general power of attorney for Unipatent.  Glock Sr.'s associate, Uwe Perz, signed on behalf of Base Technical.

219.    The Master Agreement was to continue in effect for 15 years, with Glock Ges.m.b.H. having a self-executing option to renew the contract for a five-year term.  If Glock Ges.m.b.H. opted to terminate the Master Agreement before the end of the original 15-year term, it was obligated to pay Base Technical

twice the total percentage fee due under the prior four quarters of the contract combined.

220. No services envisioned by the Master Agreement were ever provided to Glock Ges.m.b.H. by Base Technical.

221. On information and belief, Glock Ges.m.b.H. obtained from Glock, Inc. the funds that were paid out to Base Technical under the Master Agreement.

## C. Defendants' Use of the Billing Companies to Siphon and Divert Misappropriated Funds into Glock Sr.'s Coffers.

222. As part of their racketeering scheme, Defendants set up a multistage, fraudulent billing program that artificially reduced the stated profits of Glock, Inc., and diverted these monies to Glock Sr. and his associates. The billing program was designed to siphon off and divert funds from Glock, Inc. — which was the "cash cow" of Glock Sr.'s empire.

223. Glock, Inc. was charged excessively for phantom shipments of weapons from Glock H.K. Limited ("Glock Hong Kong") and Glock America N.V. ("Glock America"). Glock, Inc. would then wire funds to Glock Hong Kong and Glock America to pay for the phantom shipments. Glock Hong Kong and Glock America turned around and repatriated to Austria portions of the payments from Glock, Inc. by wiring funds to Glock Ges.m.b.H. But a significant amount of the funds that temporarily remained at Glock Hong Kong and Glock

America were ultimately wired to billing companies that charged for fraudulent "consulting" services.  The creation of the billing companies was the brain-child of Glock Sr., and they were ultimately owned and controlled by him.

224.    The billing program involved multiple companies; wire transfers across numerous countries and continents; drop shipments of weapons; and funds rightfully belonging to Glock, Inc. filling the coffers of entities exclusively owned and controlled by Glock Sr.

225.    At all relevant times, Glock Sr. was aware of and directed the fraudulent billing program.

226.    Defendants carried out this plan to steal money that had been earned by Glock, Inc. and to mask it as the original source of the funds.  Their purpose was to deprive Ms. Glock of her ownership interests in Glock Ges.m.b.H. and her indirect interest in Glock, Inc.

227.    Ms. Glock was deprived of the value of her ownership interests, her interests in the overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that should have been paid but for Defendants' scheme.  This value went directly into Glock Sr.'s pockets since he solely owned and controlled the entities into which the funds from the schemes were ultimately transferred.

228.   Ms. Glock was entirely unaware of the schemes used to siphon

profits from Glock, Inc. and the processes used to mask Glock, Inc. as the source

of the funds.

**1.     Overview of Defendants' Shell Game Using Billing
Companies and the So-Called Glock Group's Operating
Entities**

229.   The pretext for the billing program was a set of backdated "Master

Agreements," establishing the terms upon which Glock Ges.m.b.H. and its

foreign operating subsidiaries — Glock, Inc., Glock Hong Kong, and Glock

America — would conduct business with each other.

230.   The Master Agreements contained false recitals for purported

business arrangements that were not themselves real, in order to create a

pretended appearance of arm's-length dealings between independent parties.

231.   In reality, Glock Sr. and his associates stood on both sides of each

and every contractual relationship set forth in the Master Agreements.  The only

purpose for these relationships was to siphon or divert monies away from

Glock, Inc., Glock Ges.m.b.H., to directly harm Ms. Glock.

232.   From its inception until approximately 2009, Glock, Inc.'s primary

source of income was the assembly of the component parts of Glock pistols.

Those component parts were manufactured in Austria by Glock Ges.m.b.H. and shipped to Glock, Inc. in Georgia.[19]

233.    Under the first step in the billing program, Glock Ges.m.b.H. agreed to provide each of its foreign operating subsidiaries – Glock, Inc., Glock Hong Kong, and Glock America – with the contractual right to purchase and distribute one-third of its Glock pistol production.  However, in the event that Glock Hong Kong or Glock America were somehow not able to "effectively absorb[ ]" their allocated production, then Glock Ges.m.b.H. would *itself* supply these products to the U.S. market, "for and on behalf of" the other foreign subsidiaries.

234.    This purported contractual arrangement was entirely farcical, however, because the Company's primary market — and overwhelming demand — was always in the United States.  Glock, Inc. accounted for approximately 90% or more of all sales of pistols manufactured by Glock Ges.m.b.H.  Glock, Inc. would always — by design — exceed its allocation from Glock Ges.m.b.H. under the Master Agreements.  Moreover, neither Glock Hong Kong nor Glock America were ever in a position to use the entirety of their allocations.

---

[19]    Starting in about 2009, Glock, Inc. began to manufacture the frames necessary to construct Glock pistols, as well as completing assembly in Georgia.  In approximately 2011, Glock, Inc. began manufacturing all of the parts necessary to construct the pistols.

235.    Nor was there any legitimate reason for Glock Ges.m.b.H. to have "negotiated" such an arrangement with its own foreign operating subsidiaries. The actual reason for this highly unusual arrangement was to siphon money away from Glock, Inc., the Company's cash cow.

236.    Glock Ges.m.b.H. charged Glock, Inc. a materially higher price for pistols than it charged to either Glock Hong Kong or Glock America.  It charged this higher price despite the fact that the pistols shipped by Glock Ges.m.b.H. to Glock, Inc. required assembly by Glock, Inc. in the United States, whereas pistols shipped by Glock Ges.m.b.H. to Glock Hong Kong and Glock America arrived pre-assembled.

237.    Glock Ges.m.b.H. sold component parts to Glock, Inc. (with the pistols to be assembled at Glock, Inc.'s facilities in Smyrna).  Glock Ges.m.b.H. would sell the parts; ship the parts; and send an invoice for approximately $200 or $224 per SKU number to Glock, Inc.

238.    Glock Ges.m.b.H. purportedly sold *assembled* pistols to Glock Hong Kong and Glock America; shipped the pistols; and invoiced Glock Hong Kong and Glock America approximately $180 or $198 per pistol.

239.    Thus, even on paper, Glock, Inc. was being excessively charged for the products it received from Ges.m.b.H. — paying $20 more for an unassembled

weapon than Glock Hong Kong and Glock America were charged for fully-assembled product.

240.    The effect of this differential pricing was to increase costs to Glock, Inc., and to correspondingly decrease its profit.

241.    But another more subtle effect of this differential pricing scheme occurred when Glock Ges.m.b.H. undertook to supply pistols to Glock, Inc. *on behalf of Glock Hong Kong and Glock America.*

242.    The physical movement of guns sold to Glock, Inc. on behalf of the other foreign subsidiaries was exactly the same as that of guns sold to Glock, Inc. out of its "own" designated allocation.  Unassembled guns were shipped directly from Glock Ges.m.b.H. in Austria to Glock, Inc. in Smyrna, Georgia.

243.    Significantly, though, the movement of money was different.  Although the guns still came directly from Austria, and never passed through the hands of the other foreign subsidiaries, it was *Glock Hong Kong and Glock Americas* that billed Glock, Inc. for the shipments.

244.    Glock, Inc. paid the same higher price to Glock Hong Kong and to Glock America that it ordinarily paid to Glock Ges.m.b.H.  Glock Hong Kong and Glock America, however, paid a lower price back to Glock Ges.m.b.H.

245.     The difference between the price paid by Glock, Inc. to Glock Hong Kong or to Glock America, and the price paid by those entities to Glock

Ges.m.b.H. — typically somewhere between 8-12% — was then accumulated in whichever other foreign subsidiary was involved.

246.    In essence, Glock Sr. and his associates simply papered these transactions so as to run the money through Glock Hong Kong and Glock America.  The paperwork generated for this purpose by Glock Sr., by Ewert, and by Hubert Willam, the controller of Glock Ges.m.b.H., had no relationship with physical or business reality of the transactions.

247.    The purpose was to drain the 8-12% difference in purchase price away from Glock, Inc., and ultimately Glock Ges.m.b.H., by skimming those monies into other foreign subsidiaries.

248.    Glock Sr. and his associates then used the other two "billing companies," Minami and Taziria, to remove these proceeds from Glock Hong Kong and Glock America, respectively, and to appropriate them for their own purposes.

249.    In the years that followed, Glock Sr. and his associates caused Minami to bill, and Glock Hong Kong to pay, at least $19.79 million for fake invoices.  These monies, which originated with Glock, Inc., were then forwarded to Reofin, the principal collection point for monies stolen from the Company by Glock Sr. and his associates.

250.     Over the same time period, Glock Sr. and his associates also caused Taziria to bill, and Glock America to pay, at least $20.5 million for fake invoices. These monies, which also originated with Glock, Inc., were also forwarded to Reofin.

251.     Neither Minami nor Taziria ever had any employees, or provided any services whatsoever, to Glock Hong Kong or Glock America.  Their sole purpose was to facilitate Defendants' thefts from Glock, Inc., Glock Ges.m.b.H., to target and directly harm Ms. Glock.

252.     Ms. Glock had no knowledge of these thefts, and no ownership interest in Reofin or any of the entities which received the proceeds of Defendants' thefts.  She trusted her husband, who chose to conceal these activities from her.

**2.      Phantom Shipments from and Wire Transfers through Glock Hong Kong**

**(i)      Glock Hong Kong:  Glock Sr.'s Control**

253.     Glock Hong Kong is a corporation formed in 1986 under the laws of Hong Kong.  Glock Sr. made the decision to establish Glock Hong Kong. Although the company was owned by Unipatent and Glock Ges.m.b.H., it was directly controlled solely by Glock Sr.

254.     Ultimately, Unipatent's interest in Glock Hong Kong was transferred directly to Glock Sr. in September 1999.

255.     Glock Sr. was (and, on information and belief, may still be) a director of Glock Hong Kong.  He is deeply involved in "papering" the company's activities and directing the flow of money through Glock Hong Kong's accounts, going so far as to manage the transfer of the company's banking functions from one bank to another.

256.     Glock Hong Kong, however, lacked any real infrastructure.

**(ii)     Glock Hong Kong's Role as Middle-Man**

257.     Because demand in the market to which Glock, Inc. sold was so much greater than in Glock Hong Kong's market, Glock Hong Kong purportedly "sold" its excess, assembled pistols to Glock, Inc. (the "HK Excess"). While Glock Ges.m.b.H. only charged Glock Hong Kong approximately $180 for each assembled pistol, Glock Ges.m.b.H. invoiced Glock, Inc. approximately $200 per pistol.

258.     Glock Hong Kong invoiced Glock, Inc. approximately $200 for each unassembled pistol in the HK Excess — even though the HK Excess supposedly represented inventory that Glock Hong Kong was unable to sell itself and that it had purportedly purchased completely assembled from Glock Ges.m.b.H. for approximately $180.

61

259.    In reality, Glock Ges.m.b.H. actually sold and shipped an insignificant number of assembled pistols to Glock Hong Kong.  Rather the HK Excess never passed through Hong Kong at all.  Instead, the assembled pistols were shipped *directly* from Glock Ges.m.b.H. to Glock, Inc.  This process was memorialized in an agreement between Glock Ges.m.b.H. and Unipatent, dated December 9, 1988.  Glock Sr. signed on behalf of Glock Ges.m.b.H.; Ewert signed on behalf of Unipatent.  Although the agreement was ostensibly between only Glock Ges.m.b.H. and Unipatent, Walter signed the agreement on behalf of Glock, Inc. and Georges Westwater (a Glock Hong Kong "consultant" and manager) signed on behalf of Glock Hong Kong.

260.    In contrast to the component parts Glock Ges.m.b.H. sold to Glock, Inc., Glock Ges.m.b.H. did not invoice Glock, Inc. for the HK Excess.  While the actual product was supplied to Glock, Inc. by Glock Ges.m.b.H., the invoices for the sales of the HK Excess were issued by Glock Hong Kong (the "Fraudulent HK Invoices").  Glock, Inc. then wired Glock Hong Kong approximately $200 for each pistol reflected on the Fraudulent HK Invoices (*e.g.*, for pistols that purportedly comprised part of the HK Excess and purportedly only cost Glock Hong Kong approximately $180).

261.    When Glock Hong Kong was wired funds in payment for the HK Excess, Glock, Inc. was paying approximately $20 more per pistol than what had

appeared on the invoices sent to Glock Hong Kong by Glock Ges.m.b.H.  These were, however, supposedly payments for the same pistols (pistols that, in reality, had never actually been sent to Glock Hong Kong).

262.    Within six to ten days after receiving the wire transfers from Glock, Inc. for payment of the Fraudulent HK Invoices, Glock Hong Kong would then wire those same funds to Glock Ges.m.b.H.  (As explained below, Glock Ges.m.b.H. would ultimately wire a portion of those funds to Base Technical Engineers Limited ("Base Technical"), a phony billing company exclusively owned and controlled by Glock Sr.)

263.    Glock Hong Kong did not, however, pay over all of the monies it received from Glock, Inc.  Glock Hong Kong would regularly keep in its own accounts approximately 9% to 12% (ranging from a low of 3.5% to a high of 15.2%) of the payments it received on the Fraudulent HK Invoices.

264.    There was no purpose or justification for Glock, Inc. to pay any money to Glock Hong Kong for the HK Excess:  Glock, Inc. never received any products or services from Glock Hong Kong.  The Fraudulent HK Invoices represented phantom product purportedly sent by Glock Hong Kong to Glock, Inc.  If anything, Glock, Inc. should have been invoiced by Glock Ges.m.b.H. in the amount of $180 for each assembled pistol — the amount that Glock Hong

Kong was charged for product that actually was sold and shipped to Hong Kong by Glock Ges.m.b.H.

265.    On information and belief, the funds used by Glock Hong Kong to make wire transfers to Glock Ges.m.b.H. came from payments made by Glock, Inc. on the Fraudulent HK Invoices or interest earned by Glock Hong Kong on those payments.[20]

### (iii)   Glock Hong Kong's Billing Company:  Minami Enterprises

266.    The approximate 9%-12% of funds from each Glock, Inc. wire transfer to Glock Hong Kong for the Fraudulent HK Invoices would only stay in Glock Hong Kong's bank accounts for about a week to ten days before being wired to Minami (the billing company owned and controlled by Glock Sr.) in exchange for phantom "consulting"/"marketing" services or to Unipatent for false dividend payments.

267.    In total, Glock Hong Kong wired approximately $19.79 million to Minami over a period of ten years (from August 1989 through July 1998).  All of

---

[20]   As described *infra* (paragraphs 273 through 276 and 774 through 870), the funds kept by Glock Hong Kong would not remain there for long.  Glock Sr. directed that the moneys be promptly funneled into a phony billing company, Minami Enterprises Limited ("Minami"), which Glock Sr. owned and controlled.

the funds sent to Minami by Glock Hong Kong originated with and were earned

by Glock, Inc.

268.   Despite this movement of funds, no bookkeeping was ever

performed at Minami.

269.   Minami was originally incorporated in 1989 in Liberia.  It was

owned and controlled solely by Glock Sr.  When Minami was incorporated, its

shares were issued as bearer shares.  Those shares were held by Glock Sr.

270.   Despite billing for "consulting" services, Minami provided no

services to Glock Hong Kong or to any other company or person.  Minami was a

shell that served only to line Glock Sr.'s pockets with funds that had been stolen

from Glock, Inc.

271.   After the billing schemes were detected as part of an investigation

into the actions of Ewert at the "Glock Group," Glock Sr. and Defendant

Quendler "cloned" Minami — *i.e.*, they incorporated an entity with the same

name as the Minami that had been incorporated in Liberia, transferred the

original Minami's functions and accounts to the newly-incorporated entity, and

continued the "business" of the original Minami through the new entity.  The

"cloned" Minami, however, was incorporated in the Bahamas rather than

Liberia.  Glock Hong Kong later transferred an additional $6,849,900 to a

"cloned" version of Minami during the period from December 2000 through November 2001.

272.   As with the original Minami, the "cloned" Minami provided no services or products to Glock Hong Kong.

### (iv)   Transfers from Minami to Reofin

273.   Glock Sr. himself (as a director of Glock Hong Kong) commanded Glock Hong Kong's bank to permit Westwater to make transfers from Glock Hong Kong's account to Minami's account at the Hong Kong branch of the Union Bank of Switzerland ("UBS").

274.   Minami's bank account was merely a "transit" for funds that were ultimately passed to an account held by Reofin in Luxembourg.

275.   Minami's UBS account was numbered xxx.464.  A standing order on that account directed that all funds in excess of $25,000 be automatically transferred to the Bank of New York (in New York, NY) for the benefit of account xxxx36xx at the Union de Banques Suisses (also "UBS") in Luxembourg.  UBS account xxxx36xx was owned by Reofin — which was exclusively owned and controlled by Glock Sr.

276.   As a result of the standing order on Minami's account, all of the funds wired by Glock Hong Kong to UBS for the benefit of Minami were ultimately transferred to Reofin.  Through this process, Glock Sr. effectively

commandeered funds earned by Glock, Inc. and directed them away from Ms. Glock, and into his exclusive control — obscuring Glock, Inc. as the original source in the process.

### (v) Improper "Dividend" Payments from Glock Hong Kong to Unipatent

277.   Glock Hong Kong had very little income of its own and only had access to substantial funds through payments made by Glock, Inc. on the Fraudulent HK Invoices or interest earned on those payments.  Accordingly, Glock Hong Kong had no proper source of income or basis on which to pay dividends to its nominal owners, Glock Ges.m.b.H. and Unipatent.

278.   Despite these facts, Glock Hong Kong improperly paid $2 million in dividends to Unipatent from March 1992 through August 1997.

279.   Since Glock Sr. owned and controlled Unipatent, the improper dividends from Glock Hong Kong went directly to lining his pockets to the detriment of Ms. Glock.

280.   Ms. Glock was entirely unaware of the improper dividend payments made by Glock Hong Kong to Unipatent and that the original source of the funds was Glock, Inc.  Until her divorce from Glock Sr. in 2011, Ms. Glock had no reason to suspect anything about Glock Sr.'s scheme to steal funds from Glock,

Inc., and away from her, and transfer them through a series of entities under his exclusive control.

### (vi)    Transfers from Glock Ges.m.b.H. to Base Technical

281.    A portion of the funds that originated with Glock, Inc. (which had been wired to Glock Hong Kong in payment on the Fraudulent HK Invoices) were generally transferred from Glock Hong Kong to Glock Ges.m.b.H. within a week to ten days after they were received by Glock Hong Kong.

282.    A portion of those funds were subsequently wired out of Glock Ges.m.b.H. to Base Technical, which was exclusively owned and controlled by Glock Sr.

283.    Base Technical was incorporated in Ireland on August 16, 1991. Ewert was the managing director of Base Technical at all relevant times.

284.    Glock Sr.'s ownership of Base Technical was, at certain times, held through Reofin.

285.    Ewert opened Base Technical's bank account xxx750 at Banque Leu (Luxembourg) approximately a month before the company was actually incorporated.  The account was closed in August 1996 and all funds were transferred to Banque Ferrier Lullin (Luxembourg) S.A.

286.    Glock Sr. was designated as the beneficial owner of Base Technical's account.

68

287.    Funds from Base Technical were recently transferred into the Glock Foundation and Value Foundation by or under the direction of Glock Sr. and his associates.

288.    Glock Sr. orchestrated these schemes in order to steal funds from Glock, Inc. and launder them through a series of companies to mask the origin of the funds.  Glock Sr.'s conduct and that of the Defendants deprived Ms. Glock of her ownership interests in Glock Ges.m.b.H. and her indirect interest in 50% of Glock, Inc.  The value of her ownership interests, her interests in the overall valuation of Glock Ges.m.b.H. and Glock, Inc., and the dividends to which Ms. Glock was entitled were instead put directly into Glock Sr.'s pockets since he solely owned and controlled the entities into which the funds were ultimately transferred.

289.    Glock Ges.m.b.H. improperly and illegally transferred nearly $30 million to Base Technical.[21]  The transfers were without purpose or justification.  These funds — which had originated at and been stolen from Glock, Inc. — served only to line Glock Sr.'s pockets.

---

[21]  On information and belief, this amount may have been as much as $60 million or more.

### 3.    Phantom Shipments from and Wire Transfers Through Glock America

290.    Glock America is a corporation formed in December 1989 under the laws of Curaçao (part of the Netherlands Antilles).  When Taziria was incorporated, its shares were issued as bearer shares.

291.    Glock Sr. was personally involved in the establishment of Glock America and is managing director of the company.

292.    Although Glock Ges.m.b.H. was at the "top" of the so-called "Glock Group," it owns only 50% of Glock America rather than 100%.  The remaining 50% of Glock America is owned by Unipatent.  As with Glock, Inc., this 50% ownership was transferred to Unipatent for little or no value after the initial formation of Glock America.  (Unipatent, of course, was owned and controlled by Glock Sr. to the exclusion of Ms. Glock.)

293.    Glock America lacked any real infrastructure.

### (i)    The Role of Glock America in Glock Sr.'s Billing Scheme

294.    As with the schemes involving Glock Hong Kong, Glock America Glock America purportedly "sold" its excess, assembled pistols to Glock, Inc. (the "Americas Excess").

295.    Glock Ges.m.b.H. only charged Glock America approximately $198 for each assembled pistol it supposedly "sold."  Glock America then turns

around and "sold" the Americas Excess to Glock, Inc., invoicing it approximately $224 for each unassembled pistol.

296.    In reality, Glock Ges.m.b.H. actually sold and shipped an insignificant number of assembled pistols to Glock America.  Rather pistols in the Americas Excess were shipped *directly* from Glock Ges.m.b.H. to Glock, Inc. This process was memorialized in a November 30, 1989 agreement among Glock Ges.m.b.H., Glock, Inc., Unipatent, and Glock America.

297.    Invoices from Glock Ges.m.b.H. to Glock America billed the latter approximately $198 per assembled pistol, but reflected that the pistols were drop-shipped to Glock, Inc. in Smyrna, Georgia.

298.    While the actual product was supplied to Glock, Inc. by Glock Ges.m.b.H., invoices for the sales of the Americas Excess were issued by Glock America (the "Fraudulent Americas Invoices").  Glock, Inc. then wired Glock America $224 for each pistol reflected on the Fraudulent Americas Invoices.

299.    When Glock America wired funds in payment for the Americas Excess, Glock, Inc. was paying approximately $26 more per pistol than what had appeared on the invoices sent to Glock America by Glock Ges.m.b.H.

300.    There was no purpose or justification for Glock, Inc. to pay any money to Glock America for the Americas Excess:  Glock, Inc. never received any

products or services from Glock America.  The Fraudulent Americas Invoices represented phantom product purportedly sent by Glock America to Glock, Inc.

### (ii)  Glock America's Billing Company:  Taziria Holding A.V.V.

301.    The funds that were misappropriated from Glock, Inc. and wired to Glock America were ultimately wired into Taziria Holding A.V.V. ("Taziria"), in the same fashion that funds wired into Glock Hong Kong were filtered through Minami.

302.    Taziria was incorporated in August 1989 under the laws of Aruba. Glock Sr. was personally involved in the establishment of Taziria; Taziria was owned and controlled by him.  The sole function of Taziria was as a "billing" company — *i.e.*, to issue invoices to Glock America on the orders of Glock Sr.

303.    Taziria, however, never provided any services to Glock America.

304.    The funds that flowed into Taziria came exclusively from "Glock Group" entities.  Approximately $20.5 million were wired from Glock America to Taziria's bank accounts over time.  Glock Sr. directed that all of the funds from Glock America that were wired to Taziria be transferred to Reofin — despite the fact that Reofin had no direct ownership interest in Taziria.  In this manner, money that rightfully belonged to Glock, Inc. was moved into Glock Sr.'s sole control.

305.    Despite this movement of funds, no bookkeeping was ever performed at Taziria.

306.    As a result of Defendants' machinations involving Glock America and Taziria, Ms. Glock was deprived of the value of her ownership interests in Glock Ges.m.b.H. and Glock, Inc., her interests in the overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that should have been paid but for Defendants' scheme.  This value went directly into Glock Sr.'s pockets since he solely owned and controlled Taziria.

307.    Ms. Glock was entirely unaware of these schemes and had no reason to begin to suspect anything untoward until her divorce from Glock Sr. in 2011.

**D.     Defendants Use of Consultinvest to Siphon and Divert Funds from Glock, Inc.**

308.    Defendants engaged in numerous transfers of funds from Glock, Inc. to Consultinvest, Inc. ("Consultinvest"), a Georgia corporation that was controlled by Glock Sr.

309.    Glock Sr. directed Peter Manown to create Consultinvest "on behalf of" Glock Ges.m.b.H.  Manown incorporated Consultinvest in March 1988.  At the time, Charles Ewert was Consultinvest's sole Director.  Ewert acted at the direction of Glock Sr. and all significant instructions came directly from Glock Sr.

Both Glock Sr. and Quendler later held authority over certain accounts that Consultinvest opened at Summit Bank.

310.    As with Ewert, Manown was permitted to take compensation for his role in the scheme from the entities and bank accounts that he oversaw.

311.    The stated purpose for Consultinvest was to hold the real estate and equipment of the "Glock Group" in the United States:  to "realiz[e] pecuniary gain and profit, in particular to provide financial services of any nature, receive and disburse funds, acquire, own, operate and sell real property . . . ."  Manown also participated in the purchase and financing of several properties by Consultinvest for use by Glock, Inc.

312.    Glock Sr. directed that all real property in the United States owned by the "Glock Group" be held by Consultinvest.

313.    At its inception, rather than being owned by Glock Ges.m.b.H., Consultinvest was nominally owned in its entirety by Unipatent.  Defendants funded Consultinvest with money stolen from Glock, Inc. without Ms. Glock's knowledge, awareness, or input.  Glock Sr. had thus ensured that he exclusively controlled 50% of Glock, Inc. and all of Consultinvest through Unipatent. (Glock Sr.'s ownership of Consultinvest would later be held through other entities and associates that he directly controlled.)

314.    By November 1999, Quendler owned 100% of Consultinvest in trust for the "Glock Group."  Glock Sr. directed this ownership structure.

315.    For purposes of a criminal prosecution that was being instigated by Glock, Inc., Consultinvest, and Glock Sr., one of Glock Sr.'s Washington, D.C.-based counsel, Robert T. Core, Esq. (who is also a former FBI agent), privately wrote to an assistant district attorney for Cobb County, Georgia and revealed that Consultinvest is a mere construct:

> *We may have a real problem here.  Quendler was the owner of Consultinvest at the time [of the alleged criminal conduct]. . . .  [But] Quendler's ownership of the company is really as a nominee for Mr. Glock and Mr. Glock retained beneficial ownership. . . . Consultinvest only existed in order to collect rent from Glock, Inc.   Anything that takes value from Consultinvest also takes value from Mr. Glock.*

Counsel's statement was, in fact, an argument that Consultinvest's corporate veil should be pierced.

316.    Glock, Inc.'s general counsel has described Consultinvest as Glock, Inc.'s "sister company."

317.    By 2011 (and perhaps as early as 2005), Consultinvest was 100%-owned by CON Holding, which was in turn 100%-owned directly by

Glock Sr.[22]  Accordingly, all illicit funds that were siphoned off and diverted through Consultinvest ultimately accrue to Glock Sr.'s sole, direct benefit.

318.   Despite this fact, and Glock Sr.'s involvement in the creation of Consultinvest and its activities, during a legal proceeding in Austria in April 2014, Glock Sr. claimed:

> *I do not know whether Consultinvest is owned by CON Holding.  The name CON Holding I've heard.  If I am the owner of CON Holding, I cannot say.*

319.   Consultinvest was initially funded by means of wire transfers received directly from Reofin.  These funds were used to pay for the real properties that Consultinvest acquired.  Reofin obtained the funds through Defendants' thefts from Glock, Inc. and the subsequent laundering of those funds.

320.   Because Glock Sr. owned and controlled Consultinvest, Defendants' conduct ensured that Ms. Glock would receive no ownership benefits, dividends, or value from the company.  The rent and lease payments made to Consultinvest were actually just another method Defendants used to steal from Ms. Glock.

321.   Manown, Ewert, and Glock Sr. collaborated to document a set of phony loans to and loan payments from Consultinvest.  They also documented a

---

[22]   *See* Exhibit B.

variety of fraudulent agreements between Glock, Inc. and Consultinvest,

including one particularly egregious agreement in which Glock, Inc. paid $5,000

per month for an *option* to lease property from Consultinvest in the future.  These

option payments continued for at least nine years.

322.    One purpose of these machinations was to extract money from

Glock, Inc. to Consultinvest, through excessive rent payments, and then from

Consultinvest to the phony finance companies (and Glock Sr.), through bogus

interest payments.  A second purpose was for Glock Sr. to use income of

Glock, Inc. to accumulate real assets which he alone would own.  Both were to

the benefit of Glock Sr. and to the detriment of Ms. Glock.

323.    In the early stages of the scheme, Manown was a partner at the

Atlanta law firm of Cofer, Beauchamp & Butler ("Cofer Beauchamp").  At

Ewert's request, he "funneled" payments between and among Glock, Inc.,

Consultinvest, and the sham finance companies, through his law firm's trust

account at NationsBank.

324.    Later, Manown would conduct similar activities through Eaglesmith

(a Georgia corporation), using bank accounts at Summit Bank.  Manown used his

personal relationships with bank officers at Summit Bank (where he had at one

point served on the Board of Directors) to facilitate Defendants' scheme, because

he could do so there without having to answer unwelcome questions.

Employees at Summit Bank, including Heidi Hein and Miroslava Torres-Young (who were members of the Enterprise[23]), appear to have simply looked the other way.

325.   Manown used Eaglesmith as a U.S. corporate vehicle and U.S. piggy bank of sorts for Glock Sr., particularly for activities with which Glock Sr. did not want his name directly associated.  These activities included, among other things, the payment of bribes and illegal campaign contributions.  Eaglesmith accounts were also used to transfer "royalty" or "licensing" payments from Glock, Inc. directly to an account held by Glock Sr. in Austria.  (Defendant Lohr later took over management of the Eaglesmith accounts at Summit Bank.)

326.   Eaglesmith was funded not only by money received directly from Glock, Inc., and Consultinvest, but also by money received from Reofin, the collection point for money siphoned or diverted from the Company generally.

327.   After Manown's subsequent ouster from Consultinvest, longtime counsel to the "Glock Group" in the United States, John F. Renzulli, Esq., became CEO of Consultinvest.

328.   On information and belief, Glock, Inc. made payments of $14,317 to Consultinvest on a roughly monthly basis from at least October 1990 through

---

[23]   *See* paragraph 51 *supra*.

May 1991; of $34,596.50 from September 1991 through August 1992 and February

to March 1993; and of $35,987.85 from April 1993 through September 1993 (all

deposited into Consultinvest's account numbered xxxxx237 at NationsBank).

329.    On information and belief, Glock, Inc. continues to make the

fraudulent lease payments to Consultinvest.  As of 2011, these funds were still

being diverted into Glock Sr.'s pockets.

### 1.    Fraudulent Loans from Warwick and United European Finance to Consultinvest

330.    Defendants set up a series of sham lease agreements between

Consultinvest and Glock, Inc.  The funds that were improperly taken by

Defendants from Glock, Inc. via the sham leases were subsequently transferred

out of Consultinvest by Defendants and concealed or disguised using a series of

fraudulent loans between Consultinvest, on the one hand, and Warwick or

United European Finance Ltd. ("UEF"), on the other hand.

331.    Warwick was incorporated in Ireland in October 1990.  Ewert

(Glock Sr.'s associate, and a director of Consultinvest) was one of two directors

of Warwick.  It was controlled by Glock Sr. and his associates.

332.    UEF was incorporated in Ireland in January 1992.  It was controlled

by Glock Sr. and his associates.

333.    The loans from Warwick and UEF were ostensibly to finance Consultinvest's purchase of real property located in Georgia.  In fact, Consultinvest never received any money from Warwick or UEF.  In order to purchase the real property, Consultinvest received transfers of funds from Reofin.  On information and belief, the Reofin funds originated at and were stolen from Glock, Inc.

334.    Consultinvest's leases with Glock, Inc. and its loans from Warwick and UEF were created in order to conceal or disguise the theft of funds from Glock, Inc. and the improper transfers to Warwick and UEF.

335.    Defendants caused Consultinvest to transfer funds to Warwick and UEF for the purpose of moving the funds into the control of Glock Sr. and his associates.  On information and belief, Defendant Ewert was supposed to further transfer the funds out of Warwick and UEF into an account held by Reofin.  It is unclear, however, whether Defendant Ewert followed this directive from Glock Sr. or if he simply kept (some or all of) the illicit monies for himself.

### E.    Residential Real Estate Holding Companies

336.    Monies stolen by Glock Sr. and his associates were used for, among other things, acquiring various residential real estate properties.

337.    Glock Sr. treated these properties as his own, notwithstanding the fact that someone else had paid for them, and someone else's name (Manown) was listed on the corporate paperwork with the Georgia Secretary of State.

338.    The properties were located right here in metro Atlanta.  Manown formed and operated Georgia corporations just for the special purpose of owning and administering them.

339.    For instance, Manown formed and operated Vinings Cove Holdings, Inc.  This Georgia corporation held the million-dollar-plus residence that Glock Sr. regularly occupied when he spent time in Atlanta.

340.    Manown also formed and operated (1) Blackland Holdings, Inc. and (2) Glendale Terrace, Inc.  Glock Sr. used these Georgia corporations, and Vinings Cove Holdings, and the residences which they owned, to house and entertain his metro-Atlanta-based paramours.

341.    The houses were located at 92 Blackland Court, Atlanta, Georgia; 811 Glendale Terrace, Atlanta, Georgia; and 2266 Vinings Cove, Smyrna, Georgia.

342.    It was no accident that Glock Sr. and his associates used legal entities to conduct these and other illicit activities.  Defendants routinely used legal entities in order to provide Glock Sr. with plausible deniability, and to conceal his misconduct — financial and otherwise — from Ms. Glock.

81

343.    Ms. Glock had no knowledge of the illegal, improper, and wrongful activities of Glock Sr. and Manown involving Eaglesmith or the residential real estate holding companies.  Rather Glock Sr. chose to conceal these activities from her.

## VI.    PREDICATE ACTS COMMITTED BY DEFENDANTS: TRANSPORTATION OF STOLEN GOODS (IMPROPER TRANSFERS OUT OF GLOCK, INC. BY GLOCK SR. AND HIS ASSOCIATES)

344.    Defendants engaged in numerous improper transfers of securities and funds out of Glock, Inc. over an extensive period of time in order to benefit Glock Sr. and directly target and harm Ms. Glock.

345.    Each set of transfers described in the following paragraphs (349 to 470) was a step in Defendants' scheme to steal property from Glock, Inc. and transmit or transfer the funds out of Georgia into foreign countries and into the control of Glock Sr. and his associates.

346.    The funds were stolen from Glock, Inc. through a scheme or artifice to defraud directed at Ms. Glock or through false or fraudulent representations in order to deprive Ms. Glock of the value of her ownership interests in Glock Ges.m.b.H. and Glock, Inc., her interests in the overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that otherwise would have been paid to her.

347.    Each set of transfers exceeded $5,000 in value.

348.    Each set of transfers was a violation of 18 U.S.C. § 2314, which prohibits the transportation of stolen goods and moneys.  Each set of transfers is therefore a predicate act for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

A.      **Improper Transfer of Glock, Inc. Shares and Payment of Dividends to Unipatent and Rochus**

349.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

350.    Defendants transferred 50% of the ownership interest in Glock, Inc. through foreign commerce by effectively gifting securities in Glock, Inc. to an entity entirely owned and controlled by Glock Sr.

351.    Glock Sr.'s improper direction, in January 1986, that shares of Glock, Inc. be provided to Unipatent violated 18 U.S.C. § 2314.  Glock Sr. and Manown backdated the documents giving shares to Unipatent to January 1986 — more than a year before Glock Sr. acquired Unipatent.  Glock Sr. transferred or directed the transfer of securities in Glock, Inc. to Unipatent through foreign commerce.

352.    The securities in Glock, Inc. were stolen from Glock Ges.m.b.H. or taken by fraud perpetrated on Ms. Glock.

353.    Glock Sr.'s transfer or direction that shares of Glock, Inc. be transferred to Unipatent had the effect of reducing Glock Ges.m.b.H.'s ownership of Glock, Inc. from 100% to 50%.  This, in turn, reduced the value of Ms. Glock's interest in Glock Ges.m.b.H. and the value of her indirect interest in Glock, Inc.

354.    The value of the securities in Glock, Inc. exceeded $5,000.  Unipatent purportedly paid $75,000 for the securities.  On information and belief, Unipatent never actually paid this purchase price for the securities.  Rather, it is believed that the shares were simply transferred from Glock Ges.m.b.H. to Unipatent.

355.    This 50% ownership in Glock, Inc. was subsequently moved by or at the direction of Glock Sr. through series of undocumented or poorly documented transfers (in chronological order):  from Unipatent, to Glock Sr. personally, to Multipatent, to Defendant Rochus.

356.    Filling the role previously occupied by Ewert, Defendant Lohr acts as the face of Rochus and nominally speaks for it regarding its purported ownership interest in Glock, Inc.  Lohr was involved in the transfer of the stolen shares of Glock, Inc. to Rochus.

357.    As of 2011, Rochus was 100% owned by INC Holding.  INC Holding was 100% owned by the Glock Foundation.  All three entities — Rochus, INC

Holding, and the Glock Foundation — are controlled by Glock Sr.  They accrue to his personal benefit, to the direct harm of Ms. Glock.

358.    On information and belief, Glock, Inc. has paid dividends to Rochus. Because of Defendants' theft of 50% of Glock, Inc. from Ms. Glock, she was denied any interest in the dividends that were paid to Rochus.

359.    Until her divorce proceedings from Glock Sr. in 2011, Ms. Glock did not know or have any reason to suspect that Glock Sr. had effectively stolen or taken by fraud 50% of Glock Ges.m.b.H.'s ownership of Glock, Inc. by transferring securities in Glock, Inc. to other entities that he solely owned or controlled.

360.    Through his ownership and control of Unipatent, Rochus, INC Holding, and the Glock Foundation, Glock Sr. took this value from Ms. Glock and put it directly into his own pockets.

**B.    Transfers to Glock Hong Kong**

361.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

362.    Defendants' billing scheme involving Glock Hong Kong was yet another manner in which Defendants siphoned off profit from Glock, Inc. in order to put the money into Glock Sr.'s control — to the detriment of Ms. Glock.

363.    The payments made by Glock, Inc. on the Fraudulent HK Invoices were the manner in which Defendants attempted to paper their conduct in order to conceal the scheme and hide their thefts from Glock, Inc.

364.    Each of the payments made by Glock, Inc. on the Fraudulent HK Invoices constitutes a violation of 18 U.S.C. § 2314.

365.    Glock, Inc.'s payments on the Fraudulent HK Invoices involved the transmission or transfer of funds out of Georgia into foreign countries.  The funds were improperly taken from Glock, Inc., without basis or justification, through Defendants' scheme or artifice to defraud and through false or fraudulent representations.

366.    Each payment made by Glock, Inc. on the Fraudulent HK Invoices deprived Ms. Glock of the value of her ownership interests in Glock Ges.m.b.H. and Glock, Inc., her interests in the overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that otherwise would have been paid to her but for Defendants' scheme.

**The $588,810.64 Transfer**

367.    On or about March 15, 1996, Defendants directed Glock, Inc. to wire $588,810.64 to Glock Hong Kong's account numbered xxxx790 at Credit Suisse in Hong Kong (the "Credit Suisse HK Account").[24]

368.    Willam (controller of Glock Ges.m.b.H. and the so-called "Glock Group") received copies of the account statements and transaction records for the Credit Suisse HK Account, from at least April 1996 through September 1997. On information and belief, Glock Sr.'s associate Westwater also received copies of these documents.

369.    On information and belief, this payment was made to pay Fraudulent HK Invoices and did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

370.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the sole control of Glock Sr.

**The $3,019,040.53 Transfer**

371.    On or about May 14, 1996, Defendants directed Glock, Inc. to wire $3,019,040.53 from its account at Wachovia to Glock Hong Kong's Credit Suisse HK Account.  On information and belief, Glock Sr., his associate Westwater, and

---

[24]   Credit Suisse later changed its name to Credit Suisse First Boston.  For ease of reference, the name "Credit Suisse" will be used throughout this document.

87

William knew about this transfer.  The funds passed through the Bank of East Asia Ltd. in Hong Kong (as a correspondent bank).

372.    This payment was purportedly for Glock Hong Kong invoices 503, 504, 505, 506, and 507.  In fact, invoices 503, 504, 505, 506, and 507 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

373.    On information and belief, the funds transferred by Glock, Inc. to Glock Hong Kong originated in Georgia or the United States from Glock, Inc.'s sale of guns in the United States.  On information and belief, Glock, Inc. did not originate any income in Hong Kong.

374.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $3,499,303.40 Transfer**

375.    On or about June 21, 1996, Defendants directed Glock, Inc. to wire $3,499,303.40 from its account at Wachovia Bank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

376.    This payment was purportedly for Glock Hong Kong invoices 508, 509, 510CN, 512, and 513.  In fact, invoices 508, 509, 510CN, 512, and 513 were

Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

377.   The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $942,137.90 Transfer**

378.   On or about July 31, 1996, Defendants directed Glock, Inc. to wire $942,137.90 from its account at Wachovia Bank in Georgia to Glock Hong Kong's Credit Suisse HK Account.

379.   This payment was purportedly for Glock Hong Kong invoice 514.  In fact, invoice 514 was a Fraudulent HK Invoice and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

380.   The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,081,269.50 Transfer**

381.   On or about August 16, 1996, Defendants directed Glock, Inc. to wire $1,081,269.50 from its account in Georgia to Glock Hong Kong's Credit Suisse HK Account.

382.    On information and belief, this payment was made to pay Fraudulent HK Invoices and did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

383.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,548,895.20 Transfer**

384.    On or about September 24, 1996, Defendants directed Glock, Inc. to wire $1,548,895.20 from its account at Wachovia Bank in Georgia to Glock Hong Kong's Credit Suisse HK Account.

385.    This payment was purportedly for Glock Hong Kong invoices 515, 517, and 518.  In fact, invoices 515, 517, and 518 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

386.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,278,478.50 Transfer**

387.    On or about October 17, 1996, Defendants directed Glock, Inc. to wire $1,278,478.50 from its account at Wachovia Bank in Georgia to Glock Hong Kong's Credit Suisse HK Account.

388.    This payment was purportedly for Glock Hong Kong invoices 519, 520, 521, and 522.  In fact, invoices 519, 520, 521, and 522 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

389.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,099,659.10 Transfer**

390.    On or about November 23, 1996, Defendants directed Glock, Inc. to wire $1,099,659.10 from its account at NationsBank of Georgia, N.A. ("NationsBank") in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

391.    On information and belief, this payment was made to pay Fraudulent HK Invoices and did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

392.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,181,487.80 Transfer**

393.    On or about January 9, 1997, Defendants directed Glock, Inc. to wire $1,181,487.80 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

394.    This payment was purportedly for Glock Hong Kong invoices 524, 525, and 526.  In fact, invoices 524, 525, and 526 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

395.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $2,112,092.70 Transfer**

396.    On or about February 13, 1997, Defendants directed Glock, Inc. to wire $2,112,092.70 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

397.    On information and belief, this payment was made to pay Fraudulent HK Invoices and did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

398.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $682,924.70 Transfer**

399.    On or about February 19, 1997, Defendants directed Glock, Inc. to wire $682,924.70 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.  Glock Sr., his associate Westwater, and William knew about this transfer.

400.    This payment was purportedly for Glock Hong Kong invoice 529.  In fact, invoice 529 was a Fraudulent HK Invoice and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

401.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $1,663,361.80 Transfer**

402.    On or about April 22, 1997, Defendants directed Glock, Inc. to wire $1,663,361.80 from its account at Credit Suisse in New York, NY to Glock Hong Kong's Credit Suisse HK Account.

403.    This payment was purportedly for Glock Hong Kong invoices 532 and 533.  In fact, invoices 532 and 533 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

404.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**The $2,944,831.90 Transfer**

405.    On or about June 16, 1997, Defendants directed Glock, Inc. to wire $2,944,831.90 from its account at NationsBank in Atlanta, GA to Glock Hong Kong's Credit Suisse HK Account.

406.    This payment was purportedly for Glock Hong Kong invoices 534, 535, 536, 538, and CN/573.  In fact, invoices 534, 535, 536, 538, and CN/573 were Fraudulent HK Invoices and did not represent the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

407.    The transfer masked the theft of these funds from Glock, Inc. and ultimately served to move the funds into the control of Glock Sr. and his associates.

**C.    Sham Leases Between Consultinvest and Glock, Inc.**

408.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

409.    Both Manown and Ewert acted at the direction of Glock Sr. in connection with Consultinvest.  All significant instructions to Ewert came directly from Glock Sr.

410.    Beginning in the 1980s and continuing through to today, Defendants have improperly transferred funds out of Glock, Inc. to Consultinvest.  The funds were stolen or taken from Glock, Inc. through fraud, or converted from Glock, Inc.'s use by Defendants, for the purpose of harming Ms. Glock.

411.    Those funds were ultimately transferred out of Consultinvest and into foreign entities — including Warwick and UEF — which were entirely owned or controlled by Glock Sr., either directly or through his associates.

412.    Consultinvest was one of the many conduits used by Defendants to transfer, through foreign commerce, money that had been stolen, converted, or taken by fraud from Glock, Inc. and send it to entities that were owned or controlled by Glock Sr. and his associates.

413.    At all relevant times, Glock Sr. was aware that the funds transferred to Consultinvest by Glock, Inc. had been stolen, taken by fraud, or converted from Glock, Inc.

414.    The transfers of funds out of Glock, Inc. to Consultinvest, and subsequent transfers of those funds to Warwick and UEF, deprived Ms. Glock of her interest in those funds.

415.    Ms. Glock was unaware that real estate purchases by Consultinvest had been made through fraud and using laundered funds, that the lease arrangements between Consultinvest and Glock, Inc. were fraudulent and improper, and that the "loans" from Warwick and UEF to Consultinvest were shams.  She had no reason to begin to suspect such transactions had taken place until her 2011 divorce from Glock Sr.

1.    **Original Glock Office Space/ Expanded Office and Firing Range Space**

416.    In March 1988, Consultinvest purchased property consisting of slightly more than two acres of improved real estate in Land Lots 535 and 536 in Cobb County, Georgia.  The purchase price was approximately $950,000.

417.    Manown signed the closing documents on behalf of Consultinvest. Ewert signed the Board of Directors' resolution authorizing the purchase.

96

418.    Consultinvest ultimately entered into a sham lease with Glock, Inc. for the property to be used as Glock, Inc.'s United States headquarters (the "Original Glock Office Space").

419.    Effective March 31, 1995, the lease for the Original Glock Office Space was extended for a period of five years (from April 1, 1995 through March 31, 2000).  Glock Sr. signed the extension on behalf of Glock, Inc. and Ewert signed on behalf of Consultinvest.

### (i)    "Loans" on the Original Glock Office Space

420.    Consultinvest financed its purchase of the Original Glock Office Space with a $970,000 one-year loan from Bank für Gemeinwirtschaft ("BfG") in New York, which was effective March 18, 1988.  On information and belief, the term of the loan was extended until in or about early 1992.

421.    The March 18, 1988 loan agreement was signed by Ewert on behalf of Consultinvest.

422.    The BfG loan was secured by mortgages on the Original Glock Office Space.  The first mortgage was for $550,000 (with 11% annual interest, adjustable quarterly) and the second mortgage was for $420,000 (with 13% annual interest, adjustable quarterly).

423.    On or about January 29, 1992, Consultinvest wired $970,000 out of NationsBank account numbered xxxxx237.  On information and belief, the transfer was used to repay the March 1988 loan from BfG.

424.    As part of Defendants' scheme to steal funds from Glock, Inc. and launder them through Consultinvest, Ewert (on behalf of Unipatent) directed Manown (for Consultinvest) to "prepare two mortgages on the property" in order to "secure" a loan from BfG.  The first mortgage was to be for $550,000 and the second mortgage was to be for $420,000.  Glock Sr. forwarded Ewert's June 10, 1998 letter to Manown.

425.    BfG, however, already had security interests in the property in connection with the March 1988 loan it had made to Consultinvest; there was no need for Ewert to issue such a directive to Manown.  In fact, on information and belief, Defendants intended that money would appear to have been transferred from Unipatent to Consultinvest.  The mortgages that Ewert instructed Manown to prepare were simply part of Defendants' scheme to extract payments from Consultinvest on a fake loan.  The fake loan was to have been structured so that it appeared to be the same loan as the real March 1988 loan from BfG.

426.    Ewert's letter further directed Manown that, if interest payments on the "loans" (that were supposed to look like they came from Unipatent) fell due before a final lease agreement was in place with Glock, Inc., Manown was to

98

contact Karl Walter (of Glock, Inc.) to obtain "the amount falling due as down payment on leases to become due out of the [lease] agreement still to be executed." On or about the same time, Glock Sr. directed Walter to transfer $40,000 from Glock, Inc. to Consultinvest as a "first down payment/installment" on the lease that had not yet been executed.

427. Although Manown was directed by Glock Sr. and Ewert in June 1988 to set up the fake loans from Unipatent to Consultinvest for Consultinvest's purchase of the Original Glock Office Space, on information and belief, the funds were actually transferred and the paperwork created in 1992, when the original March 1988 loan from BfG ended.

428. Rather than receiving funds from Unipatent (as Defendants had originally planned in 1988), Consultinvest obtained the funds from Reofin and then set up a fraudulent loan with UEF to mask the source of the funds.

429. On or about January 27, 1992, Consultinvest received a total of $970,000 in its NationsBank account numbered xxxxx237 via wire transfer. The funds were sent in two transfers ($550,000 and $420,000) from an account held by Reofin.

430. When it was incorporated on January 27, 1992, UEF only had a capitalization of £2.

431.    Despite this minimal capitalization, on or about January 28, 1992, UEF "loaned" (on paper only) $970,000 to Consultinvest for a term of two years to finance the purchase of property in the State of Georgia.  The $970,000 that Consultinvest received had actually come from Reofin on or about January 27, 1992.

432.    Consultinvest's January 28, 1992 "loan" from UEF was secured by a first mortgage of $550,000 (with an interest rate of 10.5% per annum, adjustable quarterly) and a second mortgage of $420,000 (with an interest rate of 12.5% per annum, adjustable quarterly).  On information and belief, the fake loan from UEF was structured to look like the legitimate loan from BfG that Consultinvest had already paid off.

433.    The property securing the loans was the Original Glock Office Space.

### (ii)    Expanded Office and Firing Range Space

434.    Consultinvest entered into a sham agreement with Glock, Inc. to lease additional space adjacent to the Original Glock Space (the "Expanded Lease Agreement").

435.    Effective April 1, 1990, Consultinvest entered into a lease with Glock, Inc. for expanded office space and an indoor firing range adjacent to the Original Glock Office Space (the "Expanded Office and Firing Range Space").  It

appears, however, that Consultinvest and Glock, Inc. did not attempt to "paper" the lease arrangement until August/September 1991.

436.    Ewert signed the Expanded Lease Agreement on behalf of Consultinvest; the agreement was discussed with Glock Sr.

437.    Consultinvest charged Glock, Inc. an inflated rate for the Expanded Lease Agreement.  Under the terms of the Expanded Lease Agreement, Glock, Inc. was obligated to pay $8,100 per month for the space — which had not yet been built-out (a build out for which Glock, Inc. appears to have paid).[25]

438.    The rent on the eight-year lease was to increase by a compounded three percent every year, beginning on the second anniversary of the lease term. Therefore, over the eight-year lease, Glock, Inc. was obligated to pay over $840,000 to Consultinvest — even though both companies were ultimately owned and controlled by Glock Sr., and were his alter egos.

439.    Effective March 31, 1995, the Lease Option Agreement was extended for a period of five years (from April 1, 1995 through March 31, 2000).  Glock Sr. signed the extension on behalf of Glock, Inc. and Ewert signed on behalf of Consultinvest.

---

[25]    Consultinvest entered into a Demand Note payable to Glock, Inc. for $823,930.23, dated March 31, 1990.  On information and belief, this was for Consultinvest to repay Glock, Inc. amounts that had been spent building out the Expanded Office and Firing Range Space.

440.    Because the office space and firing range had not been built out at the time Glock, Inc. entered into the lease, both the lease term and the rent amount were unjustifiably inflated.  This improperly deprived Ms. Glock of her interest in those funds.

441.    The form and structure of the Expanded Lease Agreement were simply a means to improperly funnel money from Glock, Inc. into Consultinvest for the benefit of Glock Sr. and his associates.  This conduct was directed by Glock Sr. for the purpose of harming Ms. Glock.

### (iii)    Improper Lease Payments on the Expanded Office and Firing Range Space

442.    The Expanded Lease Agreement was a sham, designed to appropriate funds from Glock, Inc. and move them into the exclusive control of Glock Sr.

443.    Each monthly lease payment was in excess of $5,000.  Over the term of the lease, Glock, Inc. was obligated to pay over $840,000 to Consultinvest.  The lease payments were stolen by Defendants from Glock, Inc.

444.    The Expanded Lease Agreement was entirely improper.  The monthly amount that Glock, Inc. was to pay to Consultinvest under the agreement was excessive and improperly deprived Ms. Glock of her interest in those funds.

445.    Ms. Glock was unaware that real estate purchases by Consultinvest had been made through fraud and using laundered funds and that the lease arrangements between Consultinvest and Glock, Inc. were fraudulent and improper.  She had no reason to begin to suspect such transactions had taken place until her 2011 divorce from Glock Sr.

446.    Through the Expanded Lease Agreement, Defendants stole, converted, and took by fraud Glock, Inc.'s property (*i.e.*, money).  After these misappropriations had taken place and the funds transferred to Consultinvest, on information and belief, the funds were transferred through foreign commerce and deposited into accounts held by UEF.  Defendants used the fraudulent loans between UEF and Consultinvest in order to conceal or disguise the nature of these transfers.

## 2.    Unimproved Glock Property and the Lease Option Agreement

447.    In August 1990, the Board of Directors of Consultinvest (consisting of only Ewert and Manown, who acted as Glock Sr.'s associates and at his direction) passed a resolution authorizing the purchase of additional property across from the Original Glock Space.  This property consisted of nearly five acres of unimproved land in Land Lots 535 and 536 in Cobb County (the "Unimproved Glock Property").

448.    Consultinvest purchased the Unimproved Glock Property on or about December 14, 1990, for just over $540,000.  Manown signed the closing statement on behalf of Consultinvest.

449.    Defendants purposefully masked the source of the funds Consultinvest used to purchase the Unimproved Glock Property.  Defendants set up the fraudulent loan from Warwick to launder the funds stolen from Glock, Inc. through the various sham leases with Consultinvest and to move the funds into Glock Sr.'s exclusive control.

450.    On or about December 12, 1990, in a letter signed by Ewert (on behalf of Warwick) and addressed to Manown (for Consultinvest), Warwick notified Consultinvest that it had made available a credit facility of $600,000 for the "Financing of Property in Georgia."  That Georgia real property was described using the same acreage and land lot numbers as the Unimproved Glock Property.

451.    The interest rate charged by Warwick was 12% per annum, adjustable quarterly.  Ewert signed the loan documentation on behalf of Warwick.

452.    The Unimproved Glock Property served as collateral for the "loan."

453.    At the time of its incorporation in October 1990, however, Warwick had only £100,000 in authorized capital (equivalent to approximately $195,000 at the time).[26]

### (i)    The Lease Option Agreement

454.    Consultinvest repaid the "loan" from Warwick through funds stolen from Glock, Inc. using a sham agreement for Glock, Inc. to have the "option" to lease the Unimproved Glock Property (the "Lease Option Agreement").

455.    Consultinvest and Glock, Inc. entered into a lease option agreement dated April 1, 1991 (the "Lease Option Agreement").  The Lease Option Agreement was for the Unimproved Glock Property.  Walter signed the agreement on behalf of Glock, Inc. and Ewert signed for Consultinvest.

456.    The Lease Option Agreement was to last for five years and gave Glock, Inc. the right to lease the Unimproved Glock Property "for a reasonable rental" after facilities had been constructed on it.

457.    Glock, Inc. was required to pay Consultinvest $5,000 per month for the lease option — an amount ostensibly needed to cover the interest on the "loan" Consultinvest used to purchase the property in the first instance.  Glock,

---

[26]    http://www.oanda.com/currency/  historical-rates-classic?srccont=rightnav (conversion rate for British Pound Sterling to United States Dollar on December 12, 1990).

Inc. was therefore obligated to pay Consultinvest a total of $300,000 for the lease option — an amount that was over one-half of the original purchase price for the property.

458.    Effective March 31, 1995, the Lease Option Agreement was extended for a period of four years (from April 1, 1996 through March 31, 2000).  Glock Sr. signed the extension on behalf of Glock, Inc. and Ewert signed on behalf of Consultinvest.

459.    The Lease Option Agreement was entirely improper.  The monthly amount that Glock, Inc. was to pay to Consultinvest under the Lease Option Agreement was excessive and improperly deprived Ms. Glock of her interest in those funds.

460.    Ms. Glock was unaware that real estate purchases by Consultinvest had been made through fraud and using laundered funds and that the lease arrangements between Consultinvest and Glock, Inc. were fraudulent and improper.  She had no reason to begin to suspect such transactions had taken place until her 2011 divorce from Glock Sr.

461.    Through the Lease Option Agreement, Defendants stole, converted, and took by fraud Glock, Inc.'s property.  After these misappropriations had taken place and the funds transferred to Consultinvest, on information and belief, the funds were transferred through foreign commerce and deposited into

accounts held by Warwick.  Defendants used the fraudulent loan between

Warwick and Consultinvest in order to conceal or disguise the nature of these

transfers.

### 3.  Consultinvest's Lease of Machinery Equipment to Glock, Inc.

462.   Consultinvest and Glock, Inc. entered into an agreement for

Consultinvest to lease machinery to Glock, Inc. dated April 1, 1990

(the "Machinery Equipment Lease")  The machinery included injection molding

machines (used in making the weapons produced by Glock, Inc.), dryers, and a

fork-lift.

463.   The agreement was to last five years and obligated Glock, Inc. to pay

$6,850 to Consultinvest each month.  Glock, Inc. was obligated to insure,

maintain, and repair the machinery.

464.   Defendants directed that Glock, Inc. enter the Machinery Equipment

Lease with Consultinvest.

465.   Effective March 31, 1995, the Machinery Equipment Lease was

extended for a period of five years (from April 1, 1995 through March 31, 2000).

Glock Sr. signed the extension on behalf of Glock, Inc. and Ewert signed on

behalf of Consultinvest.

466.    The Machinery Equipment Lease was a sham, designed to appropriate funds from Glock, Inc. and move them into the control of Glock Sr. and his associates.

467.    The terms of and payments due under the Machinery Equipment Lease were improper.  The inflated lease payments improperly deprived Ms. Glock of her interest in those funds.

468.    Under the Machinery Equipment Lease, Glock, Inc. was obligated to pay over $5,000 per month to Consultinvest for equipment.

469.    On information and belief, Consultinvest had purchased the equipment used from Glock Ges.m.b.H.  Consultinvest then charged Glock, Inc. under the lease as though the equipment were new.

470.    Through the Machinery Equipment Lease, Defendants stole, converted, and took by fraud money belonging to Glock, Inc.  After these misappropriations had taken place and the funds transferred to Consultinvest, on information and belief, the funds were transferred through foreign commerce and deposited into bank accounts held by UEF.  Defendants used the fraudulent loans between UEF and Consultinvest in order to conceal or disguise the nature of these transfers.

**VII.  PREDICATE ACTS COMMITTED BY DEFENDANTS:  RECEIPT OF STOLEN GOODS (GLOCK SR.'S RECEIPT OF FUNDS IMPROPERLY TRANSFERRED OUT OF GLOCK, INC.)**

471.  Defendants' improper transfers funds out of Glock, Inc. were designed to benefit Glock Sr. and directly target and harm Ms. Glock.

472.  Each set of transfers described in the following paragraphs (478 to 607) was a step in Defendants' scheme to transfer property stolen from Glock, Inc. and place the funds under the exclusive control of Glock Sr.

473.  Ultimately, Glock Sr. received, possessed, or controlled the funds that had been stolen from Glock, Inc.  The funds that Glock Sr. received, possessed, or controlled under this part of Defendants' scheme are separate and apart from the stolen funds (described above in paragraphs 344 to 470) transported by Defendants.

474.  Each set of transfers described below exceeded $5,000.

475.  Each set of transfers crossed Georgia State Lines and United States Boundaries after having been stolen from Glock, Inc.

476.  At all relevant times, Glock Sr. was aware that the funds described below had been stolen, unlawfully converted, or taken from Glock, Inc.

477.  Each set of transfers was a violation of 18 U.S.C. § 2315, which prohibits the receipt of stolen goods and moneys.  Each set of transfers is

109

therefore a predicate act for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

**A.    Sham Royalties Paid to Glock Sr. by Glock, Inc. and Glock Ges.m.b.H.**

478.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

479.    Glock Sr. and Defendants have taken at least €122 million through improper "royalty" or "licensing" payments.  Over €20.8 million in improper payments were made by Glock, Inc. to Glock Sr. from 1998 through 2002.  Glock Ges.m.b.H. paid out over €101.7 million during that same period of time.

480.    Under the Trademark Agreement, Glock, Inc. was obligated to pay royalties to Glock Ges.m.b.H. for use of the "Glock" logo.  Glock, Inc. was also apparently obligated to (inappropriately) pay Glock Ges.m.b.H. royalties/ licensing for use of the "Glock" name.

481.    Through these payments, Glock Sr. and his associates stole money from Glock, Inc. valued at more than $5,000.  Each of the royalty/licensing payments made to Glock Sr. by Glock, Inc. was valued in excess of $5,000.  These funds were taken through fraud, since there was no basis for Glock, Inc. and Glock Ges.m.b.H. to enter into a separate agreement to license the "Glock" name or logo in order for Glock, Inc. to sell "Glock" pistols.  Use of the name "Glock"

was necessary in order for Glock, Inc. to make any sales of such pistols pursuant to the oral sales agreement entered into between Glock, Inc. and Glock Ges.m.b.H.

482.   Glock Sr. received, possessed, and concealed in excess of $5,000. After the funds were unlawfully converted from Glock, Inc.'s possession, they were transferred out of the State of Georgia and into Glock Sr.'s personal account in Austria.

483.   Defendants took funds directly from Glock, Inc.'s bank accounts and wired them to Glock Sr.'s personal accounts in Austria, using a third company controlled by Glock Sr. as a conduit.  Glock Sr. received, possessed, and concealed these funds in violation of 18 U.S.C. § 2315.

484.   Glock Sr. and his associates transferred or directed the transfer of funds stolen from Glock, Inc. through foreign commerce through means of the royalty/licensing payments.

485.   On information and belief, at least some of the payments made by Glock Ges.m.b.H. to Base Technical under the Master Agreement used funds that had been unlawfully converted from Glock, Inc.  These (and, on information and belief, other) funds were ultimately transferred directly to Glock Sr. in the form of the sham "royalty" or "licensing" payments.

486.    Ms. Glock was unaware of these thefts of funds from Glock, Inc.

Nor did she have any reason to suspect that such thefts had occurred until her

divorce proceedings from Glock Sr. in 2011.

### 1.    Glock, Inc.'s Transfers through Eaglesmith

487.    Glock, Inc. placed certain funds into accounts at Summit Bank.

488.    Those funds were later improperly transferred into account

numbered xxxx719 held by Eaglesmith at Summit Bank.

489.    Several Eaglesmith accounts at Summit Bank were opened "c/o

Glock, Inc." and listed the address for Eaglesmith as 6000 Highlands Parkway,

Smyrna, Georgia (Glock, Inc.'s address).  However, Glock, Inc. and Eaglesmith

had no direct relationship.

490.    Eaglesmith held an account numbered xxxx375 at Summit Bank.

The account was opened with $778,203.38 that Eaglesmith received via a wire

transfer from Glock, Inc. on or about May 28, 1994.

491.    There was no basis for Glock, Inc. to make payments or transfer any

funds to Eaglesmith at any point in time.  Accordingly, the funds that Eaglesmith

received on or about May 28, 1994 had been stolen, unlawfully converted, or

taken by fraud from Glock, Inc.

492.    Eaglesmith account numbered xxxx719 at Summit Bank was opened

on or about February 17, 1995.

493.    While a February 14, 1995 signature card for the account numbered xxxx719 lists Eaglesmith's address as 200 Galleria Parkway, Suite 445, Atlanta, Georgia, at least one account opening document identifies the account holder as "Eaglesmith Partners, Inc. c/o Glock Inc." and lists the address as 6000 Highlands Parkway, Smyrna, Georgia (which is Glock, Inc.'s address).  (A second, handwritten signature card for the account numbered 1005719, which was also dated February 14, 1995, but on which the corporate secretary's certification was left unsigned, identifies Eaglesmith's address as 200 Galleria Parkway.)

494.    On or about March 6, 1995, Eaglesmith account numbered xxxx375 was closed out and the funds were transferred to the Eaglesmith account numbered xxxx719.  The transfer amount was $511,851.77.

495.    Manown and Glock Sr. were the original signatories on account xxxx719.  Manown was Eaglesmith's CEO, CFO, and secretary.  Glock Sr. was listed "Vice President."

496.    In November 1997, Manown directed Summit Bank (including Miroslava Torres Young) to use his home address in Dunwoody, Georgia for all of the accounts held by Eaglesmith.

497.    As of at least November 2003, Quendler became an authorized signatory on Eaglesmith account numbered xxxx719.

498.    In June 2005, Manown provided Defendant Dr. Jöerg-Andreas Lohr and Dr. Markus Terhuerne with a power of attorney over all accounts held by Eaglesmith.  Lohr interacted directly with personnel at Summit Bank, including but not limited to Heidi Hein.

499.    Lohr and members of his firm requested and reviewed detailed information from Summit regarding accounts held in the name of Eaglesmith, but referred to as personally belonging to Glock Sr.  On at least one occasion, members of Lohr & Co. travelled to Atlanta for an in-person meeting at Summit to review such account information.

500.    When Defendants ultimately decided to shut down Eaglesmith and close its accounts at Summit Bank, it was Lohr who directed and oversaw the transfer of the proceeds out of the United States for Glock Sr.'s benefit.

501.    On or about July 27, 2000, $3,308,152 was transferred into Eaglesmith account numbered xxxx719 at Summit Bank.  On information and belief, the funds had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.  On information and belief, this amount was purportedly a "licensing" or "royalty" payment to Glock Sr.

502.    On or about August 3, 2000, $3,008,152 of that transfer was placed into a 5-year CD at Summit Bank in the name of Glock Sr. (account numbered CDxxx342).  Glock Sr. was aware that these funds had been placed into a CD

114

account bearing his name.  On information and belief, Glock Sr. was aware that these funds had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.

503.    On or about April 1, 2005, Glock Sr. directed Summit Bank to transfer the proceeds of the CD (account CDxxx342), along with the funds in certain other accounts he held at Summit Bank, into Glock Sr.'s account at Hypo-Alpe-Adrie Bank (account numbered xxx500).  The total amount of funds transferred was over $14.9 million.

504.    Statements for certain accounts held by Glock Sr. at Hypo-Alpe-Adrie Bank, including account number xxx500 into which the funds from Eaglesmith were transferred, were flagged with the notation "*Achtung keine Auskunft an Helga Glock!!!!*" (which may be roughly translated as "Attention, no information to Helga Glock!!!!").

505.    On or about August 1, 2002, $5,719,150.19 was transferred into Eaglesmith account numbered xxxx719 at Summit Bank.  These funds had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.'s account numbered xxxxx190 at Wachovia.  This amount directly corresponds to "licensing" payments made to Glock Sr. by Glock, Inc. for 2002.

506.    On December 18, 2003, Glock Sr. and Quendler directed Heidi Hein of Summit Bank to transfer $17,509,000 from Eaglesmith's account numbered

xxxx719 to Glock Sr.'s personal bank account numbered xxxxx xxx 601 at Bank

Austria Creditanstalt in Austria (the "December 18 Transfer"). Hein transferred

the funds on the same day.

507.  The December 18 Transfer was routed through American Express

Bank, LTD. in New York.

508.  The December 18 Transfer included Glock, Inc. money moved by

Defendants into Eaglesmith's account on August 1, 2002 ($5,719,150.19). On

information and belief, all of the remaining funds comprising the December 18

Transfer had been stolen, unlawfully converted, or taken by fraud from Glock,

Inc.

509.  Instead of returning the December 18 Transfer to or reinvesting it on

behalf of Glock, Inc., Glock Sr. took over $17.5 million for himself. Glock Sr.

knew that the funds comprising the December 18 Transfer had been stolen,

unlawfully converted, or taken by fraud from Glock, Inc.

510.  Ms. Glock was not aware of these thefts of funds from Glock, Inc.

Nor did she have any reason to suspect that such thefts had occurred until her

divorce proceedings from Glock Sr. in 2011.

511.  The December 18 Transfer improperly denied Ms. Glock her

interests in those funds.

512.    Any licensing or royalty payments owed by Glock, Inc. should have been treated as an asset of Glock Ges.m.b.H.

513.    Glock Sr. knew that the funds comprising the December 18 Transfer had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.

**B.    Glock America:  Glock Sr.'s Receipt of Stolen Property**

514.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

515.    Glock Sr. is managing director of Glock America and was personally involved its establishment.  He and his associates directed or caused the illegal transfer of funds from Glock, Inc. to Glock America in connection with the Fraudulent Americas Invoices.

516.    Glock America illegally appropriated from Glock, Inc. over $20 million during more than a decade (from at least December 21, 1990 through May 26, 1999) through payments made by Glock, Inc. on the Fraudulent Americas Invoices.

517.    Glock Sr. ultimately took possession and control of these funds because they were wired from Glock America into an account held by Taziria at NMB Bank (later known as ING Bank) in Curaçao.  Glock Sr. directed that the funds received by Glock America from Glock, Inc. (in payment for the Fraudulent Americas Invoices) be transferred from Taziria to Reofin.

518.    On information and belief, the funds were ultimately transferred to Reofin's account at UBS in Luxembourg.[27]

519.    Reofin had no direct ownership interest in Taziria.  Glock Sr. owned 100% of the shares of Reofin.

520.    Through these multiple series of transfers, Glock Sr. took control and possession of the funds that were stolen from Glock, Inc.

521.    These serial transfers through accounts held by multiple — purportedly unrelated — corporations (that were, in fact, all part of the "Glock Group"), across several continents, over several years were conducted for the purpose of concealing the fact that the original funds had been stolen, unlawfully converted, or taken from Glock, Inc.

522.    At all relevant times, on information and belief, Glock Sr. was aware that the funds paid by Glock, Inc. on the Fraudulent Americas Invoices had been stolen, unlawfully converted, or taken.

**C.    Property Stolen from Glock, Inc. and Transferred to Base Technical**

523.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

---

[27] A standing order Minami's account directed that all funds in excess of $25,000 be automatically transferred to BoNY (in New York) for the benefit of Reofin's account at UBS in Luxembourg.

524.    Certain funds paid by Glock, Inc. on the Fraudulent HK Invoices were transferred from Glock Hong Kong to Glock Ges.m.b.H.  Those funds were stolen, unlawfully converted, or taken by fraud from Glock, Inc., and subsequently wired out of Glock Ges.m.b.H. to Base Technical, for use by Glock Sr. and his associates.

525.    Glock Sr. was aware at all times that the funds paid by Glock, Inc. to Glock Hong Kong (which were ultimately transferred to Glock Ges.m.b.H. and then Base Technical) had been stolen, unlawfully converted, or taken from Glock, Inc. for the purpose of injuring Ms. Glock.

526.    Base Technical never provided any products or services to Glock Ges.m.b.H.

527.    Glock Ges.m.b.H. improperly and illegally transferred over $30 million to Base Technical in a series of at least 24 wire transfers taking place over the course of a minimum of seven years.  The transfers were without purpose or justification.  These funds — which had originated at and been stolen from Glock, Inc. — served only to line Glock Sr.'s pockets.

**The $1,169,229 "Commission"**

528.    On or about September 15, 1992, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the

Middle and Far East in the second quarter of 1992.  The invoice was signed by Ewert.

529.    Glock Ges.m.b.H.'s "declared turnover" totaled $11,692,283.  Base Technical billed Glock Ges.m.b.H. $1,169,229 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1992.

530.    On or about January 26, 1993, Glock Ges.m.b.H. wired $1,169,229 from its account at Raiffeisen Zentralbank Österreich A.G. ("Bank RZO") to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,097,583 "Commission"**

531.    On or about December 17, 1992, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1992.  The invoice was signed by Ewert.

532.    Glock Ges.m.b.H.'s "declared turnover" totaled $11,975,835. Although the invoice indicated that Base Technical's commission rate was 10% of Glock Ges.m.b.H.'s "declared turnover," the "commission" amount billed was only $1,097,583 — 9.16% of the "declared turnover" for Glock Ges.m.b.H.'s third quarter of 1992.

533.    On or about April 26, 1993, Glock Ges.m.b.H. wired $1,097,583 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,016,881 "Commission"**

534.    On or about March 12, 1993, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 8% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1992.  The invoice was signed by Ewert.

535.    Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1992 totaled $12,711,015.  Base Technical billed Glock Ges.m.b.H. $1,016,881 for commissions.  This was 8% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1992.

536.    On or about June 22, 1993, Glock Ges.m.b.H. wired $1,016,881 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $985,253 "Commission"**

537.    On or about June 4, 1993, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 8% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1993.  The invoice was signed by Ewert.

538.    Glock Ges.m.b.H.'s "declared turnover" totaled $12,315,656.  Base Technical billed Glock Ges.m.b.H. $985,253 for commissions.  This was 8% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1993.

539.    On or about October 12, 1993, Glock Ges.m.b.H. wired $985,253 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,142,491 "Commission"**

540.    On or about August 17, 1993, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 8% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1993.  The invoice was signed by Ewert.

541.    Glock Ges.m.b.H.'s "declared turnover" totaled $14,281,136.  Base Technical billed Glock Ges.m.b.H. $1,142,491 for commissions.  This was 8% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1993.

542.    On or about February 7, 1994, Glock Ges.m.b.H. wired $1,142,491 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $911,848 and $1,294,370 "Commissions"**

543.    On or about October 25, 1993, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 8% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1993.  The invoice was signed by Ewert.

544.    Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1993 totaled $11,398,112.  Base Technical billed Glock Ges.m.b.H. $911,848 for commissions.  This was 8% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1993.

545.    On February 2, 1994, Base Technical invoiced Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared

turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1993.

546. Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1993 totaled $12,943,700. Base Technical billed Glock Ges.m.b.H. $1,294,370 for commissions. This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1993.

547. On or about March 8, 1994, Glock Ges.m.b.H. wired $2,206,218 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg) in in payment for the "commissions" billed by Base Technical for the third and fourth quarters of 1993. The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,856,793 "Commission"**

548. On or about May 6, 1994, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1994. The invoice was signed by Ewert.

549. Glock Ges.m.b.H.'s "declared turnover" totaled $18,567,929. Base Technical billed Glock Ges.m.b.H. $1,856,793 for commissions. This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1994.

550.    On or about September 19, 1994, Glock Ges.m.b.H. wired $1,856,793 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,414,220 "Commission"**

551.    On or about September 12, 1994, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1994.  The invoice was signed by Ewert.

552.    Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1994 totaled $14,142,202.  Base Technical billed Glock Ges.m.b.H. $1,414,220 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1994.

553.    On or about November 22, 1994, Glock Ges.m.b.H. wired $1,414,220 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,258,848 "Commission"**

554.    On or about November 8, 1994, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1994.  The invoice was signed by Ewert.

555.    Glock Ges.m.b.H.'s "declared turnover" totaled $12,588,477.  Base Technical billed Glock Ges.m.b.H. $1,258,848 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1994.

556.    On or about February 21, 1995, Glock Ges.m.b.H. wired $1,258,848 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  The transfer was made through Harris Bank International in New York, NY as the correspondent bank.

**The $1,362,504 "Commission"**

557.    On or about February 15, 1995, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1994.  The invoice was signed by Ewert.

558.    Glock Ges.m.b.H.'s "declared turnover" totaled $13,625,039.  Base Technical billed Glock Ges.m.b.H. $1,362,504 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1994.

559.    On or about July 6, 1995, Glock Ges.m.b.H. wired $1,362,504 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  On information and belief, the transfer was made through Credit Suisse in New York, NY as the correspondent bank.

**The $1,755,957 "Commission"**

560.    On or about June 13, 1995, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1995.  The invoice was signed by Ewert.

561.    Glock Ges.m.b.H.'s "declared turnover" totaled $17,559,566.  Base Technical billed Glock Ges.m.b.H. $1,755,957 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1995.

562.    On or about November 21, 1995, Glock Ges.m.b.H. wired $1,755,957 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  On information and belief, the transfer was made through Credit Suisse in New York, NY as the correspondent bank.

**The $1,320,718 "Commission"**

563.    On or about October 12, 1995, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1995.

564.    Glock Ges.m.b.H.'s "declared turnover" totaled $13,207,180.  Base Technical billed Glock Ges.m.b.H. $1,320,718 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1995.

565.    On or about December 12, 1995, Glock Ges.m.b.H. wired $1,320,718 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  On information and belief, the transfer was made through Credit Suisse in New York, NY as the correspondent bank.

**The $1,128,506 "Commission"**

566.    On or about December 19, 1996, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1995.

567.    Glock Ges.m.b.H.'s "declared turnover" totaled $11,285,064.  Base Technical billed Glock Ges.m.b.H. $1,128,506 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1995.

568.    On or about May 29, 1996, Glock Ges.m.b.H. wired $1,128,506 from its account at Bank RZO to Base Technical's account at Banque Leu (Luxembourg).  On information and belief, the transfer was made through Credit Suisse in New York, NY as the correspondent bank.

**The $1,194,220 "Commission"**

569.    On or about May 3, 1996, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1995.

570.    Glock Ges.m.b.H.'s "declared turnover" totaled $11,942,200.  Base Technical billed Glock Ges.m.b.H. $1,194,220 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1995.

571.    On or about June 18, 1996, Glock Ges.m.b.H. wired $1,194,220 from its account at Bank RZO to Base Technical's account at Credit Suisse in New York, NY.

**The $1,474,724 "Commission"**

572.    On or about June 10, 1996, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1996.

573.   Glock Ges.m.b.H.'s "declared turnover" totaled $14,747,227.  Base Technical billed Glock Ges.m.b.H. $1,474,724 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1996.

574.   On or about October 8, 1996, Glock Ges.m.b.H. wired $1,474,724 from its account at Bank RZO to Base Technical's account at Creditanstalt Banverein.

**The $1,440,993 "Commission"**

575.   On or about August 13, 1996, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1996.

576.   Glock Ges.m.b.H.'s "declared turnover" totaled $14,409,934.  Base Technical billed Glock Ges.m.b.H. $1,440,993 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1996.

577.   On or about November 20, 1996, Glock Ges.m.b.H. wired $1,440,993 from its account at Bank RZO to Base Technical's account at Creditanstalt Banverein.

**The $1,300,601 "Commission"**

578.   On or about October 28, 1996, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of

sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1996.

579.   Glock Ges.m.b.H.'s "declared turnover" totaled $13,006,007.  Base Technical billed Glock Ges.m.b.H. $1,300,601 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1996.

580.   On or about August 29, 1997, Glock Ges.m.b.H. made an extraterritorial wire of $1,300,601 from its account at LGT Bank ("LGT Bank") to Base Technical.

## The $1,296,544 "Commission"

581.   On or about February 17, 1997, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1996.

582.   Glock Ges.m.b.H.'s "declared turnover" totaled $12,965,436.  Base Technical billed Glock Ges.m.b.H. $1,296,544 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1996.

583.   On or about September 12, 1997, Glock Ges.m.b.H. made an extraterritorial wire of $1,296,544 from its account at LGT Bank to Base Technical.

**The $1,211,186 "Commission"**

584.   On or about April 29, 1997, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1997.

585.   Glock Ges.m.b.H.'s "declared turnover" totaled $12,111,864.  Base Technical billed Glock Ges.m.b.H. $1,211,186 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1997.

586.   On or about January 28, 1998, Glock Ges.m.b.H. wired $1,211,186 from its account at LGT Bank to Base Technical.

**The $1,397,563 "Commission"**

587.   On or about July 15, 1997, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1997.

588.   Glock Ges.m.b.H.'s "declared turnover" totaled $13,975,633.  Base Technical billed Glock Ges.m.b.H. $1,397,563 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1997.

589.   On or about February 16, 1998, Glock Ges.m.b.H. wired $1,397,563 from its account at LGT Bank to Base Technical.

**The $1,004,119 "Commission"**

590.    On or about October 14, 1997, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1997.

591.    Glock Ges.m.b.H.'s "declared turnover" totaled $10,041,195.  Base Technical billed Glock Ges.m.b.H. $1,004,119 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1997.

592.    On or about April 20, 1998, Glock Ges.m.b.H. wired $1,004,119 from its account at LGT Bank to Base Technical.

**The $1,309,276 "Commission"**

593.    On or about February 9, 1998, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the fourth quarter of 1997.

594.    Glock Ges.m.b.H.'s "declared turnover" totaled $13,092,769.  Base Technical billed Glock Ges.m.b.H. $1,309,276 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the fourth quarter of 1997.

595.    On or about August 14, 1998, Glock Ges.m.b.H. wired $1,309,276 from its account at LGT Bank (now known as Invesco) to Base Technical.

**The $912,298 "Commission"**

596.    On or about April 15, 1998, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the first quarter of 1998.

597.    Glock Ges.m.b.H.'s "declared turnover" totaled $9,122,981.  Base Technical billed Glock Ges.m.b.H. $912,298 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the first quarter of 1998.

598.    On or about November 10, 1998, Glock Ges.m.b.H. wired $912,298 from its account at LGT Bank to Base Technical.

**The $1,457,245 "Commission"**

599.    On or about October 2, 1998, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the second quarter of 1998.  The invoice was signed by Ewert.

600.    Glock Ges.m.b.H.'s "declared turnover" totaled $14,572,450.  Base Technical billed Glock Ges.m.b.H. $1,457,245 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the second quarter of 1998.

601.    On or about February 2, 1999, Glock Ges.m.b.H. wired $1,457,245 from its account at LGT Bank to Base Technical.

**The $1,236,722 "Commission"**

602.    On or about November 10, 1998, Base Technical sent a sham invoice to Glock Ges.m.b.H. for "services [at] the agreed upon commission rates" of 10% of sales ("declared turnover") that took place in Africa, Europe, America, and the Middle and Far East for the third quarter of 1998.  The invoice was signed by Ewert.

603.    Glock Ges.m.b.H.'s "declared turnover" totaled $12,357,223.  Base Technical billed Glock Ges.m.b.H. $1,236,722 for commissions.  This was 10% of Glock Ges.m.b.H.'s "declared turnover" for the third quarter of 1998.

604.    On information and belief, Glock Ges.m.b.H. wired a payment of $1,236,722 to Base Technical in payment for these alleged "commissions."

**The $10,046,635 "Commissions"**

605.    On or about September 24, 1996 and November 5, 1998, Glock Ges.m.b.H. transferred a total of $10,046,635 to Base Technical's account xxx991 at Banque Leu (Luxembourg).  On information and belief, the funds that Glock Ges.m.b.H. transferred to Base Technical's account originated at Glock, Inc. and were stolen, unlawfully converted, or taken from Glock, Inc.  On information and

135

belief, Glock Sr. was aware that the funds had been stolen, unlawfully converted, or taken.

606.    The commissions billed by Base Technical and invoiced to Glock Ges.m.b.H. were a sham.  Base Technical did not provide any products, consulting, or other services to Glock Ges.m.b.H. at any time.  On information and belief, all of the funds paid by Glock Ges.m.b.H. for commissions billed by Base Technical originated at and were improperly taken from Glock, Inc.

607.    Each of the transfers described in paragraphs 527 through 606 constituted the receipt of stolen property by Glock Sr.

## VIII.  PREDICATE ACTS COMMITTED BY DEFENDANTS:  THEFT BY TAKING; THEFT BY DECEPTION; THEFT BY CONVERSION; THEFT BY RECEIVING STOLEN PROPERTY

608.    Plaintiff incorporates paragraphs 1 through 607 as if fully set forth herein.

609.    In addition to violating federal provisions against the transportation and receipt of stolen property, Defendants' conduct violated Georgia provisions prohibiting theft, including O.C.G.A. § 16-8-2 (theft by taking); § 16-8-3 (theft by deception); § 16-8-4 (theft by conversion); and/or § 16-8-7 (theft by receiving stolen property).

610.    Each violation of each of these statutes is a predicate act for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

611.    Defendants used a variety of methods to target Ms. Glock and injure her through their thefts.

**A.    Theft of 50% of Glock, Inc. from Ms. Glock**

612.    In violation of O.C.G.A. § 16-8-2, Defendants unlawfully took and unlawfully appropriated 50% of the ownership of Glock, Inc. — property to which Ms. Glock was rightfully entitled.

613.    The 50% ownership interest in Glock, Inc. was taken from Ms. Glock for little or no consideration.  The securities of Glock, Inc. were then gifted to a succession of entities entirely owned and controlled by Glock Sr.

614.    Glock Sr. and Defendant Manown backdated correspondence and agreements in order to effectuate the initial transfer of 50% of the shares of Glock, Inc.  Defendant Lohr participated in the subsequent transfer of the shares from Multipatent to Rochus.

615.    Glock Sr. obtained near-complete control over Glock, Inc., depriving Ms. Glock of interests to which she was entitled, through deceitful means or artful practice in violation of O.C.G.A. § 16-8-3.

616.    Glock Sr. and Defendants prevented Ms. Glock from acquiring information pertinent to the transfers of 50% of the ownership of Glock, Inc.

617.    Throughout the business partnership of Glock Sr. and Ms. Glock, Defendants created and confirmed Ms. Glock's impression that Glock Sr. was conducting the affairs of the Company in a legal and legitimate manner and that he was not stealing from the Company.  Defendants, however, knew that this impression was false.  Moreover, they failed to correct Ms. Glock's false impression.

618.    In violation of O.C.G.A. § 16-8-4, Glock Sr. and Defendants converted 50% of the ownership of Glock, Inc. to Glock Sr.'s own use in violation of his legal obligations to his business partner, Ms. Glock.

619.    Through the multiple transfers of ownership of Glock, Inc., Glock Sr. and Defendants brought 50% of the ownership of Glock, Inc. under the sole and exclusive control of Glock Sr.  Glock Sr. and Defendants were aware that this ownership interest had been stolen from Ms. Glock.  Glock Sr. received, disposed of, and retained this stolen property in violation of O.C.G.A. § 16-8-7.

620.    Defendants intended to deprive Ms. Glock of her interest in 50% of Glock, Inc.  Defendants took this value from Ms. Glock and put it directly into Glock Sr.'s own pockets.

B.      **Sham Royalty/Licensing Payments**

621.    Glock Sr. and Defendants caused Glock, Inc. and Glock Ges.m.b.H. to make improper "royalty" or "licensing" payments directly to Glock Sr.  On information and belief, such payments were also made into the Value Foundation.  At least a portion of the royalty/licensing payments made by Glock Ges.m.b.H. used funds that had been improperly taken from Glock, Inc.  There was no basis for Glock, Inc. or Glock Ges.m.b.H. to make royalty or licensing payments to Glock Sr. or to the Value Foundation for use of any trademarks.

622.    In violation of O.C.G.A. § 16-8-2, Defendants unlawfully took or unlawfully appropriated funds from Glock, Inc. in which Ms. Glock had an interest through the use of royalty/licensing payments made to Glock Sr. and, on information and belief, the Value Foundation.

623.    Glock Sr. obtained over €122 million in royalty/licensing payments through deceitful means or artful practice, in violation of O.C.G.A. § 16-8-3.

624.    Throughout the business partnership of Glock Sr. and Ms. Glock, Defendants created and confirmed Ms. Glock's impression that Glock Sr. was conducting the affairs of the Company in a legal and legitimate manner and that he was not stealing from the Company.  Defendants, however, knew that this impression was false.  Moreover, they failed to correct Ms. Glock's false impression.

625.   In violation of O.C.G.A. § 16-8-4, Glock Sr. and Defendants converted any legitimate royalty/licensing payments that should have been made by Glock, Inc. to Glock Ges.m.b.H. to Glock Sr.'s own use in violation of his legal obligations to his business partner, Ms. Glock.

626.   Through the royalty/licensing payments, Defendants took funds from Glock, Inc. and put them under the sole and exclusive control of Glock Sr. Glock Sr. and Defendants were aware that these payments had been stolen. Glock Sr. received, disposed of, and retained this stolen property in violation of O.C.G.A. § 16-8-7.

627.   Defendants set up the royalty/licensing payments for the purpose of siphoning funds from Glock, Inc. and depriving Ms. Glock of her interest in them.

628.   Defendants intended to deprive Ms. Glock of her interest in the funds that were used to make royalty/licensing payments to Glock Sr. and the Value Foundation.

629.   The royalty/licensing payments made by Glock, Inc. and Glock Ges.m.b.H. using funds taken from Glock, Inc. deprived Ms. Glock of the value of her ownership interests in Glock Ges.m.b.H. and Glock, Inc., her interests in the overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that otherwise would have been paid to her but for Defendants' scheme.

**C.      Fraudulent Invoicing/Billing Companies**

630.    Defendants directed that Glock, Inc. make payments to (a) Glock Hong Kong on the Fraudulent HK Invoices and (b) Glock America on the Fraudulent Americas Invoices despite the fact that those entities never provided any services or products to Glock, Inc.

631.    In violation of O.C.G.A. § 16-8-2, Defendants unlawfully took and unlawfully appropriated funds from Glock, Inc. — property to which Ms. Glock was rightfully entitled through her ownership of Glock Ges.m.b.H. — and directed that those funds be transferred to Glock Hong Kong and Glock America.

632.    Glock Sr. obtained control over funds that Glock, Inc. paid out on the Fraudulent HK Invoices and the Fraudulent Americas Invoices, depriving Ms. Glock of interests to which she was entitled, through deceitful means or artful practice in violation of O.C.G.A. § 16-8-3.

633.    Glock Sr. and Defendants prevented Ms. Glock from acquiring information pertinent to their fraudulent invoicing/billing scheme, including through the use of sham invoices for products and services that were never provided.

634.    Throughout the business partnership of Glock Sr. and Ms. Glock, Defendants created and confirmed Ms. Glock's impression that Glock Sr. was conducting the affairs of the Company in a legal and legitimate manner and that

he was not stealing from the Company.  Defendants, however, knew that this impression was false.  Moreover, they failed to correct Ms. Glock's false impression.

635.    In violation of O.C.G.A. § 16-8-4, Glock Sr. and Defendants converted the amounts paid by Glock, Inc. on the Fraudulent HK Invoices and Fraudulent Americas Invoices to Glock Sr.'s own use in violation of his legal obligations to his business partner, Ms. Glock.

636.    Through multiple series of wire transfers of monies that Glock, Inc. paid on the Fraudulent HK Invoices and Fraudulent Americas Invoices, Glock Sr. and Defendants brought these funds under the sole and exclusive control of Glock Sr. and his associates.  Glock Sr. and Defendants were aware that these funds had been stolen from Ms. Glock.  Glock Sr. and Defendants received, disposed of, and retained this stolen property in violation of O.C.G.A. § 16-8-7.

637.    Defendants set up the fraudulent billing/invoicing system in order to drain funds out of Glock, Inc. and deprive Ms. Glock of her interest in them. This system stole money from Glock, Inc. in order to put the funds into Glock Sr.'s control — to the detriment of Ms. Glock.

638.    The payments made by Glock, Inc. on the Fraudulent HK Invoices and Fraudulent Americas Invoices deprived Ms. Glock of the value of her ownership interests in Glock Ges.m.b.H. and Glock, Inc., her interests in the

overall value of Glock Ges.m.b.H. and Glock, Inc., and dividends that otherwise would have been paid to her but for Defendants' scheme.

**D.    Fraudulent Leases Between Consultinvest and Glock, Inc.**

639.    From the 1980s to today, Defendants have improperly transferred funds out of Glock, Inc. to Consultinvest using a series of fraudulent and improper lease agreements.  Payments made by Glock, Inc. on those leases were, at certain points, transferred out of Consultinvest and into Warwick and UEF. All of those entities were entirely owned or controlled by Glock Sr. and his associates.

640.    In violation of O.C.G.A. § 16-8-2, Defendants unlawfully took and unlawfully appropriated funds from Glock, Inc. — property to which Ms. Glock was rightfully entitled — using the sham Expanded Lease Agreement, Lease Option Agreement, the Machinery Equipment Lease, and other improper lease agreements.  These illicit funds were then used by Consultinvest to, among other things, make payments on fake loan agreements with Warwick and UEF.

641.    Glock Sr. and Defendants obtained control over monies paid by Glock, Inc. on the sham lease agreements, depriving Ms. Glock of interests to which she was entitled, through deceitful means or artful practice in violation of O.C.G.A. § 16-8-3.

642.    In particular, Glock Sr. and Defendants Ewert and Manown prevented Ms. Glock from acquiring information pertinent to the improper lease payments made to Consultinvest and fraudulent loan payments made by Consultinvest.  They used backdated and fraudulent agreements, and stood on both sides of the lease and loan agreements — supposedly arm's-length transactions.

643.    Throughout the business partnership of Glock Sr. and Ms. Glock, Defendants created and confirmed Ms. Glock's impression that Glock Sr. was conducting the affairs of the Company in a legal and legitimate manner and that he was not stealing from the Company.  Defendants, however, knew that this impression was false.  Moreover, they failed to correct Ms. Glock's false impression.

644.    In violation of O.C.G.A. § 16-8-4, Glock Sr. and Defendants converted the improper lease payments from Glock, Inc. to Consultinvest to their own use by, among other things, using the funds to pay fake loans between Consultinvest and other members of the so-called Glock Group.  This conduct was in violation of the legal obligations Glock Sr. and Defendants owed to Glock Sr.'s business partner, Ms. Glock.

645.    Through the sham Expanded Lease Agreement, Lease Option Agreement, the Machinery Equipment Lease, other improper lease agreements,

and fake loans Consultinvest had with Warwick and UEF, Glock Sr. and Defendants brought the lease payments made by Glock, Inc. under their own control.  Glock Sr. and Defendants were aware that these funds had been stolen from Ms. Glock.  Glock Sr. and Defendants received, disposed of, and retained this stolen property in violation of O.C.G.A. § 16-8-7.

646.    Defendants intended to deprive Ms. Glock of her interest in the improper lease payments made by Glock, Inc.  Defendants took this value from Ms. Glock and put it directly into Glock Sr.'s own pockets.

## IX.    PREDICATE ACTS COMMITTED BY DEFENDANTS:  FORGERY

647.    Plaintiff incorporates paragraphs 1 through 343 and 408 through 470 as if fully set forth herein.

648.    Defendants violated O.C.G.A. §§ 16-9-1(b) and (c), which prohibit forgery, through their repeated use of forged documents to effectuate parts of their RICO scheme.

649.    Each violation of the provisions prohibiting forgery is a predicate act for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

**A.      Forgery Used to Steal Ownership over 50% of Glock, Inc.**

650.     In order to steal 50% of the ownership of Glock, Inc. and transfer that ownership into Glock Sr.'s sole and exclusive control, Glock Sr. and Defendant Manown and Glock Sr. prepared false, backdated documents.

651.     Shortly after Glock, Inc. was incorporated, Glock Sr. ordered that 50% of its shares be fraudulently given to Unipatent.  The documents implementing this transfer were backdated to January 1986 — more than a year before Glock Sr. acquired either Unipatent or its direct parent, Reofin.

652.     In acquiring shell companies to form part of the "Glock Group," it was important to Glock Sr. that these companies had already been in existence prior to the formation of Glock, Inc.  That way, Manown could backdate the corporate records for Glock, Inc., to create the appearance that the whole structure had been in place *ab initio*.

653.     These backdated documents were created for the purpose of "papering" Defendants' activities and to conceal their thefts from Ms. Glock.  Defendants intended to defraud Ms. Glock out of her interest in ownership of 50% of Glock, Inc.

**B.      Forgeries in Connection with the Master Agreements**

654.     The various Master Agreements (among (a) Glock Ges.m.b.H., Unipatent, and Base Technical and (b) Glock Ges.m.b.H., Glock, Inc., Glock Hong

Kong, and Glock America) were all backdated in order to defraud Ms. Glock. Glock Sr. and his associates stood on both sides of each and every contractual relationship set forth in the Master Agreements. The only purpose for these relationships was to siphon or divert monies away from Glock, Inc., Glock Ges.m.b.H., in order to directly harm Ms. Glock.

655.   The Master Agreement among Glock Ges.m.b.H., Unipatent, and Base Technical, was purportedly effective November 1, 1985. Unipatent, however, did not become part of the "Glock Group" until at least 1986. Base Technical was not incorporated until 1991.

656.   No services envisioned by the Master Agreement were ever provided to Glock Ges.m.b.H. by Base Technical. On information and belief, Glock Ges.m.b.H. obtained from Glock, Inc. the funds that were paid out to Base Technical under the Master Agreement.

657.   Defendants' fraudulent invoicing/billing program was also based on a set of backdated "Master Agreements." Those backdated documents were used by Defendants as a basis for Glock, Inc. to make payments on the Fraudulent HK Invoices and the Fraudulent Americas Invoices.

658.   The Master Agreements were backdated in order to help Defendants effectuate their fraud against Ms. Glock.

C.      **Forged Lease Documents**

659.    As part of their thefts and laundering of funds through Consultinvest, Defendants backdated certain of the improper lease agreements between Glock, Inc. and Consultinvest.

660.    Ewert's June 10, 1998 letter to Manown directed that, if interest payments on the "loans" fell due before a final lease agreement was in place with Glock, Inc., Manown was to contact Karl Walter (of Glock, Inc.) to obtain the lease payment anyway.  Glock Sr. directed Walter to transfer $40,000 from Glock, Inc. to Consultinvest for that premature lease payment.

661.    Defendants also backdated the Expanded Lease Agreement, which was effective as of April 1, 1990.  The document itself, however, does not appear to have been drafted until August or September 1991.  Ewert signed the Expanded Lease Agreement on behalf of Consultinvest and it was discussed with Glock Sr.

X.      **PREDICATE ACTS COMMITTED BY DEFENDANTS:  MAIL/WIRE FRAUD**

A.      **Fraudulent Transfers from Glock, Inc. to Glock Hong Kong**

662.    Plaintiff incorporates paragraphs 1 through 343 and 362 through 407 as if fully set forth herein.

663.    Each set of transfers described in the following paragraphs (664 to 768) was a step in Defendants' scheme to fraudulently taken money stolen from Glock, Inc. and wire it from Glock, Inc. to companies under the control and ownership of Glock Sr. and his associates.  Each set of transfers was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively). Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

**The $588,810.64 Transfer**

664.    On or about March 15, 1996, Defendants directed Glock, Inc. to wire $588,810.64 to Glock Hong Kong's Credit Suisse HK Account.

665.    On information and belief, this transfer of funds was made to pay Fraudulent HK Invoices.  It did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

666.    On information and belief, the March 15, 1996 transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

667.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 367 to 370 above).

**The $3,019,040.53 and $2,702,977.10 Transfers**

668.   On or about May 14, 1996, Defendants directed Glock, Inc. to wire $3,019,040.53 from its Bank of East Asia Ltd. account in Hong Kong to Glock Hong Kong's Credit Suisse HK Account.

669.   This payment was purportedly for Glock Hong Kong Invoices 503, 504, 505, 506, and 507.  Those invoices were, in fact Fraudulent HK Invoices.

670.   Glock Hong Kong initially kept approximately 10.5% of the funds wired to it by Glock, Inc. on May 14.  The remainder of the funds was transferred to Glock Ges.m.b.H.

671.   On or about May 20, 1996, Defendants directed Glock Hong Kong to wire $2,702,977.10 from its Credit Suisse account to Glock Ges.m.b.H.'s account xx-xx.xxx.423 at Bank RZO in Vienna (the "May 20 Transfer").  On information and belief, Glock Sr., his associate Westwater, and Willam knew about this transfer.

672.   The May 20 Transfer was purportedly for invoices E5634/11658, E5495/11326, E5621/11626, E5738/11887.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

673.   At the time of the May 20 Transfer, Glock Hong Kong did not have sufficient funds to wire $2,702,977.10 to Glock Ges.m.b.H., other than through

using funds it had been wired from Glock, Inc.'s bank account on or about May 14.

674.    The May 20 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

675.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 371 to 374 above).

**The $3,499,303.40 and $3,069,680 Transfers**

676.    On or about June 21, 1996, Defendants directed Glock, Inc. to wire $3,499,303.40 from its Wachovia account in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

677.    This payment was purportedly for Glock Hong Kong invoices 508, 509, 510CN, 512, and 513.  Those invoices were, in fact, Fraudulent HK Invoices.

678.    Glock Hong Kong initially kept approximately 12.3% of the funds wired to it by Glock, Inc. on June 21.  The remainder of the funds was transferred to Glock Ges.m.b.H.

679.    On or about June 27, 1996, Defendants directed Glock Hong Kong to wire $3,069,680 from its Credit Suisse account to Glock Ges.m.b.H.'s account xx-xx.xxx.423 at Bank RZO in Vienna, Austria (the "June 27 Transfer").

680.    The June 27 Transfer was purportedly for invoices E5794/11996, E5855/12122, C/N G0137/138, E5980/12404, and E6086/12636.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

681.    On information and belief, at the time of the June 27 Transfer, Glock Hong Kong did not have sufficient funds to wire $3,069,680 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about June 21.

682.    The June 27 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

683.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 375 to 377 above).

**The $942,137.90 and $836,738 Transfers**

684.    On or about July 31, 1996, Defendants directed Glock, Inc. to wire $942,137.90 from its account at Wachovia in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

685.    This payment was purportedly for Glock Hong Kong invoice 514. That invoice was, in fact, a Fraudulent HK Invoice.

686.    Glock Hong Kong initially kept approximately 11.2% of the funds wired to it by Glock, Inc. on July 31.  The remainder of the funds was transferred to Glock Ges.m.b.H.

687.    On or about August 7, 1996, Defendants directed Glock Hong Kong to wire $836,738 from its Credit Suisse account to Glock Ges.m.b.H.'s account at RZO Bank in Vienna (the "August 7 Transfer").

688.    The August 7 Transfer was not in payment for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

689.    At the time of the August 7 Transfer, Glock Hong Kong did not have sufficient funds to wire $836,738 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about July 31.

690.    The August 7 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

691.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 378 to 380 above).

**The $1,081,269.50 and $980,855 Transfers**

692.    On or about August 16, 1996, Defendants directed Glock, Inc. to wire $1,081,269.50 from its account in Georgia to Glock Hong Kong's Credit Suisse HK Account.

693.    On information and belief, this transfer of funds was made to pay Fraudulent HK Invoices.  It did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

694.    Glock Hong Kong initially kept approximately 9.3% of the funds wired to it by Glock, Inc. on August 16.  The remainder of the funds was transferred to Glock Ges.m.b.H.

695.    On or about August 23, 1996, Defendants directed Glock Hong Kong to wire $980,855 from its Credit Suisse account to Glock Ges.m.b.H.'s account at RZO Bank in Vienna (the "August 23 Transfer").

696.    On information and belief, the August 23 Transfer was not payment for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

697.    At the time of the August 23 Transfer, Glock Hong Kong did not have sufficient funds to wire $980,855 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about August 16.

154

698.   The August 23 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

699.   In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 381 to 383 above).

**The $1,548,895.20 and $1,403,734.40 Transfers**

700.   On or about September 24, 1996, Defendants directed Glock, Inc. to wire $1,548,895.20 from its account at Wachovia in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.  On information and belief, Glock Sr., his associate Westwater, and Willam knew about this transfer.

701.   This payment was purportedly for Glock Hong Kong invoices 515, 517, and 518.  Those invoices were, in fact, Fraudulent HK Invoices.

702.   Glock Hong Kong initially kept approximately 9.4% of the funds wired to it by Glock, Inc. on September 24.  The remainder of the funds was transferred to Glock Ges.m.b.H.

703.   On or about October 1, 1996, Defendants directed Glock Hong Kong to wire $1,403,734.40 from its Credit Suisse account to Glock Ges.m.b.H.'s account at RZO Bank in Vienna (the "October 1 Transfer").  On information and belief, Glock Sr., his associate Westwater, and Willam knew about this transfer.

704.    The October 1 Transfer was purportedly for invoices E6254/12973, E6258/12982, and E6280/13254.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

705.    At the time of the October 1 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,403,734.40 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about September 24.

706.    The October 1 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

707.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 384 to 386 above).

**The $1,278,478.50 and $1,084,766.90 Transfers**

708.    On or about October 17, 1996, Defendants directed Glock, Inc. to wire $1,278,478.50 from its account at Wachovia in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

709.    This payment was purportedly for Glock Hong Kong invoices 519, 520, 521, and 522.  Those invoices were, in fact, Fraudulent HK Invoices.

710.   Glock Hong Kong initially kept approximately 15.2% of the funds wired to it by Glock, Inc. on October 17.  The remainder of the funds was transferred to Glock Ges.m.b.H.

711.   On or about October 24, 1996, Defendants directed Glock Hong Kong to wire $1,084,766.90 from its Credit Suisse account to Glock Ges.m.b.H.'s account xxxxx-xxx-900 at Bank für Arbeit und Wirtschaft ("BAWAG") in Vienna, Austria (the "October 24 Transfer").

712.   On information and belief, the October 24 Transfer was not payment for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

713.   At the time of the October 24 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,084,766.90 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about October 17.

714.   The October 24 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

715.   In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 387 to 389 above).

**The $1,099,659.10 and $1,060,754.70 Transfers**

716.    On or about November 23, 1996, Defendants directed Glock, Inc. to wire $1,099,659.10 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

717.    On information and belief, this transfer of funds was made to pay Fraudulent HK Invoices.  It did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

718.    Glock Hong Kong initially kept approximately 3.5% of the funds wired to it by Glock, Inc. on November 23.  The remainder of the funds was transferred to Glock Ges.m.b.H.

719.    On or about December 2, 1996, Defendants directed Glock Hong Kong to wire $1,060,754.70 from its Credit Suisse account to Glock Ges.m.b.H.'s account at BAWAG in Vienna (the "December 2 Transfer").

720.    The December 2 Transfer was purportedly for invoice E630/13130 and part of invoice E6315/13115.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

721.    At the time of the December 2 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,060,754.70 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about November 23.

158

722.    The December 2 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the sole control of Glock Sr.

723.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 390 to 392 above).

**The $1,181,487.80 and $1,060,124.50 Transfers**

724.    On or about January 9, 1997, Defendants directed Glock, Inc. to wire $1,181,487.80 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

725.    This payment was purportedly for Glock Hong Kong invoices 524, 525, and 526.  Those invoices were, in fact, Fraudulent HK Invoices.

726.    Glock Hong Kong initially kept approximately 10.3% of the funds wired to it by Glock, Inc. on January 9.  The remainder of the funds was transferred to Glock Ges.m.b.H.

727.    On or about February 14, 1997, Defendants directed Glock Hong Kong to wire $1,060,124.50 (with a value date of February 17, 1997) from its Credit Suisse account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "February 17 Transfer").

728.    The February 17 Transfer was purportedly for invoices E6478/13414, E6613/13725, and E6631/13848.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

729.    At the time of the February 17 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,060,124.50 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about January 9.

730.    The February 17 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

731.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 393 to 395 above).

**The $2,112,092.70 and $1,894,418.60 Transfers**

732.    On or about February 13, 1997, Defendants directed Glock, Inc. to wire $2,112,092.70 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

733.    On information and belief, this transfer of funds was made to pay Fraudulent HK Invoices.  It did not represent compensation for the shipment or provision of any products from Glock Hong Kong to Glock, Inc.

734.    Glock Hong Kong initially kept approximately 10.3% of the funds wired to it by Glock, Inc. on February 13.  The remainder of the funds was transferred to Glock Ges.m.b.H.

735.    On or about February 14, 1997, Defendants directed Glock Hong Kong to wire $1,894,418.60 (with a value date of February 25, 1997) from its Credit Suisse account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "February 25 Transfer").

736.    The February 25 Transfer was purportedly for invoices E6642/13780 and E6816/14122.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

737.    At the time of the February 25 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,894,418.60 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about February 13.

738.    The February 25 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

739.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 396 to 398 above).

**The $682,924.70 and $594,519.80 Transfers**

740.    On or about February 19, 1997, Defendants directed Glock, Inc. to wire $682,924.70 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

741.    This payment was purportedly for Glock Hong Kong invoice 529.  In fact, invoice 529 was a Fraudulent HK Invoice.

742.    Glock Hong Kong initially kept approximately 12.9% of the funds wired to it by Glock, Inc. on February 19.  The remainder of the funds was transferred to Glock Ges.m.b.H.

743.    On or about February 21, 1997, Defendants directed Glock Hong Kong to wire $594,519.80 (with a value date of February 27,1997) from its Credit Suisse account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "February 27 Transfer").

744.    The February 27 Transfer was purportedly for invoice E6807/14112. In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

745.    At the time of the February 27 Transfer, Glock Hong Kong did not have sufficient funds to wire $594,519.80 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about February 19.

162

746.    The February 27 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

747.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 399 to 401 above).

**The $1,374,606.70 Transfer**

748.    On or about April 8, 1997, Defendants directed Glock Hong Kong to wire $1,374,606.70 (with a value date of April 9, 1997) from its Credit Suisse HK Account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "April 9 Transfer"). On information and belief, Glock Sr., his associate Westwater, and Willam knew about this transfer.

749.    The April 9 Transfer was purportedly for invoices 529, 530, and 531. In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

750.    Invoice 529 represented the same invoice number for which Glock, Inc. had wired funds to Glock Hong Kong's Credit Suisse bank account on February 19, 1997.

751.    On information and belief, at the time of the April 9 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,374,606.70 to Glock

Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia.

752.    The April 9 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the sole control of Glock Sr.

**The $1,663,361.80 and $1,484,880.80 Transfers**

753.    On or about April 22, 1997, Defendants directed Glock, Inc. to wire $1,663,361.80 from its Credit Suisse account in New York to Glock Hong Kong's Credit Suisse HK Account.

754.    This payment was purportedly for Glock Hong Kong invoices 532 and 533.  Those invoices were, in fact, Fraudulent HK Invoices.

755.    Glock Hong Kong initially kept approximately 10.7% of the funds wired to it by Glock, Inc. on April 22.  The remainder of the funds was transferred to Glock Ges.m.b.H.

756.    On or about April 23, 1997, Defendants directed Glock Hong Kong to wire $1,484,880.80 (with a value date of April 29, 1997) from its Credit Suisse account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "April 29 Transfer").

757.    The April 29 Transfer was purportedly for invoices E7023/14645 and E7047/14713.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

758.    On information and belief, at the time of the April 29 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,484,880.80 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in New York on or about April 22.

759.    The April 29 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the control of Glock Sr. and his associates.

760.    In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 402 to 404 above).

**The $2,944,831.90 and $2,580,270 Transfers**

761.    On or about June 16, 1997, Defendants directed Glock, Inc. to wire $2,944,831.90 from its account at NationsBank in Atlanta, Georgia to Glock Hong Kong's Credit Suisse HK Account.

762.    This payment was purportedly for Glock Hong Kong invoices 534, 535, 536, 538, and CN/573.  Those invoices were, in fact, Fraudulent HK Invoices.

763.     Glock Hong Kong initially kept approximately 12.4% of the funds wired to it by Glock, Inc. on June 16.  The remainder of the funds was transferred to Glock Ges.m.b.H.

764.     On or about June 17, 1997, Defendants directed Glock Hong Kong to wire $2,580,270 (with a value date of June 24, 1997) from its Credit Suisse account to Glock Ges.m.b.H.'s BAWAG account in Vienna (the "June 24 Transfer").

765.     The June 24 Transfer was purportedly for invoices E7274/15220, E7493/15667, E7344/15343, E7598/15901 and G0200/201.  In fact, these invoices were not for actual goods or services provided by Glock Ges.m.b.H. to Glock Hong Kong.

766.     On information and belief, at the time of the June 24 Transfer, Glock Hong Kong did not have sufficient funds to wire $2,580,270 to Glock Ges.m.b.H., other than through using funds it had been wired from Glock, Inc.'s bank account in Atlanta, Georgia on or about June 16.

767.     The June 24 Transfer was made for the purpose of masking Glock, Inc. as the source of the funds and to move the funds into the sole control of Glock Sr.

768.     In addition to constituting wire fraud, the transfer of funds from Glock, Inc. to Glock Hong Kong violated 18 U.S.C. § 2314 (*see* paragraphs 405 to 407 above).

**B.      Fraudulent Transfers from Glock Hong Kong to Minami**

769.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

770.    Each of the transfers described in the following paragraphs (774 to 886) was a step in Defendants' scheme to take money appropriated from Glock, Inc. and to fraudulently wire it from Glock, Inc. to companies under the control and ownership of Glock Sr. and his associates.  Each transfer was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).  Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

771.    Although Glock Hong Kong made payments to Minami for purported "consultancy" or "marketing" in Australia, China, India, Malaysia, Macao, New Zealand, Pakistan, Philippines, Singapore, South Korea, Taiwan, and Thailand, Glock Hong Kong already had a separate agreement with a consultant to "carry out sales and marketing activities" in most of those (and other Asian) countries.  The consultant, Pacific Sources International Ltd., was ostensibly controlled by Westwater, who was an associate of Glock Sr.

772.    Glock Hong Kong illegally transferred by wire $19,758,853 to Minami over a period of 10 years — from August 31, 1989 through July 22, 1998.

All of the funds wired to Minami by Glock Hong Kong originated at and were improperly taken from Glock, Inc.

773.   Glock Sr. personally authorized BfG Hong Kong to permit Westwater to "arrange transfers" from the Glock Hong Kong account to Minami's UBS account in Hong Kong.

**The $1,050,000 Transfer to Minami**

774.   On or about June 19, 1990, Glock Hong Kong wired $1,050,000 from its BfG Hong Kong account numbered xxxxxxx803 to Minami's account numbered xxx.464 at UBS in Hong Kong (the "June 19 Transfer").

775.   The June 19 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami.  Minami, however, never provided any services or products to Glock Hong Kong at any time.

776.   Because the June 19 Transfer was denominated in United States dollars, on information and belief, the wire was covered by Bank of America International in New York (as the correspondent bank for BfG) and paid to the Bank of New York in New York (the correspondent bank for UBS).

777.   On information and belief, at the time of the June 19 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,050,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in

the United States, in payment on Fraudulent HK Invoices (and interest earned

thereon, which rightfully belonged to Glock, Inc.).

778.   The June 19 Transfer was made for the purpose of masking Glock,

Inc. as the original source of the funds and to move the funds into the control of

Glock Sr. and his associates.

**The $1,150,000 Transfer to Minami**

779.   On or about September 19, 1990, Glock Hong Kong wired $1,150,000

from its BfG Hong Kong account numbered xxxxxxx803 to Minami's account

numbered xxx.464 at UBS in Hong Kong (the "September 19 Transfer").

780.   The September 19 Transfer was purportedly to pay for "consultancy

services" that had been provided by Minami.  Minami, however, never provided

any services or products to Glock Hong Kong at any time.

781.   Because the September 19 Transfer was denominated in United

States dollars, on information and belief, the wire was covered by Bank of

America International in New York (as the correspondent bank for BfG) and paid

to the Bank of New York in New (the correspondent bank for UBS).

782.   On information and belief, at the time of the September 19 Transfer,

Glock Hong Kong did not have sufficient funds to wire $1,150,000 to Minami,

other than through using funds it had been wired from Glock, Inc.'s bank

accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

783.    The September 19 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $1,210,000 Transfer to Minami**

784.    On or about December 17, 1990, Glock Hong Kong wired $1,210,000 from its BfG Hong Kong account numbered xxxxxxx803 to Minami's account numbered xxx.464 at UBS or account numbered xxx-xxx-x203 at BfG in Hong Kong (the "December 17 Transfer").

785.    The December 17 Transfer was purportedly to pay for "marketing costs" that had been incurred by Minami on behalf of Glock Hong Kong. Minami, however, never provided any services or products to Glock Hong Kong at any time.

786.    On information and belief, at the time of the December 17 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,210,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment for the Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

787.   The December 17 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $700,000 Transfer to Minami**

788.   On or about May 14, 1991, Glock Hong Kong wired $700,000 from its BfG Hong Kong account numbered xxxxxx803 to Minami's account numbered xxx.464 at UBS or account numbered xxx-xxx-x203 at BfG in Hong Kong (the "May 14 Transfer").

789.   The May 14 Transfer was purportedly to pay for "marketing costs" that had been incurred by Minami on behalf of Glock Hong Kong.  Minami, however, never provided any services or products to Glock Hong Kong at any time.

790.   On information and belief, at the time of the May 14 Transfer, Glock Hong Kong did not have sufficient funds to wire $700,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

791.   The May 14 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

171

**The $2,120,000 Transfer to Minami**

792.    On or about December 13, 1991, Glock Hong Kong wired $2,120,000 from its BfG Hong Kong account numbered xxxxxxx803 to Minami's account numbered xxx.464 at UBS or account numbered xxx-xxx-x203 at BfG in Hong Kong (the "December 13 Transfer").

793.    The December 13 Transfer was purportedly to pay for "marketing costs" that had been incurred by Minami on behalf of Glock Hong Kong. Minami, however, never provided any services or products to Glock Hong Kong at any time.

794.    On information and belief, at the time of the December 13 Transfer, Glock Hong Kong did not have sufficient funds to wire $2,120,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

795.    The December 13 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $1,800,000 Transfer to Minami**

796.    On or about March 23, 1993, Glock Hong Kong wired $1,800,000 from its account numbered xxxxx-USD-xxxx-02 at Bayerische Hypotheken und

Wechsel-Bank ("Hypo-Bank') in Hong Kong to Minami's account numbered xxx.464 at UBS or account numbered xxx-xxx-x203 at BfG in Hong Kong (the "March 23 Transfer").  A record of this transaction was sent to Glock Sr.'s associate Westwater.

797.   The March 23 Transfer was purportedly to pay for "marketing costs" that had been incurred by Minami on behalf of Glock Hong Kong.  Minami, however, never provided any services or products to Glock Hong Kong at any time.

798.   On information and belief, at the time of the March 23 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,800,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

799.   The March 23 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into control of Glock Sr. and his associates.

**The $1,550,000 Transfer to Minami**

800.   On or about December 28, 1994, Glock Hong Kong wired $1,550,000 from its account numbered xxxxxx-USD-xxxx-02 Hypo-Bank in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "December 28

Transfer").  A copy of the account statement reflecting this transaction was sent to Ewert.

801.   The December 28 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami during 1993.

802.   During each quarter of 1993, Minami allegedly "develop[ed] market potential for Glock products" in China, India, Thailand, Malaysia, Taiwan, Macao, Australia, New Zealand, Philippines, Pakistan, Singapore, and South Korea.

803.   Minami sent invoices to Glock Hong Kong for those alleged services dated April 5, 1993 ($410,000 for the first quarter of 1993); July 7, 1993 ($390,000, second quarter); October 4, 1993 ($385,000, third quarter); and December 6, 1993 ($365,000, fourth quarter).  (Each of the four quarterly invoices from Minami repeated the spelling errors of "Autralia" and "Philipinnes.")

804.   Each of the invoices was signed by Ewert.

805.   Despite those invoices, Minami never provided any actual services or products to Glock Hong Kong at any time.

806.   On information and belief, at the time of the December 28 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,550,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank

accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

807.   The December 28 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $2,200,000 Transfer to Minami**

808.   On or about August 16, 1995, Glock Hong Kong wired $2.2 million from its account numbered xxxxxx-USD-xxxx-02 at Hypo-Bank in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "August 16 Transfer").  A copy of the account statement reflecting this transaction was sent to Ewert.

809.   The August 16 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami during 1994 and the first quarter of 1995.

810.   During each quarter of 1994 and the first quarter of 1995, Minami allegedly "develop[ed] market potential for Glock products" in countries including Australia, China, India, Malaysia, Macao, New Zealand, Pakistan, Philippines, Singapore, South Korea, Taiwan, and Thailand.

811.   Minami sent invoices to Glock Hong Kong for those alleged services dated April 11, 1994 ($385,000 for the first quarter of 1994); July 14, 1994

($405,000, second quarter); October 6, 1994 ($415,000, third quarter); December 29, 1994 ($495,000, fourth quarter); and March 29, 1995 ($500,000, first quarter 1995).  (Each of the quarterly invoices from Minami again misspelled Philippines with a different spelling from the 1993 invoices—"Philipines.")

812.   Each of the invoices was signed by Ewert.

813.   Despite those invoices, Minami never provided any actual services or products to Glock Hong Kong at any time.

814.   On information and belief, at the time of the August 16 Transfer, Glock Hong Kong did not have sufficient funds to wire $2.2 million to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

815.   The August 16 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $807,500 Transfer to Minami**

816.   On or about December 20, 1995, Glock Hong Kong wired $807,500 from its account numbered xxxxxx-USD-xxxx-02 at Hypo-Bank in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "December 20

Transfer").  A copy of the account statement reflecting this transaction was sent to Ewert.

817.    The December 20 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami during the second quarter of 1995.

818.    During the second quarter of 1995, Minami allegedly "develop[ed] market potential for Glock products" in countries including Australia, China, India, Malaysia, Macao, New Zealand, Pakistan, Philippines, Singapore, South Korea, Taiwan, and Thailand.

819.    Minami sent an invoice to Glock Hong Kong for the alleged services dated July 23, 1995 in the amount of $807,5000.  (The invoice again misspelled Philippines as "Philipines.")

820.    The invoice was signed by Ewert.

821.    Despite that invoice, Minami never provided any actual services or products to Glock Hong Kong at any time.

822.    On information and belief, at the time of the December 20 Transfer, Glock Hong Kong did not have sufficient funds to wire $807,500 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

823.    The December 20 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $482,830 Transfer to Minami**

824.    On or about April 22, 1996, Glock Hong Kong wired $482,830 from its account numbered xxx-x-xxxx22-8 at Standard Chartered Bank in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "April 22 Transfer").  A copy of the account statement reflecting this transaction was sent to Ewert.

825.    The April 22 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami during the third and fourth quarters of 1995.

826.    During the third and fourth quarters of 1995, Minami allegedly "develop[ed] market potential for Glock products" in countries including Australia, China, India, Malaysia, Macao, New Zealand, Pakistan, Philippines, Singapore, South Korea, Taiwan, and Thailand.

827.    Minami sent invoices to Glock Hong Kong for those alleged services dated October 24, 1995 ($400,000 for the third quarter of 1995); and December 21, 1995 ($82,830 for the fourth quarter of 1995).  (The third quarter invoice again included a misspelling of Philippines as "Philipines.")

828.    Each invoice was signed by Ewert.

829.    Despite those invoices, Minami never provided any actual services or products to Glock Hong Kong at any time.

830.    Because the April 22 Transfer was denominated in United States dollars, the wire was covered by the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

831.    On information and belief, at the time of the April 22 Transfer, Glock Hong Kong did not have sufficient funds to wire $482,830 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

832.    The April 22 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $307,723 Transfer to Minami**

833.    On or about October 1, 1996, Glock Hong Kong wired $307,723 from its account numbered xxx-x-xxxx22-8 at Standard Chartered Bank in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "October 1 Transfer").

834.   The October 1 Transfer was purportedly to pay a "marketing fee" to Minami related to the first quarter of 1996.  Minami, however, never provided any actual services or products to Glock Hong Kong at any time.

835.   Because the October 1 Transfer was denominated in United States dollars, the wire was covered by the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

836.   On information and belief, at the time of the October 1 Transfer, Glock Hong Kong did not have sufficient funds to wire $307,723 to Minami, other than through using funds it had been wired by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

837.   The October 1 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $452,400 Transfer to Minami**

838.   On or about December 9, 1996, Glock Hong Kong wired $452,400 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong (the "December 9 Transfer").

839.    The December 9 Transfer was purportedly to pay a "marketing fee" owed to Minami for the third quarter of 1996.  Minami did not, however, provide any marketing or consulting services to Glock Hong Kong during the third quarter of 1996 or at any other time.

840.    Because the December 9 Transfer was denominated in United States dollars, the wire was covered by the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

841.    At the time of the December 9 Transfer, Glock Hong Kong did not have sufficient funds to wire $452,400 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States , in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

842.    The December 9 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $605,000 Transfer to Minami**

843.    On or about December 10, 1996, Glock Hong Kong wired $605,000 from its account numbered xxx-x-xxxx22-8 at Standard Chartered Bank in Hong

Kong to Minami's account numbered xxx.464 at UBS in Hong Kong (the "December 10 Transfer").

844.    The December 10 Transfer was purportedly to pay a "marketing fee" to Minami related to the second quarter of 1996.  Minami, however, never provided any actual services or products to Glock Hong Kong at any time.

845.    Because the December 10 Transfer was denominated in United States dollars, the wire was covered by the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

846.    On information and belief, at the time of the December 10 Transfer, Glock Hong Kong did not have sufficient funds to wire $605,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

847.    The December 10 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $555,200 Transfer to Minami**

848.    On or about April 2, 1997, Glock Hong Kong wired $555,200 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in

Hong Kong (the "April 2 Transfer").  Ewert received a copy of the account statement reflecting this transfer.

849.    The April 2 Transfer was purportedly to pay for "consultancy services" that had been provided by Minami during the fourth quarter of 1996. Glock Hong Kong's payment was also described as being for a "marketing fee."

850.    During the fourth quarter of 1996, Minami allegedly "develop[ed] market potential for Glock products" in Australia, China, India, Malaysia, Macao, New Zealand, Singapore, Taiwan, and Thailand.

851.    Minami sent an invoice to Glock Hong Kong for the alleged services dated December 20, 1996 in the amount of $555,200.

852.    The invoice was signed by Ewert.

853.    Despite that invoice, Minami never provided any actual services or products to Glock Hong Kong at any time.

854.    Because the April 2 Transfer was denominated in United States dollars, the wire was covered by the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

855.    On information and belief, at the time of the April 2 Transfer, Glock Hong Kong did not have sufficient funds to wire $605,000 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the

United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

856.   The April 2 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $309,750 Transfer to Minami**

857.   On or about September 3, 1997, Glock Hong Kong wired $309,750 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong (the "September 3 Transfer").  Ewert received a copy of the account statement reflecting this transfer.

858.   The September 3 Transfer was purportedly to pay a "marketing fee" to Minami related to the first quarter of 1997.  Minami, however, never provided any actual services or products to Glock Hong Kong at any time.

859.   Because the September 3 Transfer was denominated in United States dollars, the wire was covered by the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

860.   On information and belief, at the time of the September 3 Transfer, Glock Hong Kong did not have sufficient funds to wire $309,750 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank

accounts in the United States, in payment on Fraudulent HK Invoices (and

interest earned thereon, which rightfully belonged to Glock, Inc.).

861.   The September 3 Transfer was made for the purpose of masking

Glock, Inc. as the original source of the funds and to move the funds into the

control of Glock Sr. and his associates.

**The $1,758,450 Transfer to Minami**

862.   On or about September 3, 1997, Glock Hong Kong's CSFB account

was closed out and the funds were transferred to Warburg Dillon Reed account

numbered xxx.xxx-x1.04 in Hong Kong.

863.   On or about July 22, 1998, Glock Hong Kong wired $1,758,450 from

its Warburg Dillon Reed account to Minami's account numbered xxx.464 at UBS

in Hong Kong (the "July 22 Transfer").  Ewert received a copy of the account

statement reflecting this transfer.

864.   The July 22 Transfer was purportedly to pay for "consultancy

services" that had been provided by Minami during 1997 and 1998.  Glock Hong

Kong's payment was also described was as being for "management fees."

865.   During the second, third, and fourth quarters of 1997 and first and

second quarters of 1998, Minami allegedly "develop[ed] market potential for

Glock products" in Australia, China, India, Malaysia, Macao, New Zealand,

Singapore, Taiwan, and Thailand.

866.    Minami sent invoices to Glock Hong Kong for those alleged services dated October 2, 1997 ($212,800 for the third quarter of 1997); December 19, 1997 ($357,000, fourth quarter of 1997); April 14, 1998 ($162,000, first quarter of 1998); and July 3, 1998 ($618,000, second quarter of 1998).  On information and belief, Minami also invoiced Glock Hong Kong for $408,650 for "consultancy services" allegedly performed during the second quarter of 1997.

867.    The invoices were signed by Ewert.

868.    Despite those invoices, Minami never provided any actual services or products to Glock Hong Kong at any time.

869.    On information and belief, at the time of the July 22 Transfer, Glock Hong Kong did not have sufficient funds to wire $1,758,450 to Minami, other than through using funds it had been wired from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

870.    The July 22 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $5,249,900 Transfer to the "Cloned" Minami**

871.    For the last three quarters of 1999 and the first three quarters of 2000, the "Cloned" Minami (which had been incorporated in the Bahamas by Glock Sr.

and Quendler) invoiced Glock Hong Kong for purported "Consultancy Services" in connection with "developing market potential for Glock products" in Australia, Brunei, Bhutan, Hong Kong, India, Indonesia, Japan, Cambodia, Macao, Malaysia, Micronesia, Nepal, New Zealand, Pakistan, Papua New Guinea, Philippines, Seychelles, Singapore, Sri Lanka, South Korea, Taiwan, and Thailand.

872.   On June 30, 1999, the "Cloned" Minami invoiced Glock Hong Kong for $700,000; on September 30, 1999, it invoiced Glock Hong Kong for $700,000; and on December 31, 1999, it invoiced Glock Hong Kong for $550,000.  On March 31, 2000, the "Cloned" Minami invoiced Glock Hong Kong for $700,000; on June 30, 2000, it invoiced Glock Hong Kong for $500,000; and on September 30, 2000, it invoiced Glock Hong Kong for $500,000.  Quendler signed these invoices.

873.   On or about December 21, 2000, Willam (for Glock Ges.m.b.H.) directed Standard Chartered Bank in Hong Kong to wire $5,249,900 from the account of *Glock Hong Kong* (account number xxx-x-xxxx22-8) to Minami's account numbered xxxxxx.60X at UBS Bank Zürich (the "December 21 Transfer").

874.   The December 21 Transfer was purportedly to pay for "management fees" that had been incurred by Glock Hong Kong from the second quarter of 1998 through the third quarter of 2000, including the June 30, 1999; September 30,

1999; December 31, 1999; March 31, 2000; June 30, 2000; and September 30, 2000 invoices.

875.   Despite those invoices, the "Cloned" Minami (like the original Minami) never provided any actual services or products to Glock Hong Kong at any time.

876.   On information and belief, at the time that Glock Ges.m.b.H. directed the wire transfer out of Glock Hong Kong's account, Glock Hong Kong did not have sufficient funds to pay $5,249,900 to the "Cloned" Minami, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

877.   The December 21 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

878.   On or about January 11, 2001, the funds from the December 21 Transfer were wired from Minami's account numbered xxxxxx.60X at UBS Bank Zürich into an account owned by Glock Sr. at UBS Bank Zürich.  The January 11, 2001 transfer into Glock Sr.'s account was purportedly from Glock Hong Kong for "management fees 3/98-9/00."

**The $1,600,000 Transfer to the "Cloned" Minami**

879.   For the fourth quarter of 2000 and first quarter of 2001, the "Cloned" Minami invoiced Glock Hong Kong for purported "Consultancy Services" in connection with "developing market potential for Glock products" in Australia, Brunei, Bhutan, Hong Kong, India, Indonesia, Japan, Cambodia, Macao, Malaysia, Micronesia, Nepal, New Zealand, Pakistan, Papua New Guinea, Philippines, Seychelles, Singapore, Sri Lanka, South Korea, Taiwan, and Thailand.

880.   On or about December 31, 2000, the "Cloned" Minami invoiced Glock Hong Kong for $550,000; on March 31, 2001, it invoiced Glock Hong Kong for $300,000.  Quendler signed these invoices.

881.   On or about November 13, 2001, Willam (for Glock Ges.m.b.H.) directed Standard Chartered Bank in Hong Kong to wire $1,600,000 from the account of *Glock Hong Kong* (account number xxx-x-xxxx22-8) to Minami's account numbered xxxxxx.60X at UBS Bank Zürich (the "November 13 Transfer").

882.   The November 13 Transfer was purportedly to pay for "management fees" that had been incurred by Glock Hong Kong from the fourth quarter of 2000 through the third quarter of 2001, including the December 31, 2000 and March 31, 2001 invoices.

883.    Despite those invoices, the "Cloned" Minami (like the original Minami) never provided any actual services or products to Glock Hong Kong at any time.

884.    On information and belief, at the time that Glock Ges.m.b.H. directed the wire transfer out of Glock Hong Kong's account, Glock Hong Kong did not have sufficient funds to pay $1.6 million to the "Cloned" Minami, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

885.    The November 13 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

886.    On or about November 20, 2001, the funds from the November 13 Transfer were wired from Minami's account numbered xxxxxx.60X at UBS Bank Zürich into an account owned by Glock Sr. at UBS Bank Zürich.  The November 20, 2001 transfer into Glock Sr.'s account was purportedly from Glock Hong Kong for "management fees 10/00-9/01."

**C.    Dividend Payments from Glock Hong Kong to Unipatent**

887.    Plaintiff incorporates paragraphs 1 through 343 as if fully set forth herein.

888.   Each of the transfers described in the following paragraphs (894 to 920) was a step in Defendants' scheme to fraudulently taken money stolen from Glock, Inc. and wire it from Glock Hong Kong to Unipatent.  Each transfer was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).  Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

889.   Glock Hong Kong illegally transferred by wire $2 million to Unipatent over a period of 6 years—from March 6, 1992 through August 28, 1997.  All of the funds wired to Unipatent by Glock Hong Kong originated at and were improperly taken from Glock, Inc.

890.   Glock Hong Kong had no income of its own and only had access to funds through payments made by Glock, Inc. on the Fraudulent HK Invoices or interest earned on those payments.  Accordingly, Glock Hong Kong had no proper source of income or basis on which to pay dividends to its nominal owners, Glock Ges.m.b.H. and Unipatent.

891.   The dividends paid to Unipatent improperly went directly to benefit Glock Sr., who solely owned and controlled the company.

892.    Ms. Glock was unaware of this scheme and had no reason to suspect anything improper about Glock Sr.'s conduct with regard to running the "Glock Group" until her divorce from Glock Sr. in 2011.

893.    The payment of dividends to Unipatent improperly deprived Ms. Glock of her interest in those funds.

**March 2 Dividend Payment of $150,000**

894.    On or about March 2, 1992, Glock Hong Kong wired $150,000 from its Hypo-Bank account numbered xxxxx-UDS-xxx1-02 in Hong Kong to Unipatent's account numbered xx-xxxxx9-69 at Banque Generale du Luxembourg S.A. in Luxembourg (the "March 2 Transfer").

895.    The March 2 Transfer was purportedly "Shareholder's Funds"—*i.e.*, a dividend payment for 1990.  Glock Hong Kong declared a total of $300,000 in dividends for fiscal year 1990.

896.    On information and belief, at the time that Glock Hong Kong wired the March 2 Transfer to Unipatent, Glock Hong Kong did not have sufficient funds or income to pay $150,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

897.    The March 2 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**June 1 Dividend Payment of $150,000**

898.    On or about June 1, 1993, Glock Hong Kong wired $150,000 from its Hypo-Bank account numbered xxxxxx-USD-xxx1-02 in Hong Kong to Unipatent (the "June 1 Transfer").

899.    On information and belief, the June 1 Transfer was purportedly a dividend for 1991.  Glock Hong Kong declared a total of $300,000 in dividends for fiscal year 1991.

900.    On information and belief, at the time that Glock Hong Kong wired the June 1 Transfer to Unipatent, Glock Hong Kong did not have sufficient funds or income to pay $150,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

901.    The June 1 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**December 22 Dividend Payment of $600,000**

902.    On or about December 22, 1994, Glock Hong Kong wired $600,000 from its Standard Chartered Bank account numbered xxx-x-xxx22-8 in Hong Kong to Unipatent's account numbered xxxx-xx83-8 at Banque et Caisse d'Epargne in Luxembourg (the "December 22 Transfer").

903.    On information and belief, the December 22 Transfer was purportedly dividends for 1992 and 1993.  Glock Hong Kong declared a total of $600,000 in dividends for each of the fiscal years 1992 and 1993.

904.    On information and belief, at the time that Glock Hong Kong wired the December 22 Transfer to Unipatent, Glock Hong Kong did not have sufficient funds or income to pay $600,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

905.    The December 22 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**August 16 Dividend Payment of $600,000**

906.    On or about August 16, 1995, Glock Hong Kong wired $600,000 from its Standard Chartered Bank account numbered xxx-x-xxx22-8 in Hong Kong to

Unipatent's account numbered xxxx-xx83-8 at Banque et Caisse d'Epargne in Luxembourg (the "August 16 Transfer").

907.   The August 16 Transfer was purportedly a dividend for 1994.  Glock Hong Kong declared a total of $600,000 in dividends for fiscal year 1994.

908.   On information and belief, at the time that Glock Hong Kong wired the August 16 Transfer to Unipatent, Glock Hong Kong did not have sufficient funds or income to pay $600,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

909.   The August 16 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**October 4 and 7 Dividend Payments Total $400,000**

910.   On or about October 4, 1996, Glock Hong Kong wired $200,000 from its Credit Suisse HK Account to Glock Ges.m.b.H.'s account numbered xx-xx.xxx.423 at Bank RZO in Vienna, Austria (the "October 4 Transfer").

911.   On or about October 7, 1996, Glock Hong Kong wired $200,000 from its Credit Suisse HK Account in Hong Kong to Unipatent's account numbered

xxxx-xx83-8 at Banque et Caisse d'Epargne in Luxembourg (the "October 7 Transfer").

912.    The October 4 and October 7 Transfers were purportedly "Shareholders Dividend" payments for 1995.  Glock Hong Kong declared a total of $400,000 in dividends for fiscal year 1995.

913.    On information and belief, at the time that Glock Hong Kong wired the October 4 and 7 Transfers, Glock Hong Kong did not have sufficient funds or income to pay $400,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

914.    Accordingly, at the time of the October 4 and October 7 Transfers, Glock Hong Kong lacked the funds with which to make any dividend payments.

915.    The October 4 and 7 Transfers were made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**September 3 Dividend Payment of $300,000**

916.    On or about September 3, 1997, Glock Hong Kong wired $300,000 from its Credit Suisse HK Account in Hong Kong to Unipatent's account

numbered xxxx-xx83-8 at Banque et Caisse d'Epargne in Luxembourg (the "September 3 Transfer").

917.    The September 3 Transfer was purportedly a "Shareholders Dividend" for 1996.  Glock Hong Kong declared a total of $600,000 in dividends for fiscal year 1996.

918.    Defendant Ewert specifically informed Glock Sr. about this transfer on or about February 19, 1998.  Defendant Willam was also aware of this transfer.

919.    On information and belief, at the time that Glock Hong Kong wired the September 3 Transfer to Unipatent, Glock Hong Kong did not have sufficient funds or income to pay $300,000 in dividends, other than through using funds it had received from Glock, Inc.'s bank accounts in the United States, in payment on Fraudulent HK Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

920.    The September 3 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**D.    Fraudulent Transfers from Minami to Reofin**

921.    Plaintiff incorporates paragraphs 1 through 343 and 774 through 886 as if fully set forth herein.

922.    Each of the transfers described in the following paragraphs (924 to 991) was a step in Defendants' scheme to take money appropriated from Glock, Inc. and to fraudulently wire it from Glock, Inc. to companies under the control and ownership of Glock Sr. and his associates.  Each transfer was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).  Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

923.    Glock Hong Kong illegally transferred by wire at least $13,928,853 to Minami's xxx.464 account at UBS in Hong Kong over a period of 10 years.  On information and belief, those funds were all then wired to Reofin and into the exclusive control of Glock Sr. and his associates.

**Minami Wires Out the $1,050,000 Transfer**

924.    On information and belief, Glock, Inc. was the original source of the funds comprising the June 19 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

925.    For the June 19 Transfer, Glock Hong Kong wired $1,050,000 from its BfG Hong Kong account numbered xxxxxx803 to Minami's account numbered xxx.464 at UBS in Hong Kong.

926.    The June 19 Transfer was denominated in United States dollars.  The wire was transmitted through Bank of America International in New York (as the correspondent bank for BfG) and paid to the Bank of New York in New York (the correspondent bank for UBS).

927.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the June 19 Transfer in excess of $25,000 were subsequently wired into account xxxxx8FN at UBS in Luxembourg.

928.    Account xxxxx8FN was owned by Reofin.

929.    The secondary wiring of the funds from the June 19 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $1,150,000 Transfer**

930.    On information and belief, Glock, Inc. was the original source of the funds comprising the September 19 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

931.    For the September 19 Transfer, Glock Hong Kong wired $1,150,000 from its BfG Hong Kong account numbered xxxxxxx803 to Minami's account numbered xxx.464 at UBS in Hong Kong.

932.    The September 19 Transfer was denominated in United States dollars.  The wire was transmitted through Bank of America International in New York (as the correspondent bank for BfG) and paid to the Bank of New York in New (the correspondent bank for UBS).

933.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the September 19 Transfer in excess of $25,000 were subsequently wired into account xxxxx8FN at UBS in Luxembourg.

934.    Account xxxxx8FN was owned by Reofin.

935.    The secondary wiring of the funds from the September 19 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $1,550,000 Transfer**

936.    On information and belief, Glock, Inc. was the original source of the funds comprising the December 28 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

937.    For the December 28 Transfer, Glock Hong Kong wired $1,550,000 from its Hypo-Bank account numbered xxxxxx-USD-xxx1-02 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong.

938.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the December 28 Transfer in excess of $25,000 were wired, on or about December 30, 1994, into account xxxxx6YN at UBS in Luxembourg.

939.    Account xxxxx6YN was owned by Reofin.

940.    The secondary wiring of the funds from the December 28 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $2,200,000 Transfer**

941.    On information and belief, Glock, Inc. was the original source of the funds comprising the August 16 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

942.    For the August 16 Transfer, Glock Hong Kong wired $2.2 million from its Hypo-Bank account numbered xxxxxx-USD-xxx1-02 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong.

943.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the August 16 Transfer in excess of $25,000 were wired, on or about August 17, 1995, into account xxxxx6YN at UBS in Luxembourg.

944.   Account xxxxx6YN was owned by Reofin.

945.   The secondary wiring of the funds from the August 16 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $807,500 Transfer**

946.   On information and belief, Glock, Inc. was the original source of the funds comprising the December 20 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

947.   For the December 20 Transfer, Glock Hong Kong wired $807,500 from its Hypo-Bank account numbered xxxxxx-USD-xxx1-02 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong.

948.   Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the December 20 Transfer in excess of $25,000 were wired, on or about December 22, 1995, into account xxxxx6YN at UBS in Luxembourg.

949.   Account xxxxx6YN was owned by Reofin.

950.   The secondary wiring of the funds from the December 20 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $482,830 Transfer**

951.    On information and belief, Glock, Inc. was the original source of the funds comprising the April 22 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

952.    For the April 22 Transfer, Glock Hong Kong wired $482,830 from its account at Standard Chartered Bank account numbered xxx-x-xxxx22-8 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong.

953.    The April 22 Transfer was denominated in United States dollars.  As a result, the wire was transmitted through the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

954.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the April 22 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

955.    Account xxxxx6YN was owned by Reofin.

956.    The secondary wiring of the funds from the April 22 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the sole control of Glock Sr. and his associates.

**Minami Wires Out the $307,723 Transfer**

957.   On information and belief, Glock, Inc. was the original source of the funds comprising the October 1 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

958.   For the October 1 Transfer, Glock Hong Kong wired $307,723 from its account at Standard Chartered Bank account numbered xxx-x-xxxx22-8 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong. Ewert received a copy of the account statement reflecting this transfer.

959.   The October 1 Transfer was denominated in United States dollars. As a result, the wire was transmitted through the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

960.   Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the October 1 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

961.   Account xxxxx6YN was owned by Reofin.

962.   The secondary wiring of the funds from the October Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $452,400 Transfer**

963.    On information and belief, Glock, Inc. was the original source of the funds comprising the December 9 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

964.    For the December 9 Transfer, Glock Hong Kong wired $452,400 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong.

965.    The December 9 Transfer was denominated in United States dollars. As a result, the wire was transmitted through the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

966.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the December 9 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

967.    Account xxxxx6YN was owned by Reofin.

968.    The secondary wiring of the funds from the December 9 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $605,000 Transfer**

969.    On information and belief, Glock, Inc. was the original source of the funds comprising the December 10 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

970.    For the December 10 Transfer, Glock Hong Kong wired $605,000 from its account at Standard Chartered Bank account numbered xxx-x-xxxx22-8 in Hong Kong to Minami's account numbered xxx.464 at UBS in Hong Kong.

971.    The December 10 Transfer was denominated in United States dollars.  As a result, the wire was transmitted through the branch of Standard Chartered Bank in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

972.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the December 10 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

973.    Account xxxxx6YN was owned by Reofin.

974.    The secondary wiring of the funds from the December 10 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $555,200 Transfer**

975.    On information and belief, Glock, Inc. was the original source of the funds comprising the April 2 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

976.    For the April 2 Transfer, Glock Hong Kong wired $555,200 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong.

977.    The April 2 Transfer was denominated in United States dollars.  As a result, the wire was transmitted through the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

978.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the April 2 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

979.    Account xxxxx6YN was owned by Reofin.

980.    The secondary wiring of the funds from the April 2 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $309,750 Transfer**

981.    On information and belief, Glock, Inc. was the original source of the funds comprising the September 3 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

982.    For the September 3 Transfer, Glock Hong Kong wired $309,750 from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong.

983.    The September 3 Transfer was denominated in United States dollars. As a result, the wire was transmitted through the branch of CSFB in New York (as the sender's correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

984.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the September 3 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

985.    Account xxxxx6YN was owned by Reofin.

986.    The secondary wiring of the funds from the September 3 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Minami Wires Out the $1,758,450 Transfer**

987.    On information and belief, Glock, Inc. was the original source of the funds comprising the July 22 Transfer and the funds had been wired to Glock Hong Kong by Glock, Inc. from its accounts in the United States, in payment on Fraudulent HK Invoices.

988.    For the July 22 Transfer, Glock Hong Kong wired $1,758,450 from its Warburg Dillon Reed account to Minami's account numbered xxx.464 at UBS in Hong Kong.

989.    Because of the standing order on Minami's xxx.464 account at UBS in Hong Kong, all funds from the July 22 Transfer in excess of $25,000 were subsequently wired into account xxxxx6YN at UBS in Luxembourg.

990.    Account xxxxx6YN was owned by Reofin.

991.    The secondary wiring of the funds from the July 22 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into sole control of Glock Sr. and his associates.

E.    **Fraudulent Transfers from Glock America to Taziria**

992.    Plaintiff incorporates paragraphs 1 through 343 and 515 through 522 as if fully set forth herein.

993.    Each of the transfers described in the following paragraphs (996 to 1138) was a step in Defendants' scheme to take money appropriated from Glock,

Inc. and to fraudulently wire it from Glock, Inc. to companies under the control and ownership of Glock Sr. and his associates.  Each transfer was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).  Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

994.    Although Glock America made payments to Taziria for purported "marketing" services, Taziria never provided any such services to Glock America.

995.    Glock America illegally transferred by wire $20,525,400 to Minami over a period of 10 years—from December 21, 1990 through May 26, 1999.  All of the funds wired to Taziria by Glock America originated at and were improperly taken from Glock, Inc.

**The $1,200,000 Transfer to Taziria**

996.    At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

997.    Taziria, however, never provided any actual services or products to Glock America at any time.

998.    On or about December 21, 1990, Glock America directed its bank to wire $1,200,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB

Postbank Groep N.V. ("NMB Bank") in Curaçao.  On information and belief, the wire was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

999.   Taziria received a wire transfer on or about December 21, 1990 (with the value date of December 20, 1990) in its account numbered xxxx-xxxxxx-001 at NMB Bank (the "December 21 Transfer").

1000.  At the direction of Glock Sr., the December 21 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1001.  On information and belief, the funds in the December 21 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1002.  The December 21 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $500,000 Transfer to Taziria**

1003.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.  The invoice was dated March 26, 1991.

1004.  Taziria, however, never provided any actual services or products to Glock America at any time.

1005.  On or about May 14, 1991, Glock America directed its bank to wire $500,000 from its account to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao.  On information and belief, the wire was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1006.  Taziria received a wire transfer on or about May 14, 1991 in its account numbered xxxx-xxxxxx-001 at NMB Bank (the "May 14 Transfer").

1007.  On information and belief, at the direction of Glock Sr., the May 14 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1008.  On information and belief, the funds in the May 14 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1009.  The May 14 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $2,200,000 Transfer to Taziria**

1010.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1011.  Taziria, however, never provided any actual services or products to Glock America at any time.

1012.  On or about December 27, 1991, Glock America directed its bank to wire $2,200,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao.  On information and belief, the wire was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1013.  Maduro & Curiel's Bank wired the funds to Taziria with a value date of December 27, 1991 (the "December 27 Transfer).

1014.  At the direction of Glock Sr., on or about January 14, 1992, $175,000 of the December 27 Transfer was wired from Taziria's account at NBM Bank to an account held by Reofin.  The wire had a value date of January 15, 1992.

1015.  On information and belief, the funds in the December 27 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1016.  The December 27 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $1,800,000 and $100,000 Transfers to Taziria**

1017.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1018.  Taziria, however, never provided any actual services or products to Glock America at any time.

1019.  On or about May 10, 1993, Glock America directed its bank to wire $1,800,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "May 10 Transfer").  On or about May 11, 1993, Glock America directed ING Bank in Curaçao to wire $100,000 from its account numbered xxxx-xxx078-xxx (the "ING 3 Account") to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "May 11 Transfer").  The May 10 and May 11 Transfers were supposedly to pay an invoice dated October 12, 1992. On information and belief, the October 12, 1992 invoice related to the "consultancy services" allegedly provided by Taziria to Glock America.

1020.  On information and belief, the May 10 and May 11 Transfers were supposedly to pay for the "consultancy services" engaged in by Taziria.

1021.  On information and belief, at the direction of Glock Sr., the May 10 and May 11 Transfers were later wired from Taziria's account at NMB Bank to an account held by Reofin.

1022.  On information and belief, the funds in the May 10 and May 11 Transfers originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1023.  The May 10 and May 11 Transfers were made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $400,000 and $200,000 Transfers to Taziria**

1024.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1025.  Taziria, however, never provided any actual services or products to Glock America at any time.

1026.  On or about June 28, 1993, Glock America directed its bank to wire $600,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao.  The  funds were moved in two segments — $400,000 and $200,000

215

(collectively, the "June 28 Transfers").  The June 28 Transfers were supposedly to pay an invoice dated December 28, 1992.  On information and belief, the December 28, 1992 invoice related to the "consultancy services" allegedly provided by Taziria to Glock America.

1027.  On information and belief, at the direction of Glock Sr., the June 28 Transfers were later wired from Taziria's account at NMB Bank to an account held by Reofin.

1028.  On information and belief, the funds in the June 28 Transfers originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1029.  The June 28 Transfers were made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $420,000 Transfer to Taziria**

1030.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1031.  Taziria, however, never provided any actual services or products to Glock America at any time.

1032.  On or about February 2, 1994, Glock America directed ING Bank in Curaçao to wire $420,000 (from the ING 3 Account) to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao.  The wire was supposedly to pay an invoice dated April 5, 1993.  On information and belief, that invoice related to the "consultancy services" allegedly provided by Taziria to Glock America.

1033.  Taziria received a wire transfer on or about February 2, 1994 in its account numbered xxxx-xxxxxx-001 at NMB Bank (the "February 2 Transfer").

1034.  On information and belief, at the direction of Glock Sr., the February 2 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1035.  On information and belief, the funds in the February 2 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1036.  The February 2 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $820,000 Transfer to Taziria**

1037.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1038.  Taziria, however, never provided any actual services or products to Glock America at any time.

1039.  On or about November 8, 1994, Glock America directed ING Bank in Curaçao to wire $820,000 (from the ING 3 Account) to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "November 8 Transfer").  On information and belief, the November 8 Transfer was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1040.  On information and belief, at the direction of Glock Sr., the November 8 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1041.  On information and belief, the funds in the November 8 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the

United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1042.  The November 8 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $805,000 Transfer to Taziria**

1043.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1044.  Taziria, however, never provided any actual services or products to Glock America at any time.

1045.  On or about May 31, 1995, Glock America directed ING Bank in Curaçao to wire $805,000 (from the ING 3 Account) to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "May 31 Transfer"). The transfer was made in two disbursements:  $410,000 and $395,000.  On information and belief, the May 31 Transfer was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1046.  On information and belief, at the direction of Glock Sr., the May 31 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1047.  On information and belief, the funds in the May 31 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1048.  The May 31 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $505,000 Transfer to Taziria**

1049.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1050.  Taziria, however, never provided any actual services or products to Glock America at any time.

1051.  On or about June 27, 1995, Glock America directed ING Bank in Curaçao to wire $505,000 (from the ING 3 Account) to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "June 27 Transfer").

On information and belief, the June 27 Transfer was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1052.  On information and belief, at the direction of Glock Sr., the June 27 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1053.  On information and belief, the funds in the June 27 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1054.  The June 27 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $515,000 Transfer to Taziria**

1055.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1056.  Taziria, however, never provided any actual services or products to Glock America at any time.

1057.  On or about July 6, 1995, Glock America directed its bank to wire $515,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "July 6 Transfer").  On information and belief, the July 6 Transfer was supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1058.  On information and belief, at the direction of Glock Sr., the July 6 Transfer was later wired from Taziria's account at NMB Bank to an account held by Reofin.

1059.  On information and belief, the funds in the July 6 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1060.  The July 6 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the sole control of Glock Sr.

**The $1,785,000 and $200,000 Transfers to Taziria**

1061.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice or invoices to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1062.  Taziria, however, never provided any actual services or products to Glock America at any time.

1063.  On information and belief, on or about November 28, 1995, Glock Ges.m.b.H. directed Glock America's bank to wire $1,785,000 to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "November 28 Transfer").  On or about November 30, 1995, Glock America directed ING Bank in Curaçao to wire $200,000 (from the ING 3 Account) to Taziria's account numbered xxxx-xxxxxx-001 at NMB Bank in Curaçao (the "November 30 Transfer").  On information and belief, the November 28 and November 30 Transfers were supposedly to pay for the "consultancy services" allegedly provided by Taziria to Glock America.

1064.  On information and belief, at the direction of Glock Sr., the November 28 and November 30 Transfers were later wired from Taziria's account at NMB Bank to an account held by Reofin.

1065.  On information and belief, the funds in the November 28 and November 30 Transfers originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1066.  The November 28 and November 30 Transfers were made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $500,000 Transfer to Taziria**

1067.  At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice of at least $500,000 to Glock America for "consultancy services" that Taziria allegedly provided to Glock America.

1068.  Taziria, however, never provided any actual services or products to Glock America at any time.

1069.  On or about May 27, 1997, Glock Ges.m.b.H. directed Maduro & Curiel's Bank N.V. to permit José Antonio Cuitiño to wire $500,000 from Glock America's account numbered xxx xx4 08 to account numbered xxxx-xxxxxx-001 at ING Bank N.V. ("ING Bank") in Curaçao.  (ING Bank was the successor to NMB Bank.)  The ING Bank account was owned by Taziria.  The wire was supposedly to pay for "management fees" incurred by Taziria on behalf of Glock America for the third quarter of 1995.

1070.  In a letter by Cuitiño dated May 29, 1997, Glock America directed Maduro & Curiel's Bank N.V. to wire $500,000 from Glock America's account numbered xxx xx4 08 to Taziria's account numbered xxxx-xxxxxx-001 at ING

Bank in Curaçao.  The wire was supposedly to pay for the management fees allegedly incurred by Taziria for the third quarter of 1995.

1071.  Maduro & Curiel's Bank wired the funds to Taziria on or about May 28, 1997 (the "May 28 Transfer).

1072.  Because the May 28 Transfer was denominated in United States dollars, the wire was transmitted through the Bank of Nova Scotia in New York.

1073.  At the direction of Glock Sr., the May 28 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1074.  On information and belief, the funds in the May 28 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1075.  The May 28 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $757,862 Transfer to Taziria**

1076.  At the direction of Glock Sr., Taziria sent a sham invoice to Glock America dated March 29, 1996 for the first quarter of 1996, totaling $352,512.  The March 29 invoice was purportedly for "Consultancy Services" that Taziria had

provided to Glock America for "developing market potential for Glock

products" in Brazil, Central Americas, Chile, Ecuador, and Peru.  Also at

Glock Sr.'s direction, Taziria invoiced Glock America for the same fake services

for the fourth quarter of 1995.  On information and belief, Taziria invoiced Glock

America for the same fake "consultancy services" for the third quarter of 1995.

The invoices for the third and fourth quarter of 1995 totaled $405,350, on

information and belief.

1077.  Taziria, however, never provided any actual services or products to

Glock America at any time.

1078.  On or about May 27, 1997, Willam (for Glock Ges.m.b.H.) directed

Maduro & Curiel's Bank N.V. to permit Cuitiño (of Glock America) to wire

$757,862 from Glock America's account numbered xxx x4 08 to Taziria's account

numbered xxxx-xxxxxx-001 at ING Bank in Curaçao.  The wire was supposedly

to pay for the alleged "management fees" invoiced for a portion of the third

quarter of 1995, for the fourth quarter of 1995, and for the first quarter of 1996.

1079.  In a July 16, 1997 letter by Cuitiño, Glock America directed Maduro

& Curiel's Bank N.V. to wire $757,862 from Glock America's account numbered

xxx xx4 08 to account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao for the

benefit of Taziria.  The wire was supposedly to pay for the "management fees"

invoiced by Taziria for a portion of the third quarter of 1995, for the fourth quarter of 1995, and for the first quarter of 1996.

1080.  Maduro & Curiel's Bank wired the funds to Taziria on or about July 17, 1997 (the "July 17 Transfer).

1081.  Because the July 17 Transfer was denominated in United States dollars, the wire was transmitted through the Bank of Nova Scotia in New York.

1082.  At the direction of Glock Sr., the July 17 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1083.  On information and belief, the funds in the July 17 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1084.  The July 17 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $1,435,800 Transfer to Taziria**

1085.  At the direction of Glock Sr., Taziria sent a sham invoice to Glock America dated June 28, 1996, for the second quarter of 1996, totaling $582,700 and a sham invoice dated September 30, 1996, for the third quarter of 1996,

totaling $853,100.  The June 28 and September 30 invoices were purportedly for "Consultancy Services" that Taziria had provided to Glock America for "developing market potential for Glock products" in Brazil, Central Americas, Chile, Ecuador, and Peru.

1086.  Despite those invoices, Taziria never provided any actual services or products to Glock America at any time.

1087.  On or about August 13, 1997, Willam (for Glock Ges.m.b.H.) directed Cuitiño (of Glock America) to pay Taziria $1,435,800 in "management fees" for the second and third quarters of 1996.

1088.  In a August 15, 1997 letter by Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $1,435,800 from Glock America' account to Taziria's bank account (the "August 15 Transfer").  The wire was supposedly to pay for the second and third quarter 1996 invoices from Taziria.

1089.  On information and belief, the August 15 Transfer was wired to Taziria's account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao.

1090.  At the direction of Glock Sr., the August 15 Transfer was later wired from Taziria's bank account to an account held by Reofin.

1091.  On information and belief, the funds in the August 15 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent

Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1092.  The August 15 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $483,700 Transfer to Taziria**

1093.  At the direction of Glock Sr., Taziria sent a sham invoice to Glock America dated December 20, 1996 for the fourth quarter of 1996, totaling $483,700.  The December 20 invoice was purportedly for "Consultancy Services" that Taziria had provided to Glock America for "developing market potential for Glock products" in Brazil, Central Americas, Chile, Ecuador, and Peru.

1094.  Despite that invoice, Taziria never provided any actual services or products to Glock America at any time.

1095.  In a November 17, 1997 letter from Hubert Willam to Cuitiño, Glock Ges.m.b.H. directed Glock America to pay Taziria $483,700 in "management fees" for the fourth quarter of 1996.

1096.  In a November 21, 1997 letter by Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $483,700 from Glock America's account numbered xxx xx4 08 to account numbered xxxx-xxxxxx-001 at ING Bank in

Curaçao for the benefit of Taziria.  The wire was supposedly to pay for the fourth quarter 1996 management fees allegedly incurred by Taziria.

1097.  Maduro & Curiel's Bank wired the funds to Taziria on or about November 24, 1997 (the "November 24 Transfer).

1098.  Willam informed Ewert about this transfer on or about February 16, 1998.

1099.  At the direction of Glock Sr., the November 24 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1100.  On information and belief, the funds in the November 24 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1101.  The November 24 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $912,300 Transfer to Taziria**

1102.  At the direction of Glock Sr., Taziria sent a sham invoice to Glock America dated March 31, 1997 for the first quarter of 1997, totaling $912,300.  The March 31 invoice was purportedly for "Consultancy Services" that Taziria had

provided to Glock America for "developing market potential for Glock products" in Brazil, Central Americas, Chile, Ecuador, and Peru.

1103.  Despite that invoice, Taziria never provided any actual services or products to Glock America at any time.

1104.  On or about December 17, 1997, Willam (for Glock Ges.m.b.H.) directed Cuitiño (of Glock America) to wire funds from Glock America's account xxx xx4 08 at Maduro & Curiel's Bank N.V. to pay alleged management fees for the first quarter of 1997 in the amount of $912,300.

1105.  In a December 17, 1997 letter by Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $912,300 from Glock America's account numbered xxx xx4 08 to account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao for the benefit of Taziria.  The wire was supposedly to pay for the management fees allegedly incurred by Taziria in connection with the first quarter of 1997.

1106.  Maduro & Curiel's Bank wired the funds to Taziria on or about December 23, 1997 (the "December 23 Transfer).

1107.  Willam informed Ewert about this transfer on or about February 16, 1998.

1108.  At the direction of Glock Sr., the December 23 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1109.  On information and belief, the funds in the December 23 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1110.  The December 23 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $810,250 Transfer to Taziria**

1111.  At the direction of Glock Sr., Taziria sent a sham invoice to Glock America dated July 3, 1997 for the second quarter of 1997, totaling $810,250.  The July 3 invoice was purportedly for "Consultancy Services" that Taziria had provided to Glock America for "developing market potential for Glock products" in Brazil, Central Americas, Chile, Ecuador, and Peru.

1112.  Despite that invoice, Taziria never provided any actual services or products to Glock America at any time.

1113.  On or about  May 28, 1998, Willam (for Glock Ges.m.b.H.) directed Cuitiño (of Glock America) to pay management fees related to the second quarter of 1997 in the amount of $810,250.

1114.  In a May 28, 1998 letter by Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $810,250 from Glock America's account numbered xxx xx4 08 to account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao for the benefit of Taziria.  The wire was supposedly to pay for the management fees allegedly incurred by Taziria in connection with the second quarter of 1997.

1115.  Maduro & Curiel's Bank wired the funds to Taziria on or about May 29, 1997 (the "May 29 Transfer).

1116.  Because the May 29 Transfer was denominated in United States dollars, the wire was transmitted through the Bank of Nova Scotia in New York.

1117.  At the direction of Glock Sr., the May 29 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1118.  On information and belief, the funds in the May 29 Transfer originated from payments made by Glock, Inc. from its accounts in the United States to Glock America's account in Curaçao, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1119.  The May 29 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

233

**The $1,842,500 Transfers to Taziria**

1120.  At the direction of Glock Sr., on information and belief, Taziria sent sham invoices to Glock America "management" services for the third and fourth quarters of 1997 (for $779,950 and $1,062,500, respectively).

1121.  Taziria, however, never provided any actual services or products to Glock America at any time.

1122.  In a October 20, 1998 letter by Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $1,842,500 from Glock America's account numbered xxx xx4 08 to Taziria's account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao (the "October 20 Transfer").  The October 20 Transfer was supposedly to pay for the management fees allegedly incurred by Taziria in connection with the third and fourth quarters of 1997.

1123.  On information and belief, at the direction of Glock Sr., the October 20 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1124.  On information and belief, the funds in the October 20 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1125.  The October 20 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**The $2,333,000 Transfers to Taziria**

1126.  At the direction of Glock Sr., on information and belief, Taziria sent sham invoices to Glock America "management" services for the first and second quarters of 1998 (for $1,917,500 and $415,500, respectively).

1127.  Despite those invoices, Taziria never provided any actual services or products to Glock America at any time.

1128.  In a March 25, 1999 letter by José Antonio Cuitiño, Glock America directed Maduro & Curiel's Bank N.V. to wire $2,333,000 from Glock America's account numbered xxx xx4 08 to Taziria's account numbered xxxx-xxxxxx-001 at ING Bank in Curaçao (the "March 25 Transfer").  The March 25 Transfer was supposedly to pay for the management fees allegedly incurred by Taziria in connection with the first and second quarters of 1998.

1129.  On information and belief, at the direction of Glock Sr., the March 25 Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1130.  On information and belief, the funds in the March 25 Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the

235

United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1131.  The March 25 Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**Additional Transfers to Taziria for "Consultancy Services"**

1132.  At the direction of Glock Sr., Taziria sent sham invoices to Glock America dated October 16, 1998 for the third quarter of 1998, totaling $719,000; dated February 2, 1999 for fourth quarter of 1998, totaling $565,500; dated April 16, 1999 for the first quarter of 1999, totaling $312,700.  The invoices were purportedly for "Consultancy Services" that Taziria allegedly provided to Glock America for "developing market potential for Glock products" in Brazil, Central Americas, Chile, Ecuador, and Peru.

1133.  The invoices were signed by Ewert.

1134.  Despite those invoices, Taziria never provided any actual services or products to Glock America at any time.

1135.  On information and belief, Glock America directed its bank to wire funds sufficient to pay those invoices to Taziria's account at ING Bank in Curaçao ("1998/1999 Consultancy Services Transfer").  On information and

belief, the 1998/1999 Consultancy Services Transfer was supposedly to pay for the "consultancy services" allegedly engaged in by Taziria.

1136.  At the direction of Glock Sr., the 1998/1999 Consultancy Services Transfer was later wired from Taziria's account at ING Bank to an account held by Reofin.

1137.  On information and belief, the funds in the 1998/1999 Consultancy Services Transfer originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America in Aruba, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).

1138.  The 1998/1999 Consultancy Services Transfer was made for the purpose of masking Glock, Inc. as the original source of the funds and to move the funds into the control of Glock Sr. and his associates.

**F.     Fraudulent Transfers Through Consultinvest to Warwick/UEF**

1139.  Plaintiff incorporates paragraphs 1 through 343 and 409 through 470 as if fully set forth herein.

1140.  Each of the transfers described in the following paragraphs (1150 to 1187) was a step in Defendants' scheme to take money appropriated from Glock, Inc. and to fraudulently wire it from Glock, Inc. to companies under the control and ownership of Glock Sr. and his associates.  Each transfer was violation of

18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).

Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating

Defendants' liability for violations of federal RICO and Georgia State RICO.

1141.  Ewert, Manown, and Glock Sr. transferred funds stolen from Glock,

Inc. through Consultinvest.  They then transmitted or transferred the funds from

Consultinvest to Warwick or UEF for the purpose of moving the funds into

Glock Sr.'s sole control.

1142.  The leases between Glock, Inc. and Consultinvest were a means for

Defendants to steal funds from Glock, Inc. and move them into Consultinvest.

Defendants then attempted to conceal or disguise the original source of the funds

by setting up fraudulent loans between Consultinvest and Warwick/UEF.

1143.  Each and every "loan" from Warwick/UEF to Consultinvest was

really a mechanism for Defendants to pass funds that had been improperly taken

from Glock, Inc. (through lease payments to Consultinvest) and move the money

into entities that were controlled by Glock Sr. and his associates.

1144.  Warwick and UEF never actually transferred any funds to

Consultinvest.  Rather, the money that Consultinvest used purchase real

property in the State of Georgia was generally wired to it directly from Reofin.

The funds from Reofin, on information and belief, originated at and were stolen

from Glock, Inc.

1145.  From August 1992 through June 1999, at least $4.2 million moved through Consultinvest and into foreign commerce via wire transfers to Warwick and UEF.  Those transfers were directed by Ewert, Manown, and Glock Sr.

1146.  Defendants laundered the funds wired out of Reofin by having Consultinvest use them to purchase real property in the State of Georgia.  Funds were then cycled back into the possession and control of Glock Sr. and his associates through the wire transfers from Consultinvest to Warwick and UEF.

1147.  Consultinvest only ever paid interest on the fraudulent loans, and does not ever appear to have repaid any of the purported principal.  On information and belief, the original terms on the fake loans from Warwick and UEF were extended in order to "paper" a justification for Consultinvest to continue paying interest to Warwick and UEF.

1148.  The funds that were transferred to Warwick and UEF were, on information and belief, supposed to be transmitted by Ewert back into an account held by Reofin.

1149.  Ultimately, it is unclear whether the funds that were "paid" by Consultinvest on the fraudulent loans made by Warwick and UEF were returned to Glock Sr.'s control or appropriated by Ewert for his own purposes.  Regardless, Defendants' actions deprived Ms. Glock of her direct and indirect interests in these funds.

1. **Wires Related to "Loans" on the Original Glock Office Space**

1150.  On or about January 27, 1992, Consultinvest received a total of $970,000 in its account numbered xxxxx237 at NationsBank via wire transfer. The funds were sent in two transfers ($550,000 and $420,000) from an account held by Reofin.  On information and belief, the Reofin funds originated at and had been stolen from Glock, Inc.

1151.  Consultinvest entered into a fraudulent loan with UEF in order to conceal and disguise the original source of the funds, as well as its subsequent transfers to UEF.  On information and belief, the fake loan from UEF corresponded to the terms that had been used in the legitimate March 1988 loan from BfG to Consultinvest (which had already been paid off), so that Defendants could keep $550,000 and $420,000 loans open on Consultinvest's books.

1152.  The transfers from Consultinvest to UEF were made at the direction of Glock Sr. and Ewert and carried out by Ewert or Manown.

2. **Wires Related to the Unimproved Glock Property**

1153.  On or about December 14, 1990, $600,000 was wired into the Cofer Beauchamp escrow account for the benefit of Consultinvest.  On information and belief, those funds had been wired from Reofin at the direction of Glock Sr.  As

described above, on information and belief, funds held by Reofin were derived from property stolen by Defendants from Glock, Inc.

1154.  Defendants purposefully masked the source of the funds Consultinvest used to purchase the Unimproved Glock Property.  Defendants set up the fraudulent loan from Warwick to launder funds stolen from Glock, Inc. through the various sham leases with Consultinvest and to move the funds into the control of Glock Sr. and his associates.

1155.  On August 12, 1992, Ewert wrote to Manown to direct Consultinvest to pay $133,000 to "Warwick/Ewert" for "interest" Consultinvest owed on the $600,000 one-day loan Consultinvest had obtained from BfG (which Consultinvest had used to make the initial purchase of the Unimproved Glock Property).  Ewert directed that the $133,000 payment be "funneled" through the Cofer Beauchamp escrow account.

1156.  The BfG loan was between *BfG* and Consultinvest, however, and its term had expired on or about December 12, 1990.  Despite this, Manown issued a check for $133,003 out of Consultinvest's account at NationsBank, payable to the order of Cofer Beauchamp.

1157.  On information and belief, the fake loan from Warwick corresponded to the terms that had been used for the legitimate one-day December 1990 loan from BfG to Consultinvest (which had already been paid

off), so that Defendants could keep a $600,000 loan open on Consultinvest's books.

1158. In March 1993, Ewert directed Manown to make additional transfers to the Cofer Beauchamp trust account for payments related to the $600,000 loan from BfG to Consultinvest. Pursuant to instructions from Ewert, Manown directed NationsBank to transfer $190,874 from Consultinvest's account to Cofer Beauchamp's trust account numbered xxx-xx-455. Manown's instructions to NationsBank were written on letterhead from Eaglesmith.

1159. On March 24, 1993, Ewert directed Manown to transfer $12,261 to Cofer Beauchamp's trust account. Manown then directed NationsBank to transfer the funds from Consultinvest's account into the Cofer Beauchamp trust account numbered xxx-xx-455. Manown's instructions to NationsBank were written on letterhead from Eaglesmith.

### 3. Wires on Additional "Loans" from UEF to Consultinvest

1160. To pay amounts that were purportedly due on the fraudulent loans between Consultinvest and UEF that had been set up by Ewert, Manown, and Glock Sr., Defendants used money from Glock, Inc. that it had paid to Consultinvest on the sham leases (the Expanded Lease Agreement, Lease Option Agreement, and Machinery Equipment Lease).

1161.  On or about May 17, 1993, Ewert directed Manown to pay $203,135 from the funds Cofer Beauchamp "held in trust for" UEF.  The payment was to be made to an account held by UEF in Dublin, Ireland, for a purported "loan" from UEF to Consultinvest.  On the same day, Manown instructed Cofer Beauchamp to transfer $203,135 from its escrow account to UEF.  Manown's written instructions were prepared on letterhead from Eaglesmith.

1162.  On or about July 2, 1993, Ewert instructed Manown to make a quarterly interest payment of $49,912.50 on outstanding loans held by Consultinvest.  The funds were to be paid into a UEF account at Barclays Bank, plc in London, England (the "Barclays Account").  Manown's July 2, 1993 written instructions to Cofer Beauchamp to transfer the funds were prepared on letterhead from Eaglesmith.  The funds were wired out of Cofer Beauchamp's trust account at NationsBank on or about July 2, 1993.

1163.  On or about January 28, 1994, Ewert instructed Manown to make Consultinvest's quarterly interest payments for the third and fourth quarters of 1993 (in the amount of $50,919 for each quarter).  Payment was to be made to UEF's Barclays Account.  Ewert's written instructions were sent to Manown's attention at Eaglesmith.  Manown's January 31, 1994 written instructions to Cofer Beauchamp to transfer the funds were written on Eaglesmith letterhead.  The

funds were wired out of Consultinvest's account at NationsBank on or about February 4, 1994.

1164.  On or about December 29, 1994, Ewert instructed Consultinvest (c/o Cofer Beauchamp) to make interest payments for "backlog" related to fiscal year 1992; and interest payments for fiscal years 1993 and 1994.  The interest payments were purportedly for four "loans":  the January 28, 1992 loans for $550,000 and $420,000; the June 29, 1992 loan for $320,000; and the July 31, 1992 loan for $600,000.  The total amount of interest payments due to the "lender," UEF, was $220,986.  Payment was to be made to UEF's Barclays Account.  On or about December 30, 1994, Cofer Beauchamp instructed NationsBank to wire the funds to UEF and to debit Consultinvest's account numbered xxxxx237.

1165.  On or about March 31, 1995, Ewert signed check 102 drawn on Consultinvest's NationsBank account numbered xxxxx237.  The check was payable to the order of UEF in the amount of $49,812.50, for "interest."  The check cleared the NationsBank account on or about June 7, 1995.

1166.  Although the account holder name on check 102 was "Consultinvest, Inc.," the address shown was "c/o Peter S. Manown" at the same address as Cofer Beauchamp's offices.  The address on the NationsBank account statement for account xxxxx237, however, was Manown's home address.

244

1167.   On or about June 30, 1995, Ewert signed check 103 drawn on Consultinvest's NationsBank account numbered xxxxx237.   The check was payable to the order of UEF in the amount of $50,366, for "interest."   The check cleared the NationsBank account on or about July 18, 1995.

1168.   The address information on check 103 was the same as for check 102.

1169.   On or about July 31, 1995, Consultinvest purchased property from Highland Park Partners for an approximate purchase price of $7.5 million.

1170.   On or about July 25, 1995, Consultinvest transferred a $1 million down payment to the closing attorneys as part of this purchase (the "July 25 Loans").   Although the funds Consultinvest used for the payment had been wired into its NationsBank account numbered xxxxx237 by Unipatent and Ewert, the original source of the funds was, on information and belief, Glock, Inc. Funds stolen by Defendants were transferred out of Glock, Inc. and into Reofin. From Reofin, approximately $500,000 was transferred to Unipatent and $500,000 to Ewert.   Those funds were then sent to Consultinvest to use as the down payment on the purchase from Highland Park Partners.

1171.   Defendants attempted to conceal or disguise the original source of the funds used to make the purchase.   Consultinvest and UEF entered into fraudulent loan agreements related to the purchase from Highland Park Partners.   Ewert signed the loan agreements on behalf of Consultinvest.

1172.  On or about September 26, 1995, Consultinvest wired $160,916.99 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account. This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1173.  On or about December 18, 1995, Consultinvest wired $209,044.45 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account. This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1174.  On March 21, 1996, Ewert directed NationsBank to wire $206,777.22 from Consultinvest's NationsBank account numbered xxxxx237 to UEF's Barclays Account.  Manown signed off on this transfer.  On or about March 28, 1996, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1175.  On June 27, 1996, Ewert directed NationsBank to wire $206,777.22 from Consultinvest's NationsBank account numbered xxxxx237 to UEF's Barclays Account.  Manown signed off on this transfer.  On or about July 5, 1996, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1176.  On or about September 25, 1996, Consultinvest wired $209,044.44 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.

246

This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1177.  On January 20, 1997, Ewert directed NationsBank to wire $209,044.44 from Consultinvest's NationsBank account numbered xxxxx237 to UEF's Barclays Account.  Manown signed off on this transfer.  On or about January 21, 1997, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1178.  On or about April 1, 1997, Consultinvest wired $204,500 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1179.  On or about July 8, 1997, Consultinvest wired $206,722 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1180.  On or about September 30, 1997, Consultinvest wired $209,044 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1181.  On or about January 7, 1998, Consultinvest wired $209,044 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1182.  On or about March 27, 1998, Consultinvest wired $204,500 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1183.  On or about June 24, 1998, Consultinvest wired $206,772 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1184.  On or about September 10, 1998, Consultinvest wired $206,044 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1185.  On or about December 21, 1998, Consultinvest wired $209,044 and $3,000 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

248

1186.  On or about March 22, 1999, Consultinvest wired $199,312.50 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

1187.  On or about June 21, 1999, Consultinvest wired $201,527 from its NationsBank account numbered xxxxx237 to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 25 Loans and other "loans" from UEF.

**G.      Transfers Through Eaglesmith to Glock Sr.**

1188.  Plaintiff incorporates paragraphs 1 through 343, 409 through 470, and 487 through 513 as if fully set forth herein.

1189.  The transfers described in the following paragraphs (1190 to 1204) were part of the scheme to injure Plaintiff Helga Glock, perpetrated by Defendants by taking money from Glock, Inc. and putting it into entities that were under the control and ownership of Glock Sr. and his associates.  Each set of transfers was violation of 18 U.S.C. § 1341 or § 1343, which prohibit mail and wire fraud (respectively).  Both 18 U.S.C. § 1341 and § 1343 are predicate acts for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

1190.  Money belonging to Glock, Inc. was improperly taken by Defendants and transferred into a series of accounts held by Eaglesmith at Summit Bank in Atlanta, Georgia.  Those funds were later transferred to Glock Sr.'s personal bank account in Austria.  Defendants' conduct was targeted at and intended to injure Ms. Glock.

1191.  The Eaglesmith accounts were used as a conduit to transfer funds that rightfully belonged to Glock, Inc. (and therefore to Glock Sr. and Ms. Glock jointly via their partnership and ownership of Glock Ges.m.b.H.) and place them in Glock Sr.'s sole possession.  Use of the Eaglesmith accounts also served to mask the original source of the funds and to further Defendants' scheme to injure Ms. Glock.

1192.  Several Eaglesmith accounts at Summit Bank were opened "c/o Glock, Inc." and listed the address for Eaglesmith as 6000 Highlands Parkway, Smyrna, Georgia (Glock, Inc.'s address).  Glock, Inc. and Eaglesmith had no direct relationship.  Nor did Eaglesmith provide any products or services to Glock, Inc.  Accordingly, there was no basis for Glock, Inc. to make payments or transfer any funds to Eaglesmith at any point in time.

1193.  Eaglesmith's Summit Bank account numbered xxxx375 was initially funded with $778,203.38 wired from Glock, Inc. on or about May 28, 1994.

1194.  Eaglesmith's Summit Bank account numbered xxxx719 was opened on or about February 17, 1995.  This account listed Eaglesmith's address as 6000 Highlands Parkway, Smyrna, Georgia (Glock, Inc.'s address).

1195.  On or about March 6, 1995, Eaglesmith's account numbered xxxx375 was closed out and the funds were transferred to Eaglesmith's account numbered xxxx719.  The transfer amount was $511,851.77.

1196.  On or about July 27, 2000, $3,308,152 was transferred into Eaglesmith account numbered xxxx719 at Summit Bank.  On information and belief, the funds had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.  On information and belief, this amount was purportedly a "licensing" or "royalty" payment to Glock Sr.

1197.  On or about August 3, 2000, $3,008,152 of that transfer was placed into a 5-year CD at Summit Bank in the name of Glock Sr. (account numbered CDxxx342).

1198.  On or about April 1, 2005, Glock Sr. directed Summit Bank to transfer the proceeds of the CD (and of other accounts at Summit Bank) into an account at Hypo-Alpe-Adrie Bank (account numbered xxx500).  The total amount of funds transferred was over $14.9 million.  On information and belief, Defendant Lohr oversaw this transfer of funds.

1199.  On or about August 1, 2002, $5,719,150.19 was transferred into Eaglesmith's account numbered xxxx719.  These funds had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.'s Wachovia account numbered xxxxx190.  This amount was purportedly a "licensing" or "royalty" payment to Glock Sr.

1200.  The July 27, 2000 and August 1, 2002 transfers of Glock, Inc. funds into Eaglesmith's Summit Bank account numbered xxxx719 were, on information and belief, later moved into Glock Sr.'s sole possession (as part of the April 1, 2005 transfer of $14.9 million into Glock Sr.'s account numbered xxx500 at Hypo-Alpe-Adrie Bank in Austria and the $17.5 million December 18 Transfer to his personal bank account numbered xxxxx xxx 601 at Bank Austria Creditanstalt in Austria).

1201.  Glock Sr. and Quendler directed Summit Bank employee Heidi Hein to make the December 18 Transfer.  The December 18 Transfer was routed through American Express Bank, LTD. in New York.

1202.  The December 18 Transfer moved funds that had been fraudulently taken from Glock, Inc. out of Georgia and wired them to Glock Sr.'s bank account in Austria.

1203.  Ms. Glock was unaware of these thefts of funds from Glock, Inc. and their transfer into the control of Glock Sr. and his associates.  Nor did she have

any reason to suspect that such thefts had occurred until her divorce proceedings from Glock Sr. in 2011.

## XI.   PREDICATE ACTS COMMITTED BY DEFENDANTS:  MONEY LAUNDERING AND ENGAGING IN MONETARY TRANSACTIONS USING PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITIES

1204.  Plaintiff incorporates paragraphs 1 through 1203 as if fully set forth herein.

1205.  Defendants laundered the proceeds of their thefts from Glock, Inc. in three primary ways.  First, over €122 million was laundered through payments made by Glock, Inc. and Glock Ges.m.b.H. to Glock Sr. for "royalties" on trademarks he did not — and never had — owned.  On information and belief, at least of portion of the "royalty" payments made by Glock Ges.m.b.H. used funds that Defendants had stolen from Glock, Inc.[28]

1206.  Second, Defendants moved tens of millions of dollars out of the United States through multiple series of transfers into and out of fraudulent foreign billing companies controlled by Glock Sr. and his associates.[29]

---

[28]   This aspect of the laundering scheme is detailed *infra* at paragraphs 1212 through 1241.

[29]   This aspect of the laundering scheme is detailed *infra* at paragraphs 1242 through 1390.

1207.  Third, other funds were moved out of the United States through Defendants' orchestration of fraudulent loan payments from Consultinvest to Warwick and UEF, using money stolen from Glock, Inc.  The payments were then made to foreign entities that were owned or controlled by Glock Sr. and his associates.  Money that Consultinvest received from Glock, Inc. in payment on fraudulent and improper lease agreements was used by Consultinvest to "pay" interest on the fraudulent loans.[30]

1208.  All of these actions were undertaken in order to injure Ms. Glock and to deprive her of her interest in these funds.

1209.  Through the laundering scheme, Defendants obscured their thefts from Glock, Inc. and their scheme to injure Ms. Glock.  They moved funds that were the joint property of Ms. Glock and Glock Sr. (via their partnership and ownership of Glock, Inc. through Glock Ges.m.b.H.) into the possession and control of Glock Sr. and his associates.

A.    **The Ultimate Destination:  Movement of Funds into the Glock Foundation and the Value Foundation**

1210.  On information and belief, a large portion of the funds that were laundered by Defendants, without regard to the manner in which they had been

---

[30]   This aspect of the laundering scheme is detailed *infra* at paragraphs 1391 through 1464.

laundered, were ultimately transmitted or transferred into accounts held by the

Glock Foundation and Value Foundation.  These transfers were made at

Glock Sr.'s direction, for the purpose of harming Ms. Glock and depriving her of

her interest in funds to which she was entitled by virtue of their partnership.

1211.  Although the vast majority of the laundered funds began life as

legitimate earnings by Glock, Inc., they were ultimately transferred into the

exclusive possession and control of Glock Sr. by putting them in the Glock

Foundation and Value Foundation.  Glock Sr. was then at liberty to play with his

"fun money" in whatever manner he saw fit, including transferring the stolen

funds into the Glock Horse Performance Centers in Austria and the Netherlands.

**B.     Laundering Through the Payment of Improper "Royalties" to Glock Sr.**

1212.  Defendants laundered funds improperly taken from Glock, Inc.

through improper "royalty" payments made to Glock Sr.  Such payments were

made by both Glock, Inc. and Glock Ges.m.b.H.  On information and belief, at

least a portion of the payments made by Glock Ges.m.b.H. used funds that

Defendants stole from Glock, Inc.

1213.  "Royalty" payments made by Glock, Inc. that were purportedly for

use of the "Glock" name or made pursuant to the Trademark Agreement were

improper.  Glock Ges.m.b.H. did not hold a trademark for the name "Glock."

Nor was there any basis for Glock, Inc. to pay Glock Ges.m.b.H. under a separate agreement to license the "Glock" logo in order for Glock, Inc. to sell "Glock" pistols.  Use of the name "Glock" was necessary in order for to Glock, Inc. sell Glock pistols.

1214.  On information and belief, at least a portion of the payments made by Glock Ges.m.b.H. to Base Technical under the Master Agreement used funds that had been unlawfully converted from Glock, Inc. possession.  These funds were ultimately transferred to Glock Sr. in the form of the sham "royalty" payments.

1215.  There was no basis for Glock Ges.m.b.H. to pay Glock Sr. royalties for use of the "Glock" name or logo since Glock Sr. did not own any such trademarks in the United States or America.

1216.  Ms. Glock was unaware that Glock Sr. and his of associates stole funds from Glock, Inc. or laundered them through use of sham "royalty" payments to Glock Sr.  Nor did she have any reason to suspect that such conduct had occurred until her divorce proceedings from Glock Sr. in 2011.

1217.  After Defendants unlawfully converted funds from Glock, Inc.'s possession, at least some of the funds were transferred out of the State of Georgia and directly into Glock Sr.'s personal account in Austria.  Other funds that Defendants unlawfully converted from Glock, Inc. were transferred out of the

State of Georgia into accounts in foreign countries — and later transferred to

Glock Sr. through sham "royalty" payments from Glock, Inc. and Glock

Ges.m.b.H.

### 1.   Glock, Inc.'s Transfers through Eaglesmith

1218.  Defendants stole funds from Glock, Inc. and transferred them into a

series of Eaglesmith accounts at Summit Bank.

1219.  Eaglesmith's account numbered xxxx375 was opened with

$778,203.38 in funds wired from Glock, Inc. on or about May 28, 1994.

1220.  There was no basis for Glock, Inc. to make payments or transfer any

funds to Eaglesmith at any point in time.  The funds that Eaglesmith received on

or about May 28, 1994 had been stolen, unlawfully converted, or taken by fraud

from Glock, Inc.

1221.  On or about March 6, 1995, the funds in Eaglesmith's account

numbered xxxx375 were transferred to Eaglesmith's account numbered xxxx719.

1222.  The July 27, 2000 and August 1, 2002 transfers of Glock, Inc. funds

into Eaglesmith's Summit Bank account numbered xxxx719 were, on information

and belief, later moved into Glock Sr.'s sole possession (as part of the April 1,

2005 transfer of $14.9 million into Glock Sr.'s account number xxx500 at

Hypo-Alpe-Adrie Bank in Austria and the $17.5 million December 18 Transfer to

his personal bank account numbered xxxxx xxx 601 at Bank Austria Creditanstalt in Austria).

1223.  On December 18, 2003, Glock Sr. and Quendler directed Hein of Summit Bank to make the $17.5 million December 18 Transfer.

1224.  The $17.5 million December 18 Transfer included Glock, Inc. money moved by Defendants into Eaglesmith's account on August 1, 2002 ($5,719,150.19).  These funds as well as, on information and belief, all of the remaining funds comprising the December 18 Transfer had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.  The funds transferred to Eaglesmith on August 1, 2002 were paid to Glock Sr.'s personal account for purported 2002 "royalty" payments from Glock, Inc.

1225.  On or about August 3, 2000, $3,008,152 of the July 27, 2000 transfer was placed into the 5-year CD at Summit Bank.  On information and belief, the funds transferred into the CD were made for purported "royalty" payments from Glock, Inc.

1226.  Glock Sr. directed Summit Bank to transfer the proceeds of that CD (and other funds) into his account at Hypo-Alpe-Adrie Bank (account numbered xxx500) on or about April 1, 2005.  The total amount of funds transferred was over $14.9 million.  On information and belief, Lohr oversaw this transfer of

funds, which was just one more step in the laundering of the proceeds from

Defendants' racketeering.

1227.  Any legitimate licensing or royalty payments owed by Glock, Inc.

should have been treated as an asset of Glock Ges.m.b.H.

1228.  Glock Sr. knew that the funds comprising the December 18 Transfer

had been stolen, unlawfully converted, or taken by fraud from Glock, Inc.

## 2.  Violations of Provisions Prohibiting Laundering of Monetary Instruments

1229.  Each "royalty" payment from Glock, Inc. and Glock Ges.m.b.H.

(using funds stolen from Glock, Inc.) was part of Defendants' scheme to launder

funds stolen from Glock, Inc. and transfer them to Glock Sr.'s exclusive control

and ownership.  Defendants' conduct violated 18 U.S.C. §§ 1956 and 1957, which

prohibit (respectively) the laundering of monetary instruments and engaging in

monetary transactions in property derived from specified unlawful activities.

Accordingly, each royalty payment made to Glock Sr. (as described above in

paragraphs 197 through 221, 479 through 513, and 1189 through 1203) is a

predicate act for purposes of demonstrating Defendants' liability for violations of

federal RICO and Georgia State RICO.

1230.  In violation of 18 U.S.C. § 1956(a)(1)(A), Defendants knew that the

transfers made by Glock, Inc. to Eaglesmith and to Glock Ges.m.b.H. were the

proceeds of some form of unlawful activity (*i.e.*, theft).  Subsequent to the thefts from Glock, Inc., Defendants conducted or attempted to conduct financial transactions involving those funds with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc., which were designed to target and injure Ms. Glock.  On information and belief, Defendants conducted or attempted to conduct additional financial transactions via sham "royalty" payments to Glock Sr. involving funds stolen from Glock, Inc., with the intent to promote the carrying on of that unlawful activity.

1231.  Further, in violation of 18 U.S.C. § 1956(a)(1)(B), Defendants knew that transfers of funds from Glock, Inc. to Eaglesmith and to Glock Ges.m.b.H. for the purpose of making sham "royalty" payments to Glock Sr. were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the original funds.

1232.  The funds were moved into Glock Sr.'s sole possession and control through multiple series of unnecessary wire transfers.

1233.  Glock Sr. knew that the "royalty" payments from Glock, Inc. and from Glock Ges.m.b.H. used funds that had been stolen from Glock, Inc.

1234.  In violation of 18 U.S.C. § 1956(a)(2)(A), Defendants transmitted or transferred (and attempted to transmit and transfer) the funds wired by Glock, Inc. to Eaglesmith from the United States to and through places outside of the

United States to be used as sham "royalty" payments to Glock Sr.  Defendants

engaged in these financial transactions with the intent to promote the carrying on

of the unlawful activity of the thefts from Glock, Inc., for the purpose of targeting

and injuring Ms. Glock.

1235.  In violation of 18 U.S.C. § 1956(a)(2)(B), Defendants transmitted or

transferred (and attempted to transmit and transfer) the funds wired by Glock,

Inc. to Eaglesmith from the United States to and through places outside of the

United States to be used as sham "royalty" payments to Glock Sr.  In violation of

18 U.S.C. § 1956(a)(2)(B), Defendants transmitted or transferred (and attempted

to transmit and transfer) funds they stole from Glock, Inc. from the United States

to and through places outside of the United States to be used as sham "royalty"

payments to Glock Sr.  Defendants knew that these transfers involved the

proceeds of some form of unlawful activity.  Moreover, they knew that the

transmission or transfer of the funds was designed to conceal or disguise the

nature, location, source, ownership, or control of the funds as Glock, Inc.

1236.  In violation of 18 U.S.C. § 1956(a)(3)(A), Defendants, with the intent

to promote the carrying on of the unlawful activity of the thefts from Glock, Inc.

conducted and attempted to conduct financial transactions involving the funds

stolen from Glock, Inc. by making sham "royalty" payments to Glock Sr.

1237.  In violation of 18 U.S.C. § 1956(a)(3)(B), Defendants, with the intent to conceal or disguise the nature, location, source, ownership, or control of the funds stolen from Glock, Inc., conducted and attempted to conduct financial transactions involving the funds stolen from Glock, Inc. by making sham "royalty" payments to Glock Sr.

1238.  Defendant Manown violated 18 U.S.C. § 1957(a) because (a) he engaged in monetary transactions involving funds in excess of $10,000 that were criminally derived; (b) is a United States person;[31] (c) and the offenses took place, in part, in the United States.[32]

1239.  Defendants Glock Sr., Ewert, Quendler, Lohr, Glock *Privatstiftung*, and Value *Privatstiftung* violated 18 U.S.C. § 1957(a) because (a) they engaged in monetary transactions involving funds in excess of $10,000 that were criminally derived and (b) the offenses took place, in part, in the United States.[33]

### (i)      Jurisdiction over Foreign Defendants

1240.  Under 18 U.S.C. § 1956(b)(2), the Court has jurisdiction over the foreign Defendants if process is served on them pursuant to the Federal Rules of

---

[31]  *See* 18 U.S.C. § 1957(d)(2).

[32]  *See* 18 U.S.C. § 1957(d)(1).

[33]  *See* 18 U.S.C. § 1957(d)(1).

Civil Procedure or the laws of the country in which each foreign Defendant is found because the Defendants committed offenses under 18 U.S.C. § 1956(a) involving financial transactions that occurred in part in the United States. Further, the Court has jurisdiction over (a) extraterritorial acts by Defendants who are United States citizens; (b) foreign Defendants because they committed offenses under 18 U.S.C. § 1956(a) involving financial transactions that occurred, in part, in the United States.

**(ii)    Jurisdiction over Defendants' United States Assets**

1241.  Under 18 U.S.C. § 1956(b)(3), the Court has jurisdiction over any bank account or other property held by Defendants in the United States in order to ensure that funds are available to satisfy any judgment in this action.

**C.    Laundering Using Glock Hong Kong, Glock America, and the Billing Companies**

1242.  Defendants laundered tens of millions of dollars by moving them out of the United States through multiple series of transfers into and out of fraudulent foreign billing companies controlled by Glock Sr. and his associates.

**1.    The Laundering Cycle Though Glock Hong Kong**

1243.  Each of the payments Glock, Inc. made to Glock Hong Kong on the Fraudulent HK Invoices constituted the transportation of stolen moneys through foreign commerce in violation of 18 U.S.C. § 2314 or the receipt of stolen money

that crossed a United States boundary in violation of 18 U.S.C. § 2315.  The funds were transferred out of bank accounts in Georgia belonging to Glock, Inc. and into accounts in Hong Kong held by Glock Hong Kong and the possession or control of Glock Sr. and his associates.  These thefts are detailed *supra* in paragraphs 362 through 407, 524 through 607, and 663 through 768.

1244.  Under 18 U.S.C. § 1956(c)(7)(A), the transportation of stolen property (including moneys) and the receipt of stolen goods constitute "specified unlawful activity."[34]

1245.  The funds that Defendants stole from Glock, Inc. were taken through Glock, Inc.'s payments to Glock Hong Kong on the Fraudulent HK Invoices.  The amounts charged on those invoices both (a) exceeded any legitimate amount that should have been charged to Glock, Inc. by a sister company (so that the excess could be siphoned off and laundered through Minami, as described *infra*) and (b) were not actually connected to the provision of any goods or services by Glock Hong Kong to Glock, Inc.

1246.  Glock Sr. established Glock Hong Kong and directly controlled it. Glock Hong Kong lacked any real infrastructure.

---

[34]   *See* 18 U.S.C. § 1961(1)(B).

1247.  From Glock Hong Kong, the stolen funds were initially transferred by wire into three primary entities as part of the laundering scheme:  Minami, Unipatent, and Base Technical (via Glock Ges.m.b.H.).  Minami, Unipatent, and Base Technical were under the control and ownership of Glock Sr. and his associates.

1248.  From Minami, Unipatent, and Base Technical, the laundering continued.  The funds were then transferred by wire into accounts held by Reofin — yet another entity controlled by Glock Sr. and his associates as a means to deprive Ms. Glock of property and assets to which she was entitled.

1249.  Reofin appears to have served as the general collection depot for a large portion of the laundered funds until they were transferred into the Glock Foundation, Value Foundation, or other entities to which Ms. Glock did not have access under Defendants' scheme.

### (i)   Transfers Using Minami

1250.  As part of Defendants' laundering scheme, Glock Hong Kong transferred by wire at least $19,758,853 to the original Minami over a period of 10 years—from August 31, 1989 through July 22, 1998.[35]  All of the funds wired to Minami by Glock Hong Kong were stolen from Glock, Inc.

---

[35]   These transfers are described in detail, *supra*, in paragraphs 772 through 870.

1251.  Minami was owned and controlled solely by Glock Sr. and was incorporated in Liberia.

1252.  Although Glock Hong Kong made payments to Minami for purported "consultancy" or "marketing" services, in fact, Minami never provided any such services to Glock Hong Kong.  Nor was any bookkeeping ever performed at Minami.

1253.  Rather, Minami's fraudulent bills for such services were designed to conceal or disguise (a) the origin of the funds that it was being paid by Glock Hong Kong and (b) the fact that the payments were being made despite the fact that Minami had not rendered any services to Glock Hong Kong.

1254.  Funds were transferred from Glock Hong Kong's bank accounts in Hong Kong to accounts held by Minami in Hong Kong.

1255.  Several of these transfers were denominated in U.S. Dollars and passed through correspondent banks in the United States as part of the transactions.

1256.  After these fraudulent billings were discovered as part of an internal investigation at the "Glock Group," Defendants Glock Sr. and Quendler "cloned" Minami by incorporating an entity with that name in the Bahamas.  Glock Sr. and Quendler then carried on laundering funds that had been stolen from Glock, Inc. through Glock Hong Kong and the original Minami — without missing a beat.

1257.  Glock Sr. and Quendler wired an additional $6,849,900 that had been stolen from Glock, Inc. through Glock Hong Kong to the "cloned" Minami during the period from December 2000 through November 2001.

1258.  The $6,849,900 was wired from Minami's account numbered xxxxxx.60X at UBS Bank Zürich into an account owned by Glock Sr. at UBS Bank Zürich.  The transfers took place in two stages — $5,249,900 was transferred on or about January 11, 2001 and $1,600,000 was transferred on or about November 20, 2001.  The January 11, 2001 transfer into Glock Sr.'s account was purportedly from Glock Hong Kong for "management fees 3/98-9/00."  The November 20, 2001 transfer indicates that it was from Glock Hong Kong for "management fees 10/00-9/01."

1259.  In total, from August 1989 through November 2001, Defendants laundered more than $26.6 million by transmitting or transferring funds stolen from Glock, Inc. through Glock Hong Kong and into accounts held by "Minami."

**(ii)    The Use of Reofin as an Intermediate Collection Point**

1260.  From Minami's account xxx.464 at UBS in Hong Kong, at least $13.9 million was automatically transferred into Reofin's account xxxxx6YN at UBS in Luxembourg, pursuant to direct instructions from Glock Sr.[36]

---

[36]   *See supra* paragraphs 923 through 991.

1261. A standing order Minami's account directed that all funds in excess of $25,000 be automatically transferred to the Bank of New York in New York ("BoNY") for the benefit of Reofin's UBS account.

1262. All of the transfers out of Minami's UBS account took place, in part, in the United States.

1263. Examples of the flow of money from Glock, Inc. through Glock Hong Kong and Minami to Reofin are below:

**Defendants' Laundering of $1,050,000 Stolen from Glock, Inc.**

1264. On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices. Of those funds, Defendants later directed that Glock Hong Kong wire the $1,050,000 June 19 Transfer from its BfG Hong Kong account (xxxxxxx803) to Minami's UBS account.

1265. Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1266. The transfer was made through Bank of America International in New York ("BofA") (as the correspondent bank for BfG) and paid to BoNY (the correspondent bank for UBS) for the benefit of Reofin's UBS account.

**Defendants' Laundering of $1,150,000 Stolen from Glock, Inc.**

1267.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $1,150,000 September 19 Transfer from its BfG Hong Kong account (xxxxxxx803) to Minami's UBS account.

1268.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1269.  The transfer was made through BofA (as the correspondent bank for BfG) and paid to BoNY (the correspondent bank for UBS) for the benefit of Reofin's UBS account.

**Defendants' Laundering of $1,550,000 Stolen from Glock, Inc.**

1270.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $1,550,000 December 28 Transfer from its account at Hypo-Bank (xxxxxx-USD-xxx1-02) to Minami's UBS account.

1271.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1272.  The transfer was paid to BoNY (the correspondent bank for UBS) for the benefit of Reofin's UBS account.

**Defendants' Laundering of $2,200,000 Stolen from Glock, Inc.**

1273.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $2.2 million August 16 Transfer from its account at Hypo-Bank (xxxxxx-USD-xxx1-02) to Minami's UBS account.

1274.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1275.  The transfer was paid to BoNY (the correspondent bank for UBS) for the benefit of Reofin's UBS account.

**Defendants' Laundering of $807,500 Stolen from Glock, Inc.**

1276.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock

Hong Kong wire the $807,500 December 20 Transfer from its account at

Hypo-Bank (xxxxxx-USD-xxx1-02) to Minami's UBS account.

1277.  Because of Glock Sr.'s standing order, all funds from the transfer in

excess of $25,000 were subsequently wired into Reofin's account at UBS in

Luxembourg.

1278.  On information and belief, the transfer was paid to BoNY (the

correspondent bank for UBS) for the benefit of Reofin's UBS account.

**Defendants' Laundering of $482,830 Stolen from Glock, Inc.**

1279.  On information and belief, Defendants wired funds to Glock Hong

Kong from Glock, Inc.'s bank account in the United States, in payment on

Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock

Hong Kong wire the $482,830 April 22 Transfer from its account at Standard

Chartered Bank in Hong Kong, account xxx-x-xxxx22-8 ("the Standard Chartered

Account"), to Minami's UBS account.

1280.  Because of Glock Sr.'s standing order, all funds from the transfer in

excess of $25,000 were subsequently wired into Reofin's account at UBS in

Luxembourg.

1281.  The transfer was made through Standard Chartered Bank in New

York (as the correspondent bank) and paid to Bankers Trust Company in New

York (the correspondent bank for UBS).

**Defendants' Laundering of $307,723 Stolen from Glock, Inc.**

1282.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $307,723 October 1 Transfer from its Standard Chartered Account to Minami's UBS account.

1283.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1284.  The transfer was made through Standard Chartered Bank in New York (as the correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

**Defendants' Laundering of $452,400 Stolen from Glock, Inc.**

1285.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $452,400 December 9 Transfer from its Credit Suisse HK Account to Minami's account numbered xxx.464 at UBS in Hong Kong.  Ewert received a copy of the account statement reflecting this transfer.

1286.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1287.  The transfer was made through CSFB in New York (as the correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

**Defendants' Laundering of $605,000 Stolen from Glock, Inc.**

1288.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $605,000 December 10 Transfer from its Standard Chartered Account to Minami's UBS account.  Ewert received a copy of the account statement reflecting this transfer.

1289.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1290.  The transfer was made through Standard Chartered Bank in New York (as the correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

**Defendants' Laundering of $555,200 Stolen from Glock, Inc.**

1291.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $555,200 April 2 Transfer from its Credit Suisse HK Account to Minami's UBS account.

1292.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1293.  The transfer was made through CSFB in New York (as the correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

**Defendants' Laundering of $309,750 Stolen from Glock, Inc.**

1294.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $309,750 September 3 Transfer from its Credit Suisse HK Account to Minami's UBS account.

1295.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1296.  Moreover, Defendant Ewert specifically informed Glock Sr. about this transfer on or about February 19, 1998.  Defendant Willam was also aware of this transfer.

1297.  The transfer was made through CSFB in New York (as the correspondent bank) and paid to Bankers Trust Company in New York (the correspondent bank for UBS).

**Defendants' Laundering of $1,758,450 Stolen from Glock, Inc.**

1298.  On information and belief, Defendants wired funds to Glock Hong Kong from Glock, Inc.'s bank account in the United States, in payment on Fraudulent HK Invoices.  Of those funds, Defendants later directed that Glock Hong Kong wire the $1,758,450 July 22 Transfer from its Warburg Dillon Reed account to Minami's UBS account.

1299.  Because of Glock Sr.'s standing order, all funds from the transfer in excess of $25,000 were subsequently wired into Reofin's account at UBS in Luxembourg.

1300.  On information and belief, the transfer was paid to BoNY (the correspondent bank for UBS) for the benefit of Reofin's UBS account.

### (iii)   Transfers Through Unipatent

1301.  Defendants' wire transfers of stolen funds through Glock Hong Kong to Unipatent took a less circuitous route into Glock Sr.'s exclusive possession and control.

1302.  Glock Hong Kong had no proper source of income or basis on which to pay dividends to its nominal owners, Glock Ges.m.b.H. and Unipatent.  Its only access to large sums of money was from the improper payments made by Glock, Inc. on the Fraudulent HK Invoices or interest earned on those payments.

1303.  Despite these facts, Glock Hong Kong improperly paid $2 million in dividends to Unipatent from March 1992 through August 1997.

1304.  After removing the funds stolen from Glock, Inc. in the United States via wire transfers to Glock Hong Kong, Defendants subsequently transferred the funds out of Glock Hong Kong's bank accounts in Hong Kong and into various bank accounts in Luxembourg held by Unipatent.[37]

1305.  Glock Sr. owned and controlled Unipatent.  The funds stolen from Glock, Inc. were laundered through Glock Hong Kong and transferred to Unipatent in order to directly line Glock Sr.'s pockets — for the purpose of harming Ms. Glock.

---

[37]  These transfers of funds are described in detail, *supra*, in paragraphs 888 through 920.

1306.  In an agreement dated July 3, 2003, Reofin sold 100% of the shares of Unipatent and other unspecified companies to Defendant Fitox A.G. ("Fitox"). Defendant Quendler signed the agreement on behalf of Reofin.  Arsène Kronshagen (a lawyer for the so-called "Glock Group") signed on behalf of Fitox.

1307.  Reofin also sold to Fitox unspecified assets and all of its deposits with UBS in Luxembourg (including, on information and belief, accounts numbered xxxxx8FN and xxxxx6YN, into which Minami had deposited funds as part of Defendants' laundering of funds through Glock Hong Kong).

1308.  The purchase price under the agreement between Reofin and Fitox was $1.

### (iv)    Movement Through Glock Ges.m.b.H. to Base Technical

1309.  The funds stolen from Glock, Inc. and transferred to Glock Hong Kong through payments on the Fraudulent HK Invoices were also laundered by Defendants through Glock Ges.m.b.H. and ultimately transferred into Base Technical (and then to Reofin).

1310.  While approximately 9% to 12% of Glock, Inc.'s payments of the Fraudulent HK Invoices were held by Glock Hong Kong and transferred through Minami (as described in paragraphs 253 through 272, *supra*), the vast majority of the remaining amount of the payments were transferred into Glock Ges.m.b.H.

by Glock Hong Kong.  The transfers to Glock Ges.m.b.H. took place within about six to ten days after Glock Hong Kong received the stolen funds from Glock, Inc.

1311.  A portion of those funds were subsequently wired out of Glock Ges.m.b.H. to Base Technical — into the possession and control of Glock Sr. and his associates.  These multiple series of transfers served to conceal or disguise the nature, location, source, ownership, or control of the funds as having come – and been stolen — from Glock, Inc.

1312.  To conceal or disguise these transfers, Defendants had Base Technical invoice Glock Ges.m.b.H. for "consulting services."  Many of these invoices were signed by Defendant Ewert.  No services were ever provided by Base Technical to Glock Ges.m.b.H., however.  Base Technical's invoices to Glock Ges.m.b.H. were regularly for a percentage of Glock Ges.m.b.H.'s quarterly total revenue.

1313.  Defendants directed that Glock Ges.m.b.H. transfer over $30 million to Base Technical in a series of at least 24 wire transfers taking place from September 1992 through November 1998.

1314.  The funds were transferred out of Glock Hong Kong's accounts in Hong Kong to Glock Ges.m.b.H.  Defendants then directed that the funds be transmitted or transferred into bank accounts held by Base Technical, some in Luxembourg and New York.  Many of these transfers took place, in part, in the

278

United States because the funds moved through correspondent banks in New York or were deposited into an account held by Base Technical in New York.[38]

1315.  On information and belief, nearly all of the funds transmitted or transferred by Defendants from Glock Ges.m.b.H. to Base Technical were eventually transferred or transmitted to accounts held by Reofin.

### 2.    Laundering Through the Caribbean

1316.  Similar to the laundering through Glock Hong Kong, Defendants also laundered funds stolen from Glock, Inc. through Glock America.

1317.  Each of the payments that Defendants directed Glock, Inc. to make to Glock America on the Fraudulent Americas Invoices constituted the transportation of stolen moneys through foreign commerce in violation of 18 U.S.C. § 2314 or the receipt of stolen money that crossed a United States boundary in violation of 18 U.S.C. § 2315.  The funds were transferred out of bank accounts in Georgia belonging to Glock, Inc. and into accounts held by Glock America (at least one of which was at Maduro & Curiel's Bank in Curaçao) and controlled by Glock Sr.  These thefts are detailed *supra* in paragraphs 515 through 522.

---

[38]  These transfers of funds are described in detail, *supra*, in paragraphs 524 through 607.

279

1318.  Under 18 U.S.C. § 1956(c)(7)(A), the transportation of stolen property (including moneys) and the receipt of stolen goods constitute "specified unlawful activity."[39]

1319.  Glock Sr. was personally involved in the establishment of Glock America and was managing director of the company.  It lacked any real infrastructure.

1320.  From Glock America, at least a portion of the stolen funds were initially transferred by wire to accounts held by Taziria.

1321.  Taziria was under Glock Sr.'s sole control and "belongs" to the "Glock Group."  The only function of Taziria was as a "billing" company — *i.e.*, to issue invoices to Glock America on the orders of Glock Sr.

1322.  Taziria never performed any bookkeeping.

1323.  From December 1990 through May 1999, over $20.5 million were wired from Glock America into Taziria's account at NMB Bank (later known as ING Bank) in Curaçao.  These transfers are described in detail, *supra*, in paragraphs 993 through 1138.

---

[39]   *See* 18 U.S.C. § 1961(1)(B).

1324.  The funds transferred into Taziria had been stolen from Glock, Inc. by Defendants through Glock, Inc.'s payments to Glock America on the Fraudulent Americas Invoices.

1325.  Certain of the transfers from Glock America to Taziria occurred, in part, in the United States because the funds were transmitted through correspondent banks in New York.

1326.  The transfers from Glock America to Taziria were purportedly to pay what were interchangeably called "consultancy services" and "management fees."  Taziria, however, never provided any products or services to Glock America.

1327.  Defendants later transmitted or transferred by wire into accounts held by Reofin (and therefore into the exclusive control of Glock Sr.) the funds they had stolen from Glock, Inc., wired to Glock America, then wired to Taziria. The funds were transmitted or transferred from Taziria to Reofin based on Glock Sr.'s instructions — even though Reofin had no direct ownership interest in Taziria.

(i)      Transactions Using Glock America and Taziria

1328.  Although more opaque than the transfers that went through Glock Hong Kong and Minami, Defendants laundered funds stolen from Glock, Inc. through Glock America and Taziria in order to conceal or disguise the nature,

location, source, ownership, or control of the funds as having come from Glock, Inc.

1329.  Funds that the Defendants laundered through Glock America and Taziria were later wired out of account numbered xxxxxx.60V at UBS Bank Zürich (which was held by Glock Americas or Taziria) directly into an account owned by Glock Sr. at UBS Bank Zürich.

1330.  At least two such transfers took place.  On or about December 22, 2000, $5,747,180 was transferred into Glock Sr.'s account.  The transfer was purportedly from Glock America for "management fee invoices 03/98-09/2000." On or about November 15, 2001, $3,049,980 was transferred into Glock Sr.'s account.  The transfer was purportedly from Glock America for "management fees 10/00-9/01."

**Wash Transactions**

1331.  Numerous transfers of funds for payment on "invoices" temporarily passed through Glock America's ING Bank account numbered xxxx-xxx094-xxx in Curaçao (the "ING 1 Account").  Generally, within a few days after receiving payment on an invoice, a "correction" of the payment on the same invoice number, in the exact same amount as the deposit would be sent out of the account.  Defendants used these "wash transactions" to hide Glock, Inc. as the

original source of the funds and to move the funds into the control of Glock Sr. and his associates.

1332.  On information and belief, Defendants directed that Glock, Inc. send the funds in payment on the Fraudulent Americas Invoices and directed that the "corrective" payments be made to Glock Ges.m.b.H. and then transferred out to Base Technical — similar to the manner in which funds were laundered through Glock Hong Kong (*see*, *supra*, paragraphs 1243 through 1315).

1333.  On or about January 5, 1995, Glock America received payment on invoices 354 and 355 in the amount of $1,191,644.50.  On or about January 31, 1995, Glock America paid the exact same amount for "Corr #354+#355."  These transfers were made through Glock America's ING 1 Account.

1334.  On or about March 22, 1995, Glock America received payment on invoice 358 in the amount of $1,219,528.60.  On or about April 4, 1995, Glock America paid $1,219,529 (forty cents more than it had received) for "Corr. inv. #358."  These transfers were made through Glock America's ING 1 Account.

1335.  On or about March 24, 1995, Glock America received payment on invoice 359 in the amount of $685,249.20.  On or about March 28, 1995, Glock America paid the exact same amount for "Corr. inv. #359."  These transfers were made through Glock America's ING 1 Account.

**Near-Wash Transactions**

1336.  In laundering funds through Glock America, Defendants engaged in "near-wash transactions" through Glock America's ING Bank account numbered xxxx-xxx078-xxx (the "ING 3 Account").  Unlike the "wash transactions" described above, the near-wash transactions involved a payment by Glock, Inc. to Glock America made, on information and belief, on the Fraudulent Americas Invoices.  A short time later, a large percentage of the funds were then transferred out of the ING 3 Account and sent to Glock Ges.m.b.H to pay invoices that were, on information and belief, fraudulent.  The payments made to Glock Ges.m.b.H. by Glock America averaged about 86% of the total funds transferred from Glock, Inc. by Defendants.  The invoices issued by Glock Ges.m.b.H. often bore the same number as the invoice on which Glock, Inc. had made payment to Glock America.

1337.  On information and belief, after Glock America transferred these illicit funds to Glock Ges.m.b.H., Defendants then transmitted or transferred a portion of them to Base Technical — similar to the pattern in which Defendants engaged to launder funds through Glock Hong Kong.

1338.  The funds from Glock, Inc. that remained at Glock America ultimately comprised, on information and belief, a portion of the funds that were laundered through Taziria.

1339.  The near-wash transactions occurred on a near-monthly basis from January 1993 until July 1995 and resulted in the transfer of over $23.6 million to Glock Ges.m.b.H.  On information and belief, Defendants eventually transferred at least a portion of those funds into accounts held by Base Technical and then to Reofin.

1340.  On or about January 4, 1993, Glock America received a payment on invoice 172 in the amount of $1,060,963 from Glock, Inc.  On or about January 8, 1993, Glock America transferred $228,000 and $631,942 to Glock Ges.m.b.H. for invoice 172.  The transfers to Glock Ges.m.b.H. totaled 81% of the amount that had been transferred out of Glock, Inc. by Defendants.

1341.  On or about February 1, 1993, Glock America received a payment on invoice 173 in the amount of $994,143 from Glock, Inc.  On or about the same day, Glock America transferred $217,434 and $595,172 to Glock Ges.m.b.H. for invoice 173.  The transfers to Glock Ges.m.b.H. totaled 82% of the amount that had been transferred out of Glock, Inc. by Defendants.

1342.  On or about March 1, 1993, Glock America received a payment on invoice 174 in the amount of $872,971 from Glock, Inc.  On or about March 4, 1993, Glock America transferred $735,673 to Glock Ges.m.b.H. for invoice 174. The transfers to Glock Ges.m.b.H. totaled 84% of the amount that had been transferred out of Glock, Inc. by Defendants.

1343.  On or about March 25, 1993, Glock America received a payment on invoice 175 in the amount of $506,859 from Glock, Inc.  On or about March 30, 1993, Glock America transferred $433,384 to Glock Ges.m.b.H. for invoice 175. The transfers to Glock Ges.m.b.H. totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1344.  On or about April 7, 1993, Glock America received a payment on invoice 176 in the amount of $736,641 from Glock, Inc.  On or about April 20, 1993, Glock America transferred $630,756 to Glock Ges.m.b.H. for invoice 176. The transfers to Glock Ges.m.b.H. totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1345.  On or about May 19, 1993, Glock America received a payment on invoice 177 in the amount of $1,071,444.95 from Glock, Inc.  On or about May 26, 1993, Glock America transferred $860,221.65 to Glock Ges.m.b.H. for invoice 177. The transfers to Glock Ges.m.b.H. totaled 80% of the amount that had been transferred out of Glock, Inc. by Defendants.

1346.  On or about June 4, 1993, Glock America received a payment on invoices 178 and 179 in the amount of $763,035 from Glock, Inc.  On or about June 23, 1993, Glock America transferred $506,492 to Glock Ges.m.b.H. for invoices 178 and 179.  The transfers to Glock Ges.m.b.H. totaled 66% of the amount that had been transferred out of Glock, Inc. by Defendants.

1347.  On or about June 14, 1993, Glock America received a payment on invoice 180 in the amount of $12,558 from Glock, Inc.  On or about June 18, 1993, Glock America transferred $4,670 to Glock Ges.m.b.H. for invoice 180.  The transfers to Glock Ges.m.b.H. totaled 37% of the amount that had been transferred out of Glock, Inc. by Defendants.

1348.  On or about July 19, 1993, Glock America received a payment on invoice 184 in the amount of $893,146 from Glock, Inc.  On or about July 20, 1993, Glock America transferred $765,649 to Glock Ges.m.b.H. for invoice 184.  The transfers to Glock Ges.m.b.H. totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1349.  On or about August 6, 1993, Glock America received a payment on invoice 181 in the amount of $1,005,991 from Glock, Inc.  On or about September 2, 1993, Glock America transferred $859,262 to Glock Ges.m.b.H. for invoice 181. The transfers to Glock Ges.m.b.H. totaled 85% of the amount that had been transferred out of Glock, Inc. by Defendants.

1350.  On or about September 3, 1993, Glock America received a payment on invoice 182 in the amount of $485,499 from Glock, Inc.  On or about September 7, 1993, Glock America transferred $421,633 to Glock Ges.m.b.H. for invoice 182.  The transfers to Glock Ges.m.b.H. totaled 87% of the amount that had been transferred out of Glock, Inc. by Defendants.

1351.  On information and belief, between September 3 and December 21, 1993, Glock America received a payment on invoice 186 from Glock, Inc. in the approximate amount of $1,126,000.  On or about November 1, 1993, Glock America transferred $860,221.65 to Glock Ges.m.b.H. for invoice 186.  On or about December 21, 1993, Glock America transferred $108,021.35 to Glock Ges.m.b.H. for invoice 186.  The amount transferred to Glock Ges.m.b.H. would therefore have totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1352.  On or about November 10, 1993, Glock America received a payment on invoice 187 in the amount of $709,159 from Glock, Inc.  On or about November 24, 1993, Glock America transferred $635,106 to Glock Ges.m.b.H. for invoice 187.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1353.  On or about January 6, 1994, Glock America received a payment on invoice 188 in the amount of $944,442 from Glock, Inc.  On or about January 11, 1994, Glock America transferred $846,902 to Glock Ges.m.b.H. for invoice 188. The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1354.  On or about January 27, 1994, Glock America received a payment on invoice 189 in the amount of $1,111,210 from Glock, Inc.  On or about January 28,

288

1994, Glock America transferred $1,005,983 to Glock Ges.m.b.H. for invoice 189. The transfers to Glock Ges.m.b.H. totaled 91% of the amount that had been transferred out of Glock, Inc. by Defendants.

1355.  On or about February 24, 1994, Glock America received a payment on invoice 191 in the amount of $1,558,345 from Glock, Inc.  On or about March 2, 1994, Glock America transferred $639,367 to Glock Ges.m.b.H. for invoice 191. The transfers to Glock Ges.m.b.H. totaled 41% of the amount that had been transferred out of Glock, Inc. by Defendants.

1356.  On information and belief, between January 1 and February 25, 1994, Glock America received a payment on invoice 190 from Glock, Inc. in the approximate amount of $886,000.  On or about February 25, 1994, Glock America transferred $761,793 to Glock Ges.m.b.H. for invoice 190.  The amount transferred to Glock Ges.m.b.H. would therefore have totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1357.  On or about March 28, 1994, Glock America received a payment on invoice 192 in the amount of $1,180,572 from Glock, Inc.  On or about March 29, 1994, Glock America transferred $1,062,434 to Glock Ges.m.b.H. for invoice 192. The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1358.  On or about April 7, 1994, Glock America received a payment on invoice 193 in the amount of $942,511 from Glock, Inc.  On or about April 8, 1994, Glock America transferred $844,952 to Glock Ges.m.b.H. for invoice 193.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1359.  On or about May 20, 1994, Glock America received a payment on invoice 194 in the amount of $1,066,020 from Glock, Inc.  On or about May 23, 1994, Glock America transferred $956,687 to Glock Ges.m.b.H. for invoice 194. The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1360.  On or about August 10, 1994, Glock America received a payment on invoice 198 in the amount of $1,243,702 from Glock, Inc.  On or about August 11, 1994, Glock America transferred $1,121,474 to Glock Ges.m.b.H. for invoice 198. The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1361.  On or about September 29, 1994, Glock America received a payment on invoice 351 in the amount of $1,036,053 from Glock, Inc.  On or about the same day, Glock America transferred $931,525.70 to Glock Ges.m.b.H. for invoice 351.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1362.  On or about December 21, 1994, Glock America received a payment on invoice 352 in the amount of $1,159,113.50 from Glock, Inc.  On or about December 29, 1994, Glock America transferred $1,043,411.10 to Glock Ges.m.b.H. for invoices 352 and 353.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1363.  On information and belief, between December 21, 1994 and March 10, 1995, Glock America received a payment from Glock, Inc. on invoice 356 in the approximate amount of $1,215,000.  On or about March 10, 1995, Glock America transferred $1,044,717 to Glock Ges.m.b.H. for invoice 356.  The amount transferred to Glock Ges.m.b.H. would therefore have totaled 86% of the amount that had been transferred out of Glock, Inc. by Defendants.

1364.  On or about March 17, 1995, Glock America received a payment on invoice 357 in the amount of $1,214,276.10 from Glock, Inc.  On or about the same day, Glock America transferred $1,089,145 to Glock Ges.m.b.H. for invoice 357. The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1365.  On or about March 28, 1995, Glock America received a payment on invoice 359 in the amount of $685,249.20 from Glock, Inc.  On or about the same day, Glock America transferred $614,734 to Glock Ges.m.b.H. for invoice 359.

The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1366.  On or about April 4, 1995, Glock America received a payment on invoice 358 in the amount of $1,219,529 from Glock, Inc.  On or about the same day, Glock America transferred $1,095,770 to Glock Ges.m.b.H. for invoice 358.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1367.  On or about April 20, 1995, Glock America received a payment on invoices 360 and 362 in the amount of $996,791.70 from Glock, Inc.  On or about May 10, 1995, Glock America transferred $885,648 to Glock Ges.m.b.H. for invoices 360 and 362.  The transfers to Glock Ges.m.b.H. totaled 89% of the amount that had been transferred out of Glock, Inc. by Defendants.

1368.  On or about April 27, 1995, Glock America received a payment on invoice 361 in the amount of $1,141,954 from Glock, Inc.  On or about May 2, 1995, Glock America transferred $1,034,254 to Glock Ges.m.b.H. for invoice 361.  The transfers to Glock Ges.m.b.H. totaled 91% of the amount that had been transferred out of Glock, Inc. by Defendants.

1369.  On or about June 1, 1995, Glock America received a payment on invoices 363, 364, and 365 in the amount of $ 2,106,679 from Glock, Inc.  On or about June 14, 1995, Glock America transferred $818,113 to Glock Ges.m.b.H. for

invoice 363.  On or about June 16, 1995, Glock America transferred $1, 071,590 to Glock Ges.m.b.H. for invoices 364 and 365.  The transfers to Glock Ges.m.b.H. totaled 90% of the amount that had been transferred out of Glock, Inc. by Defendants.

1370.  On or about June 26, 1995, Glock America received a payment on invoices 366, 367, and 371 in the amount of $361,413.30 from Glock, Inc.  On or about June 28, 1995, Glock America transferred $259,529.60 to Glock Ges.m.b.H. for invoices 366, 267, and 371.  The transfers to Glock Ges.m.b.H. totaled 72% of the amount that had been transferred out of Glock, Inc. by Defendants.

1371.  On or about July 31, 1995, Glock America received a payment on invoice 368 in the amount of $946,232.50 from Glock, Inc.  Sometime thereafter, Glock America transferred $840,955 to Glock Ges.m.b.H. for invoice E9103.  The transfers to Glock Ges.m.b.H. totaled 89% of the amount that had been transferred out of Glock, Inc. by Defendants.

**Direct Transfers to Glock Ges.m.b.H.**

1372.  There were also direct payments to Glock Ges.m.b.H. on invoices that, on information and belief, were fraudulent.  On information and belief, the funds transferred to Glock Ges.m.b.H. originated as funds stolen from Glock, Inc. and were later transferred out to Base Technical after being received by Glock

Ges.m.b.H.  This process was similar to that used by Defendants to launder funds through Glock Hong Kong and Minami.

1373.  On or about January 1995, Glock America transferred $645,805.50 to Glock Ges.m.b.H. on "invoices" for March 7, 1995.  The funds were transferred out of Glock America account xxxx-094-xxx at ING Bank in Curaçao (the "ING 2 Account").

1374.  On or about August 13, 1997, Hubert Willam (for Glock Ges.m.b.H.) directed José Antonio Cuitiño (of Glock America) to wire Glock Ges.m.b.H. $10,150,310.60 for invoices E10353, E10147, E10443, E10445, E10921, E11002, E11003, E9989, E11603, E11429, E11467, E11663, E11892, G139, E12634, and E12112.

1375.  On or about November 17, 1997, in a letter from Willam to Cuitiño, Glock Ges.m.b.H. directed Glock America to it $402,085 for "invoices" from June through September 1997.  On or about November 24, 1997, Glock America wired $4,384,449.37 from its Maduro & Curiel's Bank account (xxx xx4 08) to Glock Ges.m.b.H.

1376.  On or about May 28, 1998, Willam directed Cuitiño to wire Glock Ges.m.b.H. $4,118,016.60 for invoices 14155, 14623, 14517, 14520, 14711, 14718, G203, 15902, and 15334.

1377.  On or about March 25, 1999, Glock America wired over $2.8 million from its Maduro & Curiel's Bank account (xxx xx4 08) to Glock Ges.m.b.H.

### 3.   Violations of Provisions Prohibiting Laundering of Monetary Instruments

1378.  Each set of financial transactions described in the paragraphs above (1243 to 1377) was part of Defendants' scheme to launder funds stolen from Glock, Inc. and transfer them to companies under Glock Sr.'s exclusive control and ownership.  Defendants' conduct violated 18 U.S.C. §§ 1956 and 1957, which prohibit (respectively) the laundering of monetary instruments and engaging in monetary transactions in property derived from specified unlawful activities. Accordingly, each cycle of transfers (*e.g.*, out of Glock, Inc. and into (a) Glock Hong Kong to Unipatent to the Glock Foundation/Value Foundation; (b) Glock Hong Kong to Minami to Reofin to the Glock Foundation/Value Foundation; (c) Glock America to Taziria to Reofin to the Glock Foundation/Value Foundation; or (d) Glock America to Glock Ges.m.b.H. to Base Technical) is a predicate act for purposes of demonstrating Defendants' liability for violations of federal RICO and Georgia State RICO.

1379.  In violation of 18 U.S.C. § 1956(a)(1)(A), Defendants knew that the payments made by Glock, Inc. were the proceeds of some form of unlawful activity (*i.e.*, theft).  Subsequent to the thefts from Glock, Inc., Defendants

conducted or attempted to conduct financial transactions involving those funds with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc., which were designed to target and injure Ms. Glock.

1380.  Further, in violation of 18 U.S.C. § 1956(a)(1)(B), Defendants knew that transfers of the funds paid by Glock, Inc. to Glock Hong Kong and to Glock America were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the original funds.

1381.  The funds were moved into the possession and control of Glock Sr. and his associates through multiple series of unnecessary wire transfers.

1382.  Glock Sr. knew about the payments made by Glock, Inc. on the Fraudulent HK Invoices and the Fraudulent Americas Invoices.  Moreover, he directed the that the funds stolen from Glock, Inc. be transferred into his possession and control and that of his associates.

1383.  In violation of 18 U.S.C. § 1956(a)(2)(A), Defendants transmitted or transferred (and attempted to transmit and transfer) the funds paid by Glock, Inc. to Glock Hong Kong and to Glock America from the United States to and through places outside of the United States.  Defendants engaged in these financial transactions with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc., which were designed to target and injure Ms. Glock.

1384.  In violation of 18 U.S.C. § 1956(a)(2)(B), Defendants transmitted or transferred (and attempted to transmit and transfer) the funds paid by Glock, Inc. to Glock Hong Kong and Glock America from the United States to and through places outside of the United States.  Defendants knew that the transfers of these funds involved the proceeds of some form of unlawful activity.  Moreover, they knew that the transmission or transfer of the funds was designed to conceal or disguise the nature, location, source, ownership, or control of the funds as Glock, Inc.

1385.  In violation of 18 U.S.C. § 1956(a)(3)(A), Defendants, with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc. conducted and attempted to conduct financial transactions involving the funds stolen from Glock, Inc., which were designed to target and injure Ms. Glock.

1386.  In violation of 18 U.S.C. § 1956(a)(3)(B), Defendants, with the intent to conceal or disguise the nature, location, source, ownership, or control of the funds stolen from Glock, Inc., conducted and attempted to conduct financial transactions involving the funds stolen from Glock, Inc.

1387.  Defendants Manown and Willam violated 18 U.S.C. § 1957(a) because (a) they engaged in monetary transactions involving funds in excess of

$10,000 that were criminally derived; (b) they are United States persons;[40] (c) and the offenses took place, in part, in the United States.[41]

1388.  Defendants Glock Sr., Ewert, Quendler, Glock Hong Kong, and Glock America violated 18 U.S.C. § 1957(a) because (a) they engaged in monetary transactions involving funds in excess of $10,000 that were criminally derived and (b) the offenses took place, in part, in the United States.[42]

### (i)    Jurisdiction over Foreign Defendants

1389.  Under 18 U.S.C. § 1956(b)(2), the Court has jurisdiction over the foreign Defendants if process is served on them pursuant to the Federal Rules of Civil Procedure or the laws of the country in which each foreign Defendant is found because the Defendants committed offenses under 18 U.S.C. § 1956(a) involving financial transactions that occurred in part in the United States. Further, the Court has jurisdiction over (a) extraterritorial acts by Defendants who are United States citizens; (b) foreign Defendants because they committed offenses under 18 U.S.C. § 1956(a) involving financial transactions that occurred, in part, in the United States.

---

[40]  *See* 18 U.S.C. § 1957(d)(2).

[41]  *See* 18 U.S.C. § 1957(d)(1).

[42]  *See* 18 U.S.C. § 1957(d)(1).

### (ii)    Jurisdiction over Defendants' United States Assets

1390.  Under 18 U.S.C. § 1956(b)(3), the Court has jurisdiction over any

bank account or other property held by Defendants in the United States in order

to ensure that funds are available to satisfy any judgment in this action.

### D.    Laundering Through Consultinvest

1391.  In addition to Defendants' use of Glock Hong Kong, Glock America,

and the foreign billing companies to launder funds that they had stolen from

Glock, Inc., Defendants laundered funds stolen from Glock, Inc. through

Consultinvest.  Defendants then transmitted or transferred the funds from

Consultinvest to Warwick or UEF (or, on information and belief, other entities

owned or controlled by Glock Sr.) for the purpose of moving the funds into the

possession and control of Glock Sr. and his associates.

1392.  The leases between Glock, Inc. and Consultinvest were a means for

Defendants to steal funds from Glock, Inc. and move them into Consultinvest.

Defendants attempted to conceal or disguise the original source of the funds by

setting up fraudulent loans between Consultinvest and Warwick/UEF.

1393.  The funds that were transferred to Warwick and UEF were, on

information and belief, supposed to be transmitted by Defendant Ewert to an

account held by Reofin.  It is unclear, however, whether Defendant Ewert

followed this directive from Glock Sr. or if he simply kept the illicit monies for himself.

### 1. Original Glock Office Space and the "Loan" from UEF

1394.  In March 1988, Consultinvest purchased the Original Glock Office Space.  It later entered into a sham lease with Glock, Inc. and a fake loan with UEF as a means of funneling money from Glock, Inc. into UEF.  Although the loan with UEF was not papered until 1992, the sham transactions were intended from the beginning.

1395.  On or about January 27, 1992, Consultinvest received a total of $970,000 in its account xxxxx237 at NationsBank via wire transfer from Reofin.

1396.  On or about January 28, 1992, UEF "loaned" $970,000 to Consultinvest for a term of two years to finance the purchase of property in the State of Georgia.

1397.  The "loan" from UEF was secured by a first mortgage of $550,000 (with an interest rate of 10.5% per annum, adjustable quarterly) and a second mortgage of $420,000 (with an interest rate of 12.5% per annum, adjustable quarterly).  On information and belief, the interest rate charged by UEF was set or directed to be set by Glock Sr.

1398.  The mortgages were on the Original Glock Office Space.

1399.  As described in detail above, (in paragraphs 416 through 446) Defendants purposefully attempted to conceal or disguise the source of the funds Consultinvest received in connection with the $970,000 UEF "loan."

1400.  Funds that had originated at Glock, Inc. were funneled to Consultinvest through Reofin.  Defendants then attempted to conceal or disguise the movement of those funds out of Consultinvest by setting up a fake loan between it and UEF.  The purpose of these funds transfers was to move money out of an entity (Glock, Inc.) in which Ms. Glock and Glock Sr. were partners and into entities (Consultinvest, Warwick, UEF, Reofin) that were controlled only by Glock Sr. and his associates.

### 2.    Unimproved Glock Property & the Warwick "Loan"

1401.  Consultinvest purchased the Unimproved Glock Property on or about December 14, 1990, for just over $540,000.  Defendant Manown signed the closing statement on behalf of Consultinvest.

### (i)    The Real Loan from BfG

1402.  On December 11, 1990, Consultinvest received a one-day loan of $600,000 from the New York branch of BfG.  The funds were wired to Consultinvest's account at Chase Manhattan Bank N.A. in New York.

1403.  On information and belief, Consultinvest used the funds it had been loaned by BfG to purchase the Unimproved Glock Property.

1404.  Consultinvest repaid the one-day BfG loan using funds that had been wired into an escrow account held at Cofer Beauchamp.

1405.  On or about December 14, 1990, $600,000 was wired into the Cofer Beauchamp escrow account for the benefit of Consultinvest.  On information and belief, those funds had been wired from Reofin at the direction of Glock Sr.  As described above, it is believed that the bulk of the funds held by Reofin were derived from property stolen by Defendants from Glock, Inc.

1406.  Defendants purposefully masked the source of the funds Consultinvest used to purchase the Unimproved Glock Property.  Defendants set up the fraudulent loan from Warwick to launder the funds stolen from Glock, Inc. through the various sham leases with Consultinvest and to move the funds into Glock Sr.'s exclusive control.

### (ii)     The Fraudulent Loan from Warwick

1407.  The fraudulent $600,000 loan from Warwick was entered into on or about December 12, 1990 and executed by Ewert and Manown.

1408.  Under the terms of the Warwick credit facility, Consultinvest was required to provide Warwick with audited year-end financial statements and unaudited quarterly financial statements.  On information and belief, no such financials were ever prepared by Consultinvest or provided to Warwick.

### (iii)   Payments on the Fraudulent Warwick Loan

1409.  Consultinvest paid interest on the "loan" from Warwick using funds stolen from Glock, Inc. using the sham Lease Option Agreement, the Machinery Equipment Lease, and other improper lease agreements.

1410.  On August 12, 1992, Defendant Ewert wrote to Defendant Manown to direct Consultinvest to pay $133,000 to Warwick/Ewert for interest Consultinvest owed on the $600,000 BfG loan.  The funds were to be "funneled" through the Cofer Beauchamp escrow account.  The BfG loan was between *BfG* and Consultinvest, however, and the term had expired on or about December 12, 1990.  Nor did Ewert's letter mention that Warwick was the actual lender involved.  Despite this, Manown issued a check for $133,003 out of a NationsBank account from Consultinvest, payable to the order of Cofer Beauchamp.

1411.  In March 1993, Ewert directed Manown to make additional transfers to the Cofer Beauchamp trust account for payments related to the $600,000 loan from BfG to Consultinvest.  Pursuant to instructions from Ewert, Manown directed NationsBank to transfer $190,874 to Cofer Beauchamp's trust account (xxx-xx-455).  Manown's instructions to NationsBank were written on letterhead from Eaglesmith.

1412.  On March 24, 1993, Ewert directed Manown to transfer $12,261 to Cofer Beauchamp's trust account.  Manown then directed NationsBank to transfer the funds into account xxx-xx-455 (the Cofer Beauchamp trust account).  Manown's instructions to NationsBank were written on letterhead from Eaglesmith.

1413.  Although Consultinvest made sham "interest" payments on the $600,000 "loan" from Warwick, Consultinvest never repaid any principal to Warwick and Warwick never sought reimbursement of that capital.

1414.  Ms. Glock had no knowledge of these illegal wire transfers at the time they took place.  She had no reason to begin to suspect that Glock Sr. and his associates (Ewert and Manown) were attempting to conceal the illegal source of the funds — which had been improperly taken from Glock, Inc. — until her divorce proceedings from Glock Sr. in 2011.

### 3.    Additional "Loans" from UEF and Consultinvest's "Repayment" Plan

1415.  In order to launder the funds stolen from Glock, Inc., through Consultinvest, Defendants used the payments Glock, Inc. made on the sham leases (including, the Expanded Lease Agreement, Lease Option Agreement, and Machinery Equipment Lease) to pay amounts that Consultinvest purportedly owed on fraudulent loans set up between Consultinvest and UEF.

1416.  On June 29, 1992, Consultinvest entered into a loan agreement with UEF for $320,000, with 10% annual interest.  The term of the loan was to expire on June 30, 1996.  The loan agreement was signed by Ewert as President of Consultinvest.

1417.  On July 31, 1992, Consultinvest entered into a loan agreement with UEF for $600,000, with 9.5% annual interest.  The term of the loan was to expire on January 31, 1994.  Defendant Ewert initialed each page of the loan agreement.

1418.  In fact, UEF never provided Consultinvest with any funds.  Rather, Reofin transferred $320,000 and $600,000 to Consultinvest in connection with the June 29 and July 31, 1992 "loans."  The $320,000 was wired from Reofin's account xxx 440 at Banque Leu to Consultinvest's account at NationsBank (xxxxx237).

1419.  It appears that Consultinvest wired the $320,000 to Glock, Inc. on or about August 14, 1992, possibly in payment on the March 31, 1990 Demand Note (*i.e.*, to reimburse Glock, Inc. for funds it had spent building out the Expanded Office and Firing Range Space).

1420.  On or about May 17, 1993, Ewert directed Manown to make payment in the amount of $203,135 of funds Cofer Beauchamp "held in trust for" UEF.  Payment was to be made to an account held by UEF in Dublin, Ireland.  On the same day, Manown instructed Cofer Beauchamp to transfer $203,135 from its escrow account to UEF.  Manown's written instructions were prepared on

letterhead from Eaglesmith.  This transfer was made in payment on a purported "loan" from UEF to Consultinvest.

1421.  On or about July 2, 1993, Ewert instructed Manown to make a quarterly interest payment of $49,912.50 on outstanding loans held by Consultinvest.  The funds were to be paid into a UEF account at Barclays Bank, plc in London, England (the "Barclays Account").  Manown's July 2, 1993 written instructions to Cofer Beauchamp to transfer the funds were prepared on letterhead from Eaglesmith.  The funds were wired out of Cofer Beauchamp's trust account at NationsBank on or about the same day.

1422.  On or about January 28, 1994, Ewert instructed Manown to make Consultinvest's quarterly interest payments for the third and fourth quarters of 1993 (in the amount of $50,919 for each quarter).  Payment was to be made to UEF's Barclays Account.  Ewert's written instructions were sent to Manown's attention at Eaglesmith.  Manown's January 31, 1994 written instructions to Cofer Beauchamp to transfer the funds were written on Eaglesmith letterhead.  The funds were wired out of Consultinvest's account at NationsBank on or about February 4, 1994.

1423.  On or about December 29, 1994, Ewert instructed Consultinvest (c/o Cofer Beauchamp) to make interest payments for "backlog" related to fiscal year 1992; and interest payments for fiscal years 1993 and 1994.  The interest

payments were purportedly for four "loans":  the January 28, 1992 loans for

$550,000 and $420,000; the June 29, 1992 loan for $320,000; and the July 31, 1992

loan for $600,000.  The total amount of interest payments due to the "lender,"

UEF, was $220,986.  Payment was to be made to UEF's Barclays Account.  On or

about December 30, 1994, Cofer Beauchamp instructed NationsBank to wire the

funds and to debit Consultinvest's account xxxxx237.

1424.  On or about March 31, 1995, Ewert signed check 102 drawn on

Consultinvest's NationsBank account (number xxxxx237).  The check was

payable to the order of UEF in the amount of $49,812.50, for "interest."  Although

the account holder name on the check was "Consultinvest, Inc.," the address

shown was "c/o Peter S. Manown" at the same address as Cofer Beauchamp.

The address on the account statement, however, was Defendant Manown's home

address.  The check cleared the NationsBank account on or about June 7, 1995.

1425.  On or about June 30, 1995, Ewert signed check 103 drawn on

Consultinvest's NationsBank account (number xxxxx237).  The check was

payable to the order of UEF in the amount of $50,366, for "interest."  The check

cleared the NationsBank account on or about July 18, 1995.  The address

information on the check and account statement were the same as for check 102.

307

### 4.     Consultinvest's Purchase Using $7.5 Million in Laundered Funds

1426.  On or about July 31, 1995, Consultinvest purchased property from Highland Park Partners for an approximate purchase price of $7.5 million.

1427.  On or about July 25, 1995, Consultinvest transferred $1 million to the closing attorneys as part of this purchase.  Although the funds Consultinvest used for the payment had been wired into its NationsBank account (xxxxx237) by Unipatent and Defendant Ewert, the original source of the funds was, on information and belief, Glock, Inc.  Funds stolen by Defendants were transferred out of Glock, Inc. and into Reofin.  From Reofin, approximately $500,000 was transferred to Unipatent and $500,000 to Ewert.  Those funds were then sent to Consultinvest to use as the down payment on the purchase from Highland Park Partners.

1428.  Dispensing with pretense altogether, to make other payments related to the purchase ($3.5 million and $3 million both on or about July 24, 1995), Defendants appear simply to have transferred funds directly from Reofin's account xxx 928 xx at UBS Luxembourg to the seller or closing attorney (rather

than having the payments be funneled through the nominal purchaser, Consultinvest).[43]

1429. Following pattern, Defendants attempted to conceal or disguise the original source of the funds used to make the purchase. Consultinvest and UEF entered into fraudulent loan agreements related to the purchase from Highland Park Partners. On July 28, 1995, UEF and Consultinvest entered into an agreement for UEF to lend $3.5 million to Consultinvest, with a two-year term and annual interest of 9.75%. Defendant Ewert signed the agreement on behalf of Consultinvest.

1430. Also on July 28, 1995, UEF and Consultinvest entered into an agreement for UEF to lend $3 million to Consultinvest, with a two-year term and annual interest of 9.25%. Defendant Ewert signed the agreement on behalf of Consultinvest. (The maturity date on the loan was later extended until December 31, 2001.)

---

[43] Reofin's xxx 928 UBS account in Luxembourg was also used to transfer at least $2.8 million to account numbered xxx-xxx-x086 held by Fire Arms Insurance Registry, Ltd. at Bank of Butterfield International in the Cayman Islands. Defendant Ewert directed this transfer, which took place on or about July 4, 1997 and was categorized as an "[e]quity contribution." The transfer was routed through UBS and BoNY in New York, as the correspondent banks.

1431.  Consultinvest, however, never received any money from UEF in connection with the July 28, 1995 loans.  Despite this fact, Consultinvest paid interest on the "loans" using funds it had improperly obtained from Glock, Inc. (including through Glock, Inc.'s payments on the Extended Lease Agreement, Lease Option Agreement, and Machinery Equipment Lease).

1432.  On or about September 26, 1995, Consultinvest wired $160,916.99 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1433.  On or about December 18, 1995, Consultinvest wired $209,044.45 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1434.  On March 21, 1996, Defendant Ewert directed NationsBank to wire $206,777.22 from Consultinvest's NationsBank account (xxxxx237) to UEF's Barclays Account.  Defendant Manown signed off on this transfer.  On or about March 28, 1996, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1435.  On June 27, 1996, Defendant Ewert directed NationsBank to wire $206,777.22 from Consultinvest's NationsBank account (xxxxx237) to UEF's

310

Barclays Account.  Defendant Manown signed off on this transfer.  On or about July 5, 1996, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1436.  On or about September 25, 1996, Consultinvest wired $209,044.44 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1437.  On January 20, 1997, Defendant Ewert directed NationsBank to wire $209,044.44 from Consultinvest's NationsBank account (xxxxx237) to UEF's Barclays Account.  Defendant Manown signed off on this transfer.  On or about January 21, 1997, NationsBank transferred the funds.  The wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1438.  On or about April 1, 1997, Consultinvest wired $204,500 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1439.  On or about July 8, 1997, Consultinvest wired $206,722 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was

made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1440.  On or about September 30, 1997, Consultinvest wired $209,044 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1441.  On or about January 7, 1998, Consultinvest wired $209,044 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1442.  On or about March 27, 1998, Consultinvest wired $204,500 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1443.  On or about June 24, 1998, Consultinvest wired $206,772 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1444.  On or about September 10, 1998, Consultinvest wired $206,044 from its NationsBank account (xxxxx237) to UEF's Barclays Account.  This wire was

made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1445.   On or about December 21, 1998, Consultinvest wired $209,044 and $3,000 from its NationsBank account (xxxxx237) to UEF's Barclays Account.   This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1446.   On or about March 22, 1999, Consultinvest wired $199,312.50 from its NationsBank account (xxxxx237) to UEF's Barclays Account.   This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1447.   On or about June 21, 1999, Consultinvest wired $201,527 from its NationsBank account (xxxxx237) to UEF's Barclays Account.   This wire was made to "pay" interest in connection with the July 28, 1995 loans and other "loans" from UEF.

1448.   Each and every "loan" from Warwick/UEF to Consultinvest was really a mechanism for Defendants to pass funds that had been improperly taken from Glock, Inc. (through lease payments to Consultinvest) and move the money into entities that were controlled by Glock Sr. or his associates.

1449.  In total, from August 1992 through June 1999, at least $4.2 million moved through Consultinvest and into foreign commerce via wire transfers to Warwick and UEF.  Those transfers were directed by Defendants.

1450.  Consultinvest only ever paid interest on the fraudulent loans, and does not ever appear to have repaid any of the purported principal.

1451.  Ultimately, it is unclear whether the funds that were "paid" by Consultinvest on the fraudulent loans made by Warwick and UEF were returned to Glock Sr.'s control or appropriated by Defendant Ewert for his own purposes. Regardless, Defendants' actions deprived Ms. Glock of her direct and indirect interests in these funds.

### 5.    Violations of Provisions Prohibiting Laundering of Monetary Instruments

1452.  Each set of financial transactions described in the paragraphs above (1391 to 1451) was part of Defendants' scheme to launder funds stolen from Glock, Inc. and transfer them to companies under Glock Sr.'s exclusive control and ownership.  Defendants' conduct violated 18 U.S.C. §§ 1956 and 1957, which prohibit (respectively) the laundering of monetary instruments and engaging in monetary transactions in property derived from specified unlawful activities. Accordingly, each set of transfers (*e.g.*, from Glock, Inc. to Consultinvest to

Warwick/UEF) is a predicate act for purposes of demonstrating Defendants'
liability for violations of federal RICO and Georgia State RICO.

1453.  In violation of 18 U.S.C. § 1956(a)(1)(A), Defendants knew that the
payments made by Glock, Inc. were the proceeds of some form of unlawful
activity (*i.e.*, theft).  Subsequent to the thefts from Glock, Inc., Defendants
conducted or attempted to conduct financial transactions involving those funds
with the intent to promote the carrying on of the unlawful activity of the thefts
from Glock, Inc., which were designed to target and injure Ms. Glock.

1454.  Further, in violation of 18 U.S.C. § 1956(a)(1)(B), Defendants knew
that transfers of the funds paid by Glock, Inc. to Consultinvest were designed, in
whole or in part, to conceal or disguise the nature, location, source, ownership,
or control of the original funds.

1455.  The funds were moved into the possession and control of Glock Sr.
and his associates through multiple series of unnecessary wire transfers.

1456.  Glock Sr. knew about the payments made by Glock, Inc. to
Consultinvest.  Moreover, he directed the that the funds stolen from Glock, Inc.
be transferred into his possession and control and that of his associates.

1457.  In violation of 18 U.S.C. § 1956(a)(2)(A), Defendants transmitted or
transferred (and attempted to transmit and transfer) the funds paid by Glock,
Inc. to Consultinvest from the United States to and through places outside of the

United States (*i.e.*, Warwick and UEF).  Defendants engaged in these financial transactions with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc., which were designed to target and injure Ms. Glock.

1458.  In violation of 18 U.S.C. § 1956(a)(2)(B), Defendants transmitted or transferred (and attempted to transmit and transfer) the funds paid by Glock, Inc. to Consultinvest from the United States to and through places outside of the United States (*i.e.*, Warwick and UEF).  Defendants knew that the transfers of these funds involved the proceeds of some form of unlawful activity.  Moreover, they knew that the transmission or transfer of the funds was designed to conceal or disguise the nature, location, source, ownership, or control of the funds as Glock, Inc.

1459.  In violation of 18 U.S.C. § 1956(a)(3)(A), Defendants, with the intent to promote the carrying on of the unlawful activity of the thefts from Glock, Inc. conducted and attempted to conduct financial transactions involving the funds stolen from Glock, Inc., which were designed to target and injure Ms. Glock.

1460.  In violation of 18 U.S.C. § 1956(a)(3)(B), Defendants, with the intent to conceal or disguise the nature, location, source, ownership, or control of the funds stolen from Glock, Inc., conducted and attempted to conduct financial transactions involving the funds stolen from Glock, Inc.

1461.  Defendants Manown and Consultinvest violated 18 U.S.C. § 1957(a) because (a) they engaged in monetary transactions involving funds in excess of $10,000 that were criminally derived; (b) are United States persons;[44] (c) and the offenses took place, in part, in the United States.[45]

1462.  Defendants Glock Sr. and Ewert violated 18 U.S.C. § 1957(a) because (a) they engaged in monetary transactions involving funds in excess of $10,000 that were criminally derived and (b) the offenses took place, in part, in the United States.[46]

### (i)    Jurisdiction Over Foreign Defendants

1463.  Under 18 U.S.C. § 1956(b)(2), the Court has jurisdiction over the foreign Defendants if process is served on them pursuant to the Federal Rules of Civil Procedure or the laws of the country in which each foreign Defendant is found because the Defendants committed offenses under 18 U.S.C. § 1956(a) involving financial transactions that occurred in part in the United States. Further, the Court has jurisdiction over (a) extraterritorial acts by Defendants who are United States citizens; and (b) foreign Defendants because they

---

[44]  *See* 18 U.S.C. § 1957(d)(2).

[45]  *See* 18 U.S.C. § 1957(d)(1).

[46]  *See* 18 U.S.C. § 1957(d)(1).

committed offenses under 18 U.S.C. § 1956(a) involving financial transactions

that occurred, in part, in the United States.

> **(ii)   Jurisdiction Over Defendants' United States Assets**

1464.  Under 18 U.S.C. § 1956(b)(3), the Court has jurisdiction over any

bank account or other property held by Defendants in the United States in order

to ensure that funds are available to satisfy any judgment in this action.

## XII.   RICO SPECIFIC ALLEGATIONS

1465.  The activities of the enterprise and the predicate acts of racketeering

affected interstate commerce.  As described herein, the Enterprise's affairs

consisted of domestic and international firearms sales, ownership of real estate,

and the siphoning and diversion of profits from those sales away from Ms. Glock

and the operating companies of the so-called "Glock Group."  Defendants'

violations of the wire fraud, national stolen property, and money laundering

statutes utilized domestic and international financial institutions, money

transfers, communications, and business entities.

1466.  Defendants engaged in a pattern of federal racketeering activity, as

defined in Section 1961(5), because "at least two acts of racketeering activity"

were committed, "the last of which occurred within ten years after the

commission of a prior act of racketeering activity."  Further, Defendants' conduct

involved numerous acts committed on at least a quarterly, if not monthly basis throughout the relevant time period.

1467.  Defendants engaged in an ongoing pattern of racketeering activity as defined by O.C.G.A. § 16-14-3(8).

1468.  The Georgia pattern of racketeering activity engaged in by Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within four years after the commission of a prior act of racketeering activity.

1469.  These acts were related, as described herein, because:  (1) the same or similar purpose was to steal monies from Ms. Glock; (2) the same or similar results were that Defendants were personally enriched at the expense of Plaintiff; (3) the same or similar participants were Glock Sr., his associates, and their various business entities; (4) the same victim was Plaintiff; and (5) the same or similar methods of commission were the use of fictive legal relationships and transactions, offshore business entities, and international financial transactions.

1470.  The acts referenced herein were continuous, both because a series of related acts were committed which extended over a substantial period of time, and because there is a threat of continuity given that the predicate acts of racketeering were a regular way the individual Defendants were conducting business and enjoying the profits of their illegal scheme.  On information and

belief, Defendants' scheme to siphon and divert monies away from the view and reach of Plaintiff continues until this day.

1471.  Ms. Glock did not learn that she was the target of Defendants' racketeering scheme until after Glock Sr. filed for divorce from her in 2011.  Not only had Ms. Glock not known about Defendants' particular thefts, but she had also not known that they were part of an ongoing pattern of racketeering against her.

1472.  Moreover, during the course of their marriage, Glock Sr. made it his regular practice to intentionally mislead and withhold information from Ms. Glock.  Glock Sr. always told Ms. Glock to trust him, and that everything he did was for their family.  Ms. Glock trusted her husband.

1473.  The purpose of Glock Sr.'s statements was to deceive Ms. Glock into a false sense of security, especially based on their confidential relationship as husband and wife, and to prevent her from learning the truth about the racketeering activities of Glock Sr. and his associates.

1474.  Glock Sr. owed fiduciary duties to Ms. Glock, including a fiduciary duty of disclosure, which he repeatedly and purposefully violated.

1475.  For example, Glock Sr. specifically instructed his bankers not to provide certain financial information to Ms. Glock.  Bank statements from the Hypo Group, for example, included the inscription "*Achtung keine Auskunft an*

320

*Helga Glock!!!!*" (which may be roughly translated as "Attention, no information to Helga Glock!!!!")

1476.  Defendants wrongfully concealed their actions from Ms. Glock, and prevented her from learning the operative facts of their racketeering scheme. Despite Ms. Glock's continuous exercise of reasonable diligence, she remained ignorant of Defendants' scheme prior to her divorce from Glock Sr.

## COUNT I
## PIERCING THE CORPORATE VEIL

1477.  Plaintiff incorporates paragraphs 1 through 1476 as if fully set forth herein.

1478.  Defendant Glock Sr. owns and operates the various entities of what is commonly referred to as the "Glock Group" — including but not limited to Defendants Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock Hong Kong, and Glock America — as part of a single amalgamated business enterprise.

1479.  The Glock Group is not in fact a legal entity.

1480.  Despite this fact, in promoting Glock, Inc. in the United States, Defendants describe Glock, Inc. by stating:

> **The Glock Group is a leading global manufacturer of pistols and accessories.**[47]

---

[47]  *See, e.g.,*  http://www.nrablog.com/post/2014/07/20/GLOCK-recognizes-Marietta-Police-Department-for-Safety-Pledge-Drive.aspx.

1481.  Even now, lawyers treat the entities of the "Glock Group" as one large conglomeration, without separate form.  In an infringement case currently pending in this Court, Glock, Inc. seeks damages related to violations of, among other things, a trademark and a patent that it does not hold.  According to exhibits filed by Glock, Inc. in support of its complaint, one of the trademarks in question is held by Glock Ges.m.b.H. and the patent is held by Glock Sr.  John F. Renzulli, Esq., the former president of Defendant Consultinvest, is among the lawyers who represent Glock, Inc. in that litigation.[48]

1482.  Through a variety of means, Glock Sr. so completely controls and dominates the entities of the "Glock Group," such that they no longer have a separate mind, will, or corporate existence of their own.  The entities of the so-called "Glock Group" are mere instrumentalities used by Glock Sr. to further his own business interests while shielded from liability and personal accountability.  The "Glock Group" functions as Glock Sr.'s alter ego.

1483.  Glock Sr. and his associates have engaged in a persistent course of conduct, evidenced by a wide variety of activities, that is inconsistent with the purportedly separate corporate forms of the so-called "Glock Group."

---

[48]  *See, e.g., Glock, Inc. v. Wu*, 1:14-CV-568-AT (N.D. Ga.), Compl. ¶¶ 37, 43, 46, Counts I, III & ECF Nos. 1-14, 1-17.

1484.  Despite purportedly separate corporate forms, the entities of the "Glock Group" do not in fact operate as legally separate entities.  Instead, Glock Sr. and his associates have disregarded the separateness of the legal entities, and have commingled and confused their respective assets, officers, employees, records, and control.

1485.  Glock Sr. used the entities of the "Glock Group," and a tangled web of fictive legal relationships, offshore business entities, and international financial transactions to steal hundreds of millions of dollars from his business partner and former wife, Ms. Glock.

1486.  Respecting the corporate form of the entities of the Glock Group would work an injustice against Plaintiff and protect Defendants' scheme to siphon, divert, and hide monies and assets away from Plaintiff.

1487.  Glock Sr. and his associates have always regarded, and treated, the income and assets of the Glock Group entities as the personal property of Glock Sr.  Indeed, the very structure of the "Glock Group" was designed to facilitate Glock Sr.'s extraction of funds from Glock Group entities into various shell corporations and ultimately into his own pockets.

1488.  For instance, consider Glock Sr.'s disregard of corporate formalities when he in essence "gave away" 50% of the foreign operating subsidiaries of Glock Ges.m.b.H., and 100% of the entities which owned their real estate.

323

1489.  In reality, these entities were just business conduits for Glock Sr. and Glock Ges.m.b.H.  Their only legitimate business activities were the distribution of Glock pistols, and ownership of related real property.

1490.  This "gift," which notably included the Glock Group's primary economic engine — Glock, Inc. — was a sham lacking any consideration or valid business purpose.  The corporate acts and contracts which implemented Defendants' scheme were also shams, having been backdated and filled with false recitals.

1491.  Glock Sr. and his associates repeatedly reassigned ownership of Glock Group entities, especially Glock Ges.m.b.H., Glock, Inc., and Consultinvest, to serve their needs of the moment.  These corporate acts were also shams lacking any consideration or valid business purpose.

1492.  With regard to Glock Ges.m.b.H., for example, the shares of Glock Ges.m.b.H. that had been transferred to the Glock Foundation were transferred to Barchessa Trading LDA in Madeira, Spain in 2001.  Those shares were transferred back to the Glock Foundation in 2003.  On information and belief, these baseless transfers were directed by Glock Sr. under his powers to direct and control the Glock Foundation.

1493.  Glock Sr. and his associates routinely used individuals and entities to obscure the nature of their activities.  Specifically, Defendant Ewert's entire

involvement in the "Glock Group," as well as his use of various corporate titles and effectuation of corporate acts, were nothing more than a façade.

1494.  Glock Sr. also made a habit of using professionals such as Defendants Manown and Quendler as façades for the ownership and operation of Glock Group entities.

1495.  And although Defendants Ewert, Manown, and Quendler occupied various corporate offices at Glock, Inc. and Consultinvest, the reality was that Glock Sr. retained complete control over everything.  (As Glock Sr. has repeatedly insisted:  "*Alles ist meine!*"[49])

1496.  One of the ways in which Glock Sr. maintained such control was through the overlapping designation of officers from one member of the "Glock Group" as officers of other entities within the group.  By way of example, Carlos Guevara (who became the general counsel for Glock, Inc. as his first job after passing the bar in 2006) provided legal services to both Glock, Inc. and its "sister company" Consultinvest.

1497.  Defendants also treated the corporate records of members of the "Glock Group" as though they belonged to a sole company.  After Quendler's stoke, Lohr and other members of his company rifled through Quendler's law

---

[49]   Roughly translated from the German:  "All is mine!"

offices in Austria in order to remove all papers and corporate documents related to any entity in the Glock Group — including records related to Glock, Inc.  Lohr took the documents to his offices in Germany.  Lohr's "raid" was conducted at Glock Sr.'s direction.

1498.  When Glock Sr. later sought to recover monies purportedly stolen from Glock Group entities by Defendants Ewert and Manown, Glock Sr. and his lawyers regarded — and treated — these monies as his own personal funds.

1499.  Glock Sr.'s personal lawyers filed criminal complaints in Glock Sr.'s name and behalf, for purported thefts of *his funds* from Glock Group entities.  Glock Sr.'s own lawyers identified the complainant as "Gaston Glock DBA Glock, Inc. and Consultinvest Inc."

1500.  Moreover, in the criminal cases that followed, prosecutors sought to portray Glock Sr. as the alleged victim.  Believing that the money purportedly stolen from the Glock Group entities all belonged to Glock Sr. anyway, prosecutors even argued for special tolling of applicable statutes of limitation based on Glock Sr.'s advanced age.

1501.  In connection with one of those criminal cases, one of Glock Sr.'s Washington, D.C.-based counsel privately explained to the assistant district attorney from Cobb County who prosecuted the case:

> *We may have a real problem here. Quendler was the owner of Consultinvest at the time [of the alleged criminal conduct]. . . . [But] Quendler's ownership of the company is really as a nominee for Mr. Glock and Mr. Glock retained beneficial ownership. . . . Consultinvest only existed in order to collect rent from Glock, Inc. Anything that takes value from Consultinvest also takes value from Mr. Glock.*

1502.  Defendant Quendler had somehow come to own 100% of Consultinvest. The "Glock Group," which is not even a legal entity, served as just another name for Glock Sr.

1503.  Defendants Ewert and Manown also funneled monies through the trust account of Manown's law firm — Cofer, Beauchamp & Butler — in order to disguise Consultinvest's phony loans with Warwick and UEF.

1504.  Despite its complete lack of relationship to Consultinvest, Glock, Inc. purportedly "mandate[d]" that Defendants Lohr and his company, Defendant Lohr & Co., conduct an analysis of Consultinvest's (a) financial statements for the period from 2000 through 2003 and (b) "relations [to] other companies of the 'Glock Group.'"

1505.  Lohr & Co. also conducted audits of Glock, Inc. and an entity named BIA America, Inc. ("BIA").

1506.  BIA had been created for the specific purpose of holding an airplane on behalf of the Glock Group, so that it could skirt FAA regulations regarding the U.S. registration of foreign-owned aircraft.

1507.  Defendants structured a number of sham transactions between or among BIA, Glock GmbH, Consultinvest, and Glock, Inc., variously transferring, retransferring, and reversing or annulling the transfer of ownership of the airplane among these entities.

1508.  BIA had been 100% owned, in trust, by Defendant Manown, who was also its sole director and officer.  The Lohr & Co. audit concluded that neither Manown nor anyone else had kept proper corporate records for BIA. Lohr & Co. recommended that the airplane be deregistered with the FAA and essentially given back to Glock Ges.m.b.H.

1509.  According to Glock, Inc.'s backdated and inconsistent corporate records, Defendant Manown at various points owned 25%, 50%, or 75% of Glock, Inc. "as trustee" (presumably for Unipatent).  Unipatent was just a Luxembourg shell corporation created to facilitate Defendants' scheme.

1510.  None of Defendants' ownership transfers had any real economic substance or legitimacy.  Defendants also failed to document, and at times falsely documented, sources of funding for the various Glock Group entities, especially Glock, Inc. and Consultinvest.  Funds and even physical assets — such as the

Company's corporate jet — were moved back and forth between the various entities of the Glock Group, and then documented however Glock Sr. and his associates found useful at the time.

1511.  Lease agreements between Consultinvest and Glock, Inc. were also backdated and contained egregious terms, such as an *option* for Glock, Inc. to lease property from Consultinvest in the future, which cost $5,000 per month. Glock Sr. and his associates stood on both sides of these agreements and dictated their terms.

1512.  Lawyers represented Glock Sr. personally, but were paid by Glock, Inc. at Glock Sr.'s personal direction.  Glock Sr. himself directed the payment of funds from Glock, Inc. to his personal lawyers despite the fact that he was not a shareholder, director, or officer of Glock, Inc. at the time.

1513.  Glock Sr. and his associates simply rearranged the corporate pieces on the game board however they wanted, whenever they wanted, without regard to the rules of the game.  Defendants' corporate moves were intended to defeat justice, perpetrate fraud, and avoid legal responsibility for their criminal scheme.

1514.  Glock Sr. and his associates also systematically disrespected the boundaries which were supposed to have existed between separate individuals and entities.

1515.  For example, Glock Sr. collected millions of dollars of license fees or "royalty" or "license" payments from Glock, Inc. and Glock Ges.m.b.H. to which he was not personally entitled.  Glock Sr. simply took monies from Glock, Inc. for himself, even when he had previously documented them as being owed to Glock Ges.m.b.H.

1516.  Some of these funds were directed to Eaglesmith and special purpose real estate holding companies.  These entities were formed and operated by Defendant Manown, but used for Glock Sr.'s own illicit purposes.  Glock Sr. acquired a portfolio of residences, some of which he lived in when he spent time in metro Atlanta, and some of which he used for housing paramours.

1517.  In a particularly egregious example of Defendants' abuse of licensing rights and lack of respect for the corporate form, Glock Sr.'s Horse Performance Center in Austria has been permitted to use the logo "Glock Perfection."  Glock, Inc. has owned the trademark for that logo since April 2001. As a result, the logo is a valuable property of Glock, Inc.  The Glock Horse Performance Center, on the other hand, has no direct connection to Glock, Inc. — other than through its membership in the so-called "Glock Group."  On information and belief, the Glock Horse Performance Center has never paid any licensing or royalty fees to Glock, Inc. for use of the "Glock Perfection" logo.

1518.  Entities of the "Glock Group" had no independent existence or management apart from Glock Sr. and his associates.  Indeed, Glock Sr. reserved all significant decisions for himself, including unlimited personal signature authority on bank accounts.[50]

1519.  Glock Sr. and his associates had a continuous and pervasive involvement in the business and financial affairs of "Glock Group" entities.  They directly communicated with and supervised the employees of the Glock operating subsidiaries such as Glock, Inc., Glock Hong Kong, and Glock America, overseeing their business practices and financial policies, including setting and monitoring their annual budgets.

1520.  As Controller of the "Glock Group," Defendant Hubert Willam (and later Defendant Stephan Doerler) managed the worldwide financial strategy of the entire Company out of the Glock Ges.m.b.H. offices in Austria.  Together with Glock Sr., Willam set financial policy, evaluated financial investments, and reported operating results for all of the entities of the Glock Group.

---

[50]  Corporate resolutions of Glock, Inc. indicate that Plaintiff Helga Glock was also given unlimited personal signature authority on Glock, Inc. bank accounts, despite never having been an officer or director of Glock, Inc.

1521.  Sensitive financial information of Glock Group subsidiaries is routinely sent to and reviewed by Glock Sr. and Glock Ges.m.b.H. personnel, including Willam (and later Doerler).

1522.  Furthermore, Defendant Willam (and later Doerler) personally oversaw the execution of Defendants' scheme to steal and launder money, by giving instructions to issue and pay fake invoices from Glock Group "billing companies," and to direct related wire transfers.

1523.  Glock Sr. and Willam (later Doerler) personally attended to the banking arrangements of Glock subsidiaries such as Glock, Inc., Glock Hong Kong, and Glock America.  Glock Sr. was not only aware of and directing these activities, but he also travelled to the locations involved to finalize banking arrangements of "Glock Group" entities *in person*.

1524.  Glock Sr. has never permitted any of the Glock Group entities to have any independent objectives or management.  Instead, he stacks their "leadership" with his own cronies, who are in many instances singularly inappropriate or incompetent to occupy those positions.

1525.  For instance, Glock Sr. never intended that Defendants Ewert or Manown exercise any independent judgment or managerial responsibility in their roles at Glock, Inc., Consultinvest, Eaglesmith, or at the "billing companies."

1526.  Similarly, Glock Sr. later made Defendant Quendler President of Glock, Inc.  Just like Ewert, Dr. Quendler had no relevant knowledge or experience that would permit him to serve in an operational role in the firearms industry.

1527.  Nonetheless, Quendler was, at least in name, President of Glock, Inc. from 2003 to 2008.  Incredibly, when Quendler suffered a devastating stroke in 2006, and was rendered comatose, that did not prevent him from continuing to serve as President of Glock, Inc. for another two years.

1528.  Quendler's successor as President of Glock, Inc., Dr. Wilhem Goessinger, also lacked any relevant knowledge or experience in the firearms industry.  His qualifications for the job were apparently limited to having been a law firm colleague of Dr. Quendler prior to his stroke.

1529.  Somewhat similarly, Glock Sr. has also made a U.S. lawyer — John F. Renzulli, Esq. — CEO of Consultinvest.  Renzulli's qualifications for that role appear to be limited to having served as a personal lawyer for Glock Sr. and various entities of the Glock Group.

1530.  Finally, Glock Sr. appointed Defendant Lohr (a personal consultant to Glock Sr.) and his young new wife (Kathrin Glock) to the Board of Directors of Glock Ges.m.b.H.  Kathrin Glock's prior experience consisted of having been a manager of the Glock Horse Performance Centers in Treffen, Austria and in the

Netherlands, and being married to Glock Sr., the *Geschäftsführer* of Glock Ges.m.b.H. (As of December 20, 2013, Glock Sr. had also appointed Kathrin Glock to a lifetime position on the supervisory board of the Glock Foundation, with veto rights.)

1531. Glock Sr. found that these individuals were qualified to serve on the Glock Foundation supervisory board, despite his previous determination that Brigitte, Gaston Jr., and Robert were not qualified for that role. This determination was notwithstanding the fact that Brigitte, Gaston Jr., and Robert had worked at the Company for many years.

1532. The foundations are also simply the alter ego of Glock Sr. The Glock Foundation is eligible to finance the activities of the "Glock Group" (using funds stolen from Glock, Inc. and laundered by Defendants). All of Glock Sr.'s business activities qualify as activities of the "Glock Group."

1533. Even now, after formally shedding many of his operational titles in the Company, and transferring his ownership interests to the Foundations, Glock Sr. continues to rule the Glock Group by fiat. Regardless of any corporate formalities, his word is treated as law.

1534. The Court should pierce the veil and disregard the separate corporate forms of the so-called "Glock Group" — including but not limited to Defendants Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock Hong Kong, and

334

Glock America — and hold Glock Sr. liable, jointly and severally with the other Defendants in this action, for all Defendants' actions and the substantial damages suffered by Plaintiff as a result of these actions.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(c)

1535.  Plaintiff incorporates paragraphs 1 through 1476 as if fully set forth herein.

1536.   The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(c).

1537.  Plaintiff has been injured in her property and business by reason of Defendants' violations of 18 U.S.C. § 1962(c).

1538.  The injuries suffered by Plaintiff were caused by Defendants' violations of 18 U.S.C. § 1962(c).

1539.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages she has sustained and her costs of suit, including reasonable attorneys' fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(d)

1540.  Plaintiff incorporates paragraphs 1 through 1476 as if fully set forth herein.

1541.  Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

1542.  Defendants have committed overt acts, which are also acts of racketeering activity, in furtherance of their conspiracy.  These overt acts include violations of the wire fraud, national stolen property, and money laundering statutes.

1543.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

1544.  The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(d).

1545.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages she has sustained and her costs of suit, including reasonable attorneys' fees.

### COUNT IV
### VIOLATIONS OF O.C.G.A. § 16-14-4(c)

1546.  Plaintiff incorporates paragraphs 1 through 1476 as if fully set forth herein.

1547.  Defendants have endeavored to violate O.C.G.A. § 16-14-4(a), in violation of O.C.G.A. § 16-14-4(c).

1548.  Defendants have also conspired with each other to violate O.C.G.A. § 16-14-4(a), in violation of O.C.G.A. § 16-14-4(c).

1549.  Defendants have committed overt acts, which are also acts of racketeering activity, in furtherance of the conspiracy.  These overt acts include violations of the wire fraud, national stolen property, and money laundering statutes.

## COUNT V
## <u>PUNITIVE DAMAGES</u>

1550.  Plaintiff incorporates paragraphs 1 through 1476 as if fully set forth herein.

1551.  The foregoing acts of Defendants were intentional, malicious, vexatious, and in direct disregard of Plaintiff's rights.  Defendants' actions were actively undertaken with the specific intent to cause harm to Plaintiff and to unjustly enrich Defendants at Ms. Glock's expense.

1552.  Defendants' actions show willful misconduct, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences, and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands and prays for judgment and other relief as follows:

1.     Judgment piercing the corporate veil, and disregarding the purported separate legal existence of Defendants Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock America, and Glock Hong Kong.

2.     Judgment in an amount equal to three times the actual damages sustained by Plaintiff, pursuant to 18 U.S.C. § 1964(c);

3.     Reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

4.     Judgment in an amount equal to three times the actual damages sustained by Plaintiff, pursuant to O.C.G.A. § 16-14-6(c);

5.     Punitive damages in an amount to be determined by the finder of fact, pursuant to O.C.G.A. 16-14-6(c);

6.     Attorneys' fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred, pursuant to O.C.G.A. § 16-14-6(c);

7.     Appropriate orders and judgments:

      a.     Prohibiting Defendants from making any further transfer, sale, or other disposition of any fraudulently obtained or stolen property;

b.      Requiring Defendants to disgorge fraudulently obtained or stolen property, or to otherwise return the full amount of their unjust enrichment;

c.      Removing all individuals associated with or involved in Defendants' racketeering scheme, including Glock Sr., from any office, supervisory authority, or employment with any entities associated with or involved in Defendants' racketeering scheme;

d.      Requiring all individuals associated with or involved in Defendants' racketeering scheme, including Glock Sr., to divest themselves of any interest, of whatever nature or character, and however held, in any entities associated with or involved in Defendants' racketeering scheme;

e.      Appointing a receiver for Glock Ges.m.b.H., Glock, Inc., Glock America, Glock Hong Kong, Consultinvest, and all other entities associated with or involved in Defendants' racketeering scheme;

f.      Reorganizing the entities associated with or involved in Defendants' racketeering scheme, such that future lawful activities and operations of the "Glock Group" may be

conducted through a legitimate business entity in which

Plaintiff's rightful ownership interest is restored; and

g.      Prohibiting Defendants from further engaging in the

violations of law alleged herein.

8.      Total damages of approximately $500 million;

9.      Trial by jury; and

10.     Such other relief as the Court deems just and proper.

This 9th day of October 2014.

John Da Grosa Smith, Esq.
jdsmith@smithhorvath.com
Georgia Bar No. 660946

SMITH HORVATH LLC
1320 Ellsworth Industrial Blvd.
Suite A1000
Atlanta, GA 30318
Tel: 404-605-9680
Fax: 404-935-5226

*Attorney for Plaintiff Helga Glock*