IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| HELGA GLOCK, | |
|     Plaintiff, | |
|        v. | CIVIL ACTION FILE<br>NO. 1:14-CV-3249-TWT |
| GASTON GLOCK, SR., et al., | |
|     Defendants. | |

**OPINION AND ORDER**

This is a RICO action. The Plaintiff Helga Glock claims that her ex-husband, the Defendant Gaston Glock, Sr., orchestrated a scheme to depress the value of certain assets belonging to the Plaintiff. It is before the Court on the Defendants Consultinvest, Inc., Glock, Inc., and Karl Walter's Motion to Continue the Stay Based on International Abstention [Doc. 134] and the Defendant Hubert William's Motion to Continue the Stay Based on International Abstention [Doc. 135]. For the reasons set forth below, the Defendants' Motions [Docs. 134, 135] are DENIED.

## I. Background

In 1963, the Plaintiff Helga Glock and the Defendant Gaston Glock, Sr. ("Glock Sr.") founded Glock KG, an Austrian limited partnership.[1] Eventually, Glock KG began manufacturing pistols,[2] and in 1983 it officially became Glock Ges.m.b.H. (the "Parent Company").[3] The Parent Company then sought to tap into the U.S. market. Glock Sr. flew to Atlanta, Georgia to sign incorporation papers for a U.S. subsidiary company called Glock, Inc.[4] Glock, Inc. is based in Smyrna, Georgia and sells pistols manufactured by the Parent Company in Austria.[5] In addition, Glock, Inc. was originally a wholly-owned subsidiary of the Parent Company.[6]

Initially, the Plaintiff had a 15% ownership interest in the Parent Company.[7] However, in 1999, the Plaintiff and Glock Sr. created a private foundation under Austrian law called the Glock *Privatstiftung* (the "Glock Foundation").[8] The Plaintiff

---

[1]    First Am. Compl. ¶ 73.

[2]    Id. ¶¶ 82, 84.

[3]    Id. ¶ 85.

[4]    Id. ¶¶ 90-91.

[5]    Id. ¶ 92.

[6]    Id. ¶ 160.

[7]    Id. ¶ 164.

[8]    Id. ¶¶ 15, 164.

transferred the vast majority of her Parent Company shares to the Glock Foundation, leaving her with only a 1% interest in the Parent Company.[9] Although the Plaintiff and Glock Sr. were co-founders of the Glock Foundation, Glock Sr. "retained, for himself only, the ability to . . . change the terms of the deed that created the foundation."[10] Eventually, Glock Sr. used this power to "remove [the Plaintiff] . . . as [a beneficiary] of the [foundation]" after their divorce in 2011.[11] In addition, Glock Sr. "sought to force the sale of [the Plaintiff's] remaining 1% ownership interest in [the Parent Company]."[12]

This action arises out of certain business transactions involving the Parent Company and Glock, Inc. First, the Plaintiff asserts that Glock Sr., with the help of his co-Defendants, misappropriated assets of the Parent Company. For example, she alleges that, at Glock Sr.'s direction, the Parent Company "gave away . . . 50% . . . of the ownership of . . . Glock, Inc.,"[13] which was "the most valuable and strategically

---

[9]     Id. ¶ 14.

[10]    Id.

[11]    Id. ¶ 16.

[12]    Compl. ¶ 18.

[13]    First Am. Compl. ¶ 107.

important asset" of the Parent Company.[14] In particular, Glock Sr. ordered that 50% of the shares of Glock, Inc. be transferred to a company called Unipatent.[15] Unipatent was owned by a company called Reofin, which in turn was wholly-owned by Glock Sr.[16] Second, the Plaintiff also alleges that Glock Sr., with assistance, set up a series of shell corporations to allow "Glock Sr. and his associates" to "systematically appropriate virtually all of the income and assets of [Glock, Inc.] for themselves."[17] As the Plaintiff explains:

> Defendants plundered hundreds of millions of dollars from Glock, Inc. by stealing funds from Glock, Inc. and fraudulently transferring them to entities exclusively owned or controlled by Glock Sr. The illegal transfers of funds – which often purported to be for services or products – were, in fact, shams.[18]

The Plaintiff brought suit against multiple parties, including Glock Sr., the Parent Company, Glock, Inc., and the Glock Foundation. She asserts that the Defendants executed a scheme in order to misappropriate assets from the Parent Company and Glock, Inc., and that this amounted to a violation of the federal

---

[14]    Id.

[15]    Id. ¶¶ 171-172.

[16]    Id. ¶ 168.

[17]    Id. ¶ 114.

[18]    Id. ¶ 159.

Racketeer Influenced and Corrupt Organizations Act ("RICO"). To show that she personally suffered an injury, she argues that the Defendants "reduced the value of the assets held by [the Parent Company]" which in turn reduced the value of "Ms. Glock's ownership interests in [the Parent Company]."[19] According to the Plaintiff, although her divorce from Glock Sr. took place in 2011, and the alleged misappropriation began in the mid-1980's, *she* was the intended victim of the scheme.[20]

A number of parties, including Glock, Inc. (collective the "Defendants"), filed a Motion to Stay based on certain judicial proceedings that are underway in Austria.[21] Since the Plaintiff's divorce from Glock Sr. in 2011, the Plaintiff has filed a number of lawsuits in Austria against Glock Sr. and other parties that are also named Defendants in this action. For example, in July of 2011, the Plaintiff brought an action in Austria "for judicial determination of her right to distribution of all worldwide marital assets and marital savings."[22] Later, in December of 2011, the Plaintiff brought

---

[19]     Id. ¶ 167.

[20]     In this Order, the Court is not addressing the issue of whether the Plaintiff – given the nature of her claims – has standing. The Defendants may raise this argument at the Motion to Dismiss stage.

[21]     [Doc. 45].

[22]     First Enzinger Decl. ¶ 10.

a second action in Austria "for alimony and spousal support payments."[23] The Plaintiff has also brought claims unrelated to her divorce. For example, the Plaintiff filed two lawsuits in Austria – against Glock Sr. and the Glock Foundation – relating to the gift she made to the Glock Foundation consisting of the vast majority of her Parent Company shares.[24] In addition, she initiated five lawsuits challenging specific resolutions of the Parent Company's General Assembly.[25]

The Court initially granted the Defendants' Motion to Stay this action.[26] Although the Court found that the vast majority of issues in this action are distinct from those in the Austrian lawsuits, there was one potential overlapping issue: whether the Plaintiff was fraudulently induced into transferring most of her Parent Company shares into the Glock Foundation. Thus, the Court invited the Plaintiff to amend her Complaint to eliminate that issue from this action so as to minimize any international comity concerns. On July 20, 2015, the Plaintiff filed an Amended Complaint.[27] The Court must now decide whether to continue the stay.

---

[23]    Id. ¶ 11.

[24]    Id. ¶¶ 20-21.

[25]    Third Enzinger Decl. ¶ 25.

[26]    [Doc. 117].

[27]    [Doc. 121].

## II. Discussion

As an initial matter, the Plaintiff contends that Dr. Michael Enzinger's Third Declaration, which the Defendants filed in support of their Motion to Continue the Stay, should be disregarded by this Court as evidence.[28] First, the Plaintiff argues that because Dr. Enzinger only represents the Glock Foundation in one of the Austrian proceedings, Dr. Enzinger's statements with regard to the other Austrian proceedings are not based on sufficient personal knowledge.[29] A declaration may "only be considered to the extent that it is based on personal knowledge."[30] "However, when an affiant avers that his statements are based on personal knowledge, a district court is 'bound to accept [such] statements as true, unless the context demonstrate[s] otherwise.'"[31] Here, the Plaintiff's argument is without merit. Dr. Enzinger's participation in the Austrian litigation and his review of the pleadings and other documents related to the Austrian cases is sufficient evidence "to support a finding

---

[28]    Pl.'s Resp. to Mot. to Continue Stay, at 28.

[29]    Id. at 30-31.

[30]    Homebingo Network v. Chayevsky, 428 F. Supp. 2d 1232, 1238 (S.D. Ala. 2006) (citing FED. R. EVID. 602).

[31]    Id. (quoting Martin v. Rumsfeld, 137 Fed. Appx. 324, 326 (11th Cir. 2005)).

that the witness has personal knowledge of the matter."[32] Next, the Plaintiff argues

that the Court should also disregard certain exhibits attached to Dr. Enzinger's

Declaration. She contends that they have been substantially redacted and thus violate

the rule of completeness.[33] The rule of completeness, as expressed in Federal Rule of

Evidence 106, mandates that if a party introduces part of a writing, the opposing party

may move to have any other part of the writing introduced "that in fairness ought to

be considered at the same time."[34] Here, however, the Defendants have submitted to

the Court complete copies of the exhibits that were previously redacted.[35] This is

sufficient to cure any problems regarding the rule of completeness. With the

evidentiary objections resolved, the Court now turns to the issue of abstention.

Generally, when a claim falls within a federal court's jurisdiction, its

"obligation to hear and decide a case is virtually unflagging."[36] But in "some private

---

[32]     FED. R. EVID. 602; see also Atlanta Attachment Co. v. Leggett & Platt, Inc., No. 05-cv-1071, 2007 WL 5011980, at *3-4 (N.D. Ga. Feb. 23, 2007) (allowing testimony based on an affiant's experience and perceptions as officer of plaintiff company).

[33]     Pl.'s Resp. to Mot. to Continue Stay, at 34.

[34]     FED. R. EVID. 106.

[35]     [Doc. 153].

[36]     Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 591 (2013) (internal quotation marks omitted).

international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction."[37] In deciding whether to abstain based on international considerations, the Court must consider three factors: (1) judicial efficiency, (2) international comity, and (3) fairness.[38] However, abstention "is the exception instead of the rule . . . and courts regularly permit parallel proceedings in an American court and a foreign court."[39] Before proceeding to the abstention analysis, however, it is worth clarifying the nature of the Plaintiff's claims in this action.

The Plaintiff's Amended Complaint presents a narrow legal theory. The Plaintiff is claiming that the Defendants engaged in an unlawful scheme which ultimately depressed the value of her 1% ownership interest in the Parent Company. Specifically, the Plaintiff alleges that the Defendants (1) unlawfully caused the Parent Company to transfer half of its interest in Glock, Inc. to another entity under Glock Sr.'s control, and (2) misappropriated assets from Glock, Inc. The Plaintiff claims that this affected the Parent Company's value because Glock, Inc. was its most important

---

[37]      Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994).

[38]      See Belize Telecom, Ltd. v. Government of Belize, 528 F.3d 1298, 1305 (11th Cir. 2008) (The Court must consider three factors in "determining whether abstention is appropriate: (1) international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources.").

[39]      Ortega Trujillo v. Conover & Co. Commc'ns, 221 F.3d 1262, 1265 (11th Cir. 2000) (internal quotation marks omitted).

asset. Thus, at least in this lawsuit, the Plaintiff's claims stem only from the alleged injuries inflicted upon the Parent Company. This case is not about the Plaintiff's divorce from Glock Sr. It is not about her transfer of Parent Company shares to the Glock Foundation.[40] Nor is it about the Parent Company's attempt to force a buyout of the Plaintiff's remaining 1% interest in the Parent Company.

Consequently, the Court's analysis begins, and ends, with the first international abstention factor: judicial efficiency. To determine whether abstention will advance the interest of judicial efficiency, the Court considers, *inter alia*, whether the actions involve common issues.[41] Generally, the parties must be "litigating substantially the same issues in both actions."[42] The "question is not whether the suits are formally symmetrical, but whether there is a substantial likelihood that the foreign litigation will dispose of all claims presented in the federal case."[43] The "existence of a parallel

---

[40]     Pl.'s Resp. to Mot. to Continue Stay, at 22 ("[The Plaintiff] does not claim that  she was fraudulently induced to transfer ownership of a portion of her shares in Glock Ges.m.b.H. as a result of Defendants' racketeering scheme.").

[41]     See Turner Entm't, 25 F.3d at 1522 ("Criteria relevant to efficiency include (1) the inconvenience of the federal forum . . . (2) the desirability of avoiding piecemeal litigation . . . (3) whether the actions have parties and issues in common . . . and (4) whether the alternative forum is likely to render a prompt disposition.").

[42]     Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006).

[43]     AAR Int'l, Inc. v. Nimelias Enters. S.A., 250 F.3d 510, 518 (7th Cir. 2001).

action in an adequate foreign jurisdiction must be the *beginning* . . . of a district court's determination of whether abstention is appropriate,"[44] and "any doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction."[45] Here, this action and the Austrian lawsuits cited by the Defendants no longer involve "substantially the same issues." Those cases largely concern (1) assets and alimony that the Plaintiff may be entitled to as a consequence of her divorce,[46] (2) the Plaintiff's transfer of Parent Company shares to the Glock Foundation,[47] and (3) specific business resolutions passed by the Parent Company's General Assembly.[48] Based on the Defendants' evidentiary submissions, none of the cases speak to the transactions at issue in the Amended Complaint: the Parent Company's transfer of 50% of its Glock, Inc. ownership interest to another entity, and the allegedly fraudulent Glock, Inc. business transactions. Thus, the Defendants have

---

[44]     Royal & Sun Alliance, Inc., 466 F.3d at 95 (emphasis added); see also AAR Int'l, Inc., 250 F.3d at 518 ("In evaluating the propriety of the district court's decision to abstain . . . we must first determine whether the federal and foreign proceedings are parallel . . . [i]f the actions are not parallel, the *Colorado River* [abstention] doctrine does not apply.").

[45]     AAR Int'l, Inc., 250 F.3d at 520.

[46]     Third Enzinger Decl. ¶¶ 30-35.

[47]     First Enzinger Decl. ¶¶ 20-21.

[48]     Third Enzinger Decl. ¶¶ 22-29.

failed to establish that the domestic and foreign lawsuits involve substantially the same issues, and so abstention is inappropriate.

To be sure, in several of the cases cited by the Defendants in their initial Motion to Stay, the courts granted a stay based on international abstention because the domestic and foreign cases involved nearly identical issues. For example, in Turner Entertainment Co. v. Degeto Film GmbH,[49] the parties were disputing how to properly interpret a television broadcast license agreement.[50] In particular, the defendants – German public broadcasters – had purchased the right to broadcast certain licensed works to the German public.[51] The license agreement allowed the defendants "to telecast the licensed works for reception *within the licensed territory* 'by all means and methods now or hereafter known including but not limited to . . . [direct broadcasting satellite] and/or communication satellite for purposes of so-called home television reception.'"[52] Because "the reception area . . . of satellite broadcasts does not easily conform to the . . . boundaries that comprise the licensed territory, the

_____

[49]    25 F.3d 1512 (11th Cir. 1994).

[50]    See id. at 1514.

[51]    See id.

[52]    Id. (emphasis added).

parties included an exception to the strict definition . . . of the *licensed territory*."[53]
Thus, the license agreement stated that "[t]he telecast can originate any place in the
universe for reception only in the [licensed territory] . . . *inclusive of legitimate
overspill* . . . ."[54] The defendants wished to use an ASTRA 1B satellite to broadcast
a television program which incorporated certain works licensed from the plaintiff. The
ASTRA 1B satellite, however, had "a footprint over five times the size of the licensed
territory."[55] The parties disagreed as to whether the incidental broadcast to
non-licensed territories would constitute "legitimate overspill" under the license
agreement. The defendants filed a declaratory judgment action in Germany,[56] and a
week later, the plaintiff filed a breach of contract action in the U.S.[57] Both actions
involved the same legal question: whether the defendants, under the license
agreement, were allowed to broadcast a program incorporating licensed works using
the ASTRA 1B satellite. Due to this factor, in addition to several others, the Eleventh

---

[53]    Id. at 1514-15 (emphasis added).

[54]    Id. at 1515 (emphasis added).

[55]    Id. at 1516.

[56]    See id. at 1516.

[57]    See id. at 1517.

Circuit ultimately concluded that a stay was appropriate based on international considerations.[58]

The Defendants also cited to the Seventh Circuit case of <u>Ingersoll Mill. Mach. Co. v. Granger</u>.[59] There, the plaintiff Ingersoll Milling Machine Co. and the defendant John Granger were involved in a dispute concerning the latter's termination benefits. From 1971 to 1977, Granger was employed with a Belgian subsidiary of Ingersoll.[60] When his employment was terminated, he filed suit in Belgium and argued that "he was entitled, under Belgian law, to certain compensation and termination benefits from both Ingersoll and [the Belgian subsidiary]."[61] Over a year later, Ingersoll brought suit in the U.S.[62] It sought "a declaratory judgment that Mr. Granger was entitled to no further benefits from Ingersoll."[63] After the Belgian trial court ruled in favor of Granger on his claim, the district court "stayed further proceedings pending

---

[58]    <u>See id.</u> at 1522-23.

[59]    833 F.2d 680 (7th Cir. 1987).

[60]    <u>See id.</u> at 682.

[61]    <u>Id.</u>

[62]    <u>See id.</u>

[63]    <u>Id.</u> Ingersoll also asserted certain claims for reimbursement that were similar to counterclaims that it had filed in the Belgian action brought by Granger. <u>See id.</u>

the outcome of the Belgian appellate process,"[64] and the Seventh Circuit affirmed the district court's decision to stay the case.[65] Again, although the specific claims were not identical, the domestic and foreign lawsuits involved the same issue: whether, and to what extent, Granger was entitled to termination benefits. By contrast, here – as the Court explained earlier – the Defendants point to no Austrian lawsuit that involves the central issues of this litigation.

In response, the Defendants first contend that the Plaintiff's Amended Complaint continues to assert factual allegations with regard to the Glock Foundation.[66] While it is true that the Amended Complaint contains several allegations concerning the Glock Foundation, the allegations center around the Defendant Glock Sr. placing proceeds from the Defendants' racketeering scheme into the Foundation,[67] not around the Plaintiff's transfer of 14% of her ownership of the Parent Company to the Foundation. Next, the Defendants argue that the Plaintiff filed several lawsuits in

---

[64]    Id. at 683.

[65]    Id. at 685 ("[I]t is manifestly clear that the district court did not abuse its discretion in staying proceedings after the rendition of the Belgian trial court's judgment.").

[66]    Defs.' Mot. to Continue Stay, at 5.

[67]    First Am. Compl. ¶¶ 3, 14, 1446, 1491.

Austria in which she is suing in her capacity as a Parent Company shareholder.[68] But there is no indication that, in those lawsuits, she is challenging the Parent Company and Glock, Inc. transactions at issue in this case. Indeed, in the Austrian lawsuits, she appears to be challenging unrelated Parent Company resolutions, such as the Parent Company's decision to re-elect Glock Sr. to be its General Manager.[69] The Defendants also argue that both the Plaintiff's Austrian lawsuit concerning division of marital assets as well as her case here contain a number of similar allegations. For example, in both, the Plaintiff alleges that Glock Sr. diverted money into certain entities that are under his control.[70] That certain allegations are found in both lawsuits, however, does not mean that the issues in both are the same. In the Austrian lawsuit, the Plaintiff is seeking an accounting of Glock Sr.'s assets for the purpose of calculating the division of assets.[71] Thus, the Plaintiff is seeking to establish the *existence* of certain unreported assets within Glock Sr.'s possession. This case, by contrast, concerns the *origin* of those assets and the lawfulness of the *means* by which Glock Sr. came into

---

[68]    Defs.' Mot. to Continue Stay, at 10.

[69]    First Enzinger Decl. ¶ 26.

[70]    Defs.' Mot. to Continue Stay, at 22.

[71]    Pl.'s Resp. to Mot. to Continue Stay, at 13, 17.

possession of them. Consequently, despite the presence of certain common allegations, the two cases are not sufficiently related.

Accordingly, the Plaintiff's lawsuit here is sufficiently distinct from her Austrian lawsuits so as to avoid any international comity concerns. Indeed, resolution of the Austrian litigation will not resolve most of the material issues in this litigation. Thus, the stay should be lifted.

### III. Conclusion

For these reasons, the Court DENIES the Defendants Consultinvest, Inc., Glock, Inc., and Karl Walter's Motion to Continue the Stay Based on International Abstention [Doc. 134] and the Defendant Hubert William's Motion to Continue the Stay Based on International Abstention [Doc. 135].

SO ORDERED, this 14 day of December, 2015.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge