IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HELGA GLOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:14-cv-03249-TWT |
| GASTON GLOCK SR., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

John E. Floyd, Esq.
Ronan P. Doherty, Esq.
Tiana S. Mykkeltvedt, Esq.
Amanda Seals Bersinger, Esq.
BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
Tel. (404) 881-4100
Fax (404) 881-4111

*Counsel for Defendants Gaston Glock Sr., Glock Ges.m.b.H., Glock, Inc., Glock
America S.A., Glock (H.K.) Ltd., CON Holding GmbH, Consultinvest, Inc.,
Stephan Doerler, Fitox A.G., INC Holding GmbH, Joerg-Andreas Lohr, Lohr +
Company GmbH Wirtschaftsprüngsgesellschaft, Rochus GmbH, and Karl Walter*

1469372.1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

ARGUMENT AND CITATION OF AUTHORITY ................................................8

I.  The RICO Statutes Do Not Permit Ms. Glock to Recover
    for Foreign Injuries .......................................................................8

    A. The U.S. Supreme Court Has Held that Congress Did Not
       Authorize Federal Civil RICO Claims for Foreign Injuries.....................8

    B. The Georgia RICO Statute Does Not Authorize Civil RICO
       Claims for Foreign Injuries .....................................................10

II. Ms. Glock Does Not Have Standing to Assert RICO Claims ......................11

    A. Ms. Glock Lacks RICO Standing for Any Injury She
       Suffered as a Shareholder of Glock Ges.m.b.H. .................................12

    B. Ms. Glock Has Not Alleged an Injury Separate and
       Distinct From the Injury to Glock Ges.m.b.H.....................................17

    C. Ms. Glock Cannot Create Standing by Inventing an
       Alleged Business Partnership..............................................19

    D. The SAC Confirms that Alleged Racketeering Is Not
       the Proximate Cause of Ms. Glock's Alleged Injury .........................21

III. Ms. Glock Cannot Assert a Federal RICO Claim for Alleged
     Conduct Actionable as Fraud in the Purchase or Sale of Securities ............23

IV. The Statutes of Limitation Bar Ms. Glock's RICO Claims .........................29

    A. The U.S. Supreme Court has Sharply Limited the Statute
       of Limitations for Federal Civil RICO Claims........................................30

    B. The SAC Seeks to Recover for Alleged Injuries that are
       Decades Old..............................................................................32

C. The SAC Admits that the Alleged Racketeering Scheme and Ms. Glock's Injuries Were Disclosed No Later Than 2003 ............................34

D. Equitable Tolling Cannot Save Ms. Glock's RICO Claims....................44

   1. The SAC Fails to Allege Fraudulent Concealment.............................45

   2. The SAC Fails to Allege that Ms. Glock Undertook Any Investigation Before Her 2011 Divorce ......................................48

V.  The SAC Fails to State Any Viable RICO Claims.........................................50

A. The SAC Fails to Plead a Viable Association-In-Fact RICO Enterprise With Members that Share a Common Purpose.......................51

B. The SAC Does Not Allege that Any Defendant Other Than Glock Sr. Operated or Managed the Enterprise .............................55

C. The SAC Does Not Allege a Pattern of Racketeering Against Glock Sr. or Any of the "Glock Group" Defendants ...............................58

D. The Court Should Dismiss the RICO Conspiracy Claims ......................62

VI.  The Court Should Dismiss Ms. Glock's Veil Piercing Claim......................64

VII.  Ms. Glock Cannot Use a Shotgun Pleading to Mask Her Inability to Plead Viable Claims....................................................................66

A. Ms. Glock Has Ignored the Court's Warning About Shotgun Pleadings ...................................................................................66

B. The Court Should Dismiss the SAC Because It Is Riddled With Allegations Made "On Information and Belief." ............................70

CONCLUSION ......................................................................................................76

# TABLE OF AUTHORITIES

**<u>Case</u>**                                                           **<u>Page</u>**

*Agency Holding Corp. v. Malley-Duff & Assocs.*
     483 U.S. 143 (1987)..........................................................................29, 30, 31

*Ambrosia Coal & Constr. Co. v. Pages Morales*
     482 F.3d 1309 (11th Cir. 2007) ....................................................67

*Anderson v. Dist. Bd. Of Trustees of Cent. Fla. Cmty. C.*
     77 F.3d 364 (11th Cir. 1996) ........................................................67

*Anza v. Ideal Steel Supply Corp.*
     547 U.S. 451 (2006)................................................................13, 21

*Arthur v. JP Morgan Chase Bank, N.A.*
     569 F. App'x 669 (11th Cir. 2014) ...............................................11

*Ashcroft v. Iqbal*
     556 U.S. 662 (2009)................................................................52, 73

*At the Airport v. ISATA, LLC*
     438 F. Supp. 2d 55 (E.D.N.Y. 2006) ............................................16

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*
     189 F.3d 321 (3d Cir. 1999) ...................................................24, 25

*Barron v. State*
     219 Ga. App. 481, 465 S.E.2d 529 (1995) ....................................61

*Bell Atl. Corp. v. Twombly*
     550 U.S. 544 (2007)................................................................52, 73

*Beck v. Prupis*
     162 F.3d 1090 (11th Cir. 1998) ....................................................17

*Bivens Gardens Office Bldg. v. Barnett Banks, Inc.*
     140 F.3d 898 (11th Cir. 1998) ................................................12, 14

*Bixler v. Foster*
 596 F.3d 751 (10th Cir. 2010) ...................................................................15

*Boyle v. United States*
 556 U.S. 938 (2009)....................................................................................52

*Burchett v. Lagi*
 No. 1:11-CV-2379-TWT, 2012 WL 3042984
 (N.D. Ga. July 25, 2012) ...................................................................55, 57, 64

*Byrne v. Nezhat*
 261 F.3d 1075 (11th Cir. 2001) *abrogated in part on other*
 *grounds by*, 553 U.S. 639, 646 (2008) ...................................................50, 76

*Calabrese v. State Farm Mut. Auto. Ins. Co.*
 996 F.2d 1219 (7th Cir. 1993) .....................................................................48

*Calloway v. State*
 176 Ga. App. 674, 337 S.E.2d 397 (1985) .............................................60, 61

*Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*
 No. 1:14-CV-1807-RWS, 2015 WL 1395130
 (N.D. Ga. Mar. 25, 2015) .........................................................................45, 46

*Chi v. MasterCard Int'l, Inc.*
 No. 1:14-CV-614-TWT, 2014 WL 5019917
 (N.D. Ga. Oct. 7, 2014) ...........................................................................62, 63

*Crab House of Douglaston, Inc. v. Newsday, Inc.*
 801 F. Supp. 2d 64 (E.D.N.Y. 2011) ...........................................................53

*Credit Ins. Consultants, Inc. v. Republic Fin. Servs., Inc.,*
 No. 92C8320, 1993 WL 388659 (N.D. Ill. Sept. 23, 1993) .........................55

*Curtis Inv. Co., LLC v. Bayerische Hypo-Und Verinsbank*
 No. 1:06-CV-2752-WDS, 2007 WL 4564133
 (N.D. Ga. Dec. 20, 2007)........................................................................36, 48

*Dummar v. Lummis*
 543 F.3d 614 (10th Cir. 2008) ................................................................45, 49

*Dusek v. JP Morgan Chase*
  ___ F.3d ___, No. 15-14463, 2016 WL 4205857
  (11th Cir. Aug. 10, 2016) .......................................................................24, 25

*First Capital Asset Mgmt. v. Satinwood, Inc.*
  385 F.3d 159 (2d Cir. 2004) ..........................................................................52

*Fish & Neave v. Perovetz,*
  No. 91-CIV-7047 (CHS) 1993 WL 7572 (S.D.N.Y. Jan. 7, 1993) ..............65

*Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*
  165 F. Supp. 2d 1345 (S.D. Fla. 2001) ..........................................................24

*Fuller v. Home Depot Servs., LLC*
  512 F. Supp. 2d 1289 (N.D. Ga. 2007) ...........................................................63

*Gatz v. Ponsoldt*
  297 F. Supp. 2d 719 (D. Del. 2003) ...............................................................25

*GEBAM, Inc. v. Inv. Realty Series I, LLC*
  15 F. Supp. 3d 1311 (N.D. Ga. 2013) ............................................................64

*Gentry v. VW of Am., Inc.*
  238 Ga. App. 785, 521 S.E.2d 13 (1999) .......................................................21

*Gilmore v. Gilmore*
  No. 09Civ 6230 (WHP), 2011 WL 3874880 (S.D.N.Y. Sept. 1, 2011),
  *aff'd*, 503 F. App'x 97 (2d Cir. 2012) .....................................................26, 28

*Gordon v. Lee*
  No. 1:05-CV-2162-JFK, 2007 WL 1450403,
  (N.D. Ga. May 14, 2007) ...............................................................................64

*Gordon v. State*
  257 Ga. 335, 359 S.E.2d 634 (1987) .............................................................61

*Great Fla. Bank v. Countrywide Home Loans, Inc.*
  No. 10-22124-CIV, 2011 WL 382588 (S.D. Fla. Feb. 3, 2011) ...................72

*Grimes v. Greer*
    223 Ga. 628, 157 S.E.2d 260 (1967) ...........................................................10

*Grimmett v. Brown*
    75 F.3d 506 (9th Cir. 1996) .........................................................................45

*Harris v. Orange SA*
    636 F. App'x 476 (11th Cir. 2015)........................................................*passim*

*Hemi Group, LLC v. City of New York*
    559 U.S. 1 (2010).........................................................................................21

*Hill v. Morehouse Med. Assocs., Inc.*
    No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003)....................70

*Holmes v. Securities Investor Protection Corp.*
    503 U.S. 258 (1992)....................................................................12, 13, 14, 17

*Hollinger International, Inc. v. Hollinger, Inc.*
    No. 04 C 0698, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ........................27

*Howard v. Am. Online Inc.*
    208 F.3d 741 (9th Cir. 2000) .......................................................................24

*In re Doctors Hosp. of Hyde Park, Inc.*
    474 F.3d 421 (7th Cir. 2007) .......................................................................59

*In re Enron Corp. Secs., Derivative & ERISA Litig.*
    284 F. Supp. 2d 511 (S.D. Tex. 2003)..........................................................27

*In re Geer*
    522 B.R. 365 (N.D. Ga. Bankr. 2014)..........................................................64

*In re Integrated Res., Inc. Real Estate Ltd. P'ship Sec. Litig.,*
    851 F. Supp. 556 (S.D.N.Y. 1994) ...............................................................37

*In re: Libor-Based Fin. Instruments Antitrust Litig.*
 935 F. Supp. 2d 666 (S.D.N.Y. 2013) *vacated on antitrust grounds by,*
 823 F.3d 759 (2d Cir. 2016) ........................................................................26

*J&D Int'l Trading (H.K.) Ltd. v. MTD Equip., LLC*
 No. 1:13-cv-2526-RWS, 2014 WL 1683375
 (N.D. Ga. Apr. 28, 2014) ....................................................................63, 64

*Jackson v. BellSouth Telecommunications*
 372 F.3d 1250 (11th Cir. 2004) ..........................................................52, 63

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*
 610 F.3d 382 (7th Cir. 2010) .........................................................42, 45, 46

*Jennings v. Emry*
 910 F.2d 1434 (7th Cir. 1990) .................................................................70

*Johnson v. Lipton*
 254 Ga. 326, 328 S.E.2d 533 (1985) ...................................................65, 66

*Keith v. DeKalb County*
 749 F.3d 1034 (11th Cir. 2014) ................................................................41

*Klehr v. A.O. Smith Corp.*
 521 U.S. 179 (1997)..........................................................30, 44, 45, 48

*Klopfenstein v. Deutsche Bank Sec., Inc.*
 592 F. App'x 812 (11th Cir. 2014).......................................................45, 48

*Koch v. Christie's Int'l PLC*
 785 F. Supp. 2d 105 (S.D.N.Y. 2011), *aff'd,* 699 F.3d 141 (2d Cir. 2012) ..36

*Lawrie v. Ginn Development Co.*
 __ F. App'x __, No. 14-14758, 2016 WL 4036381
 (11th Cir. July 28, 2016).........................................................................*passim*

*Lehman v. Lucom*
 727 F.3d 1326 (11th Cir. 2013) ................................................................29

1469372.1

*Licht v. Watson*
    567 F. App'x 689 (11th Cir. 2014) ................................................................24

*Lorber v. Winston*
    962 F. Supp. 2d 419 (E.D.N.Y. 2013) ...............................................42, 47, 49

*Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*
    No. 13Civ. 3921 (CM), 2014 WL 3739322
    (S.D.N.Y. July 28, 2014), *aff'd*, 624 F. App'x 23 (2d Cir. 2015)...........37, 48

*Maiz v. Virani*
    253 F.3d 641 (11th Cir. 2001) .....................................................................17

*Manson v. Stacescu*
    11 F.3d 1127 (2nd Cir. 1993) ......................................................................16

*McNeal Constr. Co. v. Wilson*
    271 Ga. 540, 522 S.E.2d 222 (1999) ...........................................................29

*Miccosukee Tribe of Indians v. Cypress*
    814 F.3d 1202 (11th Cir. 2015) ...................................................................67

*Milo v. Galante*
    No. 3:09-CV 1389 (GBA), 2011 WL 1214769
    (D. Conn. Mar. 28, 2011) .......................................................42, 45, 48, 49

*Morast v. Lance*
    807 F.2d 926 (11th Cir. 1987) ....................................................................13

*Morrison v. National Australia Bank Ltd.*
    561 U.S. 247 (2010)...................................................................................10

*Moyers v. State*
    186 Ga. 446, 197 S.E. 846 (1938) ..............................................................60

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*
    651 F.3d 268 (2d Cir. 2011) .......................................................................24

*Nat'l Group for Comms'ns & Computers Ltd. v. Lucent Techs. Inc.*
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) .........................................................48

*Nicholson v. Windham*
    257 Ga. App. 429, 571 S.E.2d 466 (2002) ....................................................21

*Ohio S. Express Co. v. Beeler*
    110 Ga. App. 867, 140 S.E.2d 235 (1965) ...................................................10

*Old Time Enters., Inc. v. Int'l Coffee Corp.,*
    862 F.2d 1213 (5th Cir. 1989) ....................................................................71

*Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.*
    252 F.3d 1246 (11th Cir. 2001) ............................................................34, 44

*Pasha v. State*
    273 Ga. App. 788, 616 S.E.2d 135 (2005) ...................................................62

*Peacock v. Thomas*
    516 U.S. 349 (1996)....................................................................................64

*Pelletier v. Zweifel*
    921 F.2d 1465 (11th Cir. 1991) ..................................................................50

*Penn, LLC v. Prosper Bus. Dev. Corp.*
    No. 2:10-CV-993, 2011 WL 2118072 (S.D. Ohio May 27, 2011) ..............57

*Perkumpulan Inv. Crises Ctr. Dressel-WBG v. Wong*
    No. C09-1786-JCC, 2014 WL 1047946 (W.D. Wash. Mar. 14, 2014) ........26

*Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*
    260 Ga. 584 S.E.2d 699 (1990) ............................................................17, 18

*Price v. Pinnacle Brands*
    138 F.3d 602 (5th Cir. 1998) ......................................................................14

*Prudential Insurance Co. of America v. United States Gypsum Co.*
    359 F.3d 226 (3d Cir. 2004) .......................................................................50

*PVC Windows v. Babbitbay Beach Const., N.V.*
    598 F.3d 802 (11th Cir. 2010) ....................................................................67

1469372.1

*R.C.M. Executive Gallery Corp. v. Rols Capital Co.*
No. 93CIV8571, 1997 WL 27059 (S.D.N.Y. Jan. 23, 1997) .......................55

*Reves v. Ernst & Young*
507 U.S. 170 (1993)..............................................................................55, 56

*Riquelme Valdes v. Leisure Res. Group., Inc.,*
810 F.2d 1345 (5th Cir. 1987) ......................................................................64

*RJR Nabisco, Inc. v. European Community*
136 S. Ct. 2090 (2016)............................................................................9, 11

*Rotella v. Wood*
528 U.S. 549 (2000).............................................................................*passim*

*Rylewicz v. Beaton Servs., Ltd*
888 F.2d 1175 (7th Cir. 1989) ....................................................................15

*Sedima, S.P.R.L. v. Imrex Co.*
473 U.S. 479 (1985)....................................................................................13

*Serra v. Banco Santander P.R.*
747 F.3d 1 (1st Cir. 2014)...........................................................................25

*Sheppard v. Jodice*
No. 1:06-CV-2823-RLV, 2007 WL 2225804
(N.D. Ga. July 30, 2007) ......................................................................64, 65

*Slainte Investments, LP v. Jeffrey*
142 F. Supp. 3d 239 (D.Conn. 2015) ..........................................................42

*Southeast Clinical Nutrition Ctrs., Inc. v. Mayo*
No. 1:13-CV-00626-AT, 2013 WL 11015749
(N.D. Ga. Oct. 29, 2013) .............................................................................41

*State v. Kennedy*
266 Ga. 195, 467 S.E. 2d 493 (1996) ..........................................................61

*Steele v. Hosp. Corp. of Am.,*
        36 F.3d 69 (9th Cir. 1994) ..........................................................................18

*Town of Mamakating v. Lamm*
        __ F. App'x __, No. 15-3128, 2016 WL 3188862 (2d Cir. June 8, 2016)....38

*United States v. Adler*
        186 F.3d 574 (4th Cir. 1999) .......................................................................59

*United States v. Brandon*
        651 F. Supp. 323 (W.D. Va. 1987).................................................................59

*United States v. Browne*
        505 F.3d 1229 (11th Cir. 2007) ....................................................................62

*United States v. Burbank*
        848 F.2d 453 (4th Cir. 1988) .......................................................................59

*United States v. Carman*
        577 F.2d 556 (9th Cir. 1978) .......................................................................59

*United States ex rel. Clausen v. Lab. Corp. of Am.*
        290 F.3d 1301 (11th Cir. 2002), *cert denied*, 537 U.S. 1105 (2003) ...........70

*U.S. ex rel. Reagon v. E. Tex. Med. Ctr. Reg. Healthcare Sys.,*
        274 F. Supp. 2d 824 (S.D. Tex. 2003)...........................................................64

*United States v. Int'l Longshoreman's Ass'n*
        518 F. Supp. 2d 422 (E.D.N.Y. 2007)...........................................................52

*United States v. Turkette*
        452 U.S. 576 (1981)......................................................................................51

*Ward v. Dickinson Fin. Corp. II*
        No. 7:14-CV-8 (HL), 2015 WL 1020151 (M.D. Ga. Mar. 9, 2015).............49

*Warner v. Alexander Grant & Co.*
        828 F.2d 1528 (11th Cir. 1987) ....................................................................14

*Weiland v. Palm Beach Cty. Sheriff's Office*
    792 F.3d 1313 (11th Cir. 2015) ....................................................68

*Williams v. Mohawk Indust., Inc.*
    465 F.3d 1277 (11th Cir. 2006) ..............................................13, 21

*Williams v. Mohawk Indus., Inc.*
    568 F.3d 1350 (11th Cir. 2009) ....................................................51

*Williams v. WMX Techs., Inc.*
    112 F.3d 175 (5th Cir. 1997) ........................................................70

*Windsor v. Huber*
    No. 1:11-CV-2326-WT, 2011 WL 4436491 (N.D. Ga. Sept. 21, 2011).......63

*Wylie v. Denton*
    323 Ga. App. 161, 746 S.E.2d 689 (2013) ..................................12, 13, 14, 19

## GEORGIA STATUTORY AND REGULATORY AUTHORITY

O.C.G.A. § 16-8-1(3) ...................................................................60

O.C.G.A. § 16-14-6(c) .............................................................11, 12

O.C.G.A. § 16-14-8...................................................................29

## UNITED STATES STATUTORY AND REGULATORY AUTHORITY

18 U.S.C. § 1956......................................................................60

18 U.S.C. § 1957......................................................................60

18 U.S.C. § 1962(c) ..............................................................51, 56

18 U.S.C. § 1964(c) ......................................................9, 11, 12, 24, 25

18 U.S.C. § 2314......................................................................59

Fed. R. Evid. 201 ....................................................................41

**SECONDARY SOURCES**

5C Wright & Miller, *Federal Practice and Procedure*
§ 1364 (3d ed. 2004) ......................................................................41

Private Securities Litigation Reform Act of 1995 ...........................................*passim*

# INTRODUCTION

Ms. Glock began this action with a 354-page Complaint that alleged twenty defendants in seven countries had conspired to violate the federal and Georgia RICO statutes.  Although Ms. Glock filed that initial Complaint on October 9, 2014, she alleged that the conspiracy began to victimize her in 1985.  The Court observed that Ms. Glock's original Complaint was "a typical shotgun pleading" of the type that "wreak[s] havoc on the judicial system."[1]  Afforded an opportunity to narrow her claims to avoid abstention based on international comity, Ms. Glock limited her claims to those based on her status as a Glock Ges.m.b.H. shareholder. But Ms. Glock's first amendment did nothing to cure the shotgun pleading problem, increasing the size of her pleading to 373 pages even as she purported to reduce the scope of her claims.

After spending weeks studying the defendants' Motion to Dismiss, Ms. Glock has amended her pleadings yet again.  But rather than cure the numerous substantive defects in her claims, the Second Amended Complaint ("SAC") tries to obscure those failings in a 546-page shambles of repetitive and contradictory allegations.  Volume does not dictate viability, and the Court should dismiss Ms. Glock's third shotgun pleading with prejudice.

---

[1] *See* Opinion and Order ("Jun. 2015 Order") at 8 (June 19, 2015) [Doc. 117].

# BACKGROUND

The SAC alleges that defendant Gaston Glock Sr. and plaintiff Helga Glock are Austrian citizens who founded Glock KG, an Austrian limited partnership.[2]  In 1983, Glock KG became Glock Ges.m.b.H.[3] (the "Parent Company"), an Austrian company that manufactures Glock pistols.  The SAC alleges that until 1999, Glock Sr. owned 85% and Helga Glock owned 15% of the Parent Company.[4]  In 1999, however, Glock Sr. and Ms. Glock founded an Austrian private foundation called Glock *Privatstiftung*, to which they transferred most of their Parent Company shares.[5]  Since 1999, Ms. Glock has held only a 1% interest in the Parent Company.[6]

The SAC also alleges that Glock Sr. established defendant Glock, Inc. as a wholly-owned U.S. subsidiary of the Parent Company in 1985.[7]  Ms. Glock admits that "████████████████████████████████████████████"[8]  She further admits that her alleged interest in Glock, Inc. is indirect,[9] and has always been derivative of her 1% interest in the Parent Company:

---

[2] SAC ¶¶ 33, 38, 123-24.
[3] *Id.* ¶ 135.
[4] *Id.* ¶ 136, 216, 218.
[5] *Id.* ¶¶ 23, 218–19.
[6] *Id.* ¶¶ 218-19.
[7] *Id.* ¶¶ 141–42, 153–54, 214.
[8] *Id.* ¶ 1642.
[9] *Id.* ¶¶ 230, 282, 419.

> As an owner of Glock Ges.m.b.H., Ms. Glock was and is entitled to benefit from any distributions made to Glock Ges.m.b.H. by the entities that it owned and owns, including Glock, Inc.  Further, the overall value of Glock Ges.m.b.H. was largely predicated on the value of the entities it owned and controlled.[10]

The SAC confirms the derivative nature of Ms. Glock's claims by repeatedly alleging that the defendants' scheme to divert money from Glock, Inc. and the Parent Company "reduced the value of Ms. Glock's *interest* in Glock Ges.m.b.H. and the value of her *indirect interest* in Glock, Inc."[11]

*First*, the SAC alleges that the defendants caused the Parent Company to give away 50% of the ownership of Glock, Inc.  Ms. Glock alleges that Glock Sr. and others transferred this ownership stake to a series of other parties.[12]  The SAC alleges that this transfer began immediately after Glock, Inc.'s formation in 1985,

---

[10] *Id.* ¶ 217; *see also id.* ¶ 235.

[11] *Id.* ¶ 230 (emphasis added); *see also id.* ¶ 11 ("Specifically, Defendants' scheme deprive[s] Ms. Glock of the financial benefits of her ownership interest in Glock Ges.m.b.H. and its primary economic engine—the Smyrna, Georgia-based Glock, Inc.—and converted them to Defendants' own illicit purposes."); *id.* ¶¶ 221, 230, 238, 282, 284, 347, 365, 1228, 1694, 1734, 1760 (same); *id.* ¶¶ 411, 419, 438 (payment of allegedly fraudulent invoices harmed Ms. Glock's interest in the "overall value of Glock Ges.m.b.H."); *id.* ¶ 1507 (alleged fraudulent royalty payments harmed Ms. Glock's "ownership interests in Glock Ges.m.b.H."); *id.* ¶ 1209 (alleged theft through "Eaglesmith" harmed Ms. Glock's "ownership of Glock Ges.m.b.H.").

[12] *See id.* ¶¶ 222–38.

nearly 30 years before this action was filed.[13]

*Second*, the SAC alleges that the defendants set up a series of shell corporations to allow "Glock Sr. and his associates" to "systematically appropriate virtually all of the income and assets of [Glock, Inc.] for themselves."[14]  Like the share transfers alleged above, the SAC alleges that these schemes began decades ago.  For instance, the SAC alleges that beginning in the 1980s and 1990s,[15] the defendants caused Glock, Inc. to enter sham leases and make sham rent payments to Consultinvest, Inc., which was incorporated in 1988.[16]  Ms. Glock also alleges that the Glock (H.K.) Ltd. ("Glock Hong Kong") billing scheme involved payments between August 1989 and July 1998.[17]  A similar scheme involving Glock America N.V. and Glock America S.A. (collectively "Glock America") is

---

[13] *Id.* ¶¶ 5, 214, 150, 226–29, 416–17; *see also* Opinion and Order ("Dec. 2015 Order") at 5 (Dec. 14, 2015) [Doc. 159] (noting the apparent contradiction between the First Amended Complaint's allegation that the schemes began in the 1980s but were targeted to injure Ms. Glock upon her divorce in 2011).

[14] *See* Dec. 2015 Order at 3–4 (quoting the First Amended Complaint).

[15] *See* SAC ¶ 483; *see also id.* ¶¶ 491–94 (alleging a March 1995 lease); *id.* ¶¶ 495–508 (alleging sham loans and mortgages in March 1988 and sham payments in January 1992); *id.* ¶¶ 509–33 (alleging additional sham leases and rent payments as well as sham mortgages and loan payments extending from 1990 to March 2000); *id.* ¶¶ 537–44 (alleging sham equipment leases and payments from April 1990 to March 2000).

[16] *Id.* ¶ 368.

[17] *See id.* ¶ 1269; *see also id.* ¶¶ 440, 477 (March 1996 to June 1997).

alleged to have spanned from December 1990 to May 1999.[18]  The SAC further alleges that the defendants caused Glock, Inc. and the Parent Company to make sham royalty payments between 1998 and 2002.[19]  And Ms. Glock alleges that the defendants diverted money to Base Technical Engineers, Ltd. from September 1992 through February 1999, although "[o]n information and belief" it may have continued to "at least 2001."[20]

The SAC devotes hundreds of paragraphs to pistol purchases and money transfers that allegedly implemented these schemes.  The length and disorganization of those allegations obscure the many contradictions between the facts Ms. Glock alleges and the SAC's premise that the defendants stole from Ms. Glock by diverting funds from the Parent Company.  For instance, the SAC's allegation that the Parent Company overcharged Glock, Inc. by $20/pistol alleges a direct benefit to the Parent Company and thus, an indirect benefit to Ms. Glock.[21] The SAC similarly contradicts Ms. Glock's legal theory by complaining about transactions that end with the claim █████████████████████████████

████████████████████████████████████████████████

---

[18] *See id.* ¶ 607.
[19] *See id.* ¶ 553.
[20] *See id.*¶¶ 619–21, 692, 697.
[21] *See id.* ¶¶ 293–97.

██████████████████████████████████.[22]  And the SAC contradicts Ms.

Glock's claim that defendants Glock Hong Kong and Glock America were sham

companies with no revenues of their own by listing transactions that show both

companies distributed millions more than they ever supposedly received from

Glock, Inc.[23]

Before Ms. Glock's 2011 divorce, the SAC alleges that she benefited from

the money that Glock Sr. and the other defendants allegedly stole from her.

Paragraph 6 of the SAC alleges that "Glock Sr. ensured that Ms. Glock had access

to money (without telling her where it came from or that he had injured her in

order to get it in the first place)."  The SAC goes on to allege that beginning in

1999, Glock Sr. collected the proceeds of the alleged racketeering schemes in the

Austrian *Privatstiftungen*.[24]  More specifically, Ms. Glock alleges that Reofin

International S.A., served as the "principal collection point for monies stolen from

---

[22] *See, e.g.*, *id.* ¶¶ 1674, 1677, 1681, 1685, 1687.

[23] *See id.* ¶¶ 433–79 (alleging Glock, Inc. paid $21,642,293.67 to Glock Hong
Kong); *id.* ¶¶ 702–81 (alleging Glock Hong Kong transferred $20,128,326.50 of
those payments to the Parent Company); *id.* ¶¶ 783–899 (alleging Glock Hong
Kong paid $23,908,753.00 to Minami); *id.* ¶¶ 900–34 (alleging Glock Hong Kong
paid nearly $2 million more to Unipatent); *see also id.* ¶¶ 1359–96 (alleging Glock,
Inc. paid $31,253,503.25 to Glock America, but Glock America transferred
$48,561,204.12 to the Parent Company); *id.* ¶¶ 606–13, 1007–1154, 1342 (alleging
Glock America wired an additional $22.1 million to Taziria).

[24] *See id.* ¶¶ 22–23, 207 ("After moving the proceeds of their thefts from Glock,
Inc. around the world … Defendants began centralizing the funds into the Glock
Foundation and the Value Foundation.").

the [Parent Company] and Glock, Inc. as part of Defendants' scheme"[25] from which the illicit funds were transferred into the Austrian *Privatstiftungen*.[26]  The SAC similarly alleges that the "stolen" 50% of Glock, Inc. was transferred to an entity owned by Glock *Privatstiftung* in 2011.[27]

But the SAC also acknowledges that Ms. Glock helped create Glock *Privatstiftung* in 1999 and that she and her children were beneficiaries of that *Privatstiftung* for many years.[28]  Only after the dissolution of Ms. Glock's marriage—more than a decade later in 2011—does the SAC contend that Glock Sr. allegedly removed Ms. Glock as a beneficiary of the *Privatstiftungen*.[29]

Ms. Glock filed her initial complaint in this Court on October 9, 2014.  Ms. Glock then amended and attempted to narrow her claims to avoid abstention based

---

[25] *Id.* ¶ 306; *see also id.* ¶¶ 324–34 (alleging that money paid to Minami was paid to Reofin); *id.* ¶¶ 360–66 (alleging that money paid to Taziria was ultimately paid to Reofin); *id.* ¶¶ 339–47 (alleging Glock Sr. owned Base Technical, either directly or through Reofin, and that funds diverted to Base Technical ultimately were "transferred into the Glock Foundation and Value Foundation"); *id.* ¶ 399 (alleging that the rent Glock, Inc. paid to Consultinvest was transferred to Warwick and UEF, which were supposed to transfer the funds to Reofin); *id.* ¶¶ 1266–69, 1276–80, 1397 (alleging money laundering transfers of Glock, Inc. funds to Glock Sr. and Reofin and then to Glock *Privatstiftung* and VALUE *Privatstiftung*).

[26] *Id.* ¶ 1268; *see also id.* ¶ 306.

[27] *Id.* ¶¶ 27, 236,  n.18, 425 (alleging that the 50% ownership share had been transferred to INC Holding, which is in turn, 100% owned by Glock *Privatstiftung*).

[28] *Id.* ¶¶ 23–24, 26, 207, 209.

[29] *See id.* ¶¶ 23–24, 209; *see also id.* ¶ 16 (alleging that Glock Sr. decided to "make a sharp cut" from Ms. Glock in 2011).

on the numerous parallel cases that Ms. Glock has filed in Austria.  The defendants

moved to dismiss that First Amended Complaint on February 12, 2016.  After

studying that motion for two months, Ms. Glock successfully moved to amend her

complaint again.  The Court should dismiss Ms. Glock's case with prejudice

because even after three attempts, the SAC does not plead any viable claim.

## ARGUMENT AND CITATION OF AUTHORITY

## I.    The RICO Statutes Do Not Permit Ms. Glock to Recover for Foreign Injuries.

### A.    The U.S. Supreme Court Has Held that Congress Did Not Authorize Federal Civil RICO Claims for Foreign Injuries.

As the Court has already indicated, Ms. Glock has a "narrow legal theory"

based on the claims that "the Defendants engaged in an unlawful scheme which

ultimately depressed the value of her 1% ownership interest in the Parent

Company" and her "claims stem only from the alleged injuries inflicted upon the

Parent Company."[30]  The SAC admits that Ms. Glock is an Austrian citizen and

that her claim relates to her ownership of an Austrian company. [31]  In this case, she

has sued Glock Sr., another Austrian citizen who used to own the balance of the

---

[30] Dec. 2015 Order at 9–10.
[31] SAC ¶ 33 (Ms. Glock is a citizen of Austria); *id.* ¶ 40 (Glock Ges.m.b.H. is an Austrian company).

1469372.1

shares in the Austrian Parent Company.[32]  And she alleges that Glock

*Privatstiftung*, an Austrian private foundation, now holds the remaining 99% of the

Parent Company's shares.  Significantly, Ms. Glock does not allege that her

Austrian Parent Company stock was ever issued, received, held, or transferred

anywhere other than in Austria.[33]

After the Supreme Court's recent decision in *RJR Nabisco, Inc. v. European*

*Community*, Ms. Glock's allegations do not state a claim under the federal RICO

statute because 18 U.S.C. § 1964(c) "requires a civil RICO plaintiff to allege and

prove a domestic injury to business or property and does not allow recovery for

foreign injuries."[34]  Even where the plaintiff can allege racketeering activity that is

subject to the federal statute, the Court held that Congress had not expressly

authorized private civil actions for foreign injuries.  Thus, it makes no difference

that the SAC complains of conduct in the United States or even foreign conduct

that might be subject to the RICO statute's substantive provisions.  The Court must

dismiss because Ms. Glock's "narrow legal theory" hinges on the foreign injury

she suffered as an Austrian shareholder in the Austrian Parent Company.[35]

---

[32] *Id.* ¶ 38 (Glock Sr. is a citizen of Austria).

[33] Nor is there any allegation that Glock Ges.m.b.H. has ever been publicly traded in the United States or anywhere else.

[34] 136 S. Ct. 2090, 2096 (2016).

[35] Dec. 2015 Order at 9–10.

If that were not enough, Ms. Glock's own allegations exclude the possibility of any domestic injury.  According to the SAC, Glock, Inc. and Consultinvest are the only U.S. entities that could have suffered any conceivable domestic injury. Rather than sue to recover for those parties, however, Ms. Glock has listed them as defendants that allegedly participated in conduct that injured her as a shareholder in the Austrian Parent Company.  Moreover, the SAC admits that ███████████ ███████████████████████████████████████████████████ ████████████████.[36]  Thus, the SAC fails to allege that Ms. Glock ever suffered a domestic injury in the United States.

### B. The Georgia RICO Statute Does Not Authorize Civil RICO Claims for Foreign Injuries.

The Court also should dismiss Ms. Glock's Georgia RICO claims because Georgia statutes presumptively have no extraterritorial operation.[37]  Moreover, the Georgia courts have long refrained from applying statutes extraterritorially in the absence of "unequivocal language to the contrary."[38]  That is the very same approach that the U.S. Supreme Court adopted in *Morrison v. National Australia*

---

[36] SAC ¶ 1642.

[37] *See Grimes v. Greer*, 223 Ga. 628, 628, 157 S.E.2d 260, 261 (1967); *Ohio S. Express Co. v. Beeler*, 110 Ga. App. 867, 868, 140 S.E.2d 235, 236 (1965).

[38] *Grimes*, 223 Ga. at 629, 157 S.E.2d at 261.

*Bank, Ltd.*,[39] and then applied to the federal RICO statute in *RJR Nabisco*.[40]  If

Congress did not authorize private civil claims for foreign injury when it passed 18

U.S.C. § 1964(c), there is no basis for Ms. Glock to argue that the Georgia

Assembly unequivocally authorized such claims when it adopted the similar

language in O.C.G.A. § 16-14-6(c).[41]

## II.     Ms. Glock Does Not Have Standing to Assert RICO Claims.

Even if Ms. Glock could allege a domestic injury, she does not have

standing to assert RICO claims because she has asserted her claims as a

shareholder in the Parent Company.  Once again, the SAC admits that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[42]  Thus,

while the SAC alleges that the defendants harmed Ms. Glock by (1) siphoning

money away from Glock, Inc. and (2) diverting funds and a 50% interest in Glock,

Inc. away from the Parent Company, those allegations confirm that those

corporations—and not Ms. Glock—suffered those alleged injuries directly.  Any

---

[39] 561 U.S. 247, 255 (2010) ("[U]nless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.").
[40] 136 S. Ct. at 2100.
[41] *Cf. Arthur v. JP Morgan Chase Bank, N.A.*, 569 F. App'x 669, 681 n.12 (11th Cir. 2014) (predicting that the Florida Supreme Court would not apply the state RICO statute extraterritorially because federal law is "persuasive when interpreting the Florida RICO Act.").
[42] SAC ¶ 1642.

1469372.1

alleged injuries to Ms. Glock have been passed on from Glock, Inc. and the Parent Company and are derivative of injuries those companies suffered first and more directly.  That is the beginning and end of Ms. Glock's case because under *Holmes v. Securities Investor Protection Corp*. and the numerous federal and Georgia cases that have followed it, Ms. Glock cannot bring RICO claims to recover for injuries suffered by other parties.[43]

### A.    Ms. Glock Lacks RICO Standing for Any Injury She Suffered as a Shareholder of Glock Ges.m.b.H.

Both federal and Georgia law require a RICO plaintiff to allege an injury "by reason of" the defendants' racketeering activity.[44]  To establish standing, *Holmes* holds that it is not enough to show that the RICO violation was the "but for" cause of the plaintiff's injury.[45]  A plaintiff has standing only if her injuries were proximately caused by the RICO violation,[46] which is shown by a "direct

---

[43] 503 U.S. 258, 265–66 (1992).

[44] 18 U.S.C. § 1964(c); O.C.G.A. § 16-14-6(c).  For that reason, the Georgia courts have applied the same proximate cause and direct injury requirements to analyze standing under Georgia RICO.  *See, e.g., Wylie v. Denton,* 323 Ga. App. 161, 164–65, 746 S.E.2d 689, 693 (2013) (applying same proximate cause factors from 11th Circuit cases on RICO standing to Georgia RICO standing analysis).

[45] *Holmes,* 503 U.S. at 265–66.

[46] *Bivens Gardens Office Bldg. v. Barnett Banks, Inc.,* 140 F.3d 898, 904 (11th Cir. 1998); *Harris v. Orange SA,* 636 F. App'x 476, 483 n.5 (11th Cir. 2015) (describing the "significant overlap between proximate cause and standing requirements in RICO cases"); *Wylie,* 323 Ga. App. at 166, 746 S.E.2d at 694 ("but for" causation is insufficient under Georgia RICO).

relation between the injury asserted and the injurious conduct alleged."[47]
Following *Holmes*, the Supreme Court and the Eleventh Circuit have held that
"courts should scrutinize proximate causation at the pleading stage and carefully
evaluate whether the injury pled was proximately caused by the claimed RICO
violations."[48]

Consequently, a "plaintiff only has standing if, and can only recover to the
extent that, [she] has been injured in **[*her*]** business or property by the conduct
constituting the violation."[49]  As *Holmes* explains, "a plaintiff who complain[s] of
harm flowing merely from the misfortunes visited upon a third person by the
defendant's acts was generally said to stand at too remote a distance to recover."[50]
Because the Supreme Court has declined "to broaden the universe of actionable
harms to permit RICO suits by parties who have been injured only indirectly,"[51] a
showing of injury requires proof of concrete financial loss, not mere injury to an

---

[47] *Holmes,* 503 U.S. at 268; *see Morast v. Lance,* 807 F.2d 926, 933 (11th Cir.
1987) (no standing where injury "did not flow directly" from defendants' actions);
*Wylie,* 323 Ga. App. at 165–66, 746 S.E.2d at 694 (injury must flow directly from
predicate act, indirect harm is not sufficient).
[48] *Williams v. Mohawk Indus., Inc*., 465 F.3d 1277, 1287 (11th Cir. 2006) (citing
*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)).
[49] *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (emphasis added).
[50] *Holmes*, 503 U.S. at 268–69.
[51] *Anza*, 547 U.S. at 460.

1469372.1

expectation or valuable intangible property interest.[52]

In *Bivens Gardens,* the Eleventh Circuit applied the "direct injury" requirement to a shareholder's claim for a loss in value of her corporate shares.[53] The Court concluded that racketeering activity directed at a corporation only produces an *indirect* injury to the corporation's shareholders.[54]  Therefore "RICO standing will not arise solely because one is a shareholder or limited partner in a company that was the target of the alleged RICO violation."[55]  Because "harm flowing merely from the misfortunes visited upon a third person" is too remote,[56] a shareholder's loss from racketeering activity against the company does not confer standing.[57]  The result was the same in *Harris v. Orange S.A.,* where the Eleventh Circuit affirmed this Court's dismissal of a RICO complaint alleging the defendants had stolen from a company in which the plaintiff owned shares.[58]

---

[52] *Price v. Pinnacle Brands*, 138 F.3d 602, 607 (5th Cir. 1998).

[53] *Bivens Gardens*, 140 F.3d at 905–06; *Wylie,* 323 Ga. App. at 167–68, 746 S.E.2d at 695 (plaintiff who is indirectly injured lacks standing).

[54] *Bivens Gardens*, 140 F.3d at 905–06.

[55] *Id*. at 906; *see also Warner v. Alexander Grant & Co.,* 828 F.2d 1528, 1530 (11th Cir. 1987) (plaintiff "cannot sue under RICO for damages he sustained derivatively as a shareholder …").

[56] *Holmes*, 503 U.S. at 268–69.

[57] *Bivens Gardens,* 140 F.3d at 904; *Harris,* 636 F. App'x 476, 482–83; *Wylie*, 323 Ga. App. at 167–68, 746 S.E.2d at 695.

[58] 636 F. App'x at 481–42, 486.  This is nothing new.  As early as 1987, the Seventh Circuit observed that "[t]he standing rule that stockholders may not bring individual claims under RICO for diminution in the value of the corporation

As in those cases, the SAC's alleged injuries are indirect and derivative because Ms. Glock's "claims stem only from the alleged injuries inflicted upon the Parent Company."[59]  The SAC makes this point repeatedly, alleging:

> Glock Sr.'s transfer or direction that shares of Glock, Inc. be transferred to Unipatent had the effect of reducing Glock Ges.m.b.H.'s ownership of Glock, Inc. from 100% to 50%.  This, in turn, reduced the value of Ms. Glock's *interest* in Glock Ges.m.b.H. and the value of her ***indirect interest*** in Glock, Inc.[60]

The SAC's allegation that Glock Sr. and defendant Charles Ewert "developed a comprehensive plan … to systematically appropriate virtually all ***corporate*** income and assets for themselves" similarly confirms an indirect injury.[61]  And while the SAC is full of alleged thefts from Glock, Inc., Ms. Glock's attempt to recover for those injuries amounts to a double derivative claim because ███████████ ██████████████████████████████████████████████,[62] only an indirect

---

prevails in all the Circuits that have considered the matter."  *Rylewicz v. Beaton Servs., Ltd*, 888 F.2d 1175, 1179 (7th Cir. 1989); *see also Bixler v. Foster*, 596 F.3d 751, 758–59 (10th Cir. 2010) (recognizing the same principle as "the uniform holdings of other circuits that have considered this question").

[59] Dec. 2015 Order at 10.

[60] SAC ¶ 419 (emphasis added); *see also id.* ¶ 11 (Defendants' scheme deprived Ms. Glock of the financial benefits of her ownership interest in Glock Ges.m.b.H.).

[61] *Id.* ¶ 165 (emphasis added); *see also id.* ¶ 11 ("Specifically, Defendants' scheme deprived Ms. Glock of the financial benefits of her ownership interest in Glock Ges.m.b.H. and its primary economic engine—the Smyrna, Georgia-based Glock, Inc.—and converted them to Defendants' own illicit purposes.").

[62] *Id.* ¶ 1642.

1469372.1

15

ownership interest in Glock, Inc. through her 1% share of the Parent Company.[63] It would make no difference if Ms. Glock owned half of the Parent Company or even of Glock, Inc. itself.  A shareholder does not have standing to bring a RICO claim for injury to the corporation in which she owns stock.[64]

In *Harris*, the Eleventh Circuit held that the plaintiff did not have standing because she repeatedly alleged that her primary injury was the diminution in the value of her corporate shares.[65]  Ms. Glock made the same claim here, by repeatedly alleging that the defendants' actions "deprived [her] of the financial benefits of her ownership interest in Glock Ges.m.b.H." and reduced the "overall value of Glock Ges.m.b.H."[66]  Similarly, the SAC's allegation that the defendants transferred Glock, Inc. stock for little or no consideration is a classic derivative injury for which an individual stockholder cannot recover under RICO.[67]  Although Ms. Glock may allege that she suffered 1% of the harm inflicted on the Parent

---

[63] *Id.* ¶¶ 230, 282, 419.

[64] *See Manson v. Stacescu*, 11 F.3d 1127, 1131 (2nd Cir. 1993) (50% shareholder did not have standing to bring an individual action under RICO to redress injuries to the corporation and would not have had such standing even had he been the sole shareholder of the injured corporation).

[65] *Harris*, 636 F. App'x at 481–82.

[66] *See supra* at 2–3 nn.10–11.  *See* SAC ¶ 284 (billing company transactions); *id.* ¶¶ 365, 411 (Glock America transactions); *id*. ¶¶ 438, 1516 (Glock Hong Kong transactions); *id.* ¶ 1507 (royalty transactions).

[67] *Compare id.* ¶¶ 45, 1491 *with At the Airport v. ISATA, LLC*, 438 F. Supp. 2d 55, 63 (E.D.N.Y. 2006).

Company, *Harris* holds that she cannot use the RICO statutes to assert that claim.[68]

### B.    Ms. Glock Has Not Alleged an Injury Separate and Distinct From the Injury to Glock Ges.m.b.H.

Nor does Ms. Glock have standing to assert RICO claims based on alleged thefts from Glock, Inc. or the Parent Company.  *Harris* holds that the  "critical question" in determining standing is whether Ms. Glock can allege that she has suffered an injury that is "separate and distinct" from the injuries inflicted on the Parent Company.[69]  Standing does not exist where the "harm suffered by the plaintiff shareholder [is] 'purely contingent' on the harm suffered by the corporation."[70]  That is the very claim Ms. Glock chose to make when she amended her pleadings to lift the stay based on international abstention.[71]

Where a plaintiff fails to show that she ever paid out any of her own money or ever had any of her own money taken as a result of the alleged scheme, there is

---

[68] 636 F. App'x at 482 (rejecting RICO claim even though 19% shareholder "[i]n a very real sense" suffered 19% of the damage inflicted on the corporation).

[69] *Id.* at 481–82.

[70] *Id.* at 481 (quoting *Holmes*, 503 U.S. at 271).

[71] Dec. 2015 Order at 10 ("Plaintiff's claims stem only from the alleged injuries inflicted upon the Parent Company").  Ms. Glock, therefore, cannot benefit from *Beck v. Prupis*, 162 F.3d 1090, 1097 n.10 (11th Cir. 1998), or *Maiz v. Virani*, 253 F.3d 641, 655 (11th Cir. 2001), which allow RICO claims by shareholders who assert different theories of recovery.  *Accord Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 397 S.E.2d 699 (1990) (sole shareholder had no standing to assert Georgia RICO claims for injury to corporation absent special injury).

1469372.1

17

no concrete financial loss under RICO.[72]  This is dispositive, because Helga Glock

never contends that she was—or should have been—a shareholder of Glock, Inc.,

that she owned the guns or parts that were allegedly sold at fraudulent prices,

owned the proceeds of those sales, owned the trademarks or copyrights she

references, or owned the buildings occupied by Glock, Inc. or the machinery in

them.  And despite identifying scores of bank accounts across the world, Ms.

Glock never alleges that any of those accounts were hers.

   *Harris* similarly forecloses Ms. Glock's attempt to create standing by

alleging that the purpose of the racketeering scheme was to place money "beyond

her reach" by diverting it from the Parent Company to other entities that Glock Sr.

allegedly controlled.[73]  Like Ms. Glock, the plaintiff in *Harris* claimed that

defendants had transferred valuable intellectual property from a corporation in

which plaintiff and defendants were shareholders to a different corporation owned

solely by the defendants.  Even though the plaintiff alleged an injury different and

separate from the *other shareholders*, the Eleventh Circuit held that this difference

did not confer RICO standing because the plaintiff still failed to allege an injury

distinct from the harm to the *corporation*.[74]  As in *Harris*, therefore, Ms. Glock

---

[72] *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994).

[73] SAC ¶¶ 9, 22, 207.

[74] *Harris,* 636 F. App'x at 481–82.

1469372.1

cannot assert RICO claims for injuries inflicted on Glock, Inc. or its Parent

Company.[75]

### C.   Ms. Glock Cannot Create Standing by Inventing an Alleged Business Partnership.

The SAC tries to overcome Ms. Glock's glaring standing problem by adding

references to a supposed "business partnership" between Ms. Glock and Glock Sr.

But Ms. Glock has failed to allege any facts that plausibly suggest that any such

partnership ever existed.  For example, the SAC does not say when this alleged

partnership was formed, whether it ever had a name, what the terms were, what

assets it held, or under what jurisdiction's law it was supposedly formed.  And

although the SAC claims a direct interest in any partnership funds,[76] Ms. Glock

never says that this partnership ever had any assets and never alleges any facts that

would support a direct claim to any such assets.  By contrast, the SAC admits that

███████████████████████████████████

███████████████████████████████████

---

[75] *See also Wylie,* 323 Ga. App. at 167–68, 746 S.E.2d at 694–95 (plaintiff who is indirectly injured lacks standing under Georgia RICO).

[76] *See, e.g.*, SAC ¶ 1209 (alleging that funds that belonged to Glock, Inc. belonged to Glock Sr. and Ms. Glock "jointly via their partnership and ownership of Glock Ges.m.b.H."); *id.* ¶ 1228 (alleging a joint interest in funds via partnership and joint ownership of Glock, Inc. through the Parent Company); *id.* ¶ 1419 (alleging that Ms. Glock and Glock Sr. were partners in Glock, Inc.).

████████████████[77]

More importantly, the facts alleged in the SAC contradict any notion of a free-floating business partnership.  For instance, the SAC alleges that Glock Sr. and Ms. Glock divided ownership of the Parent Company by awarding 85% to Glock Sr. and 15% to Ms. Glock (prior to the formation of the *Privatstiftungen*),[78] leaving nothing to be owned by any "business partnership."  The SAC similarly alleges facts that attribute 100% of the shares of Glock, Inc. to a variety of different owners.[79]  And while Ms. Glock alleges that the Parent Company should have owned all of Glock, Inc,[80] that allegation also contradicts the notion that a separate business partnership owned Glock, Inc. or its assets.  Thus, even where the SAC alleges a joint interest in Glock, Inc.'s funds, the SAC must acknowledge that the alleged partnership involves Ms. Glock's ownership of the Parent

---

[77] *Id.* ¶ 266, n.29 (" ███████████████████████████████
████████████████████████████████████
███████████████████ "); *id.* ¶ 1563 ( ███████
████████████████████████████ ).
[78] *See id.* ¶ 218; FAC ¶ 164 (same) [Doc. 121]; Compl. ¶ 181 (same) [Doc. 1].
[79] *See* SAC ¶¶ 222–36,  n.18.
[80] *Id.* ¶ 419; *see also id.* ¶ 156 (50% of the ownership of Glock, Inc. was "taken away from Glock Ges.m.b.H."); *id.* ¶ 157 (Glock Ges.m.b.H. "g[ave] away" 50% of Glock, Inc.); *id.* ¶ 1600 (Glock, Inc. was "originally established as a 100% subsidiary of Glock Ges.m.b.H.").

1469372.1

Company.[81]  At bottom, Ms. Glock can allege no facts to suggest that this

"business partnership" is anything more than a euphemism for her marriage.[82]

### D. The SAC Confirms that Alleged Racketeering Is Not the Proximate Cause of Ms. Glock's Alleged Injury.

Even if Ms. Glock could overcome her status as a derivative plaintiff, the

SAC's allegations confirm that the racketeering activity she alleges is not the

proximate cause of her alleged injury.  To state a claim under federal or Georgia

RICO, Ms. Glock must allege facts to show her injury "was directly caused by

[the] RICO violation"[83] and that there is "a direct nexus between at least one of the

predicate acts [alleged] and the injury [she] purportedly sustained."[84]  In other

words, Ms. Glock must plead an injury that is not "attenuated" from the RICO

violation; it must flow directly from the commission of the predicate acts.[85]

Ms. Glock cannot satisfy those requirements because the SAC reveals that

any alleged injury to Ms. Glock was inflicted because Glock Sr. removed her as a

---

[81] *See id.* ¶ 1209 (alleging that Glock, Inc. funds also belonged "to Glock Sr. and Ms. Glock jointly via their partnership and ownership of Glock Ges.m.b.H.").

[82] *See, e.g.*, *id.* ¶¶ 157, 535, 561, 585, 906, 1221, 1235, 1433 (partnership and marriage "ended" in 2011); *id.* ¶ 6 ("unraveling" marriage and partnership in 2011); *id.* ¶¶ 161, 196, 366 ("dissolution" of marriage and partnership in 2011); *id.* ¶¶ 199, 232, 338, 431, 488, 520 ("breakup" of marriage and partnership in 2011).

[83] *Gentry v. VW of Am., Inc.*, 238 Ga. App. 785, 791, 521 S.E.2d 13, 19 (1999).

[84] *Nicholson v. Windham*, 257 Ga. App. 429, 430, 571 S.E.2d 466, 468 (2002).

[85] *See Anza*, 547 U.S. at 459; *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 13–14 (2010); *Mohawk Indus., Inc.*, 465 F.3d at 1287.

beneficiary of the Austrian *Privatstiftungen* in 2011.[86]   Although the SAC alleges a 30-year scheme to injure Ms. Glock, it also admits that the scheme's proceeds came back to her:  "Glock Sr. ensured that Ms. Glock had access to money (without telling her where it came from or that he had injured her in order to get it in the first place)."[87]   The SAC also alleges that before 2011, the proceeds of the racketeering scheme were deposited into Austrian *Privatstiftungen* that Ms. Glock co-founded for her own (and her family's) benefit.[88]

Before 2011, therefore, Ms. Glock benefited from the proceeds of any alleged racketeering.  According to the SAC, that only changed when Glock Sr. removed Ms. Glock as a beneficiary of the Austrian *Privatstiftungen*.  But the SAC does not challenge Glock Sr.'s right to remove Ms. Glock as a beneficiary under Austrian law or the declarations that established the *Privatstiftungen*.[89]   Nor does Ms. Glock allege that those changes were acts of racketeering.  Instead, the SAC admits that Glock Sr. was able to make himself the sole beneficiary of the *Privatstiftungen* because he "**completely controls** the operations of the foundations,

---

[86] *See* SAC ¶¶ 22–24, 209.

[87] *Id.* ¶ 6.

[88] *See id.* ¶¶ 22–24, 207–09.

[89] *See id.* ¶¶ 23–25; Pl.'s Opp'n to Defs.' Mot. to Continue Stay at 6, 22 (Nov. 3, 2015) [Doc. 144] (disclaiming any RICO claim based on Ms. Glock's transfers to the *Privatstiftungen* or her status as a beneficiary of those *Privatstiftungen*).

using his extraordinary founder rights,"[90] and retained the right to "change the terms of the deed that created the foundation."[91]

On this motion, the Court and the defendants must credit Ms. Glock's allegation that it was Glock Sr.'s lawful exercise of his "founder rights" under Austrian law—rather than any alleged racketeering—that eliminated her beneficial interests in the proceeds of the alleged scheme.  Because the SAC does not—and cannot—allege that an Austrian citizen's exercise of those Austrian legal rights violates federal or Georgia criminal law, the SAC confirms that the alleged racketeering activity was not the proximate cause of her alleged injuries.  The Court should dismiss the Complaint.

## III.   Ms. Glock Cannot Assert a Federal RICO Claim for Alleged Conduct Actionable as Fraud in the Purchase or Sale of Securities.

Even if Ms. Glock could overcome the foreign injury and standing obstacles, the SAC stumbles into yet another hurdle by claiming that the alleged fraud regarding the ownership of Glock, Inc. is at the heart of this case.  Specifically, Ms. Glock alleges that "[t]he securities in Glock, Inc. were stolen from Glock Ges.m.b.H. or taken by fraud perpetrated on Ms. Glock."[92]  But Ms. Glock cannot

---

[90] SAC ¶ 25 (emphasis added).

[91] *Id.* ¶ 23.

[92] *Id.* ¶ 418; *see also id.* ¶ 431 (alleging that "Glock Sr. had effectively stolen or taken by fraud 50% of Glock Ges.m.b.H.'s ownership of Glock, Inc. by

pursue federal RICO claims on that theory because the Private Securities Litigation Reform Act of 1995 ("PSLRA") amended 18 U.S.C. § 1964(c) to preclude the assertion of a private civil RICO action involving "any conduct that would have been actionable as fraud in the purchase or sale of securities."

In *Licht v. Watson*, the Eleventh Circuit confirmed that this prohibition applies irrespective of whether the RICO plaintiff has standing to bring a securities claim—*i.e.*, was a purchaser or seller of the company's stock.[93]  It similarly does not matter whether the plaintiff alleges securities laws violations or "other specified offenses, such as mail or wire fraud," because the conduct may not serve "as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."[94]  Thus, in *Dusek v. JP Morgan Chase*, the Eleventh Circuit held that "[a] plaintiff may not dodge this bar by

transferring securities in Glock, Inc. to other entities that he solely owned or controlled" until 2011); *id.* ¶ 1531 (Ms. Glock was "defraud[ed] out of [her] interest in ownership of 50% of Glock, Inc.").

[93] 567 F. App'x 689, 693 (11th Cir. 2014) (PSLRA bar applies broadly, "regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim"); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011) (PSLRA bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant"); *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (same); *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 165 F. Supp. 2d 1345, 1358 (S.D. Fla. 2001) (same *citing Howard*).

[94] *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.), *reprinted* in 1995 U.S.C.C.A.N. 730, 746).

1469372.1

24

pleading other offenses as predicate acts in a civil RICO action if the claim is

based on conduct that would have been actionable as securities fraud."[95]

Regardless of the predicate acts alleged, therefore, § 1964(c) bars Ms. Glock's

RICO claims because the SAC repeatedly alleges fraud related to the purchase and

sale of securities.[96]

    In determining whether the PSLRA amendment bars a civil RICO claim, the

courts review the complaint in its entirety rather than parsing the plaintiff's

allegations to distinguish between the various alleged predicate acts.[97]  And when a

---

[95] ___ F.3d ___, No. 15-14463, 2016 WL 4205857, at *5 (11th Cir. Aug. 10, 2016); *see also Serra v. Banco Santander P.R.*, 747 F.3d 1, 4 (1st Cir. 2014) (Congress intended "to prevent a plaintiff from pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."); *Bald Eagle Area Sch. Dist.*, 189 F.3d at 330 (Plaintiffs cannot plead "mail, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.").

[96] *See, e.g.*, SAC ¶ 410; *id.* ¶ 416 (alleging gifting of "securities in Glock, Inc. to entities entirely owned and controlled by Glock Sr."); *id.* ¶ 417 (alleging backdating of documents giving Glock, Inc. shares to Unipatent); *id.* ¶ 418 (alleging that securities in Glock, Inc. were "taken by fraud perpetrated on Ms. Glock"); *id.* ¶ 431 (referencing transfer of securities in Glock, Inc. to entities solely owned or controlled by Glock Sr.); *id.* ¶ 1491 (referencing gifting of securities of Glock, Inc. to a succession of entities owned and controlled by Glock Sr.).

[97] *See, e.g., Bald Eagle*, 189 F.3d at 329 (holding that the PSLRA bars an action even when only some of the predicate acts are actionable as securities fraud, because allowing a "surgical presentation of the cause of action … undermine[s] the congressional intent behind the RICO Amendment."); *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading").

plaintiff alleges a "'single scheme', courts have held that 'if any predicate act is barred by the PSLRA it is fatal to the entire RICO claim.'"[98]

That is exactly what Ms. Glock has done here because the SAC includes nearly a hundred references to an alleged single scheme to defraud Ms. Glock and alleges that the fraudulent transfer of Glock, Inc. stock was "[t]he most important part of the scheme ...."[99]  Beyond the initial transfer to Unipatent, the SAC catalogs subsequent alleged stock transfers as being an integral part of the scheme.[100]  And the SAC seeks to recover for alleged payment of "improper" dividends by Glock, Inc. to Unipatent and Rochus GmbH when they held 50% of Glock, Inc.'s stock,[101] as well as payments by Glock, Inc. to other entities that

---

[98] *In re: Libor-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 730 (S.D.N.Y. 2013), *vacated on antitrust grounds by,* 823 F.3d 759 (2d Cir. 2016); s*ee also Perkumpulan Inv. Crises Ctr. Dressel-WBG v. Wong*, No. C09-1786-JCC, 2014 WL 1047946, *7 (W.D. Wash. Mar. 14, 2014) ("And finally, Courts have consistently concluded that where a plaintiff alleges a single scheme and any predicate act is barred under the PSLRA, the entire RICO claim is precluded."); *Gilmore v. Gilmore,* No. 09 Civ. 6230 (WHP), 2011 WL 3874880, at *6 (S.D.N.Y. Sept. 1, 2011), *aff'd,* 503 F. App'x 97 (2d Cir. 2012) (dismissing RICO claims because where plaintiff alleges a single scheme, and "the securities aspects of the fraud must be aggregated with the non-securities aspects").
[99] SAC ¶ 222.
[100] *See, e.g.*, *id.* ¶ 236 (alleging Unipatent's ownership of 50% of Glock, Inc. subsequently passed through Multipatent Holding S.A. to Rochus GmbH, to INC Holding GmbH); *id.* ¶ 421 (same).
[101] *Id.* ¶ 79; *see also id.* ¶¶ 347, 365, 411, 426 (████████████████████ ████████████████████); *id.* ¶¶ 1707, 1709 (████████████████ ████████████████); *id.* ¶1507 (contending that royalty/licensing

deprived her of Parent Company dividends.[102]  By tying all of these alleged injuries

to a single scheme, Ms. Glock has linked all her claims to the alleged taking of

Glock, Inc. securities "by fraud perpetrated on Ms. Glock."[103]  The PSLRA

amendment, therefore, bars Ms. Glock's federal RICO claims.[104]

        In addition, the courts consistently have cited the PSLRA amendment to

dismiss private RICO claims based on the allegation that a corporation was

"looted" by insiders.  For example, in *Hollinger International, Inc. v. Hollinger,*

*Inc.*, a corporation sued its controlling shareholders alleging they used their

positions to take over $380 million from the plaintiff company.[105]  Just as in this

case, the plaintiff alleged the sale of assets to entities controlled by the defendants

at below market values, as well as alleged inflated and unearned management fees.

The *Hollinger* court explained that an allegation that "the corporation is influenced

by its controlling shareholders to engage in a transaction adverse to the

corporation's interests (in effect, the minority shareholder's interests) and there is

---

payments made by Glock, Inc. and the Parent Company using funds taken from
Glock, Inc. deprived Ms. Glock of dividends).

[102] *See id.* ¶ 438; *see also id.* ¶ 1516 (alleged Glock, Inc. payments on allegedly
fraudulent Glock Hong Kong and Glock America invoices deprived Ms. Glock of
dividends).

[103] *Id.* ¶ 418.

[104] *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 622
(S.D. Tex. 2003).

[105] No. 04 C 0698, 2004 WL 2278545, at *1 (N.D. Ill. Oct. 8, 2004).

non-disclosure … as to the material facts of the transaction" is an alleged securities law violation.[106]

The court, therefore, held that the PSLRA amendment barred any civil federal RICO claim.  "While the predicate acts alone are not per se violations of securities law, they were an integral part of Defendants' scheme to loot International,"[107] and the predicate acts of mail and wire fraud were "part of an overreaching scheme to defraud International (and thus also its majority non-controlling shareholders) by misappropriating and usurping the Company's assets for [the defendants] personal enrichment."[108]  The result should be the same here because the SAC similarly alleges that Glock Sr. and other insiders engaged in a fraudulent scheme to steal from Glock, Inc. and the Parent Company, which all started with the alleged fraudulent transfer of Glock, Inc. shares.[109]

---

[106] *Id*. at *8 (collecting authority).

[107] *Id.*

[108] *Id.* at *10; *see also Gilmore*, 2011 WL 3874880, at **2, 8 (dismissing RICO claim alleging "a multi-year scheme to defraud [the plaintiff] and his siblings by looting the family companies through self-dealing, fraudulent securities transactions, and overbilling"), *aff'd,* 503 F. App'x 97 (2d Cir. 2012).

[109] *See, e.g.,* SAC ¶ 1600 ("Glock, Sr.'s plan from the beginning was to deprive Ms. Glock of her interest in Glock, Inc."); *id*. ¶ 11 ("The object of their scheme was to siphon, divert, and hide monies and assets away from the view and reach of Ms. Glock."); *id*. ¶ 150 (same); *id.* ¶ 222 (alleging that the theft of Glock, Inc. shares was "hatched … from the start" because that was the most important part of the scheme);  *id*. ¶¶ 704–81 (alleging that the Glock Hong Kong billing scheme constitutes mail and wire fraud because it obscured the source of funds).

## IV.    The Statutes of Limitation Bar Ms. Glock's RICO Claims.

The Court also should dismiss Ms. Glock's RICO claims because they have been brought more than a decade too late.  The statute of limitations for a federal civil RICO claim is four years, which begins to run when the plaintiff discovered—or reasonably should have discovered—her injury.[110]  The statute of limitations on a Georgia civil RICO claim is five years, and it begins to run when the plaintiff reasonably should have discovered her injury plus a pattern of racketeering activity.[111]  Ms. Glock's claims are untimely because the SAC alleges a racketeering scheme that began in the mid-1980s and was publicly revealed—at the latest—by 2003.[112]  Ms. Glock did not file her Complaint until October 2014, by which time any RICO claims had long since expired.

---

[110] *See Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987); *Rotella v. Wood*, 528 U.S. 549 (2000); *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).

[111] *See* O.C.G.A. § 16-14-8.  Although the Georgia statute was recently amended, that change cannot revive Ms. Glock's claim because the effective date of the amendment was July 1, 2015, and the amendment did not revive claims that had already expired.  *See McNeal Constr. Co. v. Wilson*, 271 Ga. 540, 543, 522 S.E.2d 222, 224–25 (1999).  This retroactivity question is currently before the Georgia Court of Appeals in *Glock, Inc. v. Harper*, No. A16A2074.

[112] Ms. Glock repeatedly admits that she seeks to recover for a scheme that began decades ago.  *See, e.g.*, SAC ¶ 1 ("multiple-decade" scheme), *id.* ¶ 6 ("30-plus year racketeering scheme"), *id.* ¶ 17 ("30-year pattern"), *id.* ¶ 167 (scheme continued

## A.    The U.S. Supreme Court has Sharply Limited the Statute of Limitations for Federal Civil RICO Claims.

In *Rotella v. Wood*, the U.S. Supreme Court held that the four year statute of limitations for a federal civil RICO claim accrues no later than when the plaintiff reasonably should have discovered her injury.[113]  *Rotella* is the third in a trilogy of Supreme Court cases that prevents plaintiffs from using RICO's pattern requirement to extend the statute of limitations by stringing predicate acts together over decades.[114]  In *Klehr v. A.O. Smith Corp.*, the Court rejected any accrual rule that "would permit plaintiffs who know of the defendant's pattern of activity simply to wait, sleeping on their rights, as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the memories of witnesses have faded or evidence is lost."[115]  That language could have been written for this case because the SAC alleges a multi-decade, worldwide RICO scheme and admits that

---

"over a period of decades"), *id.* ¶ 210 (scheme occurred "over the course of multiple decades"), *id.* ¶ 1806 (pattern went on "for decades").

[113] 528 U.S. 549 (2000).

[114] *See id.* at 554–55; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997) (rejecting a last predicate act accrual rule "[b]ecause a series of predicate acts (including acts occurring at up to 10-year intervals) can continue indefinitely, such an interpretation, in principle, lengthens the limitations period dramatically.  It [a last predicate act rule] thereby conflicts with a basic objective—repose—that underlies limitations periods."); *Malley-Duff & Assocs.*, 483 U.S. at 156.

[115] 521 U.S. at 187; *see also Malley-Duff*, 483 U.S. at 156 (rejecting Justice Scalia's suggestion to impose no limitations period because that would allow stale civil RICO claims that could not be fairly adjudicated "when, because of the passage of time, the memories of witnesses have faded or evidence is lost.").

some of the central witnesses have become incapacitated and incarcerated.[116]

*Rotella* also emphasized that "[t]he object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity."[117]  To avoid squandering those public benefits, the statute of limitations should be "aimed at ***rewarding the swift*** who undertake litigation in the public good."[118]  The *Rotella* Court acknowledged that an injury discovery rule could impose hardships on the plaintiff because "a pattern of predicate acts may [] be complex, concealed, or fraudulent" and "considerable effort may be required" before the plaintiff can determine whether a pattern of racketeering exists.[119]  But the unanimous Court held that "[a] RICO plaintiff's ability to investigate the cause of his injuries is no more impaired by [her] ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing

---

[116] *See* SAC ¶ 1 ("multiple-decade" scheme); *id.* ¶¶ 57–60, 202, 400 (alleging that defendant Charles Ewert is incarcerated in Luxembourg); *id.* ¶¶ 72–73, 202 n. 15 (alleging that defendant Johann Quendler is now incapacitated).

[117] *Rotella*, 528 U.S. at 557.

[118] *Id.* at 556 (emphasis added); *see also id.* at 558 (using private suits to uncover criminal wrongdoing is "an object pursued the sooner the better"); *Malley-Duff*, 483 U.S. at 150–55 (emphasizing that private plaintiffs must act promptly to seek "the carrot of treble damages").

[119] *Rotella*, 528 U.S. at 556–57.

standards of medical practice."[120]   Under *Rotella*, therefore, the statute of

limitations begins to run when a plaintiff should have discovered her injury, not the

other elements of her claim.

### B.   The SAC Seeks to Recover for Alleged Injuries that are Decades Old.

Ms. Glock's RICO claims are untimely on the face of the SAC, which

alleges that the racketeering scheme began to victimize Ms. Glock decades ago.[121]

*First*, the SAC alleges that Ms. Glock was injured by the fraudulent transfer of

Glock, Inc. stock shortly after the company was incorporated in November 1985:

"Although Glock, Inc. was originally established as a 100% subsidiary of Glock

Ges.m.b.H., the succession of unremunerated or insignificantly remunerated

transfers of ownership of 50% of the interest in Glock, Inc. began while the ink on

its incorporation documents was still wet."[122]

---

[120] *Id.*

[121] *See* SAC ¶¶ 1, 6, 17,167, 210, 1806.

[122] *Id.* ¶ 1600; *see also id.* ¶ 5 (50% of the ownership of Glock, Inc. "was secreted away from its parent company … [a]lmost immediately after its creation"); *id.* ¶¶ 149–50 (scheme to appropriate possession and control over key entities and assets of the Glock Group "began almost as soon as Glock, Inc. had been formed"); *id.* ¶ 157 (theft of the ownership of Glock, Inc. was instituted "within days after the formation of the company"); *id.* ¶ 214 (Glock, Inc. created November 1985); *id.* ¶ 223 (theft implemented shortly after Glock, Inc. incorporated in 1985); *id.* ¶ 226 (Glock Sr. ordered that certain Glock, Inc. shares be fraudulently transferred to Unipatent shortly after Glock, Inc. was incorporated); *id.* ¶ 1529 (50% of Glock, Inc. shares were given to Unipatent shortly after Glock, Inc. was incorporated); *id.*

*Second*, the SAC alleges that in 1986 Glock Sr. and Charles Ewert developed "a comprehensive plan for structuring and operating the so-called 'Glock Group' in such a way that Glock Sr. and his associates would be able to systematically appropriate virtually all corporate income and assets for themselves."[123]  Ms. Glock alleges improper royalty and licensing payments diverted money away from Glock, Inc. and the Parent Company as early as 1985.[124]  Ms. Glock also alleges that the defendants set up Consultinvest to divert money from Glock, Inc. beginning in the 1980s.[125]  Much of the additional racketeering activity and Ms. Glock's resulting injuries are alleged to have taken place during the 1990s.[126]

---

¶ 1600 (theft of ownership of Glock, Inc. "was initiated almost immediately after the company had been created").

[123] *Id.* ¶ 165; *see also id.* ¶¶ 149–50 (scheme to appropriate possession and control over key entities and assets of the Glock Group began almost as soon as Glock, Inc. had been formed).

[124] *Id.* ¶¶ 172–74, 258–60.

[125] *See id.* ¶¶ 491–93 (alleging that Consultinvest purchased property in March 1988 and then leased it as Glock, Inc.'s original office space).

[126] *See, e.g., id.* ¶¶ 433–79 (alleging transfers from Glock, Inc. to Glock Hong Kong from March 15, 1996 to June 16, 1997); *id.* ¶¶ 480–544 (alleging fraudulent lease payments beginning in the 1980s); *id.* ¶ 553 (alleging sham royalties from 1998 to 2002); *id.* ¶ 607 (alleging Glock America transfers from 1990 to 1999); *id.* ¶¶ 619–96 (alleging transfers to Base Technical from 1992 to 1999); *id.* ¶¶ 704–81 (alleging transfers to Glock Hong Kong from 1996 to 1997); *id.* ¶¶ 785, 787–899, 1269 (alleging fraudulent transfers to Minami from 1989 to 2001); *id.* ¶¶ 902–34 (alleging dividend payments to Unipatent from 1992 to 1997); *id.* ¶¶ 1011–1154

Given those allegations, Ms. Glock waited far too long to file this case.  In

*Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.*, the Eleventh Circuit noted that

"[t]he protection of the non-diligent plaintiff is not the rule in RICO cases."[127]

Even in the face of alleged concealment,

> The financial fraud victim is also not allowed to wait for time, the mother of
> truth, to make manifest a prohibited pattern.  True, fraud by its nature means
> that the truth has been concealed.  But, 'the occurrence of fraud in RICO
> patterns' is not a good reason to put off the running of the statute.[128]

The Court thus rejected limitations arguments that would have allowed the plaintiff

to file a RICO claim 12 years after the first predicate act, because "[t]hat is too

long for a RICO suit to hang in the air."[129]  Ms. Glock's RICO suit has been

hanging in the air far longer:  She did not file suit until nearly 30 years after her

first alleged injury from racketeering activity in the mid-1980s.  The defendants

have not located any RICO case that tolls the statute of limitations for so long.

### C.  The SAC Admits that the Alleged Racketeering Scheme and Ms. Glock's Injuries Were Disclosed No Later Than 2003.

Ms. Glock knows she has a statute of limitations problem because her SAC

repeatedly and formulaically alleges that she did not know about the defendants'

---

(alleging transfers to Taziria from 1990 to 1999); *id.* ¶ 1162 (alleging transfers to
Warwick and UEF from 1992 to 1999).

[127] 252 F.3d 1246, 1252 (11th Cir. 2001).

[128] *Id.* at 1251–52 (quoting *Rotella*, 528 U.S. at 559–60).

[129] *Pacific Harbor*, 252 F.3d at 1252.

conduct.  But those allegations cannot save her claims because the SAC

affirmatively states that the alleged racketeering scheme and Ms. Glock's alleged

injuries were revealed as early as the 1980s, and no later than 2003.

*First*, Ms. Glock's own factual allegations show that she was on notice that

the Parent Company did not own 100% of Glock, Inc. from the beginning of the

alleged scheme in the late 1980s.  The SAC alleges that Glock Sr. began working

with Ewert, "a purveyor of shell companies and corporate domiciliary services,"

and whom was "nicknamed 'Panama Charly,' for his use of entities incorporated in

that jurisdiction."[130]  The SAC further alleges that Ewert was presented as "the

***public face*** of … Unipatent Holding S.A.," a company that allegedly was "falsely

portrayed by Glock Sr. as an arm's-length [distribution] partner" for the Parent

Company.[131]  A secret entity has no public face, but the SAC alleges that "Ewert,

through Unipatent, would behave as an essentially fictional ***co-owner*** of 50% of

---

[130] SAC ¶¶ 163–64.

[131] *Id.* ¶ 170 (emphasis added); *see also id.* ¶ 69 (█████████████████████
████████████████████████████████████████████████████████
█████); *id.* ¶ 177 (similarly alleging that Ewert "would ***act as the face of*** real estate
holding companies [including defendant Consultinvest], owned during their early
years by Unipatent, whose purpose was to 'own' the real property and equipment
of 'Glock Group' companies" and siphon money away from Glock, Inc. with sham
leases and rental payments (emphasis added)).

each of the [Parent] operating entities outside of Austria," including Glock, Inc.,

Glock Hong Kong, and Glock America.[132]

While the SAC goes on to allege that Ewert's "public appearances" were

false,[133] the important point is that they were *public* and thus put Ms. Glock on

notice that the Parent Company did not own all of Glock, Inc.  Moreover, the

SAC's allegations about backdated documents only confirm that those documents

revealed that "50% ownership of Glock, Inc. … had been taken away from Glock

Ges.m.b.H."[134]  Nothing more is required to trigger the statute of limitations

because a RICO claim accrues even when "the full extent of the RICO scheme is

not discovered until a later date, so long as there were 'storm warnings' that should

have prompted an inquiry."[135]  "For statute of limitations purposes, the issue is not

whether a plaintiff obtains all of the facts regarding the alleged fraud, but rather

---

[132] *Id.* ¶¶ 170–71 (emphasis added); *see also id.* ¶¶ 182 (alleging that Glock Sr. owned Unipatent through Reofin and thus owned the 50% of Glock, Inc. that had been stolen from the Parent Company).

[133] *See id.* ¶ 181–82 (alleging that Glock Sr. created the false "public appearances" that he did not personally participate in these other corporations).

[134] *Id.* ¶ 156; *see also id.* ¶ 1640 (███████████████████████████████████████████████ ).

[135] *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011), *aff'd* 699 F.3d 141 (2d Cir. 2012); *see also Curtis Inv. Co., LLC v. Bayerische Hypo- Und Veriensbank*, No. 1:06-cv-2752-WSD, 2007 WL 4564133, at **10, 16 (N.D. Ga. Dec. 20, 2007) (dismissing federal RICO claims as untimely even though plaintiff alleged that it did not discover the defendants' fraudulent intent until years after the injury).

1469372.1

whether he or she had constructive notice of facts sufficient to create a duty to investigate further into the matter."[136]  And where the RICO claim relies on fraud, the limitations period begins when the plaintiff is "placed on notice of facts which should arouse suspicion."[137]  Because Ms. Glock herself alleges that Ewert and Unipatent were publicly presented as the 50% owner of Glock, Inc. from the outset of the alleged scheme, she was on constructive notice of her RICO claims nearly 30 years before she filed this case.

*Second*, the SAC alleges that the defendants used Consultinvest to injure her by allowing Glock Sr. to use Glock, Inc.'s income "to accumulate real assets which he alone would own" via his alleged ownership of Consultinvest.[138]  In support of that claim, the SAC alleges that Consultinvest purchased the original Glock, Inc. office space in "Land Lots 535 and 536 in Cobb County, Georgia" in March 1988 and that Consultinvest took out several mortgages on the property over the

---

[136] *Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*, No. 13 Civ. 3921(CM), 2014 WL 3739322, at *11 (S.D.N.Y. July 28, 2014) (dismissing federal RICO claim even though plaintiff alleged that it discovered additional misconduct years after being put on constructive notice of its injury), *aff'd,* 624 F. App'x 23 (2d Cir. 2015).

[137] *In re Integrated Res., Inc. Real Estate Ltd. P'ship Sec. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y. 1994).

[138] SAC ¶ 386; *see also id.* ¶ 367 (complaining that Consultinvest was created outside Glock, Inc. and the Parent Company).

1469372.1

years.[139] Ms. Glock also alleges that Consultinvest purchased additional "unimproved property in the same Cobb County Land Lots in 1990."[140]

But the SAC never alleges that any entity other than Consultinvest was ever listed as the public owner of record for these properties. Nor does Ms. Glock allege that the public records identifying Consultinvest as that owner have not been freely available for inspection at the Cobb County Clerk's office or on its publicly available website.[141] Without those allegations, the SAC merely confirms that Ms. Glock should have discovered the alleged injury of holding real estate outside Glock, Inc. or the Parent Company decades ago. The availability of similar public records revealing the alleged fraud and the plaintiff's injury led the Second Circuit to affirm the dismissal of 17 RICO claims asserted in *Town of Mamakating v. Lamm*, because the public record triggered the statute of limitations by putting the plaintiff on inquiry notice of its claims.[142]

*Third*, the SAC alleges that the racketeering scheme was revealed during legal proceedings that followed Ewert's July 1999 attempt to have Glock Sr. murdered in Luxembourg.[143] During those prosecutions, the SAC alleges that

---

[139] *Id.* ¶¶ 491–508.

[140] *Id.* ¶¶ 522–23.

[141] *See* https://research.cobbsuperiorcourtclerk.com.

[142] ___ F. App'x ____, No. 15-3182, 2016 WL 3188862 (2d Cir. June 8, 2016).

[143] SAC ¶¶ 187–90, 141–42, 194, 191.

Glock Sr. disclosed he had been working with Ewert to remove money from the

Parent Company and its operating companies:

> 187.   Defendants' scheme to siphon, divert, and hide monies and assets *away from the view and reach of Ms. Glock* proceeded without any significant disruption until the summer of 1999.

> ….

> 191.   Ewert and Pecheur [the alleged assassin] would later be prosecuted and convicted in Luxembourg for the attempted murder of Glock Sr. [in the Summer of 1999].[144]

> 195.   In pursuing Ewert through the Courts, however, *Glock Sr. had to disavow the fictive legal relationships that he and Ewert had previously put in place together* for the purpose of making business and financial transactions in which the so-called "Glock Group" had engaged appear legitimate.

> 196.   The testimonial declarations that Glock Sr. provided to the courts in Luxembourg, during tax proceedings used to "get Ewert," - unknown to Ms. Glock at that time and until after the dissolution of her business partnership with and marriage to Glock Sr. - *revealed the essence of the fraudulent scheme in which Glock Sr.; Ewert; Manown; Walter; Willam; and Glock Sr.'s alter egos Glock, Ges.m.b.H., Glock, Inc., Consultinvest, Glock Hong Kong, and Glock America had all been involved*.

> 197.   Contrary to Glock Sr.'s previous portrayal of Ewert (and Unipatent) as an arm's-length partner for Glock Ges.m.b.H., Glock Sr. now conceded that *Ewert's sole role was to help him remove monies from Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock Hong Kong, and Glock America*.

---

[144] The SAC deletes the bracketed reference to the time of this prosecution, but Ms. Glock admitted that this prosecution took place in the Summer of 1999 in her prior pleadings.  *See* FAC ¶ 142 [Doc. 121].

1469372.1

39

198.   According to Glock Sr., the "Glock Group" had never needed outside capital or assistance in expanding to markets beyond Austria. Moreover, Ewert lacked any relevant knowledge or experience in the firearms industry. ***All of the legal relationships and corporate structures of Glock Ges.m.b.H., Glock, Inc., Consultinvest, Glock Hong Kong, and Glock America were simply a legal construct for Glock Sr.'s removal of money away from the  Ms. Glock's control.***

….

200.   When Glock Sr. and Unipatent had Ewert prosecuted in Luxembourg for forgery and embezzlement, ***Ewert defended himself by claiming, among other things, that he had always acted with Glock Sr.'s consent.***[145]

The scheme that Ms. Glock alleges that Glock Sr. disclosed is the same scheme of "systematically stealing from Glock Ges.m.b.H. and Glock, Inc., and laundering the proceeds through separately-owned business entities and bank accounts" that she complains of here. [146]  In fact, the SAC alleges that after Ewert went to prison, "other associates of Glock Sr. simply picked up where Ewert had left off" and continued the same scheme.[147]

The SAC further acknowledges that the Luxembourg proceedings revealed Ms. Glock's purported injury by alleging that Glock Sr. admitted the only purpose

---

[145] SAC ¶¶ 187, 191, 195–98, 200 (emphasis omitted from ¶ 195, and added to ¶¶ 187, 196–98, 200).
[146] *Id.* ¶ 18; *see also id.* ¶¶ 162–84 (alleging the various features of a single scheme to divert money from the Parent Company that the defendants allegedly carried out "over a period of decades"); *id.* ¶ 210 (alleging that Ewert and then the other defendants administered the scheme "over the course of multiple decades").
[147] *See id.* ¶¶ 202–06.

of these corporate transfers was to remove money from the Parent Company through the operating companies.[148] Because the SAC alleges that Ms. Glock was the Parent Company's only other shareholder until 1999,[149] those disclosures should have put her on notice that her financial interests had been injured. Although the SAC does not specify when these disclosures took place, it does allege that the defendants had replaced Ewert by 2005.[150]  In addition, the Court can take judicial notice that a Luxembourg court convicted Ewert in March 2003.[151]

Given the SAC's affirmative allegation that the Luxembourg proceedings revealed Ms. Glock's injury, it does Ms. Glock no good to allege that she did not discover the Luxembourg disclosures until her 2011 divorce.  The statute of

---

[148] *See id.* ¶¶ 197–98.

[149] *See id.* ¶¶ 216–17.

[150] *See id.* ¶ 202.

[151] *See* Judgment no. 626 /2003, Criminal chamber no. 5 /2003 (Mar. 12, 2003) (publicly announcing Ewert's conviction).  For the Court's convenience, a certified copy of the Judgment and a certified translation are attached hereto as Exhibit A. *See also* Dyan Machan, *Top Gun*, Forbes (Mar. 31, 2003) (reporting Ewert's conviction), available at http://www.forbes.com/global/2003/0331/020.html.  On judicial notice, *see* Fed. R. Evid. 201; *Keith v. DeKalb County*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of murder charge in § 1983 case); *Southeast Clinical Nutrition Ctrs., Inc. v. Mayo*, No. 1:13-cv-00626-AT, 2013 WL 11015749, at *3 (N.D. Ga. Oct. 29, 2013) (the Court can take judicial notice of publication dates for books); 5C Wright & Miller, *Federal Practice and Procedure* § 1364 (3d ed. 2004) ("[J]udicial notice may be taken of prior pleadings and proceedings … transcripts of prior court proceedings, and various documents that are matters of public record.").

limitations begins to run when Ms. Glock reasonably ***should have*** discovered her injuries, and the SAC offers nothing to explain why Ms. Glock was able to discover these matters so many years after the fact but not at the time her husband's assassin was being prosecuted.  Ms. Glock may no more "bury her head in the sand" than the RICO plaintiff in *Lorber v. Winston*, who should have known that her son-in-law had admitted to committing financial fraud against others six years before she claimed to have discovered his schemes against her.[152]

*Fourth*, the Complaint also contends that the alleged fraudulent billing scheme was "***discovered as part of an internal investigation*** at the 'Glock Group.'"[153]  The SAC devotes hundreds of paragraphs to allege a purported fraudulent billing scheme to siphon money away from Glock, Inc., listing purported fraudulent wire transfers from Glock Hong Kong to Minami Enterprises Ltd. between 1989 and 2001.[154]  Paragraph 1275 alleges that "[a]fter these

---

[152] 962 F. Supp. 2d 419, 444 (E.D.N.Y. 2013) (citing *Rotella*, 528 U.S. at 557–58); *see also Jay E. Hayden Found. v. First Neighbor Bank, N.A.,* 610 F.3d 382, 389 (7th Cir. 2010) (affirming dismissal of RICO claim where one of the defendants had admitted his misconduct); *Milo v. Galante*, No. 3:09CV1389 (JBA), 2011 WL 1214769, at *5 (D. Conn. Mar. 28, 2011) (news reports that defendant was being investigated for corruption were sufficient to put his business partner on notice of her federal RICO claims).  The additional state law rulings in *Milo* were superseded by statute as stated in *Slainte Invs., LP v. Jeffrey*, 142 F. Supp. 3d 239, 257 (D. Conn. 2015).

[153] *See* SAC ¶ 1275 (emphasis added).

[154] *See id.* ¶ 1278 (1989–2001).

fraudulent billings" were discovered as part of an internal investigation, some of the defendants allegedly responded by incorporating a "cloned" billing company in the Bahamas so that they could continue laundering stolen Glock, Inc. funds, "without missing a beat."  Paragraph 1276 then alleges that defendants Glock Sr. and Johann Quendler wired nearly $7 million in stolen funds to that cloned company *from December 2000 through November 2001*.  Once again, if these allegations are true, they show that the Parent Company's investigators had discovered the fraudulent billing scheme by 2000, when Ms. Glock claims she was running the Parent Company's offices.[155]

By the end of 2003, therefore, Ms. Glock's own allegations confirm that she knew—or had every reason to know—that the Parent Company did not own 100% of Glock, Inc. and that Glock, Inc. did not own its own office space.  She further knew that a con artist nicknamed "Panama Charly" had tried to have her husband murdered in a dispute over who owned Glock, Inc. and other companies.  Ms. Glock also was on notice that there were "testimonial declarations" in Luxembourg describing a web of companies and inter-company transfers allegedly designed to siphon money away from the Parent Company's operating companies.  She also

---

[155] *See id.* ¶¶ 138, 147; *id.* ¶ 17 (alleging that Ms. Glock helped build a "corporate empire"); *id.* ¶ 1563 (█████████████████████████████████████████████████████ ██████████████████.

had every reason to know that the Parent Company's own investigators had

allegedly uncovered a billing scheme involving corporations all over the world.

And she knew that this conduct must have injured her financial interests because

Ms. Glock, Glock Sr., and Glock *Privatstiftung* were the only shareholders in the

Parent Company.  These allegations are fatal to Ms. Glock's 2014 RICO claims

because they affirmatively plead that Ms. Glock knew—or should have known—

that she had been injured by a pattern of alleged criminal misconduct by at least

2000 and no later than 2003.

### D.    Equitable Tolling Cannot Save Ms. Glock's RICO Claims.

The SAC attempts to excuse Ms. Glock's decades of delay with allegations

of concealment.  But both the Supreme Court and the Eleventh Circuit have held

that the equitable tolling Ms. Glock seeks to invoke is "the exception, not the

rule."[156]  Under *Klehr*, Ms. Glock cannot toll the limitations period unless she can

demonstrate both the defendants' fraudulent concealment and her own due

---

[156] *Rotella*, 528 U.S. at 561; *Pacific Harbor*, 252 F.3d at 1252 (tolling "is … 'the
exception [and] not the rule'" and it cannot save a claim when the plaintiff "had
notice sufficient to prompt them to investigate and that, had they done so
diligently, they would have discovered the basis for their claims," quoting *Rotella*,
528 U.S. at 561).

1469372.1

diligence.[157]

### 1.   The SAC Fails to Allege Fraudulent Concealment.

To invoke tolling, Ms. Glock must first plead the defendants' alleged

fraudulent concealment with particularity under Rule 9(b).[158]  The SAC's

allegations that certain defendants "created and confirmed Ms. Glock's impression

that Glock Sr. was conducting the affairs of Glock Ges.m.b.H. and Glock, Inc. in a

legal and legitimate manner and that he was not stealing from them or her" and that

they "failed to correct Ms. Glock's false impression" [159] do not come close to

pleading fraud with specificity.

Moreover, any alleged concealment must have prevented Ms. Glock from

discovering her claim:  "[I]f the obstructive behavior occurs *after* the plaintiff's

inquiry has reached the point at which he has discovered that he has a claim upon

---

[157] *Klehr*, 521 U.S. at 194–96; *see also Klopfenstein v. Deutsche Bank Sec., Inc.*, 592 F. App'x 812 (11th Cir. 2014) (affirming dismissal of Georgia RICO claim where plaintiff failed to properly plead fraudulent concealment).

[158] *See Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc*., No. 1:14-CV-1807-RWS, 2015 WL 1395130, at *6 n.4 (N.D. Ga. Mar. 25, 2015) (fraudulent concealment must be plead with particularity under Rule 9(b) to toll ERISA statute of limitations); *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008) (RICO plaintiff must plead fraudulent concealment with particularity); *see also Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996) (plaintiff's failure to allege the facts that defendants concealed waives fraudulent concealment argument); *Milo*, 2011 WL 1214769, at *5 (describing the requirements for pleading fraudulent concealment).

[159] SAC ¶ 1495.

which to found a suit, the defendant's obstructionism has no causal significance, … and so is not a ground for an estoppel."[160]  Although Ms. Glock contends she did not discover the defendants' misconduct until after her 2011 divorce, she fails to allege what prevented her from discovering that conduct while she was at the Parent Company between 1983 and 2011, when she alleges she was actively engaged in the Parent Company's "growing office work" ██████████████████ ████████████████████████████████[161]  And because the SAC affirmatively alleges that the racketeering scheme was revealed by 2003 at the latest, allegations of subsequent concealment cannot save Ms. Glock's claims, which were not filed until 2014.

Ms. Glock vaguely alleges that the defendants concealed "the true structure Glock Sr. had set up,"[162] but the SAC admits that Ms. Glock has always known that structure was not a "business partnership" that reflected Ms. Glock's alleged contributions.  Under the heading of "Humble Origins," the SAC alleges that in the early 1960s, Glock Sr. took an 85% share of Glock KG and the Parent Company, without properly crediting Ms. Glock's "equal financial and sweat equity

---

[160] *Jay E. Hayden Found.*, 610 F.3d at 385.
[161] SAC ¶¶ 138, 147, 1563.
[162] *Id.* ¶ 6.

contributions" ███████████████████████████████.[163]  The SAC goes

so far as to allege that ██████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████.,[164]

From the outset, therefore, the SAC alleges that Glock Sr. set up the corporate

affairs as he pleased and without any regard to reality because "[t]hat is how Glock

Sr. did business."[165]  Given those allegations, Ms. Glock cannot allege that she was

the victim of any fraudulent concealment that could toll her RICO claims

throughout the decades that followed.

Moreover, the SAC utterly fails to identify any of the questions Ms. Glock

asked or the answers she received that prevented her from discovering the conduct

that she now alleges was concealed from her.[166]  It is not nearly enough for Ms.

Glock to allege that Glock Sr. "deflect[ed] [her] questions about their business with

a combination of (a) promises of fidelity; (b) demands for trust; (c) intimidation;

---

[163] *Id.* ¶¶ 121–24,  n.8 (████████████████████████████████
████████████████████████); *id.* ¶¶ 135–36 (alleging that Glock
Sr. took an 85% ownership of the Parent Company "[n]otwithstanding [Ms.
Glock's] equal financial and sweat equity contributions to the establishment of
Glock KG").
[164] *Id.* ¶ 125, n.9 (████████████████████████████████
██████████████████████████).
[165] *Id.* ¶ 126.
[166] *See Lorber*, 962 F. Supp. 2d at 445–47.

and (d) statements that it would be better that she not be knowledgeable about their financial affairs."[167]  As the Seventh Circuit put it in *Calabrese v. State Farm Mutual Automobile Insurance Co.*, "[e]vasiveness, once it becomes obvious, is the exact opposite of active concealment."[168]  And it is hard to imagine anything that would more clearly put a diligent shareholder on notice than the responses Ms. Glock has alleged here.

### 2.    The SAC Fails to Allege that Ms. Glock Undertook Any Investigation Before Her 2011 Divorce.

*Klehr* also requires that Ms. Glock plead facts that plausibly suggest that she diligently investigated her claims throughout the period for which she seeks tolling.[169]  That means the SAC must include factual allegations detailing Ms. Glock's efforts to protect her own interests and describing any investigation to

---

[167] SAC ¶¶ 15, 185.

[168] 996 F.2d 1219 (7th Cir. 1993) (unpublished table decision) (defendant's provision of unsatisfactory or evasive answers is not sufficient to allege active concealment); *see also Madison 92nd Street*, 2014 WL 3739322, at **12, 14 (dismissing RICO claim because plaintiff had to do more than allege reliance on defendant's vague reassurances).

[169] 521 U.S. at 194–96; *Milo*, 2011 WL 1214769, at *6; *Curtis Inv.*, 2007 WL 4564133, at *9; *Nat'l Group for Comms. & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 268 (S.D.N.Y. 2006); *see also Klopfenstein*, 592 F. App'x at 815–16 (dismissing Georgia RICO claim for plaintiff's failure to plead due diligence to toll statute of limitations).

uncover the defendants' alleged misconduct.[170]  Rather than meet that burden, the

SAC shows that Ms. Glock avoided learning anything about her potential claims.

Indeed, the SAC adds a new allegation that the Parent Company never held a shareholders meeting or prepared a consolidated financial statement in the 27 years between its creation in 1983 and Ms. Glock's 2011 divorce.[171]  Ms. Glock now

alleges that the Parent Company violated Austrian law by failing to conduct these

meetings, issue financial statements, and identify its subsidiaries.  But if those

allegations are true, it means that Ms. Glock should have known that she was not

receiving the information the law allowed her as a Parent Company shareholder.

Nevertheless, the SAC does not allege that Ms. Glock ever demanded this

information from the company or any of its employees beyond Glock Sr.

Ms. Glock's extended failure to investigate in the face of the many storm

warnings listed above and Glock Sr.'s alleged intimidation and evasions

completely contradict her effort to toll the statute of limitations.  The SAC's

---

[170] *See, e.g., Dummar*, 543 F.3d at 621–23 (affirming dismissal where RICO plaintiff did not allege what he had done to discover the defendants' misconduct during the years following his injury); *Ward v. Dickinson Fin. Corp. II*, No. 7:14-CV-8(HL), 2015 WL 1020151, at *11 (M.D. Ga. Mar. 9, 2015) (same); *Lorber*, 962 F. Supp. 2d at 447 (same); *Milo*, 2011 WL 1214769, at *6 (RICO plaintiff's failure "to plead any facts that suggest she diligently investigated her claims," was "fatal to [the plaintiff's] attempt to invoke fraudulent concealment to toll the statute of limitations for her civil RICO claims.").

[171] *See* SAC ¶ 1611.

silence regarding any investigation by Ms. Glock is even more striking in light of her allegations that Ewert tried to kill her husband in a struggle for control of the Glock companies.  As the Third Circuit held in *Prudential Insurance Co. v. United States Gypsum Co.*, "[t]he more ominous the warnings, the more extensive the expected inquiry."[172]  And although the SAC acknowledges that Ms. Glock was aware of the assassination attempt, it nowhere alleges that Ms. Glock attended any portion of the Luxembourg trials, reviewed any of the evidence, or otherwise made any effort to find out why (1) Ewert had tried to kill her husband or (2) Glock Sr. allegedly was telling the Luxembourg courts that Ewert had helped him siphon money out of the Glock companies.  Having failed to allege any investigation before 2011, Ms. Glock cannot invoke tolling to save her claims now.

## V.    The SAC Fails to State Any Viable RICO Claims.

Even if Ms. Glock had standing and her claims were not otherwise barred, she has failed to plead a violation of the federal or Georgia RICO statutes.  The SAC flouts the Eleventh Circuit's repeated admonition that "[p]articularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them."[173] In *Jackson v. BellSouth Telecommunications*, the Eleventh Circuit held that

---

[172] 359 F.3d 226, 238 (3d Cir. 2004).

[173] *Byrne v. Nezhat*, 261 F.3d 1075, 1115 (11th Cir. 2001), *abrogated in part on other grounds by*, 553 U.S. 639, 646 (2008) (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1522 (11th Cir. 1991) (emphasis in original)).

"establishing a RICO enterprise and pattern of racketeering activity" are the "basic requirements" that are "[e]ssential to any successful RICO claim."[174]  The SAC fails to allege these basic elements against many of the defendants and its often contradictory allegations ignore the controlling case law.

### A.   The SAC Fails to Plead a Viable Association-in-Fact RICO Enterprise With Members that Share a Common Purpose.

Ms. Glock's only substantive RICO claim is Count II, which alleges that each defendant violated 18 U.S.C. § 1962(c) by operating and managing a RICO enterprise through a pattern of racketeering activity.[175]  To plead a violation of § 1962(c), Ms. Glock must, therefore, properly allege an enterprise.  The SAC tries to meet that requirement by alleging an association-in-fact enterprise.[176]

In *United States v. Turkette*, the Supreme Court held that an association-in-fact enterprise consists of "a group of persons associated together ***for a common purpose*** of engaging in a course of conduct."[177]  While an association-in-fact enterprise need not have a strict hierarchy, it must have some discernable elements

---

[174] 372 F.3d 1250, 1264 (11th Cir. 2004); *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355–56 (11th Cir. 2009).
[175] 18 U.S.C. § 1962(c).
[176] SAC ¶ 81.
[177] 452 U.S. 576, 583 (1981) (emphasis added); *see also id.* at 583, 585 (An association-in-fact enterprise must have "an ongoing organization, formal or informal," "legitimate or admittedly criminal," and the various associates must "function as a continuing unit.").

of "structure," namely:  "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[178]  Further, "'associat[ion]' requires both interpersonal relationships and a common interest."[179]  The purpose of the enterprise must be common to all its members.[180]  Purported enterprise members with fundamentally adverse interests lack a common purpose and do not constitute a cognizable association-in-fact enterprise.[181]  The SAC's factual allegations fail to satisfy these basic requirements to plead an enterprise.

Beyond identifying the members of the alleged association-in-fact enterprise as the 18 defendants and 22 others listed at Paragraph 81, the SAC's enterprise allegations consist of formulaic legal conclusions and labels that are useless after *Twombly* and *Iqbal*.[182]  Moreover, the SAC's factual allegations show that this agglomeration neither shared a common purpose nor functioned as a continuing unit.  Ms. Glock alleges that the enterprise's affairs consisted of three things: (1) "domestic and international firearms sales;" (2) "ownership of real estate;" and (3)

---

[178] *Boyle v. United States*, 556 U.S. 938, 946 (2009).

[179] *Id.* (internal alterations omitted).

[180] *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 173-74 (2d Cir. 2004); *see also Jackson*, 372 F.3d at 1264 (RICO enterprise consists of a group that has "purpose of conducting illegal activity").

[181] *United States v. Int'l Longshoreman's Ass'n*, 518 F. Supp. 2d 422, 475–77 (E.D.N.Y. 2007).

[182] *See* SAC ¶¶ 100–04, 1692–93, 1729–31.

"the siphoning and diversion of profits from those sales away from Ms. Glock and the operating companies of the so-called 'Glock Group.'"[183]  But the facts Ms. Glock alleges demonstrate that most of the enterprise's 40 members had nothing to do with selling firearms[184], and Consultinvest is the only entity alleged to have owned any real estate.[185]  Given those allegations, neither of these alleged purposes are common to all members of the enterprise.

The SAC thus focuses on the enterprise's alleged remaining task of siphoning profits away from the "Glock Group's" operating companies and adds an allegation that the enterprise's common purpose is to steal assets "that rightfully belonged to both [Ms. Glock] and her business partner Glock, Sr. and to put them into the direct control of Glock Sr."[186]  But Ms. Glock contradicts her own theory by including both perpetrators and victims in the alleged enterprise.[187]  Even though the SAC repeatedly alleges that Glock, Inc. and the Parent Company are the primary victims of the alleged scheme,[188] Ms. Glock has named those two

---

[183] *Id.* ¶ 1540.

[184] *See id.* ¶¶ 82-99.

[185] *Id.* ¶ 371 (all real property in the United States owned by the "Glock Group" was held by Consultinvest); *id.* ¶ 1756 (Consultinvest was set up to own all of the "Glock Group's" real property in the United States).

[186] *Id.* ¶ 101.

[187] *See Crab House of Douglaston, Inc. v. Newsday, Inc.*, 801 F. Supp. 2d 64, 79–80 (E.D.N.Y. 2011) (rejecting attempt to include the victim in the enterprise).

[188] *See, e.g.,* SAC ¶¶ 18, 212, 239–40, 278, 282, 288, 292, 308, 365, 553, 618.

1469372.1

companies as defendants.  And Paragraph 81 goes on to allege that they are members of the enterprise, without any explanation of how they could share the alleged common purpose of stealing their own assets.

For instance, Ms. Glock alleges that Consultinvest was incorporated "solely for the purpose of collecting [sham] rents from Glock, Inc."[189] The SAC similarly accuses ███████████████████████████████████████████████████████

████████████████████████████████.[190]  And Ms. Glock alleges that Glock Sr. stole 50% of Glock, Inc. from the Parent Company.  Nevertheless, the SAC lumps all of these perpetrators within an alleged enterprise that includes Glock, Inc. and the Parent Company.  Because the victim and perpetrator of a theft cannot have the same purpose, the SAC repeatedly contradicts its own common purpose allegation.

The SAC further departs from any rational understanding of the common purpose requirement by alleging that the Parent Company and Glock, Inc. have no separate legal existence and should be treated as a single entity, together with Glock Sr. and the other alleged perpetrators.[191]  Of course, if all of those entities

---

[189] SAC ¶ 179 ("Glock Sr., Manown, and Ewert colluded to incorporate Consultinvest solely for the purpose of collecting rents from Glock, Inc."); *see also id.* ¶¶ 54, 386 (██████████████████████████████████████████████████
█████████████████████████████████████████).

[190] *Id.* ¶¶ 1710, 1711.

[191] *See id.*, Prayer for Relief ¶ 1 (praying for "[j]udgment piercing the corporate veil, and disregarding the purported separate legal existence of Defendants Glock

are really a single actor, they cannot also be separate entities associating for a common purpose, nor can they defraud or steal from themselves.  And "[w]hile it is true that plaintiffs may allege legal theories in the alternative, they cannot plead alternative fact scenarios that incorporate one another, yet are mutually exclusive."[192]  In *Burchett v. Lagi*, this Court dismissed a RICO claim where the plaintiff contradicted his own enterprise allegations by attempting to pierce the corporate veil between the members of the enterprise.[193]  By collapsing the central members of the alleged enterprise into a single person that is both victim and perpetrator, Ms. Glock has failed to allege a viable RICO enterprise.[194]

### B.    The SAC Does Not Allege that Any Defendant Other Than Glock Sr. Operated or Managed the Enterprise.

The SAC further contradicts Ms. Glock's claim that most of the defendants violated the federal RICO statute by alleging that Glock Sr. was in complete control of the alleged enterprise.  In *Reves v. Ernst & Young*, the Supreme Court

---

Ges.m.b.H., Glock, Inc., Consultinvest, Glock America, and Glock Hong Kong"). For good measure, Ms. Glock then also alleges that Glock Sr. is the alter ego of all of those entities.  *See, e.g., id.* ¶¶ 13, 165, 211, 220, 513, 1572, 1602, 1690.

[192] *Credit Ins. Consultants, Inc. v. Republic Fin. Servs., Inc.*, No. 92C8320, 1993 WL 388659, at *11(N.D. Ill. Sept. 23, 1993).

[193] No. 1:11-CV-2379-TWT, 2012 WL 3042984, at *2 (N.D. Ga. July 25, 2012).

[194] *See, e.g., R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, No. 93civ8571, 1997 WL 27059, at **8, 11 n.8 (S.D.N.Y. Jan. 23, 1997) ("The allegation that the plaintiffs were part of an associated-in-fact enterprise to defraud themselves is a transparent conclusory allegation that the Court is not bound to accept even on a motion to dismiss.").

held that a defendant who does not participate in the operation or management of the enterprise has no liability for conducting the enterprise's affairs in violation of § 1962(c).[195]  By alleging that Glock Sr. "directed and managed all aspects of the racketeering scheme and conspiracy alleged herein,"[196] made all significant decisions,[197] and "ruled the 'Glock Group' as an absolute Monarch,"[198] Ms. Glock has foreclosed any claim that any of the other defendants operated or managed the enterprise.  More specifically, Ms. Glock alleges that Glock Sr.'s control over the Parent Company, Glock, Inc., Glock America, Glock Hong Kong, and Consultinvest was so complete that those entities had "no … separate mind, will, or corporate existence of their own."[199]  Indeed, the SAC alleges that these entities were so completely controlled by Glock Sr. they did not even operate or manage

---

[195] 507 U.S. 170, 185 (1993) ("liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs.").

[196] SAC ¶ 39; *see also id.* ¶ 281 (Glock Sr. alone directed the fraudulent scheme).

[197] *See, e.g., id.* ¶ 1621("Indeed, Glock Sr. reserved all significant decisions for himself …."); *id.* ¶ 1582 ("Glock Sr. has never permitted  Glock Ges.m.b.H., Glock Inc., Consultinvest, Glock Hong Kong, or Glock America to have any independent objectives or management."); *see also id.* ¶ 161 (Glock Sr.'s goal "was to ensure that all of the members of the Glock Group and their assets would be under his *sole* control ….").

[198] *Id.* ¶ 13.

[199] *Id.* ¶¶ 1572, 1621 and Prayer for Relief ¶ 1; *see also id.* ¶ 311 (Glock Hong Kong "was directly controlled solely by Glock Sr."); *id.* ¶ 279  (Glock Sr. had ultimate and ownership control of the "billing companies," which according to ¶ 175 included Base Technical, Minami and Taziria).

themselves, much less operate or manage the enterprise.  But if Glock Sr. had such *complete* control over *everything*, there is no room for any other defendant to have operated or managed the enterprise under *Reves*.[200]

The SAC responds to this defect (raised in defendants' initial Motion to Dismiss) with allegations that each defendant committed at least two predicate acts.  For instance, the SAC says that "Defendant Glock, Inc. (**as Glock Sr.'s alter ego**) committed numerous predicate acts."[201]  The SAC repeats that same alter ego formulation for the Parent Company, ████████████████████████████████ ████████████.[202]  But by alleging that these defendants participated in the racketeering only as Glock Sr.'s alter ego, the SAC confirms that none of these defendants operated or managed the alleged enterprise separate and apart from Glock Sr.[203]  And because the SAC has doubled down on the claim that all the

---

[200] *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-cv-993, 2011 WL 2118072, at *12 (S.D. Ohio May 27, 2011) (allegation that individual and entities were "under the exclusive control of" their defendants and acted at their "behest" precluded them from operating and managing enterprise as required by *Reves*).
[201] SAC ¶ 1709 (emphasis added).
[202] *Id.* ¶ 1708 (Parent Company); *id.* ¶ 1710 (████████████); *id.* ¶ 1711 (████ ████████████); *id.* ¶ 1712 (████████████.
[203] *See Burchett*, 2012 WL 3042984, at *2 (N.D. Ga. July 25, 2012) (plaintiff's alter ego allegations defeated allegation that members of enterprise were separate and distinct).

1469372.1

defendants merely followed Glock Sr.'s word as law,[204] the SAC precludes any §

1962(c) liability for any defendant other than Glock Sr.

### C. The SAC Does Not Allege a Pattern of Racketeering Against Glock Sr. or Any of the "Glock Group" Defendants.

The SAC also fails to allege that Glock, Inc. or the Parent Company

committed a pattern of racketeering activity in violation of § 1962(c).  As noted

above, the SAC's premise—and repeated allegation—is that Glock Sr. and others

stole from Glock, Inc. and the Parent Company.[205]  The defendants' initial Motion

to Dismiss, therefore, argued that Ms. Glock's prior pleadings did not allege that

Glock, Inc. and the Parent Company stole from themselves.  In response, the SAC

adds allegations that attempt to plead just that.

For instance, SAC Paragraph 1709 alleges that Glock, Inc. (as Glock Sr.'s

alter ego) "participat[ed] in" improper transfers of money from itself to some other

recipient.[206]  It may be true enough to say that the victim of a theft participates in

---

[204] *See* SAC ¶ 1580 ("Regardless of any corporate formalities, his word is treated as law.").

[205] *See, e.g., id.* ¶ 226 (alleging that Glock Sr. ordered fraudulent transfer of Glock, Inc. shares); *id.* ¶¶ 239–40, 257 (alleging that Glock Sr., Base Technical and Unipatent diverted profits from Glock, Inc. and the Parent Company); *id.* ¶¶ 278–366 (alleging that other defendants siphoned money away from Glock, Inc. and the Parent Company); *id.* ¶¶ 379–93 (alleging that Consultinvest and others siphoned money away from Glock, Inc.); *see also id.* ¶¶ 1694–1727 (Count II); *id.* ¶¶ 1734–52 (Count III); *id.* ¶¶ 1760–82 (Count IV).

[206] *Id.* ¶ 1709.

the transfer of the stolen property, but that surely does not mean the victim could be charged with committing the crime.  Given the facts Ms. Glock has alleged—and her entire theory of the case—the SAC cannot properly plead that Glock, Inc. or the Parent Company committed racketeering activity by stealing from themselves.

And no matter what allegations Ms. Glock chooses to make, the law precludes any attempt to claim that any defendant stole from itself.  For example, *United States v. Burbank*, holds that 18 U.S.C. § 2314 did not authorize the government to charge a defendant with stealing from himself because "[t]he very essence of any theft offense is the wrongful appropriation of the property of another."[207]  The Court thus reversed a criminal conviction where the evidence showed that the alleged thefts from a victim corporation had been approved by the corporation's shareholders.  The law similarly precludes the notion that a person (whether natural or artificial) could defraud himself or itself.[208]

---

[207] 848 F.2d 453, 455 (4th Cir. 1988); *see also United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978) (§ 2314 requires showing that the defendant took property from "one having the attributes of an owner"); *United States v. Adler*, 186 F.3d 574, 576 (4th Cir. 1999) ("[T]he *sine qua non* of a conviction under the federal wire fraud statute is the deprivation of ***another's*** money or property…." (emphasis added)); *United States v. Brandon*, 651 F. Supp. 323 (W.D. Va. 1987) (dismissing charges that defendant had stolen from company of which he was the sole shareholder).

[208] *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 428 (7th Cir. 2007).

These principles eviscerate Ms. Glock's allegations against Glock Sr. and all the "Glock Group" defendants because the SAC repeatedly alleges that they are all one person.[209]   Accepting those allegations as true, the SAC's allegations of thefts from and transfers between the various "Glock Group" companies do not state a claim for theft or any other criminal violation that depends on the appropriation of property or the movement of stolen property.   Thus, for example, Section IX of the SAC, which contains 264 paragraphs of money laundering allegations,[210] fails because allegedly laundered money was not the product of specified unlawful activity as 18 U.S.C. §§ 1956 and 1957 require.

Georgia law similarly precludes Ms. Glock's attempt to allege racketeering on the theory that any defendant stole from itself.   Theft by taking under Georgia law requires the deprivation of the "[p]roperty of another," which the Georgia Code defines as property in which "any person other than the accused has an interest *but does not include property belonging to the spouse of an accused or to them jointly*."[211]   *Calloway v. State* further establishes that one spouse cannot steal

---

[209] *See, e.g.,* SAC ¶¶ 1572–77.

[210] *Id.* ¶¶ 1222–1485.

[211] O.C.G.A. § 16-8-1(3) (emphasis added); *see also Moyers v. State*, 186 Ga. 446, 449, 197 S.E. 846, 848 (1938) ("[o]ne cannot ordinarily be guilty of stealing his own property.").

property from another under the Georgia theft statute.[212]  Under Georgia law,

therefore, Glock Sr. could not steal property from Ms. Glock or their supposed

"business partnership" during their marriage.  To the extent the SAC also alleges

that the Parent Company, Glock, Inc., Glock Hong Kong, Glock America,

Consultinvest and any other entity is no different from Glock Sr., none of those

corporate entities can be guilty of stealing from Ms. Glock either.  Once again, this

basic point of criminal law eviscerates wide swaths of Ms. Glock's case (and

hundreds of the SAC's allegations) by negating her foundational allegations of

theft.

Georgia law also precludes Ms. Glock's racketeering claims against

Consultinvest for allegedly overcharging Glock, Inc. for rent.[213]  In *Gordon v. State*

the Georgia Supreme Court unanimously held that a defendant cannot be guilty of

theft merely for overcharging for goods or services.[214]  Without that foundation,

---

[212] 176 Ga. App. 674, 677, 337 S.E.2d 397, 400 (1985) ("if defendant and the victim were married at the time of the entry, defendant could not have had the 'intent to commit a theft' alleged in the burglary count"); *Barron v. State,* 219 Ga. App. 481, 465 S.E.2d 529 (1995) (theft statute excludes spousal property).  Despite a suggestion that the General Assembly revisit this point in *State v. Kennedy*, 266 Ga. 195, 195–96 nn.1–2, 467 S.E.2d 493, 493–94 (1996), the theft statute continues to exclude spousal property.

[213] *See* SAC ¶¶ 483–87, 491–94, 512–16 (alleging that Consultinvest charged an inflated rate on expanded office space); *id*. ¶¶ 1517–24 (alleging theft and receipt of stolen property in connection with Consultinvest rent payments).

[214] 257 Ga. 335, 335-36, 359 S.E.2d 634, 635 (1987).

Ms. Glock has not properly alleged the other predicate acts of receiving stolen property, money laundering, or wire and mail fraud arising from Consultinvest's alleged transfer of rent payments to other defendants.  Thus, the Court should dismiss any claims that rely on (1) Ms. Glock's allegations about Glock, Inc.'s rent payments; (2) any claim that a defendant stole from itself; or (3) any claim that Glock Sr. stole from Ms. Glock before their marriage ended in 2011.

### D.     The Court Should Dismiss the RICO Conspiracy Claims.

The Court should also dismiss Count III and IV, which allege that all defendants conspired to violate the federal and Georgia RICO statutes.  In *United States v. Browne*, the Eleventh Circuit held that the "touchstone of liability is an agreement to participate in a RICO conspiracy," which requires an allegation and proof that each defendant agreed on the overall objective of the conspiracy.[215] Similarly, Georgia law requires that a charge of RICO conspiracy be supported with an alleged "common design" between the conspirators.[216]  In *Chi v. MasterCard International, Inc*., this Court held, "Where an underlying RICO claim fails, and the plaintiff does not allege additional facts to support a RICO

---

[215] 505 F.3d 1229, 1264 (11th Cir. 2007) (outlining two methods for showing the required agreement); *see also Jackson*, 372 F.3d at 1269 (the failure to allege that a defendant "agreed to violate any of the substantive provisions of the RICO laws," is a "fatal pleading defect.").

[216] *Pasha v. State*, 273 Ga. App. 788, 790, 616 S.E.2d 135, 138 (2005).

conspiracy claim, the conspiracy claim must also fail."[217] *Lawrie v. Ginn Development Co.* LLC similarly holds that a lack of specificity on a substantive RICO claim "similarly condemns Plaintiffs' conspiracy claims, which are ultimately premised on the same fraudulent conduct."[218]

Ms. Glock does not allege any additional facts that would save her conspiracy claims. The SAC makes no attempt to state when, where, or how the defendants supposedly reached an agreement to violate RICO.[219] Moreover, Ms. Glock's conspiracy allegations fail for many of the same reasons as her substantive allegations. For instance, Ms. Glock cannot plausibly allege a conspiracy that includes Glock, Inc. and the Parent Company because they are alleged to be direct victims of that conspiracy. It similarly makes no sense to say that many of the defendants entered into a conspiracy to violate RICO when the SAC alleges that they have no will of their own. And the SAC further contradicts Ms. Glock's conspiracy claim by insisting that Glock Sr. is the alter ego of the Parent Company, Glock, Inc., Consultinvest, Glock America, and Glock Hong Kong, such that none

---

[217] No. 1:14-CV-614-TWT, 2014 WL 5019917, at *3 (N.D. Ga. Oct. 7, 2014). *See J&D Int'l Trading (H.K.) Ltd. v. MTD Equip., LLC*, No. 1:13-CV-2526-RWS, 2014 WL 1683375, at **12–13 (N.D. Ga. Apr. 28, 2014) (same); *Fuller v. Home Depot Servs., LLC*, 512 F. Supp. 2d 1289, 1295 (N.D. Ga. 2007) (same).

[218] ___ F. App'x ___, No. 14-14758, 2016 WL 4036381, at *9 (11th Cir. July 28, 2016).

[219] *Windsor v. Huber*, No. 1:11-CV-2326-TWT, 2011 WL 4436491, at *2 (N.D. Ga. Sept. 21, 2011).

of those entities have a separate legal existence from one another or Glock Sr.[220]  If

Glock Sr. and these entities are all one, they cannot conspire with one another.[221]

## VI.    The Court Should Dismiss Ms. Glock's Veil Piercing Claim.

The Court also should dismiss Count I because "the alter-ego and veil

piercing doctrines are only remedies in Georgia and not independent causes of

action."[222] The same is true under federal law.  In *Gordon v. Lee*, the district court

explained that "[p]iercing the corporate veil is a means of imposing liability on an

underlying cause of action, but it is not an independent cause of action."[223]

---

[220] SAC ¶¶ 1572, 1598, 1690 and Prayer for Relief ¶ 1.

[221] *See, e.g.*, *Riquelme Valdes v. Leisure Res. Group., Inc.*, 810 F.2d 1345, 1356 (5th Cir. 1987) (holding that "if two entities are so intertwined as to be alter egos, they would not have sufficient separate existence to be liable for conspiracy…."); *U.S. ex rel. Reagon v. E. Tex. Med. Ctr. Reg. Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003) (dismissing False Claims Act conspiracy claim because application of alter ego theory necessarily meant that defendants were one entity which could not conspire with itself).  *Cf. Burchett*, 2012 WL 3042984, at *2 (veil piercing claims defeated allegation that defendant and corporation were sufficiently distinct to form an enterprise).

[222] *In re Geer*, 522 B.R. 365, 393 (N.D. Ga. Bankr. 2014); *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1326 n.21 (N.D. Ga. 2013) (ruling that plaintiff's "'piercing the veil claim' is not an independent legal claim, but rather a method by which [the plaintiff] can hold the Individual Defendants liable for the actions of" their business venture).

[223] No. 1:05-CV-2162-JFK, 2007 WL 1450403, at *6 n.1 (N.D. Ga. May 14, 2007); *see also Peacock v. Thomas*, 516 U.S. 349, 353–54 (1996) (holding that piercing the corporate veil was not a separate cause of action under ERISA); *Sheppard v. Jodice*, No. 1:06-CV-2823-RLV, 2007 WL 2225804, at *1 (N.D. Ga. July 30, 2007) ("The alter ego doctrine, like respondeat superior or agency, is a

In response to the defendants' initial Motion to Dismiss, Ms. Glock added 79 paragraphs to Count I.  But none of those allegations identifies any statute or legal theory that would authorize the relief she seeks.  In particular, the SAC fails to identify any authority to suggest the Court can (or should) pierce the veils of foreign corporations, incorporated under foreign law.  Moreover, in *Fish & Neave v. Perovetz*, a New York district court held that "whether to pierce the corporate veil of a foreign corporation is determined by the law of the incorporating state."[224] Because the SAC does not invoke any foreign law to support Ms. Glock's claim, the Court should dismiss any veil piercing claim against the Parent Company, Glock Hong Kong, Glock America, and any other foreign entity.[225]

The SAC similarly identifies no authority to support any claim to pierce the veil of Glock, Inc. or Consultinvest, which are the only two U.S. defendants.  To the extent Ms. Glock relies on any authority beyond the remedies available under the RICO statutes, the Georgia Supreme Court's decision in *Johnson v. Lipton*

---

means by which a person may be held liable for the actions of another," rather than providing "a cause of action in and of itself for the award of damages.").

[224] No. 91 CIV. 7047 (CSH), 1993 WL 7572, at *4 (S.D.N.Y. Jan. 7, 1993).

[225] Although Ms. Glock has dropped the Austrian *Privatstiftungen* as defendants, the SAC continues to complain that those private foundations are no different than Glock Sr.  *See* SAC ¶ 1581.  And although SAC ¶ 1690 limits Ms. Glock's veil piercing demands to the Parent Company, Glock, Inc., Consultinvest, Glock Hong Kong and Glock America, the SAC repeatedly complains that other foreign persons and entities failed to distinguish between these companies and Glock Sr.

holds that a plaintiff cannot seek to pierce the corporate veil absent an allegation and subsequent proof that the corporate defendant is insolvent "in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim."[226]  Rather than allege any such facts, the SAC alleges that "Glock, Inc. is the 'economic engine' and 'cash cow' of the Glock Group," with estimated revenues of $400 million a year.[227]  Similarly, the SAC alleges ███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████."[228]  Because the SAC does not allege that these defendants—or any other corporate defendant—is insolvent, Ms. Glock cannot pursue veil piercing as a remedy.

## VII.  Ms. Glock Cannot Use a Shotgun Pleading To Mask Her Inability to Plead Viable Claims.

Finally, the Court should dismiss the SAC—without any further leave to amend—because she has persistently ignored the governing pleading standards.

### A.    Ms. Glock Has Ignored the Court's Warning About Shotgun Pleadings.

Nearly a year ago, this Court warned Ms. Glock that her 354-page initial

---

[226] 254 Ga. 326, 327-28, 328 S.E.2d 533, 535–36 (1985).
[227] SAC ¶¶ 43, 119.
[228] *Id.* ¶¶ 54, 381.

Complaint was a "typical shotgun pleading."[229]  Ms. Glock responded by filing a

373-page First Amended Complaint.  Now, in response to the defendants' initial

Motion to Dismiss, Ms. Glock has filed a 546-page SAC, fully 192 pages longer

than her initial pleading.  At the risk of belaboring the obvious, the SAC does not

provide the "short and plain statement of the claim" that Rule 8(a) requires.  Nor

does the SAC satisfy the heightened level of specificity that Rule 9(b) requires of a

civil RICO plaintiff alleging fraud. [230]

In *Miccosukee Tribe of Indians v. Cypress*, the Eleventh Circuit affirmed the

dismissal of a comparatively slender 300-page RICO complaint, explaining that a

plaintiff cannot "create the impression of specificity through page-number 'shock

and awe.'"[231]  The result was the same in *Lawrie v. Ginn Development Co*., where

the Court very recently affirmed the dismissal of a 142-page RICO complaint

because "[i]n pleading, as in many aspects of life, quality matters more than

---

[229] *See* Jun. 2015 Order at 8, quoting *PVC Windows v. Babbitbay Beach Const., N.V.*, 598 F.3d 802,806 n.4 (11th Cir. 2010).

[230] *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007) (reciting the requirements for pleading fraud with particularity); *see also Anderson v. Dist. Bd. Of Trustees of Cent. Fla. Cmty. C.,* 77 F.3d 364 (11th Cir. 1996) (failure to "present each claim for relief in a separate count, as required by Rule 10(b)," constitutes shotgun pleading).

[231] 814 F.3d 1202, 1212 (11th Cir. 2015).

1469372.1

quantity."[232]   The Court should similarly dismiss this case because Ms. Glock's

three attempts have failed to yield a claim of any quality.

In *Weiland v. Palm Beach County Sheriff's Office,* the Eleventh Circuit

surveyed over sixty published opinions on "shotgun pleading," and identified four

categories of improper pleading.[233]   The SAC appears to cover all four of those

bases.   *First*, the SAC repeats, realleges, cross-references and incorporates

hundreds of paragraphs.   By way of example, Paragraphs 415, 433, 480, 552, 605,

614, 702, 782, 900, 935, 1007, 1155, 1205, 1222, 1486, 1525, 1552, 1691, 1728,

1753, and 1805 each incorporate Sections I through V of the SAC in their entirety.

Sections I through V comprise 409 numbered paragraphs, filling 124 pages.[234]

*Second*, each of Ms. Glock's complaints has been full of "conclusory, vague,

and immaterial facts,"[235] untethered to any particular cause of action.   Despite the

Court's earlier warning, the SAC adds even more such facts, including, for

---

[232] 2016 WL 4036381, at *1.

[233] 792 F.3d 1313, 1323 (11th Cir. 2015).

[234] Many of those cross-incorporations go even further than the 124 pages
encompassed by Sections I through V.  For example, although Count III
incorporates Sections I–V and Section XII, *see* ¶ 1728, it later also incorporates
Section VI (¶ 1734), Section VII (¶ 1736), Section VIII (¶ 1738), and Section IX
(¶ 1739).  Similarly, in Count IV incorporates Sections I–V and X–XII (¶ 1753),
but then goes on to incorporate Section VI (¶ 1760), Section VII (¶ 1761), Section
VIII (¶ 1762), Section IX (¶ 1763), Sections X–XI (already incorporated in ¶ 1753)
(¶ 1765).  Likewise, Count V incorporates Sections I–V and XII in ¶ 1805 and then
incorporates VI–XI in ¶ 1807 n. 98.  Those cross-incorporations total 411 pages.

[235] *Weiland,* 792 F.3d at 1322–23.

example, ███████████████████████████████████████████

███████████████████████████.[236]  Combining irrelevance with

repetition, Ms. Glock incorporates these allegations ████████████████

into every Count of the SAC.[237]

*Third*, the SAC prevents the parties or the Court from sorting Ms. Glock's

claims into discrete counts in violation of Rule 10(b).  Although the SAC has

sections entitled "Count I," "Count II," etc., its cross-incorporations of hundreds of

preceding paragraphs into each "Count," and the repeated cross-incorporation of

the same mass of allegations over and over into a single "Count," render those

designations meaningless.

*Fourth*, Ms. Glock responded to the Defendants' initial Motion to Dismiss

by adding scores of allegations purporting to identify each defendant's specific

misconduct.  A review of those new paragraphs, however, reveals that the

misconduct they allege frequently has nothing to do with the allegations that

precede them.  For example, in Count II Ms. Glock ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

---

[236] SAC ¶ 123 n. 8.

[237] *See id.* ¶¶ 1552 (incorporating into Count I); *id.* ¶ 1691 (incorporating into Count II); *id.* ¶ 1728 (incorporating into Count III); *id.* ¶ 1753 (incorporating into Count IV); *id.* ¶ 1805 (incorporating into Count V).

██.[238]   Rarely—if ever—is there a specific allegation that Glock Sr. personally did or said anything with the particularity required by Rule 9(b).  In the end, the SAC's effort to identify individual specific misconduct is a sham.[239]

### B. The Court Should Dismiss the SAC Because it is Riddled With Allegations Made "On Information and Belief."

The Eleventh Circuit has held that under "Rules 8 and 9(b), some indicia of reliability must be given in the complaint to support the allegation of fraud …. Therefore, 'pleadings generally cannot be based on information and belief.'"[240] And while the RICO statute requires some complexity, "[t]he necessity for complexity, however, does not give litigants license to plead by means of obfuscation."[241]  The SAC violates these basic pleading commandments because it is marbled with irrelevant allegations, pointless repetitions, and rampant speculation.  And although Ms. Glock's latest pleading comes after her U.S.

---

[238] *Id.* ¶ 1707.

[239] *See Lawrie*, 2016 WL 4036381, at *1 (holding that despite complaint's "impressive magnitude" the allegations did not comply with Rule 9(b)).

[240] *Hill v. Morehouse Med. Assocs., Inc.,* No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1310 (11th Cir. 2002) *cert denied*, 537 U.S. 1105 (2003)).

[241] *Jennings v. Emry*, 910 F.2d 1434, 1435–36 (7th Cir. 1990). *See also Lawrie*, 2016 WL 4036381 at ** 2, 9 (describing a 142-page complaint as "an unwieldy, prolix 'shotgun pleading'" and affirming dismissal with prejudice); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity.  Indeed, such a garrulous style is not an uncommon mask for an absence of detail.").

counsel received access to reams of documents produced for the Austrian litigation, the SAC continues to depend on hundreds of allegations based on information and belief, including two[242] and even three layers[243] of information and belief allegations in a simple paragraph, as well as strings of three[244] and even as many as eight paragraphs in a row[245] based on information and belief.[246]

In words the Fifth Circuit could have written for this case, the SAC combines the "somewhat fervid desire to cover all even remotely conceivable theories while retaining a level of generality and indefiniteness that would mask any legal deficiencies and preclude effective challenge."[247]  That approach is impermissible because it "only leads to essentially nothing being alleged, for the needle in the haystack might as well not be there …."[248]  This Court need not look for needles in haystacks, and the parties should not be required to defend RICO claims just because the plaintiff says there is a haystack and she is informed and

---

[242] *See, e.g.*, SAC ¶¶ 490, 1151, 1214, 1571, 1652.

[243] *Id.* ¶ 1391.

[244] *See, e.g.*, *id.* ¶¶ 937–39, 1042–44, 1073–75, 1079–81.

[245] *Id.* ¶¶ 592–99.

[246] *See id.* ¶¶ 1079–81 (5 information and belief allegations in 3 paragraphs).

[247] *Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1220 (5th Cir. 1989).

[248] *Id.*

believes that it contains a needle.[249]

Dismissal is appropriate when allegations made on information and belief permeate a complaint.[250]  The SAC's speculative allegations concern the very facts that are supposedly central to Ms. Glock's claims.  For example, while Ms. Glock claims that the "biggest part" of the alleged scheme is that shares of Glock, Inc. were stolen when they were transferred to Unipatent, the SAC's allegations that Unipatent never paid for those shares are made on information and belief.[251]

Ms. Glock's similarly contends that she has been injured because money was diverted from Glock, Inc., thereby reducing the profitability of the Parent Company and the value of her interest in the Parent Company.[252]  Yet, the SAC's allegations repeatedly reveal that she is merely speculating that the alleged transactions involved money from Glock, Inc.  For example, Ms. Glock spends hundreds of paragraphs on payments from Glock, Inc. to Glock Hong Kong and Glock America, but time and again her allegations that these payments did not

---

[249] *See, e.g., Lawrie*, 2016 WL 4036381, at **8–9 (rejecting an "unwieldy, everything but-the-kitchen-sink approach to pleading" a RICO claim and holding that "Rule 9(b) does not permit us to assemble [the complaint's] impressive collection of disparate and disjointed facts into a collage of fraud").

[250] *Great Fla. Bank v. Countrywide Home Loans, Inc.*, No. 10-22124-CIV, 2011 WL 382588, at *5 (S.D. Fla. Feb. 3, 2011) (dismissing complaint with more than 30 information and belief allegations).

[251] SAC ¶¶ 231, 420.

[252] *Id.* ¶ 11.

1469372.1

represent payment for the shipment of any products rely on mere information and belief.[253]   The SAC offers no additional factual support, nor does it ever account for the "obvious alternative explanation" that the funds may have come from another source.[254]

The SAC then proceeds to stack one layer of speculation upon another. After asserting on information and belief that Glock Hong Kong did not ship products to Glock, Inc., Ms. Glock speculates on information and belief that any money paid by Glock Hong Kong to the Parent Company came from Glock, Inc.[255] A third layer of speculation asserts on information and belief that transactions between Glock Hong Kong the Parent Company did not involve payment for actual goods or services provided by Parent Company to Glock Hong Kong, even though the Parent Company was the sole manufacturer of Glock pistols during the relevant time period.[256]   In a fourth layer of speculation, Ms. Glock asserts on

---

[253] *Id.* ¶¶ 440–41, 445, 453–54, 462–63, 468–69 (Glock Hong Kong); *id.* ¶¶ 1017, 1024, 1031, 1038, 1044, 1051, 1057, 1063, 1069, 1075, 1081, 1090, 1099, 1107, 1116, 1125, 1134, 1140, 1146, 1153, 1355–56, 1358, 1370, and 1382 (Glock America).

[254] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (in light of "more likely explanations" plaintiff did not allege discrimination).

[255] *See, e.g.*, SAC ¶¶ 714, 768, 773.

[256] *See, e.g., id.* ¶¶ 299–300, 725, 737;  *id.* ¶¶ 1028, 1036, 1048, 1055, 1061, 1067, 1073, 1079 (alleging similar speculation about the purpose of payments between Glock America and Taziria).

information and belief that payments from Glock Hong Kong to Minami must have involved money Glock Hong Kong received from Glock, Inc.[257]  A fifth layer of speculation asserts on information and belief that all of the money transferred from Glock Hong Kong to Minami over ten years was wired to Reofin.[258]

The SAC proceeds to a sixth layer of speculation that this money from Glock, Inc. was then used to fund loans from Reofin to Consultinvest.  And in a seventh layer, the SAC speculates that those loans ultimately financed the purchase of real property, improvements thereto and machinery used by Glock, Inc.[259]  But Ms. Glock identifies only a single, specific transaction between Consultinvest and Reofin that is alleged to have taken place in 1992, and the allegation that these funds originated at and had been stolen from Glock, Inc. is made upon information and belief. [260]

---

[257] *Id.* ¶¶ 790, 795, 799, 803, 807, 811, 819, 827, 835, 844, 849, 859, 868, 873, 882, 889, 897; *see also id.* ¶¶ 1023–24, 1030–31, 1037–38, 1043–44, 1050–51, 1056–57, 1062–63, 1068–69, 1074–75, 1080–81, 1089–90, 1098–99, 1106–07, 1115–16, 1124–25, 1133–34, 1139–40, 1145–46, 1152–53 (alleged transfers from Glock America to Taziria and then on to Reofin).

[258] *Id.* ¶ 938; *see also id.* ¶¶ 1050–51, 1056–57, 1062–63, 1068–69, 1074–75, 1080–81, 1139–40, 1145–46 (similar speculation for Glock America).

[259] *See, e.g.*, *id.* ¶ 397 (alleging upon information and belief that funds transferred from Reofin to Consultinvest originated at and were stolen from Glock, Inc.); *id.* ¶ 1161 (repeating same allegation).

[260] *Id.* ¶ 1167.

Ms. Glock's speculative claims about the nature of these alleged transactions are accompanied by equally speculative allegations about who was involved in them.  For example, the SAC alleges—upon information and belief—that Glock Sr., Ewert, Quendler, Walter, Willam, the Parent Company, Glock, Inc. and Glock Hong Kong knew about or directed payments from Glock, Inc. to Glock Hong Kong.[261]  But elsewhere the SAC alleges—also upon information and belief—that a different group was aware of and directed these transfers.[262]

After three complaints, spanning more than a thousand pages, Ms. Glock's persistent violation of the pleading rules is no accident.  Each complaint has been an obvious example of shotgun pleading, and the SAC is the worst of the three.  Rather than improving or streamlining her allegations, Ms. Glock has used every amendment to obscure her inability to state a claim and to increase the burden this litigation inflicts on the parties and the Court.  The Court can dismiss the SAC with

---

[261] *Id.* ¶ 435.

[262] *See id.* ¶ 937 (omitting Quendler and Walter while adding Westwater, Minami, and Reofin).  *Compare id.* ¶ 1009 (speculating that Glock Sr., Ewert, and Willam "were aware of and directed the[] transfers" from Glock America to Taziria Holding A.V.V.) with ¶¶ 1012–14, 1018–21, 1023–24, 1026–31, 1033–38, 1040–44, 1046–51, 1053–57, 1059–63, 1065–69, 1071–75, 1077–81, 1083–85, 1089–92 (speculating that Glock Sr. or the Parent Company directed the transfer of funds from Glock America to Taziria).

prejudice on that basis alone.[263]

## CONCLUSION

Ms. Glock is an Austrian citizen, whose claims concern her 1% ownership

of an Austrian Parent Company.  The SAC states no viable claim against any

defendant, and the Court should dismiss this case with prejudice.

Respectfully submitted, this 23rd day of August, 2016.

*/s/Ronan P. Doherty*
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykkeltvedt@bmelaw.com
Amanda Seals Bersinger
Georgia Bar No. 502720
bersinger@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
Tel. (404) 881-4100
Fax (404) 881-4111

---

[263] *See Byrne,* 261 F.3d at 1133 (if a plaintiff repleads her shotgun complaint with the same deficiencies, the "court should strike [her] pleading or, depending on the circumstances, dismiss [her] case and consider the imposition of monetary sanctions.").

1469372.1

*Counsel for Defendants Gaston Glock Sr., Glock Ges.m.b.H., Glock, Inc., Glock America S.A., Glock (H.K.) Ltd., CON Holding GmbH, Consultinvest, Inc., Stephan Doerler, Fitox A.G., INC Holding GmbH, Joerg-Andreas Lohr, Lohr + Company GmbH Wirtschaftsprüngsgesellschaft, Rochus GmbH, and Karl Walter*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel certifies that the foregoing **BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** was prepared in Times New Roman, 14 point font, in accordance with Local Rule 5.1, and, in accordance with this Court's Order of June 1, 2016 [Doc. 180 ¶ 2], does not exceed 80 pages.

*/s/Ronan P. Doherty*
Ronan P. Doherty
Georgia Bar No. 224885

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
Tel. (404) 881-4100
Fax (404) 881-4111

1469372.1