IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HELGA GLOCK,

    Plaintiff,

      v.

GASTON GLOCK, SR., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:14-CV-3249-TWT

**OPINION AND ORDER**

This is a RICO action. It is before the Court on the Defendants Gaston Glock Sr., Glock Ges.m.b.H., Glock, Inc., Glock America S.A., Glock (H.K.) Ltd., CON Holding GmbH, Joerg-Andreas Lohr, Lohr + Company GmbH Wirtschaftsprüngsgesellschaft, Rochus GmbH, and Karl Walter's Motion to Dismiss [Doc. 187], the Defendant Hubert Willam's Motion to Dismiss [Doc. 191], and the Defendant Peter Manown's Motion to Dismiss [Doc. 192]. For the reasons set forth below, the Defendants' Motions to Dismiss are GRANTED.

# I. Background

In 1963, the Plaintiff Helga Glock and the Defendant Gaston Glock, Sr. ("Glock Sr.") founded Glock KG, an Austrian limited partnership.[1] In the beginning, Glock KG was a small manufacturing business that sold "curtain rods and brass fittings for doors and windows, as well as machine gun belts and knives for the Austrian army."[2] Later, Glock Sr. developed a pistol with the hopes of winning a gun supplier contract with the Austrian army.[3] His pursuits were eventually successful: Glock Sr. patented the Glock 17 semi-automatic pistol and signed a contract with the Austrian army to supply the pistol.[4] In 1983, Glock KG became Glock Ges.m.b.H. (the "Parent Company").[5] While producing pistols for the Austrian army, the Parent Company discovered it could produce more pistols than could be sold in Austria.[6] Thus, in 1985, Glock Sr. turned his attention to the American gun market, creating a subsidiary – Glock, Inc. – in Smyrna, Georgia.[7] Glock, Inc., which was a wholly-owned subsidiary

---

[1]     Second Am. Compl. ¶¶ 123-24.

[2]     Id. ¶ 124.

[3]     Id. ¶¶ 128-131.

[4]     Id. ¶¶ 132-134.

[5]     Id. ¶ 135.

[6]     Id. ¶ 139.

[7]     Id. ¶¶ 140-42.

of the Parent Company, distributed pistols that were manufactured by the Parent Company in Austria.[8] Glock, Inc. quickly became very successful in the U.S.[9] As the Plaintiff explains, "[i]ts high degree of success in penetrating the world's largest gun market, combined with an estimated profit margin per pistol of 68%, made Glock, Inc. a cash cow and extraordinary wealth-generating machine."[10]

Originally, the Plaintiff owned 15% of the Parent Company.[11] But, in 1999, the Plaintiff began transferring her Parent Company shares into a private Austrian foundation called the Glock *Privatstiftung* (the "Glock Foundation").[12] After transferring the vast majority of her shares into the Glock Foundation, the Plaintiff was left with only a 1% interest in the Parent Company.[13] While the Plaintiff and Glock Sr. were joint founders of the Glock Foundation, "Glock Sr. retained, for himself only, the ability to . . . change the terms of the deed that created the foundation."[14] As a result, after the Plaintiff and Glock Sr. divorced in 2011, "Glock

---

[8]   Id. ¶¶ 142, 153.

[9]   Id. ¶ 144.

[10]   Id. ¶ 145.

[11]   Id. ¶ 218.

[12]   Id. ¶¶ 23, 218.

[13]   Id. ¶ 219.

[14]   Id. ¶ 23.

Sr. unilaterally changed the deed for the Glock Foundation so as to remove Ms. Glock and their children (Brigitte, Gaston Jr., and Robert) as beneficiaries of the foundations."[15]

This action arises out of certain business transactions involving the Parent Company and Glock, Inc. Specifically, the Plaintiff contends that the Defendants orchestrated a series of fraudulent transactions involving the Parent Company and Glock, Inc., which ultimately depressed the value of her 1% ownership interest in the Parent Company.[16] First, the Plaintiff alleges that Glock Sr., with the help of his co-Defendants, "hatched the theft of 50% of the ownership of Glock, Inc.," which was the Parent Company's most valuable asset.[17] She alleges that, shortly after Glock, Inc. was incorporated, Glock Sr. ordered that 50% of Glock, Inc. shares be transferred to a company called Unipatent, which was owned by a company called Reofin.[18] "Glock Sr. owned 100% of the shares of Reofin. Accordingly, Glock Sr. controlled and indirectly owned 100% of Unipatent."[19] Second, the Plaintiff alleges that the

---

[15]   Id. ¶ 24.

[16]   Id. ¶¶ 221, 230.

[17]   Id. ¶ 222.

[18]   Id. ¶ 226.

[19]   Id. ¶ 228.

Defendants siphoned money from the Parent Company and Glock, Inc. to Glock Sr. through licensing and royalty payments. For instance, she contends that Glock Sr., with assistance, charged Glock, Inc. for using the Glock logo.[20] But, according to the Plaintiff, these licensing and royalty payments should have been paid directly to the Parent Company.[21] Third, the Plaintiff alleges that the Defendants set up a series of shell corporations that allowed them to appropriate funds and assets of Glock, Inc. for themselves. Specifically, she alleges that the Defendants "set up a multistage, fraudulent billing program that artificially reduced the stated profits of Glock, Inc., and diverted these monies to Glock Sr."[22] Fourth, the Plaintiff asserts that, through fraudulent loans, the Defendants used Consultinvest to siphon funds from Glock, Inc.[23] Fifth, the Defendants allegedly used monies from Glock, Inc. to set up sham real-estate holding companies.[24]

Based on these allegedly fraudulent transactions, the Plaintiff brought suit against multiple parties, including Glock Sr., the Parent Company, Glock, Inc., and

---

[20]   Id. ¶¶ 239-245, 249.

[21]   Id.

[22]   Id. ¶ 278.

[23]   Id. ¶ 367.

[24]   Id. ¶¶ 402-409.

the Glock Foundation. She asserts that the Defendants executed a scheme in order to misappropriate assets from the Parent Company and Glock, Inc., and that this amounted to a violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). To show that she personally suffered an injury, the Plaintiff states "Glock Sr. purposefully and improperly reduced the value of assets held by [the Parent Company], the value of [the Parent Company] and Ms. Glock's ownership interests in [the Parent Company] and Glock, Inc. (the cash cow of the "Glock Group")."[25] According to the Plaintiff, although her divorce from Glock Sr. took place in 2011, and the alleged misappropriation began in the mid-1980's, *she* was the intended victim of the scheme.[26] In addition to her federal RICO claim, the Plaintiff asserts that the Defendants violated the Georgia RICO statute.

Initially, a number of the Defendants filed a Motion to Stay based on certain judicial proceedings in Austria.[27] Since the Plaintiff's divorce from Glock Sr. in 2011, the Plaintiff has filed a number of lawsuits in Austria against Glock Sr. and other parties that are also named Defendants in this action. The Court granted the Defendants' Motion to Stay this action based on the doctrine of international

---

[25]   Id. ¶ 221.

[26]   Id. ¶ 2.

[27]   [Doc. 45].

abstention, but also allowed the Plaintiff to amend her Complaint so to avoid any potential overlapping issues between the legal actions.[28] The Plaintiff amended her Complaint, and so the Court lifted the stay.[29] Later, the Plaintiff amended her Complaint for a second time.[30] The Defendants now move to dismiss.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.[31] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."[32] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.[33] Generally, notice pleading is all that is required for a valid

---

[28]     [Doc. 117].

[29]     [Doc. 159].

[30]     [Doc. 182].

[31]     Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

[32]     Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).

[33]     See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of

complaint.[34] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.[35]

## III. Discussion

### A. Shotgun Pleading

In its initial Order granting the Defendants' Motion to Stay, the Court noted that the Plaintiff's Complaint was a typical example of shotgun pleading.[36] "[F]or each Count in the Complaint, the Plaintiff . . . incorporat[ed] each antecedent allegation."[37] In their Motions to Dismiss, the Defendants again raise the issue of shotgun pleading. Specifically, the Defendants argue that the Second Amended Complaint ("SAC") fails to provide a "short and plain statement" for each claim.[38] In support of their argument, the Defendants cite Weiland v. Palm Beach County Sheriff's Office, in which the

_____

imagination").

[34]    See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).

[35]    See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 550 U.S. at 555).

[36]    [Doc. 117], at 8.

[37]    Id. at 9.

[38]    Glock Sr., et al.'s Mot. to Dismiss, at 67.

Eleventh Circuit identified four categories of shotgun pleadings.[39] The Eleventh

Circuit characterized the four categories as follows:

> The most common type – by a long shot – is a complaint containing multiple counts where each count adopts the allegations of all preceding counts . . . . The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relative rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.[40]

The Defendants state that the SAC appears to fall into all four categories. For

example, they assert that the SAC "repeats, realleges, cross-references and

incorporates hundreds of paragraphs."[41] They point out that numerous paragraphs

incorporate Sections I through V – which comprise 409 numbered paragraphs – in

their entirety.[42] Moreover, the Defendants assert that the SAC is full of immaterial,

vague facts that are "untethered to any particular cause of action."[43] As an example,

---

[39]    792 F.3d 1313 (11th Cir. 2015).

[40]    Id. at 1321-23 (footnotes omitted).

[41]    Glock Sr., et al.'s Mot. to Dismiss, at 68.

[42]    Id.

[43]    Id.

they note that the Plaintiff made allegations regarding whether loans from the Plaintiff's mother that were given to the Plaintiff and Glock Sr. to start Glock KG in 1963 were ever repaid.[44] The Plaintiff then "incorporates these allegations about loans made in the 1960s into every Count of the SAC."[45]

The Court agrees with the Defendants. The SAC is "in no sense the 'short and plain statement of the claim' required by Rule 8 of the Federal Rules of Civil Procedure."[46] It contains 1,810 paragraphs, many of which contain repetitive factual allegations or factual allegations that are irrelevant to the stated claims. This "force[d] the [] [C]ourt [to] sift through the facts presented and decide for [itself] which [a]re material to the particular cause of action asserted."[47] To be sure, in the SAC – unlike in the Plaintiff's first Complaint – the Plaintiff does not "incorporate every antecedent allegation by reference into each subsequent claim."[48] But the Plaintiff does incorporate hundreds of paragraphs into each count, meaning each count is "is replete

---

[44]     Id. at 69.

[45]     Id.

[46]     Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (per curiam).

[47]     Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.9 (11th Cir. 2002) (third and fourth alternations in original).

[48]     Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006).

with factual allegations that could not possibly be material to that specific count."[49] As a result, the Court finds that the Plaintiff's SAC is an impressible shotgun pleading.[50]

## B. Pleading Based on "Information and Belief"

Next, the Defendants contend that the SAC must be dismissed because it fails to comply with Federal Rule of Civil Procedure 9(b). Under Rule 9(b), a complaint must "state[] with particularity . . . the circumstances constituting fraud or mistake."[51] Specifically, the "plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."[52] The Defendants argue that because the SAC is largely based on the Plaintiff's "information and belief," the SAC does not provide the necessary particularity. When Rule 9(b) applies,

---

[49]     Magluta, 256 F.3d at 1284.

[50]     Lampkin-Asam v. Volusia Cty. Sch. Bd., 261 F. App'x 274, 277 (11th Cir. 2008) (per curiam) ("A complaint that fails to articulate claims with sufficient clarity to allow [] defendant[s] to frame a responsive pleading constitutes a 'shotgun pleading.'" (citation omitted)).

[51]     Fed. R. Civ. P. 9(b).

[52]     Hill v. Morehouse Medical Assocs., Inc., No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (quoting United States ex rel. Clausen v. Laboratory Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002)).

"pleadings generally cannot be based on information and belief [.]"[53] "However, Rule 9(b)'s heightened pleading standard is applied less stringently when specific factual information about the details of the fraud are peculiarly within the defendants' knowledge or control."[54] Still, the plaintiff must support his or her pleading with "specific facts supporting a strong inference of fraud."[55] "Bald or otherwise conclusory allegations will not suffice."[56]

The Court finds that the SAC does not satisfy Rule 9(b)'s pleading standard. In the SAC, the Plaintiff alleges facts based on "information and belief" more than 250 times. More importantly, though, the Plaintiff fails on many occasions to provide specific facts to support her allegations based on information and belief. For example, a large part of the Defendants' alleged scheme was the fraudulent sale of shares of Glock, Inc. to Unipatent. The Plaintiff alleges: "The value of the securities in Glock, Inc. exceeded $5,000. Unipatent purportedly paid $75,000 for the securities. On

---

[53]     Clausen, 290 F.3d at 1310 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F. Supp. 1040, 1052 (S.D. Ga. 1990)).

[54]     Great Florida Bank v. Countrywide Home Loans, Inc., No. 10-22124-CIV, 2011 WL 382588, *5 (S.D. Fla. Feb. 3, 2011) (citing U.S. ex rel. Heater v. Holy Cross Hosp., Inc., 510 F. Supp. 2d 1027, 1033 (S.D. Fla. 2007)).

[55]     Stinson, 755 F. Supp. at 1052 (quoting Wexner v. First Manhattan Co., 902 F. 2d 169, 172 (2d Cir. 1990)).

[56]     Id.

information and belief, Unipatent never actually paid this purchase price for the securities. Rather, it is believed that the shares were simply transferred from Glock Ges.m.b.H to Unipatent."[57] The Plaintiff provides no additional facts to support her conclusion that Unipatent did not actually pay for the shares. This is simply a conclusory allegation. Thus, the Court has no basis to infer that the transfer was fraudulent.

The other key part of the Defendants' alleged scheme was the transfer and diversion of money from Glock, Inc. But, once again, the Plaintiff fails on many occasions to support these allegations with specific facts.[58] For example, the Plaintiff alleges that Glock, Inc. made fraudulent payments to Glock America. For one allegedly fraudulent transfer – "The $1,200,000 Transfer to Taziria" – the Plaintiff states:

> At the direction of Glock Sr., on information and belief, Taziria sent a sham invoice to Glock America for "consultancy services" that Taziria allegedly provided to Glock America. . . . On information and belief, the funds . . . originated from funds earned by Glock, Inc. and wired out of its accounts in the United States to Glock America accounts held outside of the United States, in payment on Fraudulent Americas Invoices (and interest earned thereon, which rightfully belonged to Glock, Inc.).[59]

---

[57]     Second Am. Compl. ¶¶ 231, 420.

[58]     See, e.g., id. ¶¶ 440-41, 445, 453-53, 462-63, 468-69.

[59]     Id. ¶¶ 1012, 1017.

Thus, the Plaintiff, building on multiple levels of speculation, alleges Glock Sr. ordered the payment and that the payment was made from Glock, Inc. funds. However, there are no supporting facts to suggest that the money actually came from "funds earned by Glock, Inc."[60] Nor are there any supporting facts to suggest Glock Sr. ordered the payment.[61]   Because these types of conclusory and speculative allegations are woven throughout the SAC, the Court finds that the SAC fails to comply with Rule 9(b).[62] As a result, the Court finds that the SAC should be dismissed. Despite the SAC's insufficiencies, the Court will review the Plaintiff's specific clams to determine whether she stated any plausible claims for relief.[63]

## C. RICO Claims

---

[60]     Id. ¶ 1017.

[61]     See, e.g., id. ¶ 1009 (speculating that Glock Sr., Ewert, and Willam "were aware of and directed the[] transfers" from Glock America); id. ¶¶ 1012-14 (speculating that Glock Sr. ordered the transfer of Glock, Inc. funds).

[62]     See United States ex rel. Clausen v. Laboratory Corp. of Am., 290 F.3d 1301, 1313 (11th Cir. 2002) ("If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion.").

[63]     Phillips v. City of Atlanta, No. 1:15-cv-03616-TWT-RGV, 2016 WL 5429668, at *7 (N.D. Ga. July 29, 2016) ("[S]ince the defendants have also argued that Phillips' first amended complaint fails to state any plausible claims for relief, the Court 'deems it proper to [also] review [defendants'] [m]otion [to dismiss] on the merits[.]'" (quoting Andela v. University of Miami, 692 F. Supp. 2d 1356, 1370 (S. D. Fla. 2010)), report and recommendation adopted, No. 1:15-CV-3616-TWT, 2016 WL 5394116 (N.D. Ga. Sept. 16, 2016).

To state a claim for a violation of the federal RICO Act, "[§] 1964(c) requires civil RICO plaintiffs to allege and prove a domestic injury to their business or property."[64] The Defendants argue that the Plaintiff, as an Austrian citizen, whose claims relate to her ownership of an Austrian company, has not suffered a domestic injury as required by RICO.

In <u>RJR Nabisco Inc. v. European Community</u>, the U.S. Supreme Court considered whether RICO's private right of action has extraterritorial application. In holding that it does not, the Court stated that 18 U.S.C. § 1964(c) "requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow for recovery for foreign injuries."[65] However, the Supreme Court did not define a "domestic" and "foreign" injury.[66] Since the Supreme Court's ruling, several district courts have addressed this issue.[67] For example, in <u>Bascuñan v. Daniel Yarur ELS Amended ComplaintA</u>, the Southern District of New York held that when

---

[64]      <u>Tatung Co., Ltd. v. Shu Tze Hsu</u>, No.: SA CV 13-1743 (DOC) (ANx), 2016 WL 6683201, at *5 (C.D. Cal. Nov. 14, 2016) (citing <u>RJR Nabisco, Inc. v. European Cmty.</u>, 136 S. Ct. 2090, 2111 (2016)).

[65]      <u>RJR Nabisco</u>, 136 S. Ct. at 2111.

[66]      <u>Id.</u>

[67]      <u>See</u> <u>City of Almaty, Kazakhstan v. Ablyazov</u>, 15-CV-5345 (AJN), 2016 WL 7756629, at *7-9 (S.D.N.Y. Dec. 23, 2016) (describing the different approaches to the domestic-injury rule).

presented with an alleged economic injury, the court should focus "upon where the economic impact of the injury was ultimately felt."[68] Essentially, "(1) who became poorer, and (2) where did they become poorer."[69] In Tatung Co., Ltd. v. Shu Tze Hsu, the Central District of California declined to follow Bascuñan, citing concerns that its approach "amounts to immunity for U.S. corporations who, acting entirely in the United States, violate civil RICO at the expense of foreign corporations doing business in this country" and prevents suits by "foreign individual[s] . . . for financial injuries incurred while they are working, traveling, or doing business in this country as the result of an American RICO operation."[70] The plaintiff in Tatung was a foreign corporation that maintained a U.S. "hub" and had allegedly been injured by a conspiracy to prevent it from collecting on an arbitration award issued in California.[71] The court held that the plaintiff suffered a domestic injury because "the 'defendants specifically targeted their conduct at California' with the aim of 'thwarting Tatung's rights in California.'"[72]

---

[68]   No. 15-CV-2009 (GBD), 2016 WL 5475998, at *4 (S.D.N.Y. Sept. 28, 2016).

[69]   Id.

[70]   Tatung, 2016 WL 6683201, at *7.

[71]   Id. at *7.

[72]   Id. (quoting the plaintiff's supplemental opposition brief, at 6).

Here, the Court does not have to choose an approach; the Plaintiff's alleged economic injury does not qualify as a domestic injury under either approach. Under the <u>Bascuñan</u> rule, the Plaintiff's alleged injury is undoubtedly a foreign injury. The RICO injury alleged is the reduced value of the Plaintiff's 1% ownership interest in the Austrian Parent Company. The Plaintiff, as an Austrian citizen and resident, suffered her loss in Austria.[73] For the <u>Tatung</u> approach, the Plaintiff clearly was not "working, traveling, or doing business" in the United States when she was injured.[74] She has not alleged that she holds any assets or maintains any other presence in the United States. She stated in the SAC that she suffered an injury by the theft of Glock, Inc. shares, but that injury was only indirect. Indeed, she admits in the SAC that she never held a direct interest in Glock, Inc.[75] This is unlike the plaintiff in <u>Tatung</u>, a foreign corporation that maintained a U.S. presence and was doing business in the United States when it was injured.[76]

In response, the Plaintiff first contends that this Court should look to antitrust law and borrow a test that is used to determine whether anticompetitive behavior

---

[73]    <u>See Bascuñan</u>, 2016 WL 5475998, at *6.

[74]    <u>Tatung</u>, 2016 WL 6683201, at *7.

[75]    Second Am. Compl. ¶ 1642.

[76]    <u>Tatung</u>, 2016 WL 6683201, at *7.

occurring outside the U.S. falls under the ambit of U.S. antitrust statutes.[77] The "substantial effects" test asks whether the defendant's "conduct is intended to or has produced 'substantial effects' in the United States."[78] The Plaintiff notes that the Foreign Trade Antitrust Improvements Act ("FTAIA") employs this test in its domestic-injury provision. The Court, however, "finds reliance on extraterritoriality jurisprudence from antitrust context to be at odds with the RJR Nabisco Court's express 'reluctance' to determine the territorial scope of Section 1964(c) by reference to its past interpretations of the antitrust statutes."[79] While the RJR Nabisco Court did briefly mention the FTAIA, it did so in the context of explaining why § 1964(c) should not be read as broadly as the Clayton Act.[80] Specifically, the Supreme Court noted that Congress, through the FTAIA, "define[d] precisely the antitrust laws' extraterritorial effect and [] exclude[d] from their reach most conduct that 'causes only foreign injury.'"[81] The Supreme Court then stated that this congressional action

---

[77]    Pl.'s Resp. Br., at 73.

[78]    See Union Comm. Servs. Ltd. v. FCA Int'l Ops. LLC, No. 16-cv-10925, 2016 WL 6650399, at *4 (E.D. Mich. Nov. 10, 2016).

[79]    City of Almaty, Kazakhstan v. Ablyazov, 15-CV-5345 (AJN), 2016 WL 7756629, at *8 n.9 (S.D.N.Y. Dec. 23, 2016) (citing RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2109-2111 (2016)).

[80]    RJR Nabisco, 136 S. Ct. at 2110-2111.

[81]    Id.

"counsel[s] against importing into RICO those Clayton Act principles that are at odds with the Court's current extraterritoriality doctrine."[82] Thus, the Court is not persuaded that borrowing the substantial effects test from the FTAIA is proper.[83]

Next, the Plaintiff asserts that, when determining whether a plaintiff has suffered a domestic injury, the Court should look to where the bulk of the racketeering activity took place.[84] The Plaintiff points to a variety of cases that she claims support the conclusion "that the developing rule is to treat the place where plaintiffs ultimately feel harm as less important than where the racketeering acts take place and cause the harm."[85] The Court disagrees. This interpretation of the domestic injury requirement would violate RJR Nabisco's holding that the RICO statute does not authorize a private right of action for domestic racketeering activity that results in a foreign

---

[82]     Id.

[83]     See City of Almaty, 2016 WL 7756629, at *8 n.9 (concluding that, in the RICO context, the court's reliance on the substantial effects test would not be in accordance with RJR Nabsico). But see Union Commercial, 2016 WL 6650399, at *4 (employing the substantial effects test to determine whether the plaintiff suffered a domestic injury).

[84]     Pl.'s Resp. Br., at 74.

[85]     Id. at 82.

injury.[86] Moreover, the cases the Plaintiff cites do not stand for the proclamation that the location of the alleged RICO conduct is the most important factor.[87]

To be sure, the majority of the RICO conduct alleged by the Plaintiff took place in the United States, but that does not mean she suffered a domestic injury. The Plaintiff does not fall into any of the scenarios considered by the Tatung court.[88] As noted above, she has no presence in the United States and any injuries she suffered occurred in Austria, where she owns her 1% interest of the Parent Company. As a

_____

[86]    See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2111 (2016) ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries.").

[87]    See Tatung Co., Ltd. v. Shu Tze Hsu, No.: SA CV 13-1743 (DOC) (ANx), 2016 WL 6683201, at *7-8 (C.D. Cal. Nov. 14, 2016) (finding the plaintiff suffered a domestic injury because the plaintiff maintained a "hub" in the U.S., did business in the U.S., and was prevented from collecting on a California arbitration award due to the RICO conspiracy); Union Commercial, 2016 WL 6650399, at *4-5 (finding the plaintiff did not suffer a domestic injury because the foreign plaintiff contracted to distribute cars in Angola and "the only specific injury of which plaintiff complains – lost sales and lost profits – occurred entirely outside of the United States"); Eceed Indust., LLC v. Younis, No. 15 C 14, 2016 WL 6599949 (N.D. Ill. Nov. 8, 2016) (dismissing RICO claims because the plaintiffs suffered their injuries in the United Arab Emirates and did not maintain a U.S. presence); Elsevier, Inc. v. Grossman, 2016 WL 7077109, at * 13-14 (S.D.N.Y. Aug. 4, 2016) (concluding that neither of the plaintiffs' alleged injuries occurred on U.S. soil and thus were not domestic injuries).

[88]    Tatung, 2016 WL 6683201, at *7 (noting two scenarios a foreign plaintiff could suffer a domestic injury: (1) a foreign corporation doing business in the U.S. that sues a U.S. corporation, acting entirely in the U.S., for RICO violations; (2) a foreign individual who sues under civil RICO for financial injuries that occurred while living, traveling, or working in the U.S.).

result, the Court finds that the Plaintiff has not suffered a domestic injury to her business or property for the purposes of civil RICO's private right of action.[89]

For her Georgia RICO claim, the Plaintiff must also prove a domestic injury. Like their federal counterparts, Georgia statutes have a presumption against extraterritorial application.[90] Thus, absent a clear statement to the contrary, the Georgia courts refrain from applying statutes extraterritorially.[91] The Plaintiff contends that, in order to state a Georgia RICO claim, she must only allege that some of the RICO conduct occurred in Georgia.[92] She bases her argument on the fact that Georgia courts have jurisdiction over RICO crimes that are only partially committed in Georgia.[93] However, the Georgia civil RICO provision is patterned after the federal civil RICO provision.[94] Thus, the Court finds that Georgia courts would apply the

---

[89]    RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2111 (2016).

[90]    See Ohio S. Express Co. v. Beeler, 110 Ga. App. 867, 868 (1965) ("It is not presumed that the statutory law of a foreign state is the same as ours, as our statutory law has no extra-territorial operation.").

[91]    Id.

[92]    Pl.'s Resp. Br., at 84-88.

[93]    Id. at 86.

[94]    See, e.g., Williams v. Mohawk Indus., Inc., 465 F.3d 1277,1294 (11th Cir. 2006) ("[B]ecause the state RICO act is modeled upon and closely analogous to the federal RICO statute, Georgia courts look to federal authority in determining RICO standing."), abrogated on other grounds as recognized in Simpson v. Sanderson

domestic injury rule proclaimed in RJR Nabisco to determine whether the Plaintiff has adequately alleged a domestic injury for a Georgia civil RICO claim.[95] As a result – like the federal RICO claim – the Court concludes that the Plaintiff has not alleged a domestic injury under the Georgia RICO statute.

Even if the Plaintiff had suffered a domestic injury, she has not established a direct injury. To establish standing under 18 U.S.C. § 1964(c), the Plaintiff must demonstrate an "injury[] in his business or property by reason of a violation of section 1962."[96] The Eleventh Circuit "has interpreted [] [§ 1964(c)] to include a requirement that the party's injuries be the direct result of the alleged racketeering activity. Therefore, a plaintiff has RICO standing only if his injuries were proximately caused by the RICO violation."[97]

Applying this principle to the shareholder context, the Eleventh Circuit has held that "'losses suffered by a company's stakeholders as a result of racketeering activity against the company do not give them standing under RICO' because '[s]uch an injury

---

Farms, Inc., 744 F.3d 702, 714-15 (11th Cir. 2014).

[95]    See Absolute Activist Value Master Fund Limited v. Devine, No: 2:15-CV-328-FtM-29MRM, 2017 WL 519066, at *21-22 (M.D. Fla. Feb. 8, 2017).

[96]    18 U.S.C. § 1964(c).

[97]    Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc., 140 F.3d 898, 906 (11th Cir. 1998) (citing Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir. 1991)).

is too indirect or "derivative" to confer RICO standing.'"[98] But "[a] plaintiff's status as a creditor or stockholder . . . does not preclude standing for RICO violations if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering that target the plaintiff."[99] As a result, "[t]he critical question in determining whether a shareholder has standing to file a RICO action is whether or not the plaintiff suffered a harm that stands separate and distinct from the harm suffered by the corporation."[100] Additionally, as the Court noted above, if a party lacks standing to assert a federal RICO claim, she also lacks standing to assert a Georgia RICO claim.[101]

Here, it is clear that the Plaintiff's alleged injury is not separate and distinct from the Parent Company's alleged injury. The Parent Company's alleged injury is that it was deprived of its funds and most valuable asset through the Defendants' purported complex scheme of fraudulent transactions. The Plaintiff's only alleged

---

[98]     Harris v. Orange S.A., 636 F. App'x 476, 481 (11th Cir. 2015) (per curiam) (quoting Bivens, 140 F.3d at 906).

[99]     Beck v. Prupis, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998).

[100]     Harris, 636 F. App'x at 481.

[101]     See Mohawk Indus., Inc., 465 F.3d 1277, 1294 (11th Cir. 2006) ("[B]ecause the state RICO act is modeled upon and closely analogous to the federal RICO statute, Georgia courts look to federal authority in determining RICO standing.").

injury is the depreciation of her 1% share in the Parent Company. As the Eleventh Circuit has made clear, "losses suffered by a company's stakeholders as a result of racketeering activity against the company do not give them standing under RICO."[102] Thus, the Plaintiff has alleged a harm that is "'purely contingent' on the harm suffered by the corporation."[103]

Nevertheless, the Plaintiff raises additional arguments with regard to RICO standing in her piercing the corporate veil count. In Count I[104] of her SAC, the Plaintiff contends that the Court should pierce the corporate veil of the Parent

---

[102]    Bivens Gardens, 140 F.3d at 906; cf. United States v. Palmer, 578 F.2d 144, 145-46 (5th Cir. 1978) ("The law is clear that only a corporation and not its shareholders, not even a sole shareholder, can complain of an injury sustained by, or a wrong done to, the corporation."); Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir. 1981) ("[D]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.").

[103]    Harris, 636 F. App'x at 481 (quoting Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 271 (1992)).

[104]    It should be noted that the Plaintiff's Count I, entitled "Piercing the Corporate Veil," is not an independent legal claim. See Second Am. Compl. ¶ 1553. Rather, veil piercing is a method by which a plaintiff seeks to hold a defendant liable for the obligations of a corporation. See GEBAM, Inc. v. Investment Realty Series I, LLC, 15 F. Supp. 3d 1311, 1326 n.21 (N.D. Ga. 2013) ("Piercing the corporate veil is not itself an independent cause of action, but rather is a means of imposing liability on an underlying cause of action.") (quoting Peacock v. Thomas, 516 U.S. 349, 354 (1996)). As a result, it was improper for the Plaintiff to assert this as a separate count in her SAC. Nonetheless, the Court will still consider whether it is appropriate to pierce the corporate veil.

Company, Glock, Inc., Consultinvest, Glock Hong Kong, and Glock America.[105] She alleges that Glock Sr. used the Glock corporations as his alter ego to further his criminal enterprise. According to the Plaintiff, once the corporate veil is pierced, "all that remain are (1) the business partnership between Gaston and Helga and (2) that partnership's assets."[106] And because she made contributions to the partnership, she is entitled to "[a] portion of the proceeds of their joint efforts."[107] In addition, she argues that piercing the Glock corporations' veils will provide her with standing to assert her RICO claims.[108] She contends that she suffered a domestic injury because Glock, Inc. was part of the partnership's assets. Moreover, she alleges her injury would be direct because the Defendants specifically targeted her by wasting the partnership's assets.

It appears that the Plaintiff is attempting to use the veil piercing doctrine to ignore the corporate form and to reach the corporations' assets, which she claims

---

[105]   The Court also notes that the Plaintiff fails to provide a choice of law analysis. The Court may have to apply foreign law to "pierce the corporate veil" of the foreign Glock corporations, specifically the Parent Company, Glock Hong Kong, and Glock America. See Fish & Neave v. Perovetz, No. 91 CIV. 7047 (CSH), 1993 WL 7572, at *4 (S.D.N.Y. Jan. 7, 1993) ("[W]hether to pierce the corporate veil of a foreign corporation is determined by the law of the incorporating state.").

[106]   Pl.'s Resp. Br., at 48.

[107]   Id.

[108]   Id. at 48-49, 83-84.

belong to her "partnership" with Glock Sr.[109] This is no more than a veiled request for a division of assets that allegedly belong to the Plaintiff's and Glock Sr.'s marital estate. If the Court granted this unique request for equitable relief, it would offend the international abstention doctrine. As the Court discussed in its abstention Order, it cannot rule on any claims related to the Plaintiff's divorce proceedings or her transfer of Parent Company shares to the Glock Foundation.[110] As a result, the Court will not consider the Plaintiff's veil piercing claim.

Even if the Court could reach the Plaintiff's veil piercing claim, it would not provide the Plaintiff with RICO standing. The veil piercing/alter ego "doctrine is generally used for the purpose of piercing the corporate veil to hold an individual stockholder liable for debts incurred by the corporation."[111] But the Plaintiff is not employing the doctrine to hold Glock Sr. liable for the Parent Company's debts. Instead, she asks the Court to ignore the corporate form in order to claim the Glock corporations' assets as of her own. This argument is simply a means to circumvent the RICO standing rule regarding shareholders. As the Court noted above, any harm the

---

[109]   The Plaintiff has failed to alleged any facts that prove a legal partnership existed.

[110]   See [Doc. 117], at 7.

[111]   Gwinnett Prop., N.V. v. G+H Montage GmbH, 215 Ga. App. 889, 893 (1994).

Plaintiff suffered as a result of the Defendants' alleged corporate waste was only indirect.[112] She may have motivated the Defendants' actions but that does not make her injury direct. If the Plaintiff wishes to bring a claim based upon the Defendants' alleged corporate waste, the appropriate avenue would be a derivative claim in the Austrian courts.

The Plaintiff primarily relies on Stooksbury v. Ross in support of her argument that piercing the corporate veil will create RICO standing.[113] However, that case is unhelpful. In Stooksbury, the plaintiff, who was a minority shareholder at a company called Tellico Landing, LLC, brought a RICO claim that included a request to pierce the corporate veil of Tellico.[114] The court found that it was appropriate to pierce the corporate veil of Tellico because the defendant had used numerous sham entities, including Tellico, to further a fraudulent real-estate enterprise.[115] The court then concluded that the plaintiff had RICO standing. The court stated that:

> [s]eparate and apart from just depleted value in investment, Plaintiff established that Ross used Tellico as his alter ego to further the Ross

---

[112]    See Harris v. Orange S.A., 636 F. App'x 476, 484 (11th Cir. 2015) (finding that a shareholder did not have RICO standing because she failed to allege an injury that was separate and distinct from the corporation's injuries).

[113]    528 F. App'x 547 (6th Cir. 2013).

[114]    Id. at 557.

[115]    Id. at 549-50, 557.

Defendants' criminal enterprise of materially misrepresenting and artificially inflating property values and *caused* Plaintiff to unknowingly contribute capital and resources to the enterprise's scheme, resulting in the misappropriation of Plaintiff's funds and profits.[116]

Thus, the court found that the plaintiff "sufficiently pleaded that he, independent of Tellico, was injured by the conspiracy."[117] By contrast, here, the Plaintiff has not alleged that Glock Sr., by using the Glock corporations as his alter ego to further the Defendants' criminal enterprise, *caused* her to contribute assets or capital to the Glock enterprise.[118] Rather, the Plaintiff is alleging the Defendants used the scheme to take assets and capital from the Parent Company and Glock, Inc. Therefore, unlike the defendants' scheme in <u>Stooksbury</u>, which was partially directed at the plaintiff, here, the Defendants' alleged scheme was directed solely at the corporations and not the Plaintiff as an individual.

The Court therefore finds that the Plaintiff cannot create RICO standing by disregarding the corporate formalities of the Glock corporations. Accordingly, the

---

[116]    <u>Id.</u> at 557 (emphasis added).

[117]    <u>Id.</u>   Notably, Georgia law does not allow the "reverse veil-piercing" which the Plaintiff seeks. <u>See</u> <u>Acree v. McMahan</u>, 276 Ga. 880 (2003).

[118]    The Plaintiff contends in her response brief that the Defendants' actions did, in fact, cause her to involuntarily contribute capital and resources to the racketeering scheme. <u>See</u> Pl.'s Resp. Br., at 51-52. But the Plaintiff does not cite any allegations in her SAC supporting her claim. She only cites case law. <u>Id.</u>

Plaintiff lacks standing to assert her federal and state RICO claims, and so the

Defendants' Motions to Dismiss should be granted.

## IV. Conclusion

For these reasons, the Court GRANTS the Defendants Gaston Glock Sr., Glock Ges.m.b.H., Glock, Inc., Glock America S.A., Glock (H.K.) Ltd., CON Holding GmbH, Joerg-Andreas Lohr, Lohr + Company GmbH Wirtschaftsprüngsgesellschaft, Rochus GmbH, and Karl Walter's Motion to Dismiss [Doc. 187], the Defendant Hubert Willam's Motion to Dismiss [Doc. 191], and the Defendant Peter Manown's Motion to Dismiss [Doc. 192].

SO ORDERED, this 20 day of March, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge